**Appendix – Section One**

**Congressional Enactments and Materials on Noncommercial Broadcasting**

**Pages A001 – A141**

Appendix – Section One

**Congressional Enactments and Materials on Noncommercial Broadcasting**

### Table of Contents

*Radio Act of 1912*, Pub. L. No. 62-264, 37 Stat. 302 (1912) ............................... A001 - A008

*President Coolidge's Message to Congress*, 68 Cong. Rec. 32 (1926) ........................... A009

*History of Efforts Toward Legislation*, 68 Cong. Rec. 2571 (1927) .................... A010 - A011

*Radio Act of 1927*, Pub. L. No. 69-632, 44 Stat. 1162 (1927) ............................... A012 - A024

*Address of Senator James E. Watson to the National Broadcasting Co,,*
       69 Cong. Rec. 1791 (1928) ........................................................................ A025 - A027

*Debate on the Davis Amendments to the Radio Act of 1927,*
       69 Cong. Rec. 3980 (1928) ........................................................................ A028 - A037

*Debate Preceding Passage of the Communications Act of 1934,*
       78 Cong. Rec. 8843 (1934) ........................................................................ A038 - A040

*Communications Act of 1934 (Relevant Sections)*, Pub. L. No. 73-416,
       48 Stat. 1064 (1934) ................................................................................. A041 - A056

*Third Annual Report of the Federal Communications Commission (Excerpt)* ...... A057 - A063

*Adoption of Rules Governing Operation of "Non-Commercial*
       *Educational" Broadcast Stations*, 3 Fed. Reg. 312 (1938) .................................... A064

*Address by Frank R. McNinch Before National Association of Broadcasters,*
       *February 15, 1938 (Excerpt)*, 83 Cong. Rec. 1904 (1938) ........................ A065 - A066

*Federal Communications Commission's Sixth Report and Order,*
       17 Fed. Reg. 3905 (1952) ......................................................................... A067 - A076

Kenneth D. Norberg & Thomas D. Clemens, *Current Developments in*
       *Communication: The First Year of Title VII*, Audio Visual
       Commc'n Rev., Vol. 7, No. 4 (Fall, 1959) ................................................ A077 - A092

*Public Broadcasting Act of 1967 (with Amendments),* Pub. L. No. 90-129,
       47 U.S.C. § 396 (1967) .............................................................................. A093 - A106

*Public Broadcasting Financing Act of 1975*, Pub. L. No. 94-245,
       89 Stat. 1099 (1975) ................................................................................. A107 - A140

# _Radio Act of 1912,_
## Pub. L. No. 62-264, 37 Stat. 302 (1912)

(Initial Legislation Setting Forth Mandate That All Radio Stations in the U.S. Be
Licensed by the Federal Government)

302 SIXTY-SECOND CONGRESS. Sess. II. Chs. 285–287. 1912.

August 10, 1912.
[S. 7295.]

[Public, No. 262.]

**CHAP. 285.**—An Act To authorize the Great Northern Railway Company to construct a bridge across the Missouri River.

Missouri River.
Great Northern
Railway Company
may bridge, in North
Dakota or Montana.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Great Northern Railway Company, a corporation organized and existing under the laws of the State of Minnesota, its successors and assigns, be, and they are hereby, authorized to construct, maintain, and operate a bridge and approaches across the Missouri River at a point suitable to the needs of navigation, either in the county of McKenzie or Williams, in the State of North Dakota, or the county of Dawson or Valley, in the State of Montana, in accordance with the provisions of the Act entitled "An Act to regulate the construction of bridges over navigable waters," approved March twenty-third, nineteen hundred and six.

Location.

Vol. 34, p. 84.

Amendment.

Sec. 2. That the right to alter, amend, or repeal this Act is expressly hereby reserved.

Approved, August 10, 1912.

---

August 13, 1912.
[S. 7163.]

[Public, No. 263.]

**CHAP. 286.**—An Act Authorizing the State of Arizona to select lands within the former Fort Grant Military Reservation and outside of the Crook National Forest in partial satisfaction of its grant for State charitable, penal, and reformatory institutions.

Fort Grant Military
Reservation.
Arizona may select
lands in.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all lands, together with the improvements thereon, within that part of the former Fort Grant Military Reservation, in the State of Arizona, situate and being outside the boundaries of the Crook National Forest, be, and the same hereby are, made subject to selection by the State of Arizona in partial satisfaction of the grant of one hundred thousand acres made to it for State charitable, penal, and reformatory institutions by section twenty-five of the Act of Congress approved June twentieth, nineteen hundred and ten (Thirty-sixth Statutes at Large, page five hundred and fifty-seven): *Provided,* That such selection shall be made within three years from the date of approval of this Act: *Provided further,* That no more than two thousand acres of such lands shall be selected under the provisions of this Act.

Vol. 36, p. 573.

Provisos.
Condition.

Quantity.

Approved, August 13, 1912.

---

August 13, 1912.
[S. 6412.]

[Public, No. 264.]

**CHAP. 287.**—An Act To regulate radio communication.

Radio communication.
License required for
operating, in United
States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That a person, company, or corporation within the jurisdiction of the United States shall not use or operate any apparatus for radio communication as a means of commercial intercourse among the several States, or with foreign nations, or upon any vessel of the United States engaged in interstate or foreign commerce, or for the transmission of radiograms or signals the effect of which extends beyond the jurisdiction of the State or Territory in which the same are made, or where interference would be caused thereby with the receipt of messages or signals from beyond the jurisdiction of the said State or Territory, except under and in accordance with a license, revocable for cause, in that behalf granted by the Secretary of Commerce and Labor upon application therefor; but nothing in this Act shall be construed to apply to the transmission and exchange of radiograms or signals between points situated in the same State: *Provided,* That the effect thereof shall not extend beyond the jurisdiction of the said State or interfere with the reception of radiograms or signals from beyond said jurisdiction; and a license shall

Exception.

Proviso.
If entirely within a
State.
Government stations.

A1001

not be required for the transmission or exchange of radiograms or signals by or on behalf of the Government of the United States, but every Government station on land or sea shall have special call letters designated and published in the list of radio stations of the United States by the Department of Commerce and Labor. Any person, company, or corporation that shall use or operate any apparatus for radio communication in violation of this section, or knowingly aid or abet another person, company, or corporation in so doing, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars, and the apparatus or device so unlawfully used and operated may be adjudged forfeited to the United States. *Violation a misdemeanor. Penalty.*

SEC. 2. That every such license shall be in such form as the Secretary of Commerce and Labor shall determine and shall contain the restrictions, pursuant to this Act, on and subject to which the license is granted; that every such license shall be issued only to citizens of the United States or Porto Rico or to a company incorporated under the laws of some State or Territory or of the United States or Porto Rico, and shall specify the ownership and location of the station in which said apparatus shall be used and other particulars for its identification and to enable its range to be estimated; shall state the purpose of the station, and, in case of a station in actual operation at the date of passage of this Act, shall contain the statement that satisfactory proof has been furnished that it was actually operating on the above-mentioned date; shall state the wave length or the wave lengths authorized for use by the station for the prevention of interference and the hours for which the station is licensed for work; and shall not be construed to authorize the use of any apparatus for radio communication in any other station than that specified. Every such license shall be subject to the regulations contained herein and such regulations as may be established from time to time by authority of this Act or subsequent Acts and treaties of the United States. Every such license shall provide that the President of the United States in time of war or public peril or disaster may cause the closing of any station for radio communication and the removal therefrom of all radio apparatus, or may authorize the use or control of any such station or apparatus by any department of the Government, upon just compensation to the owners. *Form of license. Limited to citizens, etc. Details to be specified. Subject to regulations. Action by Government in time of war, etc.*

SEC. 3. That every such apparatus shall at all times while in use and operation as aforesaid be in charge or under the supervision of a person or persons licensed for that purpose by the Secretary of Commerce and Labor. Every person so licensed who in the operation of any radio apparatus shall fail to observe and obey regulations contained in or made pursuant to this Act or subsequent Acts or treaties of the United States, or any one of them, or who shall fail to enforce obedience thereto by an unlicensed person while serving under his supervision, in addition to the punishments and penalties herein prescribed, may suffer the suspension of the said license for a period to be fixed by the Secretary of Commerce and Labor not exceeding one year. It shall be unlawful to employ any unlicensed person or for any unlicensed person to serve in charge or in supervision of the use and operation of such apparatus, and any person violating this provision shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment for not more than two months, or both, in the discretion of the court, for each and every such offense: *Provided*, That in case of emergency the Secretary of Commerce and Labor may authorize a collector of customs to issue a temporary permit, in lieu of a license, to the operator on a vessel subject to the radio ship Act of June twenty-fourth, nineteen hundred and ten. *Licensed operator required. Suspension of operator. Punishment for use, etc., of unlicensed operators. Proviso. Temporary permits for vessels. Vol. 36, p. 629. Ante, p. 199.*

304        SIXTY-SECOND CONGRESS. Sess. II. Ch. 287. 1912.

Stations subject to regulations.

Enforcement.

Sec. 4. That for the purpose of preventing or minimizing interference with communication between stations in which such apparatus is operated, to facilitate radio communication, and to further the prompt receipt of distress signals, said private and commercial stations shall be subject to the regulations of this section. These regulations shall be enforced by the Secretary of Commerce and Labor through the collectors of customs and other officers of the Government as other regulations herein provided for.

Authority to waive regulations.

The Secretary of Commerce and Labor may, in his discretion, waive the provisions of any or all of these regulations when no interference of the character above mentioned can ensue.

Temporary licenses for experiments, etc.

The Secretary of Commerce and Labor may grant special temporary licenses to stations actually engaged in conducting experiments for the development of the science of radio communication, or the apparatus pertaining thereto, to carry on special tests, using any amount of power or any wave lengths, at such hours and under such conditions as will insure the least interference with the sending or receipt of commercial or Government radiograms, of distress signals and radiograms, or with the work of other stations.

Government land stations.

In these regulations the naval and military stations shall be understood to be stations on land.

Regulations.

## REGULATIONS.

### NORMAL WAVE LENGTH.

Normal wave length.

First. Every station shall be required to designate a certain definite wave length as the normal sending and receiving wave length of the station. This wave length shall not exceed six hundred meters or it shall exceed one thousand six hundred meters. Every coastal station open to general public service shall at all times be ready to receive messages of such wave lengths as are required by the Berlin convention. Every ship station, except as hereinafter provided, and every coast station open to general public service shall be prepared to use two sending wave lengths, one of three hundred meters and one of six hundred meters, as required by the international convention in force: *Provided,* That the Secretary of Commerce and Labor may, in his discretion, change the limit of wave length reservation made by regulations first and second to accord with any international agreement to which the United States is a party.

*Post,* p. 1565.

*Proviso.*
Changes allowed.

### OTHER WAVE LENGTHS.

Other wave lengths.

Second. In addition to the normal sending wave length all stations, except as provided hereinafter in these regulations, may use other sending wave lengths: *Provided,* That they do not exceed six hundred meters or that they do exceed one thousand six hundred meters: *Provided further,* That the character of the waves emitted conforms to the requirements of regulations third and fourth following.

*Provisos.*
Restriction.

Character.

### USE OF A "PURE WAVE."

Use of "pure wave."

Third. At all stations if the sending apparatus, to be referred to hereinafter as the "transmitter," is of such a character that the energy is radiated in two or more wave lengths, more or less sharply defined, as indicated by a sensitive wave meter, the energy in no one of the lesser waves shall exceed ten per centum of that in the greatest.

A003

## USE OF A "SHARP WAVE."

Fourth. At all stations the logarithmic decrement per complete oscillation in the wave trains emitted by the transmitter shall not exceed two-tenths, except when sending distress signals or signals and messages relating thereto.

*Use of "sharp wave."*

## USE OF "STANDARD DISTRESS WAVE."

Fifth. Every station on shipboard shall be prepared to send distress calls on the normal wave length designated by the international convention in force, except on vessels of small tonnage unable to have plants insuring that wave length.

*Distress calls.*

## SIGNAL OF DISTRESS.

Sixth. The distress call used shall be the international signal of distress . . . — — — . . .

*Distress signal.*

## USE OF "BROAD INTERFERING WAVE" FOR DISTRESS SIGNALS.

Seventh. When sending distress signals, the transmitter of a station on shipboard may be tuned in such a manner as to create a maximum of interference with a maximum of radiation.

*Wave for distress signals.*

## DISTANCE REQUIREMENT FOR DISTRESS SIGNALS.

Eighth. Every station on shipboard, wherever practicable, shall be prepared to send distress signals of the character specified in regulations fifth and sixth with sufficient power to enable them to be received by day over sea a distance of one hundred nautical miles by a shipboard station equipped with apparatus for both sending and receiving equal in all essential particulars to that of the station first mentioned.

*Distance requirement for distress signals.*

## "RIGHT OF WAY". FOR DISTRESS SIGNALS.

Ninth. All stations are required to give absolute priority to signals and radiograms relating to ships in distress; to cease all sending on hearing a distress signal; and, except when engaged in answering or aiding the ship in distress, to refrain from sending until all signals and radiograms relating thereto are completed.

*Right of way for distress messages.*

## REDUCED POWER FOR SHIPS NEAR A GOVERNMENT STATION.

Tenth. No station on shipboard, when within fifteen nautical miles of a naval or military station, shall use a transformer input exceeding one kilowatt, nor, when within five nautical miles of such a station, a transformer input exceeding one-half kilowatt, except for sending signals of distress, or signals or radiograms relating thereto.

*Reduced power for ships near a Government station.*

## INTERCOMMUNICATION.

Eleventh. Each shore station open to general public service between the coast and vessels at sea shall be bound to exchange radiograms with any similar shore station and with any ship station without distinction of the radio systems adopted by such stations, respectively, and each station on shipboard shall be bound to exchange radiograms with any other station on shipboard without distinction of the radio systems adopted by each station, respectively.

*Communication required between shore and shipboard stations.*

It shall be the duty of each such shore station, during the hours it is in operation, to listen in at intervals of not less than fifteen minutes

*Attention required.*

Case: 1:10-cv-07003 Document #: 45-1 Filed: 07/06/11 Page 8 of 30 PageID #:274

306                SIXTY-SECOND CONGRESS. Sess. II. Ch. 287.  1912.

and for a period not less than two minutes, with the receiver tuned to receive messages of three hundred meter wave lengths.

### DIVISION OF TIME.

Division of time between Government and commercial stations.

Twelfth. At important seaports and at all other places where naval or military and private or commercial shore stations operate in such close proximity that interference with the work of naval and military stations can not be avoided by the enforcement of the regulations contained in the foregoing regulations concerning wave lengths and character of signals emitted, such private or commercial shore stations as do interfere with the reception of signals by the naval and military stations concerned shall not use their transmitters during the first fifteen minutes of each hour, local standard time. The Secretary of Commerce and Labor may, on the recommendation of the department concerned, designate the station or stations which may be required to observe this division of time.

Exceptions.

### GOVERNMENT STATIONS TO OBSERVE DIVISIONS OF TIME.

Time for Government stations.

Thirteenth. The naval or military stations for which the above-mentioned division of time may be established shall transmit signals or radiograms only during the first fifteen minutes of each hour, local standard time, except in case of signals or radiograms relating to vessels in distress, as hereinbefore provided.

### USE OF UNNECESSARY POWER.

Minimum power to be used.

Fourteenth. In all circumstances, except in case of signals or radiograms relating to vessels in distress, all stations shall use the minimum amount of energy necessary to carry out any communication desired.

### GENERAL RESTRICTIONS ON PRIVATE STATIONS.

Private stations. General restrictions.

Fifteenth. No private or commercial station not engaged in the transaction of bona fide commercial business by radio communication or in experimentation in connection with the development and manufacture of radio apparatus for commercial purposes shall use a transmitting wave length exceeding two hundred meters, or a transformer input exceeding one kilowatt, except by special authority of the Secretary of Commerce and Labor contained in the license of the station: *Provided*, That the owner or operator of a station of the character mentioned in this regulation shall not be liable for a violation of the requirements of the third or fourth regulations to the penalties of one hundred dollars or twenty-five dollars, respectively, provided in this section unless the person maintaining or operating such station shall have been notified in writing that the said transmitter has been found, upon tests conducted by the Government, to be so adjusted as to violate the said third and fourth regulations, and opportunity has been given to said owner or operator to adjust said transmitter in conformity with said regulations.

*Proviso.* Exemption from penalties.

### SPECIAL RESTRICTIONS IN THE VICINITIES OF GOVERNMENT STATIONS.

Restriction if near Government stations.

Sixteenth. No station of the character mentioned in regulation fifteenth situated within five nautical miles of a naval or military station shall use a transmitting wave length exceeding two hundred meters or a transformer input exceeding one-half kilowatt.

A 005

### SHIP STATIONS TO COMMUNICATE WITH NEAREST SHORE STATIONS.

Seventeenth. In general, the shipboard stations shall transmit their radiograms to the nearest shore station. A sender on board a vessel shall, however, have the right to designate the shore station through which he desires to have his radiograms transmitted. If this can not be done, the wishes of the sender are to be complied with only if the transmission can be effected without interfering with the service of other stations. *[margin: Communications from shipboard.]*

### LIMITATIONS FOR FUTURE INSTALLATIONS IN VICINITIES OF GOVERNMENT STATIONS.

Eighteenth. No station on shore not in actual operation at the date of the passage of this Act shall be licensed for the transaction of commercial business by radio communication within fifteen nautical miles of the following naval or military stations, to wit: Arlington, Virginia; Key West, Florida; San Juan, Porto Rico; North Head and Tatoosh Island, Washington; San Diego, California; and those established or which may be established in Alaska and in the Canal Zone; and the head of the department having control of such Government stations shall, so far as is consistent with the transaction of governmental business, arrange for the transmission and receipt of commercial radiograms under the provisions of the Berlin convention of nineteen hundred and six and future international conventions or treaties to which the United States may be a party, at each of the stations above referred to, and shall fix the rates therefor, subject to control of such rates by Congress. At such stations and wherever and whenever shore stations open for general public business between the coast and vessels at sea under the provisions of the Berlin convention of nineteen hundred and six and future international conventions and treaties to which the United States may be a party shall not be so established as to insure a constant service day and night without interruption, and in all localities wherever or whenever such service shall not be maintained by a commercial shore station within one hundred nautical miles of a naval radio station, the Secretary of the Navy shall, so far as is consistent with the transaction of governmental business, open naval radio stations to the general public business described above, and shall fix rates for such service, subject to control of such rates by Congress. The receipts from such radiograms shall be covered into the Treasury as miscellaneous receipts. *[margin: New stations near specified Government stations, limited. Commercial business by Government stations. Post, p. 1565. Naval stations for public business. Receipts.]*

### SECRECY OF MESSAGES.

Nineteenth. No person or persons engaged in or having knowledge of the operation of any station or stations, shall divulge or publish the contents of any messages transmitted or received by such station, except to the person or persons to whom the same may be directed, or their authorized agent, or to another station employed to forward such message to its destination, unless legally required so to do by the court of competent jurisdiction or other competent authority. Any person guilty of divulging or publishing any message, except as herein provided, shall, on conviction thereof, be punishable by a fine of not more than two hundred and fifty dollars or imprisonment for a period of not exceeding three months, or both fine and imprisonment, in the discretion of the court. *[margin: Secrecy of messages to be maintained. Punishment for divulging.]*

A006

308       SIXTY-SECOND CONGRESS. Sess. II. Ch. 287. 1912.

PENALTIES.

*Penalty for violating regulations.*
*By owner of apparatus.*
For violation of any of these regulations, subject to which a license under sections one and two of this Act may be issued, the owner of the apparatus shall be liable to a penalty of one hundred dollars, which may be reduced or remitted by the Secretary of Commerce and Labor, and for repeated violations of any of such regulations, the license may be revoked.

*By operator.*
For violation of any of these regulations, except as provided in regulation nineteenth, subject to which a license under section three of this Act may be issued, the operator shall be subject to a penalty of twenty-five dollars, which may be reduced or remitted by the Secretary of Commerce and Labor, and for repeated violations of any such regulations, the license shall be suspended or revoked.

*Willful interference by operators forbidden.*
Sec. 5. That every license granted under the provisions of this Act for the operation or use of apparatus for radio communication shall prescribe that the operator thereof shall not willfully or maliciously interfere with any other radio communication. *Punishment for.* Such interference shall be deemed a misdemeanor, and upon conviction thereof the owner or operator, or both, shall be punishable by a fine of not to exceed five hundred dollars or imprisonment for not to exceed one year, or both.

*"Radio communication." Term construed.*
Sec. 6. That the expression "radio communication" as used in this Act means any system of electrical communication by telegraphy or telephony without the aid of any wire connecting the points from and at which the radiograms, signals, or other communications are sent or received.

*Uttering false signals, etc., forbidden.*
Sec. 7. That a person, company, or corporation within the jurisdiction of the United States shall not knowingly utter or transmit, or cause to be uttered or transmitted, any false or fraudulent distress signal or call or false or fraudulent signal, call, or other radiogram of any kind. *Punishment for false distress calls.* The penalty for so uttering or transmitting a false or fraudulent distress signal or call shall be a fine of not more than two thousand five hundred dollars or imprisonment for not more than five years, or both, in the discretion of the court, for each and every such *Other signals.* offense, and the penalty for so uttering or transmitting, or causing to be uttered or transmitted, any other false or fraudulent signal, call, or other radiogram shall be a fine of not more than one thousand dollars or imprisonment for not more than two years, or both, in the discretion of the court, for each and every such offense.

*Restriction on foreign ships.*
Sec. 8. That a person, company, or corporation shall not use or operate any apparatus for radio communication on a foreign ship in territorial waters of the United States otherwise than in accordance with the provisions of sections four and seven of this Act and so much of section five as imposes a penalty for interference. Save as aforesaid, nothing in this Act shall apply to apparatus for radio communication on any foreign ship.

*Trial of offenses.*
Sec. 9. That the trial of any offense under this Act shall be in the district in which it is committed, or if the offense is committed upon the high seas or out of the jurisdiction of any particular State or district the trial shall be in the district where the offender may be found or into which he shall be first brought.

*Not applicable to Philippines.*
Sec. 10. That this Act shall not apply to the Philippine Islands.
*In effect in four months.*
Sec. 11. That this Act shall take effect and be in force on and after four months from its passage.

Approved, August 13, 1912.

*A 007*

Case: 1:10-cv-07003 Document #: 45-1 Filed: 07/06/11 Page 11 of 30 PageID #:277

SIXTY-SECOND CONGRESS. Sess. II. Chs. 288, 289. 1912.     309

**CHAP. 288.**—An Act To change the name of the Public Health and Marine-Hospital Service to the Public Health Service, to increase the pay of officers of said service, and for other purposes.

August 14, 1912.
[S. 2117.]

[Public, No. 265.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Public Health and Marine-Hospital Service of the United States shall hereafter be known and designated as the Public Health Service, and all laws pertaining to the Public Health and Marine-Hospital Service of the United States shall hereafter apply to the Public Health Service, and all regulations now in force, made in accordance with law for the Public Health and Marine-Hospital Service of the United States shall apply to and remain in force as regulations of and for the Public Health Service until changed or rescinded. The Public Health Service may study and investigate the diseases of man and conditions influencing the propagation and spread thereof, including sanitation and sewage and the pollution either directly or indirectly of the navigable streams and lakes of the United States, and it may from time to time issue information in the form of publications for the use of the public.

Public Health Service.
Public Health and Marine-Hospital Service changed to.
Vol. 32, p. 712.

Investigations authorized.

SEC. 2. That beginning with the first day of October next after the passage of this Act the salaries of the commissioned medical officers of the Public Health Service shall be at the following rates per annum: Surgeon General, six thousand dollars; Assistant Surgeon General, four thousand dollars; senior surgeon, of which there shall be ten in number, on active duty, three thousand five hundred dollars; surgeon, three thousand dollars; passed assistant surgeon, two thousand four hundred dollars; assistant surgeon, two thousand dollars; and the said officers, excepting the Surgeon General, shall receive an additional compensation of ten per centum of the annual salary as above set forth for each five years' service, but not to exceed in all forty per centum: *Provided,* That the total salary, including the longevity increase, shall not exceed the following rates: Assistant Surgeon General, five thousand dollars; senior surgeon, four thousand five hundred dollars; surgeon, four thousand dollars: *Provided further,* That there may be employed in the Public Health Service such help as may be provided for from time to time by Congress.

Salaries.

Longevity allowance.

Provisos.
Maximum pay.

Help authorized.

Approved, August 14, 1912.

---

**CHAP. 289.**—An Act Authorizing the Secretary of the Interior to sell to the county of Hill, in the State of Montana, the jail building and fixtures now upon the abandoned Fort Assinniboine Military Reservation, in the State of Montana.

August 14, 1912.
[S. 6817.]

[Public, No. 266.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized to sell the jail building and the fixtures of said building, now situate on the abandoned Fort Assinniboine Military Reservation, in the State of Montana, to the county of Hill, in the State of Montana, at a price to be agreed upon by the Secretary of the Interior and the board of county commissioners of said county, and said county, by its duly authorized officials, shall have the right to enter upon the said abandoned Fort Assinniboine Military Reservation at any time after such sale has been consummated and remove said buildings and such fixtures.

Fort Assinniboine Military Reservation, Mont.
Sale of jail buildings and fixtures on abandoned, to Hill County.

Approved, August 14, 1912.

A008

# _President Coolidge's Message to Congress,_
# 68 Cong. Rec. 32 (1926)

(Commentary on the Urgent Necessity for Further Legislation and Regulation of
Radio Broadcasting)

national problems involved. Only in this way may we be fully prepared to meet intelligently the needs of our fast-growing population in the years to come.

### TRANSPORTATION

It would be difficult to conceive of any modern activity which contributes more to the necessities and conveniences of life than transportation. Without it our present agricultural production and practically all of our commerce would be completely prostrated. One of the large contributing causes to the present highly satisfactory state of our economic condition is the prompt and dependable service, surpassing all our previous records, rendered by the railroads. This power has been fostered by the spirit of cooperation between Federal and State regulatory commissions. To render this service more efficient and effective and to promote a more scientific regulation, the process of valuing railroad properties should be simplified and the primary valuations should be completed as rapidly as possible. The problem of rate reduction would be much simplified by a process of railroad consolidations. This principle has already been adopted as Federal law. Experience has shown that a more effective method must be provided. Studies have already been made and legislation introduced seeking to promote this end. It would be of great advantage if it could be taken up at once and speedily enacted. The railroad systems of the country and the convenience of all the people are waiting on this important decision.

### MERCHANT MARINE

It is axiomatic that no agricultural and industrial country can get the full benefit of its own advantages without a merchant marine. We have been proceeding under the act of Congress that contemplates the establishment of trade routes to be ultimately transferred to private ownership and operation. Due to temporary conditions abroad and at home we have a large demand just now for certain types of freight vessels. Some suggestion has been made for new construction. I do not feel that we are yet warranted in entering that field. Such ships as we might build could not be sold after they are launched for anywhere near what they would cost. We have expended over $250,000,000 out of the Public Treasury in recent years to make up the losses of operation, not counting depreciation or any cost whatever of our capital investment. The great need of our merchant marine is not for more ships but for more freight. Our merchants are altogether too indifferent about using American ships for the transportation of goods which they send abroad or bring home. Some of our vessels necessarily need repairs, which should be made. I do not believe that the operation of our fleet is as economical and efficient as it could be made if placed under a single responsible head, leaving the Shipping Board free to deal with general matters of policy and regulation.

### RADIO LEGISLATION

The Department of Commerce has for some years urgently presented the necessity for further legislation in order to protect radio listeners from interference between broadcasting stations and to carry out other regulatory functions. Both branches of Congress at the last session passed enactments intended to effect such regulation, but the two bills yet remain to be brought into agreement and final passage.

Due to decisions of the courts, the authority of the department under the law of 1912 has broken down; many more stations have been operating than can be accommodated within the limited number of wave lengths available; further stations are in course of construction; many stations have departed from the scheme of allocation set down by the department, and the whole service of this most important public function has drifted into such chaos as seems likely, if not remedied, to destroy its great value. I most urgently recommend that this legislation should be speedily enacted.

I do not believe it is desirable to set up further independent agencies in the Government. Rather I believe it advisable to entrust the important functions of deciding who shall exercise the privilege of radio transmission and under what conditions, the assigning of wave lengths and determination of power, to a board to be assembled whenever action on such questions becomes necessary. There should be right of appeal to the courts from the decisions of such board. The administration of the decisions of the board and the other features of regulation and promotion of radio in the public interest, together with scientific research, should remain in the Department of Commerce. Such an arrangement makes for more expert, more efficient, and more economical administration than an independent agency or board, whose duties, after initial stages, require but little attention, in which administrative functions are confused with semijudicial functions and from which of necessity there must be greatly increased personnel and expenditure.

### THE WAGE EARNER

The great body of our people are made up of wage earners. Several hundred thousands of them are on the pay rolls of the United States Government. Their condition very largely is fixed by legislation. We have recently provided increases in compensation under a method of reclassification and given them the advantage of a liberal retirement system as a support for their declining years. Most of them are under the merit system, which is a guaranty of their intelligence, and the efficiency of their service is a demonstration of their loyalty. The Federal Government should continue to set a good example for all other employers.

In the industries the condition of the wage earner has steadily improved. The 12-hour day is almost entirely unknown. Skilled labor is well compensated. But there are unfortunately a multitude of workers who have not yet come to share in the general prosperity of the Nation. Both the public authorities and private enterprise should be solicitous to advance the welfare of this class. The Federal Government has been seeking to secure this end through a protective tariff, through restrictive immigration, through requiring safety devices for the prevention of accidents, through the granting of workman's compensation, through civilian vocational rehabilitation and education, through employment information bureaus, and through such humanitarian relief as was provided in the maternity and infancy legislation. It is a satisfaction to report that a more general condition of contentment exists among wage earners and the country is more free from labor disputes than it has been for years. While restrictive immigration has been adopted in part for the benefit of the wage earner, and in its entirety for the benefit of the country, it ought not to cause a needless separation of families and dependents from their natural source of support contrary to the dictates of humanity.

### BITUMINOUS COAL

No progress appears to have been made within large areas of the bituminous-coal industry toward creation of voluntary machinery by which greater assurance can be given to the public of peaceful adjustment of wage difficulties such as has been accomplished in the anthracite industry. This bituminous industry is one of primary necessity and bears a great responsibility to the Nation for continuity of supplies. As the wage agreements in the unionized section of the industry expire on April 1 next, and as conflicts may result which may imperil public interest, and have for many years often called for action of the Executive in protection of the public, I again recommend the passage of such legislation as will assist the Executive in dealing with such emergencies through a special temporary board of conciliation and mediation and through administrative agencies for the purpose of distribution of coal and protection of the consumers of coal from profiteering. At present the Executive is not only without authority to act but is actually prohibited by law from making any expenditure to meet the emergency of a coal famine.

### JUDICIARY

The Federal courts hold a high position in the administration of justice in the world. While individual judicial officers have sometimes been subjected to just criticism, the courts as a whole have maintained an exceedingly high standard. The Congress may well consider the question of supplying fair salaries and conferring upon the Supreme Court the same rule-making power on the law side of the district courts that they have always possessed on the equity side. A bill is also pending providing for retirement after a certain number of years of service, although they have not been consecutive, which should have your favorable consideration. These faithful servants of the Government are about the last that remain to be provided for in the postwar readjustments.

### BANKING

There has been pending in Congress for nearly three years banking legislation to clarify the national bank act and reasonably to increase the powers of the national banks. I believe that within the limitation of sound banking principles Congress should now and for the future place the national banks upon a fair equality with their competitors, the State banks, and I trust that means may be found so that the differences on branch banking legislation between the Senate and the House of Representatives may be settled along sound lines and the legislation promptly enacted.

It would be difficult to overestimate the service which the Federal reserve system has already rendered to the country.

## *History of Efforts Toward Legislation,*
## 68 Cong. Rec. 2571 (1927)

(Commentary on the Importance of Radio Broadcasting as an Uncensored Public
Trust)

I do not expect to defeat the adoption of this conference report by the House. I realize that there has been a tremendous amount of misleading propaganda; that an extensive campaign in favor of the passage of the White radio bill has been conducted by those expecting to profit thereby. I also realize that there is a general demand for some character of radio legislation by reason of the confusion and general dissatisfaction with respect to broadcasting. I myself readily concede, as I have many times stated on this floor and elsewhere during the past several years, that there is an imperative need for appropriate radio legislation. However, I deny that the problem will be solved or conditions improved by the enactment of just any kind of legislation. I earnestly insist that the enactment of this bill reported by the conferees would be infinitely worse than no legislation. From the viewpoint of public interest it would be very much better to permit the present unfortunate situation in the broadcasting field to continue until the next Congress, or to pass temporary legislation to obtain until the Congress can enact an adequate, comprehensive radio bill.

And I wish to state to those Members who may feel inclined in response to public clamor for radio legislation to vote for this bill with its vicious provisions, that whatever criticism might occur as a result of their voting against this bill will be nothing as compared to the public condemnation which will follow, if this bill becomes a law, as soon as its effects are seen and the public and the independent broadcasters realize what it has done to them.

I am opposed to this conference report because, according to my conception, it is not only not proper legislation but it is very far-reaching, very dangerous, and very vicious legislation, and surrenders some of the very important and fundamental rights of the American people, as I shall undertake to show to you.

I know that, perhaps, with the exception of one conferee from whom I have heard no expression, the members of the conference committee are not satisfied with this bill. With one exception I have heard all the conferees express their great dissatisfaction with it, and some of them who saw proper to sign the conference report because of their view of the urgency of and the great demand for legislation have condemned it in the strongest sort of terms. However, having seen proper to sign the conference report there are naturally in the position, as related by Irvin Cobb, of a former prominent United States Senator who was engaged in a conference with some of his other party leaders, in which they were undertaking to devise ways and means of electing the party ticket.

One of those present spoke up and said, "Well, Blank is a very poor fish and I do not see how we can afford to support him." This former United States Senator replied, "Yes; he is a poor fish, indeed, but he is our fish."

As a member for the past seven or eight years of the Committee on the Merchant Marine and Fisheries and of the subcommittee on radio thereof, I have given this problem, particularly from a legislative standpoint, the very best and most conscientious investigation and study of which I have been capable. I have absolutely no interest whatever in the matter except to discharge my duty as one of the Representatives of the American people.

## HISTORY OF EFFORTS TOWARD RADIO LEGISLATION

Our committee held considerable hearings on radio in the Sixty-sixth Congress, but only reported out some resolutions dealing with certain phases of the subject.

### SIXTY-SEVENTH CONGRESS

During the Sixty-seventh Congress our committee held considerable hearings on a radio bill introduced by the gentleman from Maine [Mr. WHITE]. I aided in revising, perfecting, reporting, and passing said bill through the House, advocating and defending the bill on the floor. The committee report accompanying this bill, which was prepared for the committee by Mr. WHITE, was filed January 16, 1923.

This report stated, in part, as follows:

The bill before you is not a comprehensive radio law but is limited in its scope. There are many phases of the subject which invite study and which in the not distant future may call for legislative action. Your committee has embodied in this bill only such proposals as are vital at this time and as to which the members of the committee are in unanimous agreement. The approaching end of the session and the imperative need for conferring upon the regulatory body the powers authorized by this bill are sufficient reasons for avoiding at this time controversial matters.

During the debate on the bill different Members criticized the bill because it vested too great power in an administrative official and because there were no adequate provisions against monopoly, for regulation of rates, and so forth. Different members of the committee answered such criticisms in the same manner as did the report, explaining that the Congress would soon adjourn and it was not considered possible to pass a bill within the short time intervening which contained highly controversial provisions, and that they had only presented an emergency bill, but giving assurances that such matters would likely be adequately dealt with in subsequent legislation.

Notwithstanding the fact that said bill was only presented as an emergency and temporary measure, and very moderate claims were made as to it, yet it was a much better bill, more protective of the public interest, and much less favorable to the monopoly than the bill under consideration.

After the passage of the bill through the House, the radio monopoly got very busy against it. It was never even reported out of committee at the other end of the Capitol.

### SIXTY-EIGHTH CONGRESS

During the Sixty-eighth Congress our committee held extensive hearings on a radio bill introduced by Mr. WHITE.

As a member of the subcommittee on radio, to which the bill was referred after the hearings, I again gladly aided in revising and perfecting said bill, and voted with the other members of the subcommittee to report back to the full committee with a recommendation that the bill be reported to the House; and the committee unanimously reported the bill to the House.

Hon. Herbert Hoover, Secretary of Commerce, appeared before the committee in behalf of the bill, and among other things made the following statements at the hearings thereon:

There is no problem of more technical complexity, or that has more indeterminate factors at the present time, than the one you have under consideration. It is urgent that we have an early and vigorous reorganization of the law in Federal regulation of radio. Not only are there questions of orderly conduct between the multitude of radio activities, in which more authority must be exerted in the interest of every user, whether sender or receiver, but the question of monopoly in radio communication must be squarely met.

It is inconceivable that the American people will allow this newborn system of communication to fall exclusively into the power of any individual, group, or combination. Great as the development of radio distribution has been, we are probably only at the threshold of the development of one of the most important of human discoveries bearing on education, amusement, culture, and business communication. It can not be thought that any single person or group shall ever have the right to determine what communication may be made to the American people. * * *

We can not allow any single person or group to place themselves in position where they can censor the material which shall be broadcasted to the public. * * *

The problems involved in Government regulation of radio are the most complex and technical that have yet confronted Congress. We must preserve this gradually expanding art in full and free development; but for this very purpose of protecting and enabling this development and its successful use further legislation is absolutely necessary.

Radio communication is not to be considered as merely a business carried on for private gain, for private advertisement, or for entertainment of the curious. It is a public concern impressed with the public trust and to be considered primarily from the standpoint of public interest to the same extent and upon the basis of the same general principles as our other public utilities.

As soon as this bill was reported to the House, pursuant to directions of the committee, Mr. WHITE introduced a resolution providing for a special rule for the early consideration of the bill in the House, which resolution was referred to the Committee on Rules. Members of the Rules Committee gave assurance that said resolution would be promptly reported to the House. I personally saw the minority members of the Rules Committee, all of whom assured me that they would support the resolution.

The radio monopoly got very active against the bill, particularly because of certain antimonopoly provisions contained therein. Two representatives of the monopoly called upon me in my office and, among other things, stated that if certain provisions were eliminated from the bill they would no longer oppose its passage. I told them that, so far as I was concerned, as one Member of the committee and of the Congress, I would agree to no such thing and would see whether they were strong enough to prevent Congress from passing the bill.

The said bill was reported to the House May 13, 1924. The Committee on Rules failed to report a resolution providing for the consideration of the bill, the majority refusing to report the resolution. Consequently, that session of Congress adjourned June 7, 1924, without action on the bill.

Secretary Hoover's representative, the Solicitor of the Department of Commerce, collaborated with members of the radio subcommittee in the revision and final draft of the bill, and it was understood that Secretary Hoover was freely consulted as to the various provisions of the bill; it was also understood that the bill had the general approval of the Secretary of Commerce.

About the time the second session of the Sixty-eighth Congress convened, the first part of December, 1924, Secretary Hoover wrote a letter to Mr. White withdrawing his approval of the White radio bill, which had been reported by the House committee and was then pending in the House in the Sixty-eighth Congress, as before explained. Mr. Hoover taking the position in substance that there were so many important developments in the radio art and industry that the pending bill would not adequately meet the situation and that the enactment of comprehensive legislation should be deferred for 12 months in order that appropriate legislation might then be intelligently drafted in the light of development in the meantime so as to effectively deal with the situation and guard against the dangers which he mentioned in his letter.

However, Secretary Hoover submitted a short bill with a recommendation that it be substituted for the White bill and passed, such short bill being as follows:

*Be it enacted, etc.,* That it is hereby declared and reaffirmed that the ether within the limits of the United States, its Territories and possessions, is the inalienable possession of the people thereof and that the authority to regulate its use in interstate or foreign commerce is conferred upon the Congress of the United States by the Federal Constitution.

That section 1 of the act of Congress, approved August 13, 1912, entitled "An act to regulate radio communication," is hereby amended by adding at the end of said section the following:

The wave length of every radio-transmitting station for which a license is now required by law, its power, emitted wave, the character of its apparatus and the time of transmission, shall be fixed by the Secretary of Commerce as in his judgment and discretion he shall deem expedient, and may be changed or modified from time to time in his discretion.

The members of the Committee on the Merchant Marine and Fisheries being unwilling to substitute the short bill suggested by Secretary Hoover, no further action was taken during the Sixty-eighth Congress.

In my opinion, the said bill unanimously reported by the committee in the Sixty-eighth Congress was decidedly the best bill which has been at any time reported to the House, although it was inadequate and incomplete in several respects.

SIXTY-NINTH CONGRESS

Hearings on radio legislation were again held by the committee on the Merchant Marine and Fisheries during the first session of the present Congress, and the subject was referred to the subcommittee on radio.

For the past few years there has been favorable discussion among members of the committee as to the advisability of creating a radio commission, clothed with full and exclusive authority to regulate radio, and also of the creating of a communications commission, clothed with full and exclusive authority to regulate all communications services, both wire and wireless. The radio subcommittee took up the consideration of drafting a bill along this line, and Mr. WHITE and I were directed to draft a bill along that line. However, it was decided that our committee did not have jurisdiction over legislation relative to wire communications, and it was ascertained that members of the committee having jurisdiction over this subject would object to our committee reporting legislation relative thereto. Furthermore, it developed that the Department of Commerce objected to the creation of a commission with exclusive jurisdiction over radio. Consequently, a majority of the subcommittee opposed the creation of such a radio commission. However, the subcommittee did incorporate in the bill provisions offered by me, dividing the country into five zones, providing for the creation of a commission composed of one resident citizen from each of said zones, and also providing for an equitable distribution of licenses, wave lengths, and power among the different zones and between the different States and communities within a zone; but the bill provided that such commission should only have authority to pass upon matters referred to it by or appealed from a decision by the Secretary of Commerce, and only authorized said commission to sit not to exceed 120 days in any calendar year and only on a per diem basis.

The committee reported the bill to the House. The bill as reported also changed to such an extent as to nullify the usefulness of the most valuable antimonopoly provision which

was contained in the bill unanimously reported to and passed by the House in the Sixty-seventh Congress, and unanimously reported to the House in the Sixty-eighth Congress (S. 2930, sec. 2 (C) ). However, the bill (H. R. 9108, sec. 4) as reported to the House in the present Congress contained another very important antimonopoly provision which would have proven most effective in the protection of the interests of the public and the independent broadcasters; but representatives of the radio monopoly got very active against said provision. Mr. WHITE introduced a bill identical with H. R. 9108, except that section 4 was omitted therefrom. On the following day, March 4, 1926, the Committee on the Merchant Marine and Fisheries reported to the House the said latter bill, H. R. 9971.

I filed minority views (Rept. No. 464, 69th Cong.) on the said bill generally called the "White radio bill," setting forth fully my position relative thereto. My position, briefly stated, was that the bill contained many excellent provisions; that I approved most of the provisions, but that the bill did not adequately and effectively meet the requirements and should be amended and supplemented; I insisted that the most important functions to be performed were quasi judicial in character and that an appropriate tribunal should be authorized to deal adequately with the problem; and I objected particularly to the deletion of those provisions designed to protect the public against the powerful and oppressive radio monopoly; I insisted that the time had arrived when we should redeem the assurances we had given in our report filed in the Sixty-seventh Congress and made by members of the committee during debate, and deal with the subject intelligently, effectively, and patriotically; that the time for emergency and makeshift proposals had passed; that the enactment of adequate legislation had already been too long deferred, and it still further deferred it would be still more difficult, if not impossible, to protect the public interest, as the radio monopoly was becoming so thoroughly intrenched and so powerful that it would be impossible to dislodge them from what they would be claiming to be their vested rights; that if the monopoly was now influential enough to dictate to Congress what provisions should or should not be incorporated in legislation, and even to prevent any legislation, what would be the result when they acquired complete control of all wire and wireless communication services and of the most potent political instrument of the future? During the consideration of the bill in the House I offered numerous amendments to the bill in an effort to effect the purposes indicated. While a few of my proposed amendments were adopted, yet most of them were rejected by very slender majorities. (See CONGRESSIONAL RECORD, 69th Cong., 1st sess., March 12, 13, and 15, 1926.) This bill passed the House March 15, 1926.

After extensive hearings the Committee on Interstate Commerce of the Senate, on May 6, 1926, reported the said House bill (H. R. 9971) with an amendment striking out all after the enacting clause and inserting a new bill in the form of one amendment to the House bill. The Senate bill, while retaining a large portion of the provisions in the House bill, provided that the commission created by the House bill should be authorized to act all the time, upon annual salaries, and should have exclusive jurisdiction over radio communications, and so forth. While, in my opinion, the Senate bill did not clothe the commission with sufficient authority to regulate rates, service, and so forth, of radio utilities rendering the public service for hire, and while the Senate bill also emasculated that important House provision providing for an equitable distribution of licenses, wave lengths, and power, yet on the whole it was the best radio bill which has yet been reported to either the House or the Senate. This bill passed the Senate without opposition and without a record vote on July 2, 1926.

THE CONFERENCE REPORT

We now come to the bill reported by the conferees and now under consideration.

In this connection, I wish to quote from the letter written to the gentleman from Maine [Mr. WHITE] December 5, 1924, in which Secretary Hoover withdrew his approval of the White radio bill then pending, recommended the substitution and enactment of the short bill heretofore quoted, "to enable the department to retain firm control of the situation," until probably 12 months later, when there should be enacted more comprehensive and effective legislation than embraced in the White bill or yet contemplated.

Mr. Hoover's said letter reads in part as follows:

I feel, however, that the new developments in the art during the last 12 months have taken such a departure as to require somewhat further time for ascertaining its ultimate result to the public before we can adequately determine the proper course of legislation. There is a probability that by the end of that time we may require wholly new legislative provisions * * *.

# _Radio Act of 1927,_
# Pub. L. No. 69-632, 44 Stat. 1162 (1927)

(Transfer of Most of the Responsibilities for Radio Broadcasting Regulation to the
Newly Created Federal Radio Commission)

1162    SIXTY-NINTH CONGRESS. Sess. II. Chs. 168, 169. 1927.

than the maximum rate of the grade when such higher rate is permitted by the Classification Act of 1923, and is specifically authorized by other law.

Approved, February 23, 1927.

---

February 23, 1927.
[H. R. 9971.]
[Public, No. 632.]

**CHAP. 169.**—An Act For the regulation of radio communications, and for other purposes.

Radio Act of 1927.
Regulation and control of all radio transmission intended hereby.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act is intended to regulate all forms of interstate and foreign radio transmissions and communications within the United States, its Territories and possessions; to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by individuals, firms, or corporations, for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. That no person, firm, company, or corporation shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any Territory or possession of the United States or in the District of Columbia to another place in the same Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel of the United States; or (f) upon any aircraft or other mobile stations within the United States, except under and in accordance with this Act and with a license in that behalf granted under the provisions of this Act.

Licenses required for use of radio apparatus.

Interstate and foreign transmission.

Within a State if use extends beyond its borders.

American vessels, aircraft, etc.

Zones designated.

Sec. 2. For the purposes of this Act, the United States is divided into five zones, as follows: The first zone shall embrace the States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Delaware, Maryland, the District of Columbia, Porto Rico, and the Virgin Islands; the second zone shall embrace the States of Pennsylvania, Virginia, West Virginia, Ohio, Michigan, and Kentucky; the third zone shall embrace the States of North Carolina, South Carolina, Georgia, Florida, Alabama, Tennessee, Mississippi, Arkansas, Louisiana, Texas, and Oklahoma; the fourth zone shall embrace the States of Indiana, Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, Iowa, Nebraska, Kansas, and Missouri; and the fifth zone shall embrace the States of Montana, Idaho, Wyoming, Colorado, New Mexico, Arizona, Utah, Nevada, Washington, Oregon, California, the Territory of Hawaii, and Alaska.

Federal Radio Commission.
Creation, composition, and appointment.

Sec. 3. That a commission is hereby created and established to be known as the Federal Radio Commission, hereinafter referred to as the commission, which shall be composed of five commissioners appointed by the President, by and with the advice and consent of

Ao12

the Senate, and one of whom the President shall designate as chairman: *Provided*, That chairmen thereafter elected shall be chosen by the commission itself. — Chairman.

Each member of the commission shall be a citizen of the United — Citizenship and residence qualifications.
States and an actual resident citizen of a State within the zone from which appointed at the time of said appointment. Not more than one commissioner shall be appointed from any zone. No member of — Financial interests prohibited.
the commission shall be financially interested in the manufacture or sale of radio apparatus or in the transmission or operation of radiotelegraphy, radiotelephony, or radio broadcasting. Not more — Political party selection.
than three commissioners shall be members of the same political party.

The first commissioners shall be appointed for the terms of two, — Tenure of first appointees.
three, four, five, and six years, respectively, from the date of the taking effect of this Act, the term of each to be designated by the President, but their successors shall be appointed for terms of six — Successors.
years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the commissioner whom he shall succeed.

The first meeting of the commission shall be held in the city of — Meetings.
Washington at such time and place as the chairman of the commission may fix. The commission shall convene thereafter at such times and places as a majority of the commission may determine, or upon call of the chairman thereof.

The commission may appoint a secretary, and such clerks, special — Secretary and personnel.
counsel, experts, examiners, and other employees as it may from time to time find necessary for the proper performance of its duties and as from time to time may be appropriated for by Congress.

The commission shall have an official seal and shall annually make — Seal, and reports.
a full report of its operations to the Congress.

The members of the commission shall receive a compensation of — Compensation for first year.
$10,000 for the first year of their service, said year to date from the first meeting of said commission, and thereafter a compensation of — Thereafter.
$30 per day for each day's attendance upon sessions of the commission or while engaged upon work of the commission and while traveling to and from such sessions, and also their necessary traveling expenses.

Sec. 4. Except as otherwise provided in this Act, the commission, — Duties specified.
from time to time, as public convenience, interest, or necessity requires, shall—

(a) Classify radio stations; — Classify stations.

(b) Prescribe the nature of the service to be rendered by each — Service to be rendered.
class of licensed stations and each station within any class;

(c) Assign bands of frequencies or wave lengths to the various — Assign wave lengths, etc.
classes of stations, and assign frequencies or wave lengths for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual — Locate stations.
stations;

(e) Regulate the kind of apparatus to be used with respect to its — Regulate apparatus, etc.
external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may — Regulations to prevent interference.
deem necessary to prevent interference between stations and to carry out the provisions of this Act: *Provided, however,* That changes in — *Proviso.* Restriction on changes.
the wave lengths, authorized power, in the character of emitted signals, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, in the judgment of the commission, such changes will promote public convenience or

interest or will serve public necessity or the provisions of this Act will be more fully complied with;

*Areas to be served.*    (g) Have authority to establish areas or zones to be served by any station;

*Chain broadcasting.*    (h) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

*Require station records,*    (i) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable; .

*Exclude railroad rolling stock, etc.*    (j) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

*General authority.*    (k) Have authority to hold hearings, summon witnesses, administer oaths, compel the production of books, documents, and papers and to make such investigations as may be necessary in the performance of its duties. *Expenditures allowed.* The commission may make such expenditures (including expenditures for rent and personal services at the seat of government and elsewhere, for law books, periodicals, and books of reference, and for printing and binding) as may be necessary for the execution of the functions vested in the commission and, as from time to time may be appropriated for by Congress. All expenditures of the commission shall be allowed and paid upon the presentation of itemized vouchers therefor approved by the chairman.

*Powers to be vested in Secretary of Commerce after first year.*    Sec. 5. From and after one year after the first meeting of the commission created by this Act, all the powers and authority vested in the commission under the terms of this Act, except as to the revocation of licenses, shall be vested in and exercised by the Secretary of *Jurisdiction of Commission thereafter.* Commerce; except that thereafter the commission shall have power and jurisdiction to act upon and determine any and all matters brought before it under the terms of this section.

*Duties of Secretary.*    It shall also be the duty of the Secretary of Commerce—

*During first year.*    (A) For and during a period of one year from the first meeting of the commission created by this Act, to immediately refer to the commission all applications for station licenses or for the renewal or modification of existing station licenses.

*Thereafter to refer to Commission disputes as to granting station licenses.*    (B) From and after one year from the first meeting of the commission created by this Act, to refer to the commission for its action any application for a station license or for the renewal or modification of any existing station license as to the granting of which dispute, controversy, or conflict arises or against the granting of which protest is filed within ten days after the date of filing said application by any party in interest and any application as to which such reference is requested by the applicant at the time of filing said application.

*Issue station operators' licenses.*    (C) To prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to such persons as he finds qualified.

*Suspend operators' licenses.* *Grounds for specified.*    (D) To suspend the license of any operator for a period not exceeding two years upon proof sufficient to satisfy him that the licensee (a) has violated any provision of any Act or treaty binding on the United States which the Secretary of Commerce or the commission is authorized by this Act to administer or by any regulation made by the commission or the Secretary of Commerce under any such Act or treaty; or (b) has failed to carry out the lawful orders of the master of the vessel on which he is employed; or (c) has willfully damaged or permitted radio apparatus to be damaged; or (d) has transmitted superfluous radio communications or signals or radio communications containing profane or obscene words or language; or (e) has willfully or maliciously interfered with any other radio communications or signals.

A014

(E) To inspect all transmitting apparatus to ascertain whether in construction and operation it conforms to the requirements of this Act, the rules and regulations of the licensing authority, and the license under which it is constructed or operated. *Inspect transmitting apparatus.*

(F) To report to the commission from time to time any violations of this Act, the rules, regulations, or orders of the commission, or of the terms or conditions of any license. *Report to Commission, violations, etc.*

(G) To designate call letters of all stations. *Designate call letters.*

(H) To cause to be published such call letters and such other announcements and data as in his judgment may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this Act. *Publish call letters, announcements, etc.*

The Secretary may refer to the commission at any time any matter the determination of which is vested in him by the terms of this Act. *Refer any matter to Commission.*

Any person, firm, company, or corporation, any State or political division thereof aggrieved or whose interests are adversely affected by any decision, determination, or regulation of the Secretary of Commerce may appeal therefrom to the commission by filing with the Secretary of Commerce notice of such appeal within thirty days after such decision or determination or promulgation of such regulation. All papers, documents, and other records pertaining to such application on file with the Secretary shall thereupon be transferred by him to the commission. The commission shall hear such appeal de novo under such rules and regulations as it may determine. *Appeals allowed to Commission from decisions of Secretary.* *Hearings on, by Commission.*

Decisions by the commission as to matters so appealed and as to all other matters over which it has jurisdiction shall be final, subject to the right of appeal herein given. *Effect of Commission's decision.*

No station license shall be granted by the commission or the Secretary of Commerce until the applicant therefor shall have signed a waiver of any claim to the use of any particular frequency or wave length or of the ether as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise. *Waiver of claims required of applicants for station licenses.*

Sec. 6. Radio stations belonging to and operated by the United States shall not be subject to the provisions of sections 1, 4, and 5 of this Act. All such Government stations shall use such frequencies or wave lengths as shall be assigned to each or to each class by the President. All such stations, except stations on board naval and other Government vessels while at sea or beyond the limits of the continental United States, when transmitting any radio communication or signal other than a communication or signal relating to Government business shall conform to such rules and regulations designed to prevent interference with other radio stations and the rights of others as the licensing authority may prescribe. Upon proclamation by the President that there exists war or a threat of war or a state of public peril or disaster or other national emergency, or in order to preserve the neutrality of the United States, the President may suspend or amend, for such time as he may see fit, the rules and regulations applicable to any or all stations within the jurisdiction of the United States as prescribed by the licensing authority, and may cause the closing of any station for radio communication and the removal therefrom of its apparatus and equipment, or he may authorize the use or control of any such station and/or its apparatus and equipment by any department of the Government under such regulations as he may prescribe, upon just compensation to the owners. Radio stations on board vessels of the United States Shipping Board or the United States Shipping Board Emergency Fleet Corporation or the Inland and Coastwise Waterways Service shall be subject to the provisions of this Act. *Government stations. Provisions governing.* *President may suspend regulations, etc., in time of war or other emergency.* *Authorize use of stations by departments, etc.* *Shipping Board, etc., vessels subject to this Act.*

Sec. 7. The President shall ascertain the just compensation for such use or control and certify the amount ascertained to Congress *Compensation for Government use.*

1166        SIXTY-NINTH CONGRESS. Sess. II. Ch. 169. 1927.

Appeal if amount unsatisfactory. for appropriation and payment to the person entitled thereto. If the amount so certified is unsatisfactory to the person entitled thereto, such person shall be paid only 75 per centum of the amount and shall be entitled to sue the United States to recover such further sum as added to such payment of 75 per centum which will make such amount as will be just compensation for the use and control.

Procedure. Vol.36, pp.1092,1131. Such suit shall be brought in the manner provided by paragraph 20 of section 24, or by section 145 of the Judicial Code, as amended.

Special letters for Government stations. Sec. 8. All stations owned and operated by the United States, except mobile stations of the Army of the United States, and all other stations on land and sea, shall have special call letters designated by the Secretary of Commerce.

Licenses not applicable to foreign ships in American jurisdiction. Regulations for. Section 1 of this Act shall not apply to any person, firm, company, or corporation sending radio communications or signals on a foreign ship while the same is within the jurisdiction of the United States, but such communications or signals shall be transmitted only in accordance with such regulations designed to prevent interference as may be promulgated under the authority of this Act.

Granting of station licenses. Sec. 9. The licensing authority, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act, shall grant to any applicant therefor a station license provided for by this Act.

Consideration of applications. In considering applications for licenses and renewals of licenses, when and in so far as there is a demand for the same, the licensing authority shall make such a distribution of licenses, bands of frequency of wave lengths, periods of time for operation, and of power among the different States and communities as to give fair, efficient, and equitable radio service to each of the same.

Terms allowed for operating stations. No license granted for the operation of a broadcasting station shall be for a longer term than three years and no license so granted for any other class of station shall be for a longer term than five years, and any license granted may be revoked as hereinafter provided. Upon the expiration of any license, upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed three years in the case of broadcasting licenses and not to exceed five years in the case of other licenses.

Renewals.

Time for granting renewals. No renewal of an existing station license shall be granted more than thirty days prior to the expiration of the original license.

Application requirements. Facts to be stated in. Sec. 10. The licensing authority may grant station licenses only upon written application therefor addressed to it. All applications shall be filed with the Secretary of Commerce. All such applications shall set forth such facts as the licensing authority by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies or wave lengths and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and

Additional statements may be required. such other information as it may require. The licensing authority at any time after the filing of such original application and during the term of any such license may require from an applicant or licensee further written statements of fact to enable it to determine

Oath to application. whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee under oath or affirmation.

Conditions, etc., if use in intercourse with foreign countries intended. The licensing authority in granting any license for a station intended or used for commercial communication between the United

A 016

States or any Territory or possession, continental or insular, subject to the jurisdiction of the United States, and any foreign country, may impose any terms, conditions, or restrictions authorized to be imposed with respect to submarine-cable licenses by section 2 of an Act entitled "An Act relating to the landing and the operation of submarine cables in the United States," approved May 24, 1921.

*Vol. 42, p. 8.*

Sec. 11. If upon examination of any application for a station license or for the renewal or modification of a station license the licensing authority shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the licensing authority upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe.

*Issue authorized if public interest would be served thereby.*

*Hearings, etc., if no decision reached.*

Such station licenses as the licensing authority may grant shall be in such general form as it may prescribe, but each license shall contain, in addition to other provisions, a statement of the following conditions to which such license shall be subject:

*Additional statement on licenses.*

(A) The station license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies or wave length designated in the license beyond the term thereof nor in any other manner than authorized therein.

*Operation only as designated.*

(B) Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of this Act.

*Limiting assignments.*

(C) Every license issued under this Act shall be subject in terms to the right of use or control conferred by section 6 hereof.

*Subject to Government control.*
*Ante, p. 1165.*

In cases of emergency arising during the period of one year from and after the first meeting of the commission created hereby, or on applications filed during said time for temporary changes in terms of licenses when the commission is not in session and prompt action is deemed necessary, the Secretary of Commerce shall have authority to exercise the powers and duties of the commission, except as to revocation of licenses, but all such exercise of powers shall be promptly reported to the members of the commission, and any action by the Secretary authorized under this paragraph shall continue in force and have effect only until such time as the commission shall act thereon.

*Temporary emergency authority of Secretary during first year.*

*Limitations.*

Sec. 12. The station license required hereby shall not be granted to, or after the granting thereof such license shall not be transferred in any manner, either voluntarily or involuntarily, to (a) any alien or the representative of any alien; (b) to any foreign government, or the representative thereof; (c) to any company, corporation, or association organized under the laws of any foreign government; (d) to any company, corporation, or association of which any officer or director is an alien, or of which more than one-fifth of the capital stock may be voted by aliens or their representatives or by a foreign government or representative thereof, or by any company, corporation, or association organized under the laws of a foreign country.

*Prohibition of granting or transfers to aliens, etc.*
*Classification of.*

The station license required hereby, the frequencies or wave length or lengths authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner, either voluntarily or involuntarily, disposed of to any person, firm, company, or corporation without the consent in writing of the licensing authority.

*No transfers without consent of licensing authority.*

Sec. 13. The licensing authority is hereby directed to refuse a station license and/or the permit hereinafter required for the construction of a station to any person, firm, company, or corporation,

*Licenses refused to any party guilty of monopoly, unfair competition, etc.*

1168    SIXTY-NINTH CONGRESS. Sess. II. Ch. 169.   1927.

or any subsidiary thereof, which has been finally adjudged guilty by a Federal court of unlawfully monopolizing or attempting unlawfully to monopolize, after this Act takes effect, radio communication, directly or indirectly, through the control of the manufacture or sale of radio apparatus, through exclusive traffic arrangements, or by any other means or to have been using unfair methods of competition. The granting of a license shall not estop the United States or any person aggrieved from proceeding against such person, firm, company, or corporation for violating the law against unfair methods of competition or for a violation of the law against unlawful restraints and monopolies and/or combinations, contracts, or agreements in restraint of trade, or from instituting proceedings for the dissolution of such firm, company, or corporation.

*Granting a license no estoppel of proceedings against violators of antitrust laws, etc.*

Sec. 14. Any station license shall be revocable by the commission for false statements either in the application or in the statement of fact which may be required by section 10 hereof, or because of conditions revealed by such statements of fact as may be required from time to time which would warrant the licensing authority in refusing to grant a license on an original application, or for failure to operate substantially as set forth in the license, for violation of or failure to observe any of the restrictions and conditions of this Act, or of any regulation of the licensing authority authorized by this Act or by a treaty ratified by the United States, or whenever the Interstate Commerce Commission, or any other Federal body in the exercise of authority conferred upon it by law, shall find and shall certify to the commission that any licensee bound so to do, has failed to provide reasonable facilities for the transmission of radio communications, or that any licensee has made any unjust and unreasonable charge, or has been guilty of any discrimination, either as to charge or as to service or has made or prescribed any unjust and unreasonable classification, regulation, or practice with respect to the transmission of radio communications or service: *Provided,* That no such order of revocation shall take effect until thirty days' notice in writing thereof, stating the cause for the proposed revocation, has been given to the parties known by the commission to be interested in such license. Any person in interest aggrieved by said order may make written application to the commission at any time within said thirty days for a hearing upon such order, and upon the filing of such written application said order of revocation shall stand suspended until the conclusion of the hearing herein directed. Notice in writing of said hearing shall be given by the commission to all the parties known to it to be interested in such license twenty days prior to the time of said hearing. Said hearing shall be conducted under such rules and in such manner as the commission may prescribe. Upon the conclusion hereof the commission may affirm, modify, or revoke said orders of revocation.

*Revocation of licenses.*
*Grounds for, specified.*

*Proviso.*
*Notice to interested parties.*

*Application for hearing.*

*Notice of hearing, and procedure*

*Authority of Commission.*

Sec. 15. All laws of the United States relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade are hereby declared to be applicable to the manufacture and sale of and to trade in radio apparatus and devices entering into or affecting interstate or foreign commerce and to interstate or foreign radio communications. Whenever in any suit, action, or proceeding, civil or criminal, brought under the provisions of any of said laws or in any proceedings brought to enforce or to review findings and orders of the Federal Trade Commission or other governmental agency in respect of any matters as to which said commission or other governmental agency is by law authorized to act, any licensee shall be found guilty of the violation of the provisions of such laws or any of them, the court, in addition to the penalties imposed by said laws, may adjudge,

*Antitrust laws applicable to dealers in radio apparatus, etc.*

*Revocation of license, etc., in addition to other penalties, if licensees guilty of violating.*

order, and/or decree that the license of such licensee shall, as of the date the decree or judgment becomes finally effective or as of such other date as the said decree shall fix, be revoked and that all rights under such license shall thereupon cease: *Provided, however,* That such licensee shall have the same right of appeal or review as is provided by law in respect of other decrees and judgments of said court.

*Proviso.*
*Right of appeal.*

Sec. 16. Any applicant for a construction permit, for a station license, or for the renewal or modification of an existing station license whose application is refused by the licensing authority shall have the right to appeal from said decision to the Court of Appeals of the District of Columbia; and any licensee whose license is revoked by the commission shall have the right to appeal from such decision of revocation to said Court of Appeals of the District of Columbia or to the district court of the United States in which the apparatus licensed is operated, by filing with said court, within twenty days after the decision complained of is effective, notice in writing of said appeal and of the reasons therefor.

*Applicants for construction permits, licenses, etc., refused by licensing authority, may appeal to Court of Appeals, D. C.*
*Appeal if license revoked.*

The licensing authority from whose decision an appeal is taken shall be notified of said appeal by service upon it, prior to the filing thereof, of a certified copy of said appeal and of the reasons therefor. Within twenty days after the filing of said appeal the licensing authority shall file with the court the originals or certified copies of all papers and evidence presented to it upon the original application for a permit or license or in the hearing upon said order of revocation, and also a like copy of its decision thereon and a full statement in writing of the facts and the grounds for its decision as found and given by it. Within twenty days after the filing of said statement by the licensing authority either party may give notice to the court of his desire to adduce additional evidence. Said notice shall be in the form of a verified petition stating the nature and character of said additional evidence, and the court may thereupon order such evidence to be taken in such manner and upon such terms and conditions as it may deem proper.

*Action on appeals.*
*Papers to be filed in court.*
*Additional evidence may be adduced.*

At the earliest convenient time the court shall hear, review, and determine the appeal upon said record and evidence, and may alter or revise the decision appealed from and enter such judgment as to it may seem just. The revision by the court shall be confined to the points set forth in the reasons of appeal.

*Early action of court.*
*Limits of revision.*

Sec. 17. After the passage of this Act no person, firm, company, or corporation now or hereafter directly or indirectly through any subsidiary, associated, or affiliated person, firm, company, corporation, or agent, or otherwise, in the business of transmitting and/or receiving for hire energy, communications, or signals by radio in accordance with the terms of the license issued under this Act, shall by purchase, lease, construction, or otherwise, directly or indirectly, acquire, own, control, or operate any cable or wire telegraph or telephone line or system between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any foreign country, or shall acquire, own, or control any part of the stock or other capital share of any interest in the physical property and/or other assets of any such cable, wire, telegraph, or telephone line or system, if in either case the purpose is and/or the effect thereof may be to substantially lessen competition or to restrain commerce between any place in any State, Territory, or possession of the United States or in the District of Columbia and any place in any foreign country, or unlawfully to create monopoly in any line of commerce; nor shall any person, firm, company, or corporation now or hereafter engaged directly or indirectly through any subsidiary, associated, or affiliated person,

*Radio licensees forbidden to acquire, etc., telegraph or telephone systems between United States and foreign countries effecting monopoly, etc.*
*Telegraph and telephone systems, forbidden to acquire, etc., radio stations if thereby creating a monopoly in commerce, etc.*

43892°—27——74

company, corporation, or agent, or otherwise, in the business of transmitting and/or receiving for hire messages by any cable, wire, telegraph, or telephone line or system (a) between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any other State, Territory, or possession of the United States; or (b) between any place in any State, Territory, or possession of the United States, or the District of Columbia, and any place in any foreign country, by purchase, lease, construction, or otherwise, directly or indirectly acquire, own, control, or operate any station or the apparatus therein, or any system for transmitting and/or receiving radio communications or signals between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any foreign country, or shall acquire, own, or control any part of the stock or other capital share or any interest in the physical property and/or other assets of any such radio station, apparatus, or system, if in either case the purpose is and/or the effect thereof may be to substantially lessen competition or to restrain commerce between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any foreign country, or unlawfully to create monopoly in any line of commerce.

Candidates for office to be accorded equal opportunity, for using broadcasting stations.

SEC. 18. If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, and the licensing authority shall make rules and regulations to carry this provision into effect: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this paragraph. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate.

*Proviso.* No censorship allowed, etc.

Paid broadcast matter to be so announced.

SEC. 19. All matter broadcast by any radio station for which service, money, or any other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, firm, company, or corporation, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person, firm, company, or corporation.

Transmissions only by licensed operators.

SEC. 20. The actual operation of all transmitting apparatus in any radio station for which a station license is required by this Act shall be carried on only by a person holding an operator's license issued hereunder. No person shall operate any such apparatus in such station except under and in accordance with an operator's license issued to him by the Secretary of Commerce.

Construction permits required.

SEC. 21. No license shall be issued under the authority of this Act for the operation of any station the construction of which is begun or is continued after this Act takes effect, unless a permit for its construction has been granted by the licensing authority upon written application therefor. The licensing authority may grant such permit if public convenience, interest, or necessity will be served by the construction of the station. This application shall set forth such facts as the licensing authority by regulation may prescribe as to the citizenship, character, and the financial, technical, and other ability of the applicant to construct and operate the station, the ownership and location of the proposed station and of the station or stations with which it is proposed to communicate, the frequencies and wave length or wave lengths desired to be used, the hours of the day or other periods of time during which it is proposed to operate the station, the purpose for which the station is to be used, the type of transmitting apparatus to be used, the power to be used, the date upon which the station is expected to be

Facts to be set forth in applications.

A0 20

SIXTY-NINTH CONGRESS. Sess. II. Ch. 169. 1927. 1171

completed and in operation, and such other information as the
licensing authority may require. Such application shall be signed
by the applicant under oath or affirmation.

Such permit for construction shall show specifically the earliest  *Permits to show dates of operation, etc.*
and latest dates between which the actual operation of such station
is expected to begin, and shall provide that said permit will be
automatically forfeited if the station is not ready for operation
within the time specified or within such further time as the licensing
authority may allow, unless prevented by causes not under the
control of the grantee. The rights under any such permit shall not  *Assignment of rights restricted.*
be assigned or otherwise transferred to any person, firm, company,
or corporation without the approval of the licensing authority.
A permit for construction shall not be required for Government
stations, amateur stations, or stations upon mobile vessels, railroad
rolling stock, or aircraft. Upon the completion of any station for  *License for operation granted if conditions complied with.*
the construction or continued construction for which a permit has
been granted, and upon it being made to appear to the licensing
authority that all the terms, conditions, and obligations set forth
in the application and permit have been fully met, and that no cause
or circumstance arising or first coming to the knowledge of the
licensing authority since the granting of the permit would, in the
judgment of the licensing authority, make the operation of such
station against the public interest, the licensing authority shall issue
a license to the lawful holder of said permit for the operation of
said station. Said license shall conform generally to the terms of
said permit.

Sec. 22. The licensing authority is authorized to designate from  *Stations liable to interfere with distress calls, to be designated.*
time to time radio stations the communications or signals of which,
in its opinion, are liable to interfere with the transmission or  *Requirements for.*
reception of distress signals of ships. Such stations are required
to keep a licensed radio operator listening in on the wave lengths
designated for signals of distress and radio communications relating
thereto during the entire period the transmitter of such station is
in operation.

Sec. 23. Every radio station on shipboard shall be equipped to  *Distress signals. Requirements for, on shipboard stations.*
transmit radio communications or signals of distress on the fre-
quency or wave length specified by the licensing authority, with
apparatus capable of transmitting and receiving messages over a
distance of at least one hundred miles by day or night. When sending
radio communications or signals of distress and radio communications
relating thereto the transmitting set may be adjusted in such a
manner as to produce a maximum of radiation irrespective of the
amount of interference which may thus be caused.

All radio stations, including Government stations and stations  *Priority to distress signals to be given by all stations.*
on board foreign vessels when within the territorial waters of the
United States, shall give absolute priority to radio communications
or signals relating to ships in distress; shall cease all sending on
frequencies or wave lengths which will interfere with hearing a
radio communication or signal of distress, and, except when engaged
in answering or aiding the ship in distress, shall refrain from
sending any radio communications or signals until there is assurance
that no interference will be caused with the radio communications
or signals relating thereto, and shall assist the vessel in distress, so
far as possible, by complying with its instructions.

Sec. 24. Every shore station open to general public service between  *Public shore stations to exchange communications with shipboard, and shipboard with each other.*
the coast and vessels at sea shall be bound to exchange radio
communications or signals with any ship station without distinction
as to radio systems or instruments adopted by such stations, respec-
tively, and each station on shipboard shall be bound to exchange
radio communications or signals with any other station on shipboard

AO 21

1172        SIXTY-NINTH CONGRESS. Sess. II. Ch. 169. 1927.

without distinction as to radio systems or instruments adopted by each station.

Time arrangement for land stations to prevent interference with Government ones in proximity.

SEC. 25. At all places where Government and private or commercial radio stations on land operate in such close proximity that interference with the work of Government stations can not be avoided when they are operating simultaneously such private or commercial stations as do interfere with the transmission or reception of radio communications or signals by the Government stations concerned shall not use their transmitters during the first fifteen minutes of each hour, local standard time.

Government stations to have first 15 minutes in each hour.

The Government stations for which the above-mentioned division of time is established shall transmit radio communications or signals only during the first fifteen minutes of each hour, local standard time, except in case of signals or radio communications relating to vessels in distress and vessel requests for information as to course, location, or compass direction.

Minimum power to be used.

SEC. 26. In all circumstances, except in case of radio communications or signals relating to vessels in distress, all radio stations, including those owned and operated by the United States, shall use the minimum amount of power necessary to carry out the communication desired.

Unauthorized divulgence of radio communication by receiver, forbidden.

SEC. 27. No person receiving or assisting in receiving any radio communication shall divulge or publish the contents, substance, purport, effect, or meaning thereof except through authorized channels of transmission or reception to any person other than the addressee, his agent, or attorney, or to a telephone, telegraph, cable, or radio station employed or authorized to forward such radio communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the radio communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpœna issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any message and divulge or publish the contents, substance, purport, effect, or meaning of such intercepted message to any person; and no person not being entitled thereto shall receive or assist in receiving any radio communication and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided*, That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcasted or transmitted by amateurs or others for the use of the general public or relating to ships in distress.

Unauthorized intercepting any message.

Divulging contents, etc., of intercepted message.

Proviso. Not applicable to broadcasting or distress signals.

Uttering false distress signals, forbidden.

SEC. 28. No person, firm, company, or corporation within the jurisdiction of the United States shall knowingly utter or transmit, or cause to be uttered or transmitted, any false or fraudulent signal of distress, or communication relating thereto, nor shall any broadcasting station rebroadcast the program or any part thereof of another broadcasting station without the express authority of the originating station.

Rebroadcasting prohibitions.

No censorship, etc., allowed.

SEC. 29. Nothing in this Act shall be understood or construed to give the licensing authority the power of censorship over the radio communications or signals transmitted by any radio station, and no

Ao 22

regulation or condition shall be promulgated or fixed by the licensing authority which shall interfere with the right of free speech by means of radio communications. No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication. *Communication of obscene, etc., language by radio, prohibited.*

Sec. 30. The Secretary of the Navy is hereby authorized unless restrained by international agreement, under the terms and conditions and at rates prescribed by him, which rates shall be just and reasonable, and which, upon complaint, shall be subject to review and revision by the Interstate Commerce Commission, to use all radio stations and apparatus, wherever located, owned by the United States and under the control of the Navy Department (a) for the reception and transmission of press messages offered by any newspaper published in the United States, its Territories or possessions, or published by citizens of the United States in foreign countries, or by any press association of the United States, and (b) for the reception and transmission of private commercial messages between ships, between ship and shore, between localities in Alaska and between Alaska and the continental United States: *Provided,* That the rates fixed for the reception and transmission of all such messages, other than press messages between the Pacific coast of the United States, Hawaii, Alaska, the Philippine Islands, and the Orient, and between the United States and the Virgin Islands, shall not be less than the rates charged by privately owned and operated stations for like messages and service: *Provided further,* That the right to use such stations for any of the purposes named in this section shall terminate and cease as between any countries or localities or between any locality and privately operated ships whenever privately owned and operated stations are capable of meeting the normal communication requirements between such countries or localities or between any locality and privately operated ships, and the licensing authority shall have notified the Secretary of the Navy thereof. *Naval stations. Use of, authorized.* *Press messages.* *Private commercial messages with ships, and Alaska.* *Provisos. Rates, other than Pacific coast press messages.* *Termination of use when private stations able to meet requirements.* *Notification to Secretary of the Navy.*

Sec. 31. The expression "radio communication" or "radio communications" wherever used in this Act means any intelligence, message, signal, power, pictures, or communication of any nature transferred by electrical energy from one point to another without the aid of any wire connecting the points from and at which the electrical energy is sent or received and any system by means of which such transfer of energy is effected. *Meaning of "radio communication."*

Sec. 32. Any person, firm, company, or corporation failing or refusing to observe or violating any rule, regulation, restriction, or condition made or imposed by the licensing authority under the authority of this Act or of any international radio convention or treaty ratified or adhered to by the United States, in addition to any other penalties provided by law, upon conviction thereof by a court of competent jurisdiction, shall be punished by a fine of not more than $500 for each and every offense. *Penalty for violating regulations, etc.*

Sec. 33. Any person, firm, company, or corporation who shall violate any provision of this Act, or shall knowingly make any false oath or affirmation in any affidavit required or authorized by this Act, or shall knowingly swear falsely to a material matter in any hearing authorized by this Act, upon conviction thereof in any court of competent jurisdiction shall be punished by a fine of not more than $5,000 or by imprisonment for a term of not more than five years or both for each and every such offense. *Punishment for violating provisions, false swearing, etc.*

Sec. 34. The trial of any offense under this Act shall be in the district in which it is committed; or if the offense is committed upon the high seas, or out of the jurisdiction of any particular State or district, the trial shall be in the district where the offender may be found or into which he shall be first brought. *Venue of trials.*

1174     SIXTY-NINTH CONGRESS. Sess. II. Ch. 169. 1927.

*Not applicable to Philippines or Canal Zone.*
**Sec. 35.** This Act shall not apply to the Philippine Islands or to the Canal Zone. In international radio matters the Philippine Islands and the Canal Zone shall be represented by the Secretary of State.

*Authority of Secretary of State.*
*Administrative officers in Territories and possessions.*
**Sec. 36.** The licensing authority is authorized to designate any officer or employee of any other department of the Government on duty in any Territory or possession of the United States other than the Philippine Islands and the Canal Zone, to render therein such services in connection with the administration of the radio laws of the United States as such authority may prescribe: *Provided,* That *Proviso.* *Approval of.* such designation shall be approved by the head of the department in which such person is employed.

*Wireless communication.*
*Unexpended balances for, made available.*
*Ante, p. 355.*
**Sec. 37.** The unexpended balance of the moneys appropriated in the item for " wireless communication laws," under the caption " Bureau of Navigation " in Title III of the Act entitled "An Act making appropriations for the Departments of State and Justice and for the judiciary, and for the Departments of Commerce and Labor, for the fiscal year ending June 30, 1927, and for other purposes," approved April 29, 1926, and the appropriation for the same purposes for the fiscal year ending June 30, 1928, shall be available both for expenditures incurred in the administration of this Act and for expenditures for the purposes specified in such items. There is hereby authorized to be appropriated for each fiscal year such sums as may be necessary for the administration of this Act and for the purposes specified in such item.

*In appropriations for 1928.*
*Post, p. 1206.*
*Future authorization.*

*Invalidity of any provision not to affect remainder of Act.*
**Sec. 38.** If any provision of this Act or the application thereof to any person, firm, company, or corporation, or to any circumstances, is held invalid, the remainder of the Act and the application of such provision to other persons, firms, companies, or corporations, or to other circumstances, shall not be affected thereby.

*Laws repealed.*
*Vol. 37, p. 302; Vol. 41, p. 1061; Vol. 42, p. 485; Vol. 43, p. 1091.*
*Ante, p. 917.*
**Sec. 39.** The Act entitled "An Act to regulate radio communication," approved August 13, 1912, the joint resolution to authorize the operation of Government-owned radio stations for the general public, and for other purposes, approved June 5, 1920, as amended, and the joint resolution entitled "Joint resolution limiting the time for which licenses for radio transmission may be granted, and for other purposes," approved December 8, 1926, are hereby repealed.

*Pending suits, etc., not affected by repeal.*
Such repeal, however, shall not affect any act done or any right accrued or any suit or proceeding had or commenced in any civil cause prior to said repeal, but all liabilities under said laws shall continue and may be enforced in the same manner as if committed; and all penalties, forfeitures, or liabilities incurred prior to taking effect hereof, under any law embraced in, changed, modified, or repealed by this Act, may be prosecuted and punished in the same manner and with the same effect as if this Act had not been passed.

*Use of radio apparatus except as hereby provided forbidden.*
Nothing in this section shall be construed as authorizing any person now using or operating any apparatus for the transmission of radio energy or radio communications or signals to continue such use except under and in accordance with this Act and with a license granted in accordance with the authority hereinbefore conferred.

*In force on approval.*
*Penalties not enforced for 60 days.*
**Sec. 40.** This Act shall take effect and be in force upon its passage and approval, except that for and during a period of sixty days after such approval no holder of a license or an extension thereof issued by the Secretary of Commerce under said Act of August 13, 1912, shall be subject to the penalties provided herein for operating a station without the license herein required.

*Title of Act.*
**Sec. 41.** This Act may be referred to and cited as the Radio Act of 1927.

Approved, February 23, 1927.

*AO 24*