# *Address of Senator James E. Watson to the National Broadcasting Co.*, 69 Cong. Rec. 1791 (1928)

(Praise of the Federal Radio Commission's Achievements in the Regulation of Radio Broadcasting)

rightly understood and practiced is a crusade of good will. America, that has attracted the heroic sons and daughters of all the races of the world, enjoys more than any other nation the unique mission of becoming a broadcasting station for world brotherhood. If America, where there has been the greatest mingling of the races and the greatest experiment of the ages, is to rise to the sublime heights for which we believe she is destined—indeed, which she has already achieved—it is because we have striven to substitute justice and understanding for rivalry, jealousy, and prejudice.

The creed of America is that there is no inferiority of religion and nationality.

Laws, leagues, and courts will never produce good will. They may help, but love, justice, and charity implanted in the human soul can alone make for lasting good will. Religion, all religions, should stimulate love, justice, and charity and abolish hate, prejudice, and intolerance. We are on the way to lasting good will when priest, minister, and rabbi can get together and deliberate not on the major things that divide them but on the major things that unite them. The next step is cooperation. If Catholic and Protestant can not respect each other's opinions, what will a pagan world think of Christianity? If Catholic, Protestant and Jew can not live together, there is an abandonment of that charity which all religions teach.

As in the World War and at the grave of the unknown soldier, we asked not what class or caste or creed, we let down all barriers, we leveled all partitions, so as we move among the living and enjoy the blessings of peace and prosperity, let all these barriers disappear.

We must not confuse what we call religious rights with religious toleration. In this country we need not ask toleration for religion and its free exercise, for it is an inalienable right. We live in a country which happily gives no sanction to bigotry or persecution, and toleration is not an indulgence bestowed upon us by the grace of government, but recognized as an inherent right. Our ideals of religious equality and justice are as fundamental as our love of personal liberty and free speech.

Let us not be satisfied with mere tolerance of our neighbor, but let us make of him our friend. Good will is an expansive spirit that takes in enemies, suppresses jealousy, and embraces rivals; good will seeks the good of all people across all the barriers that caste and class and race can erect. The possession or absence of it is an elemental test of character. I never could understand the religious processes of the man or woman, who would hasten to aid his fellow being, regardless of condition or creed, in suffering or poverty, yet would rob that same fellow being of the full enjoyment of that which was dearer and more priceless to him than anything in life; that for which he would willingly suffer pain and endure destitution, namely, communion with God in the manner his soul prompted. The one is surface or exterior charity, the other is spiritual perfidy.

Religious liberty is nothing more nor less than Christian charity. To be tolerant and charitable is to hate no man, to injure no man, to live in harmony with all men; to assist so far as we can those who need aid, regardless of religious opinion.; to practice the duties of citizenship without favor to any religion or religious group, but with due regard to the rights and principles of justice, to which all religions are entitled in a free government.

The tolerant citizen does not limit his friendships and good will to those who only agree with him in faith. The champion of religious liberty is opposed to all political movements that tend to control spiritual conduct, and insists upon confining the jurisdiction of the Government to the protection of the health, happiness, and the inalienable rights to life and property of the citizen.

Religious tolerance, like political tolerance, prompts us to give every human being the utmost concession which trust, justice, and decency permit. No man can be classed as tolerant who entertains in his heart a hatred of all who differ with him on any religious doctrines, or who seeks to deny the American principles of political equality and religious freedom to all his neighbors.

The words "brethren" and "fellow citizen" are synonymous in the vocabulary of men seeking to promote good will and mutual understanding.

We should not take too seriously the movements of lawlessness, bigotry, and intolerance that from time to time appear in our fair land. The great heart of America is tolerant. The overwhelming sentiment of our people is to maintain unsullied our most priceless liberties—freedom of speech, freedom of the ballot, and freedom of the pulpit.

Underlying influences certain to appear occasionally not only against religious liberty but against our very form of government will never penetrate below the surface into the fair breast of the Nation.

We have numerous forces and forms of tyranny and oppression outside the domain of religion to battle against and destroy. Every form of social and industrial injustice is an enemy of liberty; racial hatred is a form of oppression; monopolistic combinations that enhance the cost of living, lessen the purchasing power of wages, and increase the already too great disparity of living conditions between the rich and poor lead to economic slavery; the possession of the country's resources by a limited few may eventually mean for America what it has meant to other peoples of the world, the establishment of a dynasty of wealth instead of a democracy.

If we are to preserve the soul and spirit of America, we must check the present tendency of directing our governmental energy toward restricting instead of enlarging individual liberty; toward bureaucratic instead of popular government. When governments carry this policy to any extreme they cease to adhere to true principles of liberty and to remain democracies. These, and in fact all our great political problems, involve no religious tenets.

The slave mind, which education and religion should eradicate, has no place in a democracy. The slave mind has no vision and can not grasp the necessity of action when inaction means retrogression and disintegration.

The slave mind is found everywhere—on the platform, in the press, and sometimes in the pulpit; aye, it is found in public service and in politics. It applauds the cant of the demagogue and secretly encourages the bigot. It votes for party labels and not principles. It follows blindly party leadership regardless of the purpose and selfish interests of that leadership. It votes for the party program in the halls of legislation and it votes the party ticket on election day, regardless of convictions.

The slave mind remains silent when one should speak, for fear lest the smile of favor of those in high places be lost; it follows the mob—for there are mobs of social snobbery and class privilege as well as mobs of ignorance and lawlessness.

All nations have been cursed from time to time with movements, temporary in nature, hindering the onward march of the spirit of tolerance. When Jefferson advocated the separation of the church and state he was denounced from platform and pulpit as an infidel, though he was at the same time spending his nights on the codification of The Morals of Jesus.

Less than 100 years ago a political party placed a presidential candidate upon a platform having no other ruling principle than an appeal to a supposed prejudice against Freemasonry. Later, masquerading as the American Party, a strong political organization made an appeal to the people in one or more presidential campaigns based upon religious intolerance and prejudice against those of foreign birth. These movements failed because the principles which were espoused were subversive of our institutions; because a people so persevering in its fight for civil liberty will never waver when put to the test in its opposition to religious intolerance.

The American Protestant, the American Catholic, and the American Jew, and the American of no religious creed must stand united in firm opposition to any intolerant movement which deprives any group of equal rights under the law or curtails personal liberty of conscience or religion.

Let us, therefore, live in the sunlight of American liberty, hating no man who, because of his belief, may not agree with us. Let us live in harmony with all men, assisting, so far as we can, those who need our help, regardless of their religious opinion; practicing the duties of citizenship without favor to any one class or religious group, but with due regard to the rights and principles of justice for all.

Let us live in unity with our neighbor and make of him our friend, and remember that what is true of nations is as true of the individual—"Give to the world the best that you have and the best will come back to you."

ADDRESS OF SENATOR JAMES E. WATSON

Mr. DILL. Mr. President, I ask unanimous consent to have inserted in the RECORD a speech delivered over the radio by the Senator from Indiana [Mr. WATSON], Saturday evening, November 5, 1927, at New York City, on the subject of the achievements of the Federal Radio Commission.

There being no objection, the speech was ordered printed in the RECORD, as follows:

ACHIEVEMENTS OF THE RADIO COMMISSION

It is my first duty, as well as my first pleasure, to make my grateful acknowledgments to Mr. Merlin H. Aylesworth, president of the National Broadcasting Co., for this opportunity to present as fully as possible within the brief time allotted to me the achievements of the Federal Radio Commission.

I am not a radio engineer and I shall not venture to discuss the complex problems involved in that phase of radio transmission. Nor shall I attempt to set forth the use and the importance of this great agency in our present daily affairs; its educational and cultural advantages; its utilization by business concerns of every character and by farmers and others interested in the dissemination of information regarding all the problems relating to our farm life; the pleasure and enjoyment it brings to seven millions of American homes that may listen to instruction every day and to entertainment every night by the best the Nation affords. This agency by its ship-to-ship, its ship-to-shore, and its shore-to-ship communications almost revolutionized ocean transportation, rescuing hundreds of lives and saving millions in money before broadcasting was dreamed of. Since that it has become the source of enjoyment to the youth, of entertainment and culture to those of middle life, and of comfort and consolation to the

aged of our land, and has woven itself inextricably into the very fiber of our civilization. Nor shall I attempt to portray the mysteries of this force which has been projected to 500 feet of firm rock and a dozen feet of solid lead, a force by means of which the voice of the orator and of the prima donna may be heard across the continent swifter than the coming light. Certainly it is renewed evidence of the sublime fact that "God moves in a mysterious way his wonders to perform."

### NOT BROADCASTING ALONE

As a whole, the public knows more about broadcasting than any other phase of radio transmission, but it is by no means the sole subject with which the commission has been compelled to deal. The law of 1927 places all the uses of radio, except alone those of various governmental departments, under the jurisdiction of the commission. These uses include all point-to-point stations, which form of transmission is yet in its infancy, but which is destined to become of tremendous importance in the immediate future, 2,000 ship stations, 200 experimental stations, 16,000 amateur stations, 340 land communication stations, and more than 100 technical and trade-school stations, with a great host of people clamoring all the while for a more efficient service and with an ever-increasing number demanding an opportunity to "get on the air."

The radio act of 1927 became law on February 23 of this year. In substance, it provides that no apparatus shall be used within the United States or its possessions to transmit energy or communications by radio except under Federal license. Authority to issue, withhold, modify, or revoke radio licenses, and to make such regulations regarding radio transmission as are necessary in the public interest, is vested by the law in the commission for a period of one year from its first meeting, March 14, 1927.

The law gives great discretionary power to the licensing authority. It is directed to issue licenses to applicants "if public convenience, interest, or necessity will be served thereby," and thus it is their duty to determine whether the public convenience, necessity, or interest served by any given radio station is sufficient to offset the crowding which such a station inevitably causes in the limited number of available wave lengths.

Similarly, the licensing authority may make changes in the wave lengths, authorized power, or hours of operation of any radio station if, in its judgment, "such changes will promote public convenience or interest or will serve public necessity." The power to revoke licenses is given "for failure to operate substantially as set forth in the license" and for various other specified causes.

This, in brief, is the legal foundation upon which the Federal Radio Commission undertook its work. The exact nature of the task which faced it can best be understood if we look for a moment at what had happened to American radio broadcasting during the eight months immediately preceding the passage of the radio act of 1927.

### CONDITIONS WHEN COMMISSION TOOK CHARGE

On June 30, 1926, there were under the jurisdiction of the Department of Commerce 535 licensed broadcasting stations. Even with that number radio reception was by no means satisfactory, and the department was disapproving practically all requests for new licenses, for changes of frequency or for power increases, on the unchallengeable ground that there was no more room.

Then, most unexpectedly, came the decision by a Federal court in the Zenith case, followed by an opinion of the Attorney General based on it, making it evident that the Department of Commerce had no recourse but to approve any and every application made to it. Secretary Hoover did everything possible for any individual to do to preserve order, as well as private and public rights, in this great field of activity, but his hands were securely tied and he was rendered practically helpless by this decision effectively to serve the public. The Government issued a warning and an appeal, pointing out that public interest absolutely required the maintenance of the radio situation approximately unchanged until a new law was enacted by Congress, and this appeal was seconded by practically all the responsible organizations connected with radio.

Despite these warnings there followed nearly eight months of wholesale "air piracy." Public opinion was most vehement against the "wave jumpers," but, as a matter of fact, they were not the ones responsible for the greatest trouble. Of the 535 broadcasting stations licensed as of June 30, 1926, there were only 86, or 16 per cent, who took advantage of the situation to change their frequencies.

Far more numerous, if not individually so troublesome, were the "power jumpers," 168 in number, or 31 per cent of the whole. Since 40 broadcasters changed both power and frequency, the total number of those who helped themselves during the eight months' period to privileges which had been denied them before the breakdown of regulation was 214, or 40 per cent of the entire list. Twenty-seven stations by some happy miracle, dropped out; the remainder, 294, or 55 per cent took no advantage of the situation.

### RESULTING CHAOS

After the decision in the Zenith case, practically holding that nobody had any right to any wave length and that the Secretary of Commerce had no authority to bestow any such right, there was an indiscriminate scramble on the part of those who had been denied the privilege of erecting stations or broadcasting on desired wave lengths to take whatever they wanted, and this resulted in a chaos so complete that nation-wide interference and static and heterodyning almost destroyed the usefulness of this agency.

And so it was neither the "wave jumpers" nor the "power jumpers," however, that did the real mischief. Scarcely was the ink dry on the Attorney General's opinion before this wild scramble to "get on the air" began before Congress could act. Between July 1, 1926, and February 23, 1927, the Department of Commerce found itself compelled to license no fewer than 225 new stations. In eight months the total number increased 37 per cent, or up to 735 stations.

In vain were most vigorous protests heralded throughout the land that there were no available frequencies; in vain were announcements repeatedly made that public interest was being ruthlessly sacrificed by the men who were rushing into a field already overcrowded. And it was not until the radio act of 1927 was approved that this utterly disastrous scramble ceased.

### PROBLEM TO BE SOLVED

What was the new Federal Radio Commission to do with such a situation? It was easy for irresponsible counselors to say, "Cut out half the stations," but the law made no provision for revoking a license except for some unlawful act or for failure to obey the orders of the commission under the new law itself.

And because congestion still exists and because reception in multiplied instances is now anything but satisfactory we still have multitudes of people who insist on the commission summarily cutting off one-half of all the broadcasting stations in order to give the remainder exclusive use of these channels of communication. But these impatient individuals must remember that there is something else besides the mere physical and engineering aspects of the case to be considered. It would indeed be easy for a competent engineer to sit down and work out a scheme that would solve the problem in accordance with this program, but it must be remembered that there are legal questions of personal and property rights that can not be overlooked if the law is to be sustained.

Moreover, there are questions of justice and fair dealing involved, for the past service of stations must be taken into consideration and it can not be forgotten that those granted the right to certain wave lengths and power and division of time by the commission, even under stress of circumstances, and who because of such grant invested money and established stations and acquired a clientele have rights that everybody is bound to respect. Nor must it be forgotten that the rights of religious bodies are brought into the situation and that the contentions of labor organizations, and other associations of like character who insist on the right of free speech, simply must be dealt with and can not be cast into the scrap heap.

Putting the "wave jumpers" and the "power jumpers" all back where they were on June 30—another favorite suggestion—would have accomplished nothing with regard to the 225 newcomers, who manifestly could not be put where they came from, as they had come from nowhere. They were all new. To make matters still more complex, a few of the "jumpers," and a very few, though not many, of the newcomers, were clearly rendering a real and valuable service, quite within the intent of the law.

### OTHER DIFFICULTIES

In recounting the complex and vexatious problems that confronted the commission on its assembling, please remember that Congress, while it established the commission, failed to appropriate a dollar for its organization or its operation or its maintenance. So that when it met to begin its duties it was anything but a going concern. Its members were not even personally acquainted with one another, and the chairman had to call the first meeting by radio and wire from Peking.

There was no clerical staff to handle the enormous volume of mail that poured in. The entire organization, necessarily very limited because of lack of adequate funds, even to provide a sufficient corps of stenographers and clerks, to say nothing of technical aides, had to be built up by the commissioners while they were carrying on the work, for the public demand for immediate action was so strong and so entirely legitimate that delay was out of the question.

The commission's first step was to segregate broadcasting from all other forms of radio activity, in order to give it immediate and practically exclusive attention. It is by no means clear that broadcasting is the most important part of the field covered by the radio act, but certainly it was the part which, from the standpoint of public convenience, necessity, and interest, most urgently required action.

Then, in order to get the full benefit of the country's best-informed opinion on the subject, the commission arranged for a general public conference, to be held in Washington late in March, in the hope that suggestions might be there presented for the solution of the problem.

The conference was a magnificent success in showing the commission just how difficult its task was, for there was a confusion of tongues there almost equal to the worst static. We were most forcefully reminded by the varied interests represented that the commission must

on no account widen the broadcasting band, that it must maintain a separation of at least 10 kilocycles between adjacent channels, that it must keep stations in the same community fully 50 kilocycles apart, that it must not require too much division of time, that it must not prohibit the use of high power, that it must not put more than a very limited number of stations on the same frequency. Only one question, reiterated by the commissioners over and over again, remained unanswered: "How can all these admirable things be done?"

Meanwhile the 60 days which the radio act set aside as a period of grace were passing by; on April 24 every broadcaster in the country, unless relicensed, might contemplate the choice between a fine of $5,000 and five years in the penitentiary, the penalties provided by law for broadcasting without a license. Accordingly, as the applications for new licenses came in, the commission issued temporary permits, good only until revoked or superseded.

The commission had prepared and mailed to all broadcasters the forms for application for new licenses, and these forms, executed under oath, provided much of the information upon which any new general reallocation could be undertaken until all of the 733 licensed broadcasters and the 300 or 400 new applicants had filed these forms with the commission, and there was no way of compelling anyone to file them before the 60 days of grace were up on April 24. As a matter of fact, it was April 27 before the commission had in hand the material necessary as the basis for a general reallocation, and so, in order that broadcasting might go on for the next few weeks, the commission issued its temporary permits on the old basis, except in two respects.

TWO TROUBLESOME QUESTIONS

During the uncontrolled period a number of broadcasters had deliberately violated the agreement entered into with Canada whereby 6 of the 91 broadcasting channels were to be reserved exclusively for Canadian use. No temporary permits were issued for these channels, and their complete and immediate clearance was the commission's first definite achievement. Furthermore, about 120 stations had elected to operate on "split frequencies"—that is, on frequencies less than 10 kilocycles removed from the nearest authorized one—so that each one was causing interference on at least two wave lengths. All of these wandering souls, under the temporary permits were put where they would make a little less trouble.

All the broadcasting applications were received and the temporary permits issued by April 27. Then began the work of reallocation. In theory it would have been desirable for every station to have appeared before the commission and set forth its claims before it was reassigned, but such hearings, even at the rate of two or three a day, would have consumed more than a year, and meanwhile the public would have had no vestige of relief.

It was determined, therefore, to set up, as a basis for future developments, an immediate reallocation based on such evidence of ability to serve the public as was then available. That such an arrangement, involving more than 730 broadcasting stations, would be far from ideal was perfectly obvious.

The making of this reallocation was a stupendous task, for not only did the evidence regarding the public service rendered by each of the stations have to be weighed, but a place had to be found for each one consonant with its apparent merits, clear of local overlapping, and reasonably free from distant heterodyning.

THE REAL WORK BEGUN

The new allocations were announced on May 24, four weeks after the applications were all in hand, and went into effect on June 15. There was protest on the part of some of the broadcasters, but the authority of the commission remained essentially unchallenged, and the allocations of June 15, modified in individual instance, appear to have established themselves beyond question as the basis for the future development of American broadcasting service, though many changes and reallocations have since been rendered necessary by sheer force of circumstances.

On May 27 began the period of public hearings, a period which will continue throughout the life of the commission. Any broadcaster who is dissatisfied with his assignment of frequency, or of power, or of time division may apply for any change he wishes, provided only that his application specifies the exact frequency, power, or time he desires.

Since it is obvious that no such application can be granted without injury to some other station, every wave length being packed to capacity, each hearing becomes a definite contest among two or more parties, and in this way the relative claims of the stations, on the basis of public service, are brought out. The same thing applies to interference between stations; definite machinery has been set up for hearings to remedy such conflicts.

Between May 27 and October 15 the commission held some 70 of these public hearings, most of them in Washington, although a few hearings were held by individual commissioners at distant points, thus giving everybody an opportunity to be heard. As most hearings have involved at least two stations, and some of them as many as half a dozen, it follows that through this agency something like 150 broadcasting stations have already appeared before the commission and publicly placed on the records, under oath, their statements as to what they have done and are doing to serve public interest, convenience, or necessity. The fact that every hearing is open to the public has been of great value in bringing every appplication, and also every valid opposition to it, out into the open. The commission has not done its work behind closed doors.

The hearings have provided the commission with a vast amount of information, and in accordance with it many changes have been made in the original allocations of June 15. Furthermore, practical experience, which is the only sure guide in such matters, has shown many cases of serious interference, and in such cases, wherever possible, the commission has acted under the "public convenience, necessity, or interest" clause of the law; and by changes of wave lengths, reduction of power, or further division of time has taken steps to reduce interstation interference to a minimum. This process is constantly going on; every day or two the commission announces one or more changes, all designed for the single purpose of providing better radio service to the American listener.

RESULTS SUBSTANTIAL AND DEFINITE

It should be made clear that, in the present stage of radio engineering, no ideal condition for all the broadcast listeners is conceivable. It would require 10,000 broadcasting stations on the air to give all the listeners what they want when they want it, and then nobody could hear anything at all. The aim of the commission is to give every part of the United States a reasonable variety of broadcast service, dependable and free from abnormal interference, and at the same time to safeguard the rights of the broadcasters in so far as they do not conflict with the rights of the listeners.

In some ways the greatest achievement of the commission has been the extraordinary improvement in the work being done by the broadcasters themselves. Knowing that the commission will judge them solely on the standard of public service, they have made notable changes in the character of their programs, and the records of the commission are full of instances in which, as soon as the commission's policy was made known, broadcasters hastened to replace programs of trashy entertainment by ones of real public value. Furthermore, the insistence on a strict maintenance of the assigned frequency has resulted in a marked improvement in the character of radio transmission. Whereas last February only a very few stations were equipped with adequate devices for staying on their wave lengths, there were to-day very few stations of any importance which have not such equipment.

Such, in brief, has been the work of the Federal Radio Commission during its first months. Much could be said of the loyal work done by its far too small clerical staff, of the generous aid given to it by the leading scientists and engineers of the radio industry, of the splendid support of the press, of the fine cooperation of most of the broadcasters themselves, of the invaluable assistance given by other branches of the Federal Government.

Its most serious handicap—more disturbing by far even than its shortage of funds—was the prolonged illness and death of one of its five members, Col. John F. Dillon, whose long experience, shrewd judgment, and unswerving courage were an incalculable help to his colleagues throughout the first 12 weeks; and very recently the unexpected resignation of Henry H. Bellows, who because of previous knowledge and experience and an ardent love of the cause had become one of the most useful members of the commission and one of the best-informed men on the subject in the whole country.

The commission is by no means inclined to overestimate its achievement so far; it recognizes that there is much even in the broadcasting field yet to be done, and the other and potentially greater field of point-to-point communication is as yet practically untouched. It feels, however, that it has definitely established its own authority to serve the public and that it has provided a basis for a progressive and orderly clearing up of the radio situation. More than this, it hopes that in the performance of its difficult task it has won the confidence and good will of the broadcasters, of the radio industry, and, most of all, of the public. It is on the basis of public confidence that it has carried out the task intrusted to it by Congress in the administration of a very notable piece of national legislation, the radio act of 1927.

And it is my deliberate judgment, after a careful survey of the entire situation, that the Radio Commission has fully justified its creation and that, notwithstanding the many disappointments that its decisions have occasioned, it ought to and will receive the unstinted support of a grateful people.

APPROPRIATIONS FOR DEPARTMENTS OF STATE, JUSTICE, ETC.

Mr. JONES. I ask unanimous consent that the Senate proceed to the consideration of the bill (H. R. 8269) making appropriations for the Departments of State and Justice and for the judiciary and for the Departments of Commerce and Labor for the fiscal year ending June 30, 1929, and for other purposes.

The PRESIDING OFFICER. Is there objection?

There being no objection, the Senate, as in Committee of the Whole, proceeded to consider the bill, which had been reported from the Committee on Appropriations with amendments.

# *Debate on the Davis Amendments to the Radio Act of 1927, 69 Cong. Rec. 3980 (1928)*

(Recognition of the Unequal Distribution of Broadcasting Licenses and Discrimination Against Nonprofit Broadcasters)

men of our community. We want you to feel that you are entitled to call upon this post at any time for any help we may render you in these matters.

Sincerely,                                          MILT PHILLIPS,
                                                    Post Commander.

---

THE AMERICAN LEGION, DEPARTMENT OF OKLAHOMA,
                        Oklahoma City, Okla., December 29, 1927.
Hon. F. B. SWANK,
    House of Representatives,
        Washington, D. C.
SIR: I certainly appreciate your promptness and interest in behalf of Mr. Hyden. I trust that we will soon be able to have his claim in the pension department adjudicated.

I also want to take this opportunity to thank you for sending a copy of H. R. 347. We heartily indorse this amendment to the World War veterans' act, and want to thank you for your introducing the bill and having it passed the first day of the session of the House of Representatives.

Very truly yours,
                                    C. B. DOLLARHIDE, Service Officer.

---

THE AMERICAN LEGION, OKLAHOMA CITY POST, NO. 35,
                        Oklahoma City, December 30, 1927.
Hon. F. B. SWANK, M. C.
    House of Representatives,
        Washington, D. C.
DEAR MR. SWANK: Owing to a mix-up in who was to write to you in regard to the action of our post on your H. R. 347, which was read and approved at our last meeting, I'm not going to wait any longer to give you the information.

The bill was read in the regular procedure of the post meeting, on December 20, and approved by the post; many of us know the import of this bill, and are behind it and you to a man.

Thanking you on behalf of the post and also again for myself, I am
    Yours truly,
                                                FRED W. HUNTER.

---

LEBRON POST, AMERICAN LEGION, NO. 58,
                        DEPARTMENT OF OKLAHOMA,
                            Guthrie, December 31, 1927.
Hon. F. B. SWANK,
    Member of Congress, House Office Building,
        Washington, D. C.
DEAR SIR: I have at hand your good letters of December 17 and December 27 with reference, respectively, to H. R. 347, your bill to amend section 205 of the World War veterans' act of 1924, to give the ex-soldier better advantages with reference to ratings under the act, and to prevent appeals by the central board from the regional office ratings against the desire of the soldier, and to your good work in checking the list of dependents of men who lost their lives in the war, and assisting them to get their adjusted compensation.

I wish to thank you very much for your efforts and interest on behalf of the veterans of the late war, and to assure you that they are appreciated by the members of this post.

Yours very truly,
                            A. G. C. BIERER, Jr., Post Commander.

---

STILLWATER, OKLA., January 10, 1928.
Hon. F. B. SWANK,
    Washington, D. C.
DEAR MR. SWANK: I have your letter dated December 17, 1927, relative to changing a soldier's rating by the regional office.

The above-mentioned matter was referred to the American Legion of Stillwater on January 5, which was the first meeting since I received your letter, with an attendance at that meeting of about 80 members. They voted unanimously to indorse the bill which you presented.

The above-mentioned bill has been referred to the legislative committee of the American Legion and you will soon receive the expression of the Legion through them.

Yours very truly,                              CECIL G. JONES.

---

STILLWATER, OKLA., January 11, 1928.
Hon. F. B. SWANK,
    Representative fifth district Oklahoma, Washington, D. C.:
Carter C. Hanner Post, No. 129, indorses House bill 347 and recommends its passage.
                                    HUGH J. NESTER, Adjutant.

Mr. SANDLIN. Mr. Chairman, I yield 20 minutes to the gentleman from Tennessee [Mr. DAVIS].

Mr. DAVIS. Mr. Chairman, I shall be unable to say all I want to say and quote all the documents that I have, and I ask unanimous consent to extend my remarks in the RECORD by incorporating in these remarks some tables and statistics of broadcasting institutions, some Supreme Court decisions, and a few official letters.

The CHAIRMAN. The gentleman from Tennessee asks unanimous consent to extend his remarks in the RECORD by incorporating certain Supreme Court decisions, letters and statements from officials, and extracts from other sources, as well as tables. Is there objection?

There was no objection.

Mr. DAVIS. Mr. Chairman, radio is now a very important problem, and in which there is a very wide general interest. The public is especially interested in radiobroadcasting. There are millions of owners of radio receiving sets. It is estimated that approximately half a billion dollars is spent annually in this country for radio apparatus.

The first measure dealing with this subject was enacted by the Congress in 1912. Radio was then in its infancy, and there has been a tremendous development since that time. The need of new legislation on the subject was apparent, and various efforts to enact additional legislation were made during the past several Congresses. Prior to the last Congress the committee on the Merchant Marine and Fisheries of the House had prepared and voted out several bills, one of which passed the House; but all of those attempts at general legislation were thwarted by the opposition and activities of the radio monopoly. During the last Congress the House and the Senate passed different radio bills, both of which went to conference. There finally emerged from conference a bill different in many respects from both the House and Senate bills, and the conference report bill was finally adopted after much opposition and approved. It was the only bill of a general nature which had the approval of the radio monopoly. Subsequent events have vindicated my criticism of features of that bill and my predictions as to what would result. My apprehension was increased when the personnel of the commission created by the act was announced.

The act created a commission of five members, one of whom should be an actual bona fide resident of each of the five zones established by this act. The act provided that this commission during the first year after their appointment should have original jurisdiction in granting or refusing licenses, assigning wave lengths and station power, the authority to revoke licenses under certain conditions, and so forth. The act further provided that during such year the commissioners should receive an annual salary of $10,000 each. The act also provides that from and after one year all the powers and authority vested in the commission, except as to revocation of licenses, shall be vested in and exercised by the Secretary of Commerce; except that it is made the duty of the Secretary of Commerce to refer to the commission for its action any application for a license or renewal or modification, as to which a dispute, controversy, or conflict arises, and any aggrieved party may appeal from a decision of the Secretary of Commerce.

Furthermore, the act provides that "the Secretary may refer to the commission at any time any matter the determination of which is vested in him by the terms of this act."

The commission is given power and jurisdiction to act upon and determine any and all matters thus referred or appealed to it.

Two of the nominees for places on the Federal Radio Commission were confirmed by the Senate, but the Senate failed to confirm the other three. After the last Congress adjourned the President reappointed the members of the commission who had not been confirmed, and the commission entered upon the performance of its duties. By reason of deaths and changed personnel and a lack of adequate funds it is conceded that the commission has been handicapped, but this does not afford any justification for affirmative action taken that was not in the public interest. Although Commissioner Caldwell stated at the hearings that he considered that 70 per cent of the work to be accomplished by the commission had been performed, yet this was apparently not the view of the other members of the commission, and it is certainly not the view of the Congress or of the public generally.

A large number do not believe that the commission has improved the situation at all, and many are of the opinion that the work they have done was worse than to have done nothing at all. They have been credited with stopping "wave jumping," which followed in the wake of the court decision which held, in effect, that the Secretary of Commerce possessed but very little authority under the 1912 act, but this result was effected by the act itself.

PENDING BILL

The Senate during the present session passed a bill, S. 2317, amending the radio act of 1927, extending for another year the original jurisdiction of the commission but restricting the period of licenses during that period and also embracing section 4, providing that the term of office of each member of the

commission shall expire on February 23, 1929, and thereafter commissioners shall be appointed for terms as provided in the radio act of 1927.

This Senate bill was referred to the Committee on the Merchant Marine and Fisheries of the House, which committee favorably reported the bill with amendments reducing the period of broadcasting licenses to three months and of other classes of licenses to six months prior to January 1, 1930, and with another amendment striking out said section 4 of the Senate bill, and with another amendment substituting for the second paragraph of section 9 of the existing law a provision designed to insure a fair distribution of broadcasting licenses as follows:

> The licensing authority shall make an equal allocation to each of the five zones established in section 2 of this act of broadcasting licenses, of wave lengths, and of station power; and within each zone shall make a fair and equitable allocation among the different States thereof in proportion to population and area.

It was recognized that there existed a very unequal and unfair allocation of broadcasting licenses, wave lengths, and station power, and this provision in the act for which this amendment is proposed as a substitute was designed to insure more equitable distribution.

The White radio bill, which was reported by the House committee and was passed by the House, contained a stronger and more definite distribution provision, but, like many other provisions in both the House and Senate bills which were designed to protect the public interest, the distribution provision in the House bill was changed and weakened in conference. There had been no criticism whatever of the equitable distribution clause either in the House committee or in the House. However, after the emasculation process was applied in conference, in discussing the conference report in the House on January 29, 1927, I called attention to the significance of the change and that the provision in the conference bill was ambiguous and susceptible of two interpretations. It appeared at the hearings that members of the Radio Commission differed in their interpretation of the clause, and members of the commission suggested that the clause should be clarified and made unambiguous.

As a matter of fact, the Radio Commission has utterly disregarded the equitable distribution clause in the existing law under either interpretation thereof.

The proposed amendment is clear enough that it can not be misconstrued, misunderstood, or disregarded by the commission unless they are disposed to violate an unequivocal provision of the law which they are sworn to administer. The amendment is intended to insure an equal distribution as between the zones and a fair and equitable distribution as between the different States and communities within each zone. An equal distribution as between the different zones is entirely fair, as the first four zones are substantially equal in population, and the fifth zone, while considerably smaller in population, is so much larger in area that it is considered that it should be placed on the same basis as the other zones. As the States and other subdivisions and cities in each zone vary so in population and area, it is considered proper that there should be a fair and equitable allocation among them.

Of course, it is not expected that this result can be effected immediately, but that it can be worked out in the course of a reasonable time. Furthermore, of course, this provision would necessarily be administered in the light of the other provisions in the act, including the provision in the same section immediately preceding, which is as follows:

> The licensing authority, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this act, shall grant any applicant therefor a station license provided for by this act.

In order that the present unfair and discriminatory allocation may be understood, attention is called to the following:

*Analysis of broadcasting licenses by zones*

| | Population | Population, per cent | Area, square miles | Area, per cent | Number of stations | Total station power in watts | Per cent of station power | Stations with over 1,000 watts | Per cent of receiving sets |
|---|---|---|---|---|---|---|---|---|---|
| Zone 1 | 24,378,131 | 22.73 | 129,769 | 3.63 | 138 | 223,305 | 36.98 | 12 | 24.20 |
| Zone 2 | 24,337,341 | 22.69 | 247,517 | 6.93 | 115 | 106,805 | 17.68 | 7 | 21.04 |
| Zone 3 | 24,826,050 | 23.14 | 761,895 | 21.33 | 102 | 47,105 | 7.80 | 4 | 15.97 |
| Zone 4 | 24,492,986 | 22.83 | 658,148 | 18.42 | 215 | 164,870 | 27.30 | 26 | 25.01 |
| Zone 5 | 9,213,720 | 8.59 | 1,774,447 | 49.68 | 131 | 61,785 | 10.24 | 8 | 13.11 |
| Total | 107,248,228 | 100 | 3,571,776 | 100 | 701 | 603,870 | 100 | 57 | 100 |

These figures are based on the January set-up, since which there have been a number of changes of a minor nature, as such changes are taking place all the time; but such changes will not materially affect the comparative figures, so that these statistics are substantially correct.

The gentleman from New York [Mr. CELLER] made a speech on the floor the other day, in which he stated that he was just advised by the Radio Commission that there are now 680 radio stations; it is a fact that a number of small stations have either not applied for renewal of licenses or been denied renewals, but they are unimportant and the changes effected by them in the aggregate are relatively unimportant. Mr. CELLER also took the position that in view of the fact that 126 stations split time that half that number should be eliminated from the calculation. There is no logic in that insistence as we are dealing with outstanding broadcasting station licenses. The fact that 126 stations are required to split time only serves to accentuate my insistence that a comparatively few stations are given desirable wave lengths and power, and that a large number of other stations are not given proper consideration. However, following Mr. CELLER's line of argument, and considering the table given by him, the discrimination is just as apparent.

Below is the table given by Mr. CELLER, together with the percentages of population and power which I have added, based upon his figures:

| Zone | Average population | Population per cent | Number of stations | Power in watts | Percentage of power |
|---|---|---|---|---|---|
| First | 23,000,000 | 21.65 | 95 | 202,400 | 36.75 |
| Second | 24,000,000 | 22.6 | 93 | 103,700 | 18.82 |
| Third | 25,000,000 | 23.54 | 88 | 45,570 | 8.27 |
| Fourth | 25,000,000 | 23.54 | 166 | 139,000 | 25.22 |
| Fifth | 9,213,920 | 8.67 | 112 | 60,620 | 11 |
| Total | 106,213,920 | 100 | 554 | 551,000 | 100 |

The population figures furnished by me are exactly as given in the official census of 1920; Mr. CELLER is less accurate in that in most instances he gives round numbers, and furthermore he made a mistake of 1,213,920 in his addition, which I have corrected.

The gentleman from New York [Mr. CELLER] states that, in rough figures, the radio population of zone 1 is just under 50 per cent greater than the radio population of the third zone, whereas the figures of receiving sets which he himself inserts in the RECORD are that the number in the first zone are 1,144,100, whereas the receiving sets in the third zone are 1,037,950.

I shall insert in the RECORD as an exhibit to my speech the estimated number of receiving sets in the different radio zones and States. These estimates were made by a reliable radio magazine, as of January 1, 1927; I have been unable to locate a later estimate.

There are many other inaccuracies and specious arguments in the remarks of the gentleman from New York [Mr. CELLER], which I shall not take time to point out.

The following are statistics giving:

*Broadcasting stations by zones and States*

| First zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| Maine | 768,014 | 3 | 850 | |
| New Hampshire | 443,083 | 3 | 650 | |
| Vermont | 352,428 | 3 | 160 | |
| Massachusetts | 3,852,356 | 20 | 19,565 | a 1 |
| Connecticut | 1,380,631 | 5 | 2,100 | |
| Rhode Island | 604,397 | 10 | 2,750 | |
| New England | 7,400,909 | 44 | 26,075 | 1 |

*Broadcasting stations by zones and States*—Continued

| First zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| New Jersey | 3,155,900 | 21 | 17,280 | b 2 |
| Delaware | 223,003 | 1 | 100 | |
| Maryland | 1,449,661 | 5 | 5,700 | c 1 |
| District of Columbia | 437,571 | 3 | 11,150 | d 1 |
| Porto Rico | 1,299,809 | 1 | 500 | |
| Virgin Islands | 26,051 | 0 | 0 | |
| | 13,992,904 | 75 | 60,805 | 5 |
| New York | 10,385,227 | 63 | 162,500 | e 7 |
| Zone totals | 24,378,131 | 138 | 223,305 | 12 |

EXPLANATORY NOTES

a—WBZ–Springfield, Mass., Westinghouse Electric & Manufacturing Co. ¹ 15,000
b—WPG–Atlantic City, N. J., Municipality of Atlantic City ............... 5,000
b—WOR–Newark, N. J., L. Bamberger & Co. ............................... 3,500
c—WBAL–Baltimore, Md., Gas and Electric Light & Power Co. .......... ¹ 5,000
d—WTFF–Washington, D. C., Independent Publishing Co. ................ 10,000
e—WEAF–New York, N. Y., National Broadcasting Co. .................... ¹ 50,000
e—WEAF–New York, N. Y., National Broadcasting Co. .................... ¹ 5,000
e—WJZ–New York, N. Y., Radio Corporation of America (transmitter at Bound Brook, N. J.) .......... ¹ 30,000
e—WGY–Schenectady, N. Y., General Electric Co. ........................ ¹ 50,000
e—WHAM–Rochester, N. Y., Stromberg Carlson Telephone Manufacturing Co. ........................................................ ¹ 5,000
e—WABC–Richmond Hill, N. Y., Atlantic Broadcasting Co. ............. { ² 2,500 / ³ 5,000 }
e—WLWL–New York, N. Y., Missionary Society of St. Paul ............... 5,000

¹ Members of National Broadcasting Co. chain.
² Night.
³ Day.

| Second zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| Pennsylvania | 8,720,017 | 45 | 59,845 | a 1 |
| Virginia | 2,309,187 | 10 | 2,365 | |
| West Virginia | 1,463,701 | 3 | 400 | |
| Ohio | 5,759,394 | 31 | 27,670 | b 4 |
| Michigan | 3,668,412 | 23 | 15,475 | c 2 |
| Kentucky | 2,416,630 | 3 | 1,050 | |
| Zone totals | 24,337,341 | 115 | 106,805 | 7 |

EXPLANATORY NOTES

a—KDKA–E. Pittsburgh, Pa., Westinghouse Electric Co. ................. ¹ 50,000
b—WLW–Cincinnati, Ohio, Crosley Radio Co. ........................... ¹ 5,000
b—WSAI–Cincinnati, Ohio, U. S. Playing Card Co. ...................... ¹ 5,000
b—WAIU–Columbus, Ohio, American Insurance Union ................ 5,000
b—WTAM–Cleveland, Ohio, Willard Battery ............................. ¹ 5,000
c—WJR–Detroit, Mich., Free Press, General Motors, etc.² .............. ¹ 5,000
c—WCX–Pontiac, Mich., Free Press, General Motors, etc.² ............. 5,000

¹ Members of National Broadcasting Co. chain.
² WJR and WCX divide time.

| Third zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| North Carolina | 2,559,123 | 4 | 1,750 | |
| South Carolina | 1,683,724 | 1 | 75 | |
| Georgia | 2,895,832 | 5 | 1,950 | |
| Florida | 968,470 | 12 | 5,660 | |
| Alabama | 2,348,174 | 5 | 1,375 | |
| Tennessee | 2,337,885 | 17 | 9,805 | a 1 |
| Mississippi | 1,790,618 | 1 | 250 | |
| Arkansas | 1,752,204 | 3 | 1,550 | |
| Louisiana | 1,798,509 | 13 | 3,435 | |
| Texas | 4,663,228 | 31 | 10,130 | b 3 |
| Oklahoma | 2,028,283 | 10 | 2,925 | |
| Zone total | 24,826,050 | 102 | 47,105 | 4 |

EXPLANATORY NOTES

a—WSM–Nashville, Tenn., National Life & Accident Insurance Co. (on wave length with Canada) ................................... ¹ 5,000
b—WBAP–Fort Worth, Tex., Carter Publishing Co. ...................... ¹ 5,000
b—WOAI–San Antonio, Tex., Southern Equipment Co. (WBAP and WOAI divide time and are on wave length with Canada) ............. 5,000
b—KTSA–San Antonio, Tex., Alamo Broadcasting Co. .................. 2,000

¹ Members of National Broadcasting Co. chain.

| Fourth zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| Indiana | 2,930,390 | 18 | 6,315 | a 1 |
| Illinois | 6,485,280 | 70 | 83,170 | b 13 |
| Wisconsin | 2,632,067 | 19 | 6,335 | |
| Minnesota | 2,387,125 | 18 | 10,130 | c 1 |
| North Dakota | 646,872 | 6 | 720 | |
| South Dakota | 636,547 | 10 | 2,345 | |
| Iowa | 2,404,021 | 25 | 25,200 | d 4 |
| Nebraska | 1,296,372 | 17 | 5,930 | e 1 |
| Kansas | 1,769,257 | 8 | 3,950 | f 1 |
| Missouri | 3,404,055 | 24 | 17,015 | g 5 |
| Zone total | 24,492,986 | 215 | 164,870 | 26 |

EXPLANATORY NOTES

a—WOWO–Fort Wayne, Ind., Main Auto Supply Co (6 a. m. to 6 p. m.) { 2,500 / 5,000 }
b—KYW–Chicago, Ill., Westinghouse E. & M. Co. (after 10 p. m.) { ¹ 2,500 / 5,000 }
b—WLIB–Chicago, Ill., Liberty Weekly, Inc. } ¹ 15,000
b—WGN–Chicago, Ill., Tribune Co.
b—WSBM–Glenview, Ill., Atlas Investment Co ........................... 5,000
b—WLS–Chicago, Ill., Sears-Roebuck Co. ................................ 5,000
b—WCBD–Zion, Ill., Wilbur Glen Voliva.
b—WHT–Chicago, Ill., Radiophone B. Corp.
b—WIBO–Chicago, Ill., WIBO Broadcasting Co. ........................ 5,000
b—WJAZ–Chicago, Ill., Zenith Radio Corporation.
b—WMBI–Chicago, Ill. Moody Bible Inst. ................................ 5,000
b—WORD–Batavia, Ill., Peoples Pulpit Association (one-fourth time only) 5,000
b—WMBB–Chicago, Ill., American Bond & Mortgage Co. .............. 5,000
b—WOK–Chicago, Ill., American Bond & Mortgage Co. ............... { ¹ 5,000 / 7,500 }
c—WCCO–Anoka, Minn., Washburn-Crosby Co. (6 a. m. to 6 p. m.)
d—KTNT–Muscatine, Iowa, Norman Baker .............................. 2,000
d—WHO–Des Moines, Iowa, Bankers Life Co. .......................... ¹ 5,000
d—WOC–Davenport, Iowa, Palmer School of Chiropractic ............. ¹ 5,000
d—KOIL–Council Bluffs, Iowa, Mona Motor Oil Co.
e—KFAB–Lincoln, Nebr., Buick Auto Co. (station KFAB shares time with KOIL.) } 5,000
f—KFKB–Milford, Kans., Dr. J. R. Brinkley (7 a. m. to 7 p. m) { 1,500 / 2,500 }
g—KMOX–Kirkwood, Mo., Voice of St. Louis, Inc. ...................... ¹ 5,000
g—KWK–St. Louis, Mo., Gr. St. Louis Broadcasting Co. (shares time with WMAY and KFKA) 6 a. m. to 6 p. m. ..................... ¹ 1,000
g—KFEI–St. Joseph, Mo., Scroggin & Co. Bank (6 a. m. to 6 p. m) { 2,000 / 1,000 }
g—KMBC–Independence, Mo., Midland Broadcasting Co.
g—KLDS–Independence, Mo., Reorg. Church of J. C. and Latter Day Saints. } 1,500

¹ Members of National Broadcasting Co. chain.

| Fifth zone | Population | Stations | Total station power in watts | Stations with over 1,000 watts |
|---|---|---|---|---|
| Montana | 548,889 | 4 | 660 | |
| Idaho | 431,866 | 4 | 2,275 | a 1 |
| Wyoming | 194,402 | 1 | 500 | |
| Colorado | 939,629 | 15 | 6,450 | b 1 |
| New Mexico | 300,350 | 1 | 5,000 | c 1 |
| Arizona | 334,162 | 5 | 765 | |
| Utah | 449,396 | 4 | 1,200 | |
| Nevada | 77,407 | 0 | 0 | |
| Washington | 1,356,621 | 24 | 11,975 | d 2 |
| Oregon | 783,389 | 15 | 5,390 | e 1 |
| California | 3,426,861 | 54 | 26,460 | f 2 |
| Hawaii | 255,912 | 1 | 500 | |
| Alaska | 55,036 | 3 | 810 | |
| Zone totals | 9,213,720 | 131 | 61,785 | 8 |

EXPLANATORY NOTES

a—KFAN–Boise, Idaho, School District ................................ 2,000
b—KOA–Denver, Colo., General Electric Co. ........................... ¹ 5,000
c—KOB–State College, N. Mex., College of Agriculture and Mechanic Arts. 5,000
d—KJR–Seattle, Wash., Northwest Radio Broadcasting Co. ............ 2,500
d—KGA–Spokane, Wash., Northwest Radio Service Co. ................ 2,000
e—KEX–Portland, Oreg., Western Broadcasting Co. ................... 2,500
f—KFI–Los Angeles, Calif., E. C. Anthony (Inc.) ....................... ¹ 5,000
f—KGO–Oakland, Calif., General Electric .............................. ¹ 5,000

¹ Members of National Broadcasting Co. chain.

The foregoing statistics are likewise based upon the January set-up, since which there have been some changes which will cause but slight change in the final results, and particularly from a comparative standpoint. I have undertaken to keep up with all important changes and to correct these figures accordingly, and do not think that I have overlooked any important change.

Case: 1:10-cv-07003 Document #: 45-2 Filed: 07/06/11 Page 9 of 19 PageID #:305

RADIO MONOPOLY

In order to obtain a correct picture of the situation and to understand the source of the opposition to the proposed distribution clause, it is necessary to call attention to the radio monopoly.

The Committee on the Merchant Marine and Fisheries on February 22, 1923, unanimously reported a resolution requesting the Federal Trade Commission to investigate and report to the House of Representatives the facts relating to the alleged radio monopoly. This resolution was called up under a unanimous-consent request and adopted by the House without opposition March 3, 1923.

The Federal Trade Commission conducted the investigation and made its report December 1, 1923. This report, together with the appendix, contains 347 pages. I respectfully urge Members of Congress to read said report.

The Federal Trade Commission, under its own motion, filed a complaint, commencing and concluding as follows:

APPENDIX

United States of America, before Federal Trade Commission. In the matter of General Electric Co., American Telephone & Telegraph Co., Western Electric Co. (Inc.), Westinghouse Electric & Manufacturing Co., the International Radio Telegraph Co., United Fruit Co., Wireless Specialty Apparatus Co., and Radio Corporation of America, Docket No. 1115.

COMPLAINT

Acting in the public interest, pursuant to the provisions of an act of Congress approved September 26, 1914, entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," the Federal Trade Commission charges that the various persons, corporate and individual, mentioned in the caption hereof, and more particularly hereinafter described and hereinafter referred to as respondents, have been and are using unfair methods of competition in commerce in violation of the provisions of section 5 of said act, and states its charges in that respect as follows:

Then follows detailed charges of the specific written contracts entered into between these different defendants and the manner in which they are violating the laws.

The complaint concludes as follows:

PAR. 30. By reason of the facts and acts of the respondents set forth in the preceding paragraphs Nos. 8 to 29, inclusive, the respondents have combined and conspired for the purpose and with the effect of restraining competition and creating a monopoly in the manufacture, purchase, and sale, in interstate commerce, of radio devices and apparatus, and other electrical devices and apparatus, and in domestic and transoceanic radio communication and broadcasting by the following means:

(1) Acquiring collectively, directly and indirectly, patents and patent rights covering all devices and apparatus known to and used in any and all branches of the practice of the art of radio, and combining and pooling, by assignment and licensing, rights thereunder to manufacture and use and/or sell such devices and apparatus, competing and noncompeting, and allotting certain of such rights exclusively to certain respondents.

(2) Granting to the Radio Corporation of America the exclusive right to sell such devices and apparatus manufactured under said patents and patent rights and restricting purchases by the Radio Corporation of America of devices and apparatus useful in the art of radio to certain respondents and apportioning such purchases among them.

(3) Restricting the competition of certain respondents in the respective fields of manufacture and commerce of other respondents.

(4) Attempting to restrict and restricting the use of radio communication and/or broadcasting of articles manufactured and sold under said patents and patent rights.

(5) Acquiring the equipment heretofore existing in this country essential for transoceanic radio communication and perpetuating the monopoly thereof by refusing to supply to others apparatus and devices necessary for the equipment and operation of such service.

(6) Entering into exclusive contracts and preferential agreements for the handling of transoceanic radio traffic and the transmission of radio messages in this country, thereby excluding others from the necessary facilities for the transmission of radio traffic.

(7) Agreeing and contracting among themselves to cooperate in the development of new inventions relating to radio and to exchange patents covering the results of the research and experiment of their employees in the art of radio, including patents on inventions and devices which they may obtain in the future, seeking thereby to perpetuate their control and monopoly of the various means of radio communication and broadcasting beyond the time covered by existing patents owned by them or under which they are licensed.

PAR. 31. The above alleged acts and practices of respondents are all to the prejudice of the public and of respondents' competitors and constitute unfair methods of competition in commerce within the intent and meaning of section 5 of an act of Congress entitled "An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914.

Wherefore, the premises considered, the Federal Trade Commission, on this 24th day of January, A. D. 1924, now here issues this its complaint against said respondents:

The Federal Trade Commission includes in the appendix to said report numerous admitted written contracts entered into between the different members of the monopoly. I do not see how it is possible for any lawyer to read those contracts and reach any other conclusion than that on their face they violate the Sherman and Clayton Anti-trust Laws and the Federal Trade Commission act.

I regret to state that this complaint has not yet been heard by the Federal Trade Commission. It was a considerable time before the pleadings were made up, and they have not yet completed the taking of proof.

The market assets of these members of the Radio Trust aggregate about $5,000,000,000, including the subsidiaries of the American Telephone & Telegraph Co. The recent annual report of the latter company shows it to be the largest concern in the world. The radio monopoly is doubtless the largest and most effective monopoly in the world. It dominates and controls every phase of the radio industry. I shall later refer to some of its activities and unfair methods. For the present I shall call attention to its dominance of communicative service.

As evidence of the "strangle hold" which the radio monopoly has in the broadcasting and commercial radio field I call attention to the following facts, which constitute a résumé of official data filed by the Federal Radio Commission at recent committee hearings, as follows:

MONOPOLY BROADCASTING STATIONS

The Westinghouse Electric & Manufacturing Co. has five broadcasting licenses, with 70,500-watt power.

The General Electric Co. has three broadcasting licenses, with 57,500-watt power.

The Radio Corporation of America has three broadcasting licenses, with 31,000-watt power.

The National Broadcasting Co. (owned by the Radio Corporation of America, the General Electric Co., and Westinghouse Co.) has two broadcasting licenses, with 55,000-watt power.

This makes a total station power of 213,000 watts, as compared with 390,660-watt power granted the remaining 687 broadcasting stations.

Nine of these monopoly stations, with a total watt power of 206,500, are on the 25 cleared channels.

Three of these monopoly stations, with 50,000-watt power each, one with 30,000, and one with 15,000-watt power are on the cleared channels.

The Federal Radio Commission has "cleared" 25 channels or wave lengths between 600 and 1,000 kilocycles, or between 499.7 and 299.8 meters. Wave lengths within this range are decidedly the most valuable for broadcasting.

Chain stations, including the nine monopoly stations just mentioned, are placed on 24 of these cleared channels. Thirty-one of the National Broadcasting Co. chain stations are placed on these cleared channels. The stations on these 25 cleared channels are licensed to use a total of 323,700-watt power, as compared to a total of 279,920-watt power granted to the 623 other stations which are crowded together on the remaining 64 less valuable wave lengths available for broadcasting. It will thus be seen that there are an average of more than 9½ of these latter stations on a wave length.

A broadcasting license may be worthless, as most of them are. The usefulness and value of a broadcasting license depends upon the wave length, and as to whether the licensee has an exclusive or substantially exclusive wave length or is placed on the same wave length with numerous other stations, and as to the amount of station power authorized to be used.

COMMERCIAL RADIO STATION LICENSES

While the general public is more interested in broadcasting than any other phase of radio, yet there are other features, uses, and potentialities that are very much more valuable than broadcasting. In this field there has been even a greater discrimination and favoritism to the monopoly than in the broadcasting field, if that be possible.

For instance, the Radio Corporation of America has 56 station licenses, 72 calls, and 132 wave lengths, with an aggregate of 4,226,950-watt station power; 13 of these stations are each authorized to employ 200,000-watt power.

The Westinghouse, General Electric, American Telephone & Telegraph Co., and Tropical Radio Telegraph Co. have 10 commercial stations authorized to use 41 wave lengths and 188,000-watt power.

The total power granted all other commercial radio stations combined amounts to only 674,887 watts.

It will be noted that the Radio Corporation of America is granted more than seven times as much station power as all the stations combined, exclusive of monopoly stations.

With the exception of the Mackay Radio & Telegraph Co., no other commercial station other than the monopoly stations is granted more

than 5,000-watt power. The Mackay company has one station authorized to use 125,000 watts, one 75,000 watts, two 30,000 watts, and some stations authorized to use lesser power. The Mackay company has, all told, 10 licensed stations.

Excluding the monopoly companies and the Mackay company, there are no stations authorized to use over 5,000 watts and only eight authorized to use this much power, they being chiefly packers' stations in Alaska. An interesting feature is that there are 102 licensed commercial stations in Alaska, chiefly packers and canners.

Competitors of the Radio Corporation of America are begging for more commercial licenses, wave lengths, and power.

And yet the different branches of the Government are unable to procure the allocation of as many radio wave lengths as they consider they need, with the result that a fight has developed in the interdepartmental radio committee between the Army and the Navy over the division of the comparatively small number of wave lengths allocated for Government use.

EXPERIMENTAL STATIONS

According to data furnished by the Federal Radio Commission at the committee hearings, as of February 1, 1928, the monopoly stations have been favored in this field as follows:

The Radio Corporation of America has 17 stations licensed to use wide ranges of wave lengths covering the entire range and a total of 404,100-watt station power; has 2 stations licensed to employ wide ranges of wave lengths and to use unrestricted power.

The Westinghouse Electric & Manufacturing Co. has two stations licensed to use variable wave lengths and 50,500-watt power and 6 stations authorized to use variable wave lengths and unrestricted power.

The General Electric Co. has 15 stations authorized to use wide ranges of wave lengths and a total of 380,250-watt power and one station authorized to use a wide range of wave lengths and unrestricted station power.

The American Telephone & Telegraph Co. has 5 stations authorized to use wide ranges of wave lengths with 180,700-watt power; 2 stations with unrestricted wave lengths and 50,500-watt power; 1 station with wave length of 500 to 300 meters and unrestricted power; 1 station with unrestricted wave length and unrestricted power.

The Tropical Radio Telegraph Co. has 6 stations licensed to use unrestricted wave lengths and unrestricted power.

It is thus seen that these five monopoly companies have 41 stations authorized to use wide ranges of wave lengths and to employ a total of 1,072,550-watt station power; and 4 stations authorized to use wide ranges of wave lengths and unrestricted power; and 13 stations authorized to use unrestricted wave lengths and unrestricted station power; making a total of 58 stations. On the other hand, all other experimental stations licensed by the Federal Radio Commission are as follows:

Ninety-three stations authorized to use either specific or varying wave lengths and 114,380-watt station power; 21 stations with assigned wave lengths and unrestricted station power; 6 stations with unrestricted wave lengths and unrestricted station power; making a total of 120 stations.

These experimental stations are authorized to use wave lengths ranging from 1 meter to 15,000 meters; numerous stations are authorized to use the meter range assigned for broadcasting, 200 to 550 meters. Naturally they will conflict and interfere with broadcasting stations.

Mr. McREYNOLDS. Mr. Chairman, will the gentleman yield?
Mr. DAVIS. Yes.
Mr. McREYNOLDS. Where are those unrestricted stations located?
Mr. DAVIS. At various places, particularly in the East. Naturally the Radio Trust is satisfied with the situation. The Radio Commission has given them the cream. It has favored them beyond measure. Consequently, as has always been their policy, the monopoly is opposed to any legislation which may result in breaking their strangle hold on the radio industry. They have all the high-powered stations and do not want independent stations to have any such licenses.

MONOPOLY OPPOSING EQUALIZATION CLAUSE

Wherefore, when the House committee reports a bill containing a provision designed to insure a fair equalization of broadcasting licenses, wave lengths, and power among the different zones throughout the country, the radio monopoly immediately gets very busy. Their lobbyists are infesting Capitol Hill. Their propagandists have been busily at work. Their faithful ally, Commissioner Caldwell, gave out a statement which misrepresented the purposes and effects of the equalization amendment. He gave figures and conclusions based upon an absolutely false premise. He arrogantly and intemperately criticized the committee and the Congress. I gave out a statement exposing the fallacies and misstatements in his unfair and abusive statement. Senator DILL inserted my reply in the CONGRESSIONAL RECORD, which appears on page 4011 of the RECORD of March 1.

Caldwell's criticism of Congress and pending legislation is, to say the least of it, extraordinary and a breach of propriety.

In the conduct of his propaganda operations, he sent to the radio stations in the first zone the following communication:

RADIO STATIONS, FIRST ZONE

If you have followed newspaper reports of the recent discussions in the committees of Congress charged with radio legislation, you have undoubtedly detected both (1) a very evident dissatisfaction with the present distribution of radio stations, powers, and frequencies throughout the various States, and (2) a demand for these to be more "equitably" divided as between States.

In view of the fact that at present a very few States and metropolitan communities have a high concentration of radio, while nearly 40 other States are far below the average of the country, it is apparent that any redistribution in accordance with the "State rights" views of Congress must mean withdrawal of many wave lengths from centers and States now having an excessive proportion, as well as reduction of powers in such communities also.

Since such redistribution will be chiefly at the expense of the congested first-zone area (which now has by far the greatest power, and also certain excessive channel concentrations), I feel it my duty to call this impending situation to your attention at this time in order that you may duly regard it in your future plans for operation.

O. H. CALDWELL, Commissioner.

This letter admits our contention as to the present unfair allocation, and at the same time it is very evidently intended to arouse opposition to the pending provision on the part of the radio stations in the first zone.

Then L. S. Baker, managing director of the National Association of Broadcasters (Inc.), who always works for and with the monopoly on radio legislation, sent out communications to stations throughout the country grossly misrepresenting the facts, and unjustly and abusively criticizing the committee which reported the bill containing the provision under discussion.

The first statement in Baker's communication is as follows:

Besides unjustly and unfairly disregarding the request of others to be heard on the subject of amendments to the radio law beyond the extension of the life of the commission, the House Merchant Marine and Fisheries Committee with utter disregard for all known radio principles has favorably reported a proposal which, if it became law and was enforced by the Radio Commission under present conditions, would render useless or obsolete practically one-third of the radio sets of the country, or approximately $230,000,000 worth of equipment purchased by listeners.

This entire statement is absolutely and unqualifiedly false. The reverse is true.

He charges the House committee with "complete ignorance" and talks of a "legislative brain storm." He tries to camouflage his efforts in behalf of the radio monopoly by pretending concern for radio listeners. He concludes his infamous statement as follows:

Again if, through neglect, Congress fails to extend the life of the commission with full and constituted authority and adequate appropriation as provided for in the radio act of 1927, with confusion resulting because of a transfer of this authority from the commission to the Department of Commerce, when the job is only half done, one of the greatest crimes of the entire history of democratic representation in government, affecting millions of people, will have been perpetrated by those who are supposed to represent and protect the people's interest.

As evidence of the insincerity and duplicity of Baker and those he is serving, attention is called to the fact that he and the remainder of the radio monopoly and their allies were originally opposed to a radio commission, insisting that full authority should be left in the Department of Commerce. After the Senate had passed a bill conferring exclusive jurisdiction over radio in a commission authorized to act full time upon annual salaries, and the House had passed a bill continuing jurisdiction in the Secretary of Commerce, but creating a commission with authority to hear appeals from the Secretary, and both bills had gone to conference, this self-same Baker, along with others who are now fighting this equalization provision, sent communications to the conferees, which declared, in part, as follows:

The committee, eliminating all considerations except those of the good of the radio listeners and the industry, and the existing subject matter in the Senate and House bills, favors a control consisting of two bodies, a Federal Radio Commission and the Department of Commerce, whose functions shall be as determined in the House bill.

And yet, "if through neglect the Congress fails to extend the life of the commission with full and constituted authority," such as it possessed during the first year, and should, on the other hand, permit the initial authority to vest in the Secretary of Commerce, as Baker and his crowd insisted in Decem-

ber, 1926, should be done, he and his association state in their propaganda that "one of the greatest crimes of the entire history of democratic representation in government, affecting millions of people, will have been perpetrated by those who are supposed to represent and protect the people's interest."

Is it possible that such vicious and unconscionable assaults upon Congress as this and such misrepresentation of facts can deter the Members of Congress from performing their duty to protect the public from the machinations of the radio monopoly?

CLAIM OF VESTED RIGHTS

The arguments of Caldwell, Baker, and other defenders of the radio monopoly and their methods are also predicated upon the doctrine of "vested rights" in the air, which we emphatically deny to exist, and which are denied and guarded against in the radio act of 1927, although the provisions guarding against the acquirement of vested rights were weakened in conference. Caldwell made a spirited defense of the monopoly at the hearings, referring to their benevolent (?) work. They talk about the investments in broadcasting apparatus which would be destroyed by this equalization clause. In the first place, such property would not be destroyed. In the second place, no broadcaster has ever received a broadcasting license for a longer period than 90 days, so that he went into the business with his eyes open, and consequently acquired no vested rights. In the third place, the investments of the radio monopoly in broadcasting apparatus certainly can not mean more to them than the amounts which the hundreds of independent broadcasters have invested in broadcasting apparatus which they had to purchase from the monopoly. Under the present set-up these investments of hundreds of independent broadcasters are practically useless and valueless. Are they not entitled to quite as much consideration as the monopoly from a property standpoint? However, it is certainly the spirit of the radio act that the interests of the listeners should be first considered. The investments in broadcasting apparatus are small indeed compared to the investment of the citizens in receiving sets. Under the present situation a vast number of receiving sets are either useless or practically so.

PURPOSE AND EFFECT OF EQUALIZATION AMENDMENT

The purpose and effect of this amendment would not be to destroy but to improve the general situation. Under the present situation there exists a gross and unfair discrimination against the second, third, and fifth zones and against the citizens of nearly all of the States. Caldwell states: "Nearly 40 States are far below the average of the country." Statistics show even a larger number than that.

We insist upon a fair distribution throughout the country of licenses, wave lengths, and power. We insist that it is unfair for all of the high station power to be given to a few monopoly stations within a small area in the East. If such power is necessary to constitute a national station, why are not the Middle West, the West, the Southwest, and the South entitled to their fair quota of national stations? Are a few monopoly-owned stations to be the only ones with a national audience? Although there are three monopoly stations in the East with 50,000-watt power each, one with 30,000 and one with 15,000-watt power, yet west and south of Pittsburgh there is but one station with as much as 15,000-watt power (WLIB, owned by Liberty Weekly (Inc.), Elgin, Ill.); and within that immense area south and west of Pittsburgh there is only one other station with as much as 10,000-watt power.

Even within the first zone there exists a very unfair allocation. For instance, the six New England States have 30 per cent of the population and 31 per cent of the receiving sets in the first zone, and yet have only 8½ per cent of station power granted in the first zone; more than half of the station power granted in New England is given to one monopoly station. Substantially the same situation obtains with respect to all the other States in the first zone except New York, which has only 43 per cent of the population and 45 per cent of the receiving sets, and yet has over 72 per cent of power in the first zone.

We deny and resent the insistence that no worth-while program can come out of any except a monopoly station or a New York station. The fact of the business is that, with the exception of a semioccasional high-class program, the average advertising programs of the big monopoly stations are no better than, and in many instances not as good as, the average nightly program of numerous other stations. Furthermore, not everybody is interested in their customary advertising programs, and those who do like to hear the programs from those stations at times do not want to be compelled to listen to them to the exclusion of all other programs from worthy stations located elsewhere.

We want broadcasting licenses fairly distributed in such a manner that those who desire to do so may listen to the New York and chain stations when they want to, but may, when they so desire, listen to programs broadcast by stations elsewhere throughout the country, including their own zones, States, and cities. Most people naturally desire a variety of programs. Many mature thinking people are not as much interested in jazz, grand opera, or any other music as they are in listening to addresses, sermons, convention proceedings, agricultural and home economic information, and various other matters of sectional or State interest. Under the present situation, generally speaking, the reception of such programs is either impossible or unsatisfactory because of the fact that the stations are so crowded together on the same wave lengths that there is inevitable confusion and heterodyning; and in many other instances there is a lack of adequate station power.

A fair equalization of licenses, wave lengths, and power would not necessarily be effected by a reduction of the most-favored zones to that of the least-favored zones, as falsely insisted by Caldwell and other opponents of this distribution amendment. Such course would be exceedingly unwise and no sensible commission would pursue such course. Under the plain provisions of the amendment the equalization could be brought about by bringing the less-favored zones up to the more favored, or by both increases and reductions. As a matter of fact, the members of the Radio Commission have repeatedly stated that there should be a reduction in the congested zones. Such reduction would be beneficial rather than detrimental to the listeners in such congested areas. As it is, the air is so cluttered up by broadcasting from numerous stations within congested areas that local reception is frequently very unsatisfactory and listeners in those congested areas state that ordinarily they can not satisfactorily hear the programs of any except a very few of their stations. Furthermore, they complain that they are unable to receive programs from other sections of the country.

We want to hear New York at times, but we should also like for those citizens in New York who desire to do so to have the privilege of hearing our stations. New York is a great city, but not all of the good things come out of New York. I have a letter from a New Jersey club in which they enumerate various independent stations throughout the country which give most entertaining programs. The letter states in part:

There is a wide difference of opinion as to what constitutes the best program. Those originating in WEAF and WJZ (New York monopoly stations) are very good, but rarely have any novelty about them. Take your own State stations WSM; I'll bet that they and WLS have a larger "air audience" on Saturday nights than any two other 5,000-watt stations in the country. Their programs are so different from what we hear from the NBC studios that I know hundreds of fans who regularly tune in for them every Saturday night.

The same letter also highly compliments station WEEI, Boston, but complains that it only has 500-watt power on a shared wave length, and that its programs are smeared unmercifully.

This letter is typical of numerous other letters I have received.

A fair distribution of broadcasting licenses will render all receiving sets much more useful and satisfactory than at present. It will likewise render all broadcasting apparatus and stations more useful and valuable with the possible exception of a few of the very high-powered monopoly stations. If they are rendered less valuable to their owners it will be for no other reason than that they will have competition in the broadcasting field which they substantially dominate under the present set-up. That is naturally undesirable from their own selfish standpoint, but is it undesirable from the standpoint of the general public?

FAVORITISM TO STATIONS OPERATING FOR A PROFIT AND DISCRIMINATION AGAINST WORTHY CLASSES OF STATIONS

There has not only been discrimination against various sections and most of the States but there has also been discrimination against certain classes of stations, chiefly educational institutions and other high types of noncommercial stations. There has been especial discrimination in favor of advertising stations. The large monopoly stations broadcasting advertising programs are being especially favored. As bearing upon this subject, I beg to quote from the recent hearings before the Committee on the Merchant Marine and Fisheries on the pending bill:

Mr. DAVIS. In other words, as I understand, you recognize the fact that there is a useful and proper place not only for what might be termed national stations but for regional stations and State stations and purely local stations; is that correct?

Commissioner PICKARD. Yes, sir.

Mr. DAVIS. And you think proper provision should be made for all of them?

Commissioner PICKARD. Yes, sir.

Mr. DAVIS. You were formerly with the Kansas Agricultural College, were you not?

Commissioner PICKARD. Yes, sir.

Mr. DAVIS. And then you were in the Department of Agriculture at the head of the agricultural radio service?

Commissioner PICKARD. That is right, sir.

Mr. DAVIS. I assume, then, you realize the very useful service that is being rendered and is susceptible of being rendered the public by universities and particularly agricultural stations?

Commissioner PICKARD. Indeed I do.

Mr. DAVIS. In that connection I wish to call attention to the fact that at the Fourth National Radio Conference held in Washington in 1926, at which were in attendance leading representatives of radio broadcasters and of radio commercial services, dealers, the various Government departments interested in radio, together with inventors and various other representatives of the radio industry, committee No. 1, which was appointed by Secretary Hoover, who was president of the convention, was a committee of 32 members of the conference appointed to study and make a report on the allocation of frequencies of wave lengths. The chairman of that committee was Dr. J. H. Dallinger; the secretary was Col. J. F. Dillon, formerly a member of this commission; and among others on that committee were H. A. Bellows, who was formerly a member of the commission; H. P. Maxim, president of the amateur association, known, I believe——

The CHAIRMAN. That is known as the American Relay League.

Mr. DAVIS. Also Mr. M. Goldsmith, an engineer and vice president of the Radio Corporation of America, and various others. This committee made a unanimous report, which was adopted without controversy by the convention, and a part of that report states as follows:

"The committee recommends affirmative action by the conference on the resolution quoted in Appendix A, submitted by the Department of Agriculture, for provision for adequate broadcast and dissemination of agricultural educational information.

"Now, this Appendix A, which, as I recall, was the only resolution presented with any report having a direct reference to specific legislation, is as follows:

"Whereas the Federal Government, through the United States Department of Agriculture and the State governments through State universities, agricultural colleges, and departments of agriculture, are conducting public extension services in the distribution of material of an educational, informative, and economic character;

"Whereas the United States Congress and the State legislatures have provided for these services through appropriations approximating more than $100,000,000 annually, of which $70,000,000 is for agricultural support and equipment of the colleges and universities; $9,000,000 for experiment stations, and $23,000,000 for services and research by the Federal Department of Agriculture, in addition to hundreds of millions of dollars in permanent equipment;

"Whereas the distribution of the information gathered by these agencies to the public, particularly the rural districts, is a matter of national importance;

"Whereas radiobroadcasting presents the most satisfactory and economical method of reaching the public with this important information and of making effective the public investment in these agencies;

"Whereas these institutions have immediately at hand among the regular staffs abundant material for educational and public-service programs with practically no additional cost: Be it

"Resolved, (1) That full recognition should be given by the Department of Commerce to the needs of these services, and (2) that adequate, definite, and specific provision should be made for these services within the broadcasting band of frequencies."

Mr. DAVIS. Are you in accord with the expressions contained in that resolution?

Commissioner PICKARD. Yes, sir.

There will also be found as an exhibit to my speech a letter of January 11, 1927, from the Association of College and University Broadcasting Stations, which consists of 42 members.

And yet so little consideration has still been shown these State agricultural colleges and other agricultural institutions that on October 24, 1927, Secretary of Agriculture Jardine addressed a letter to the Federal Radio Commission calling attention to the splendid and valuable service being rendered by such stations, and asking for protection and consideration in the broadcasting field.

I quote from the said hearings further:

Mr. DAVIS. You take a State like Kansas, for instance. How much power would you say your State agricultural station would need to reach all the farmers and housewives of that State consistently?

Commissioner PICKARD. In bad weather, in bad reception weather, it would need from 5,000 to 10,000 watts to do the job. I have encouraged them to go to more power. They should have it, especially for the daylight work. I would like to point out to you, Judge Davis, that most colleges stress the daytime operation. They feel they have less competition from other stations and less interference and that more effective work can be done in the daytime.

Mr. DAVIS. These college stations are some of the stations which are broadcasting not for profit?

Commissioner PICKARD. That is right, sir.

Mr. DAVIS. But simply for public service. Is that not so?

Commissioner PICKARD. That is right; yes, sir.

Mr. DAVIS. And as indicated in this resolution, and as a matter of common knowledge, both the National Government and the various State governments and the various counties and municipalities are annually appropriating enormous sums of money to educate the youth of the country as well as to furnish information to the adults. That is true, is it not?

Commissioner PICKARD. Yes, sir.

Mr. DAVIS. I will ask you if some responsibility does not rest upon the Government and upon the representatives of the Government with respect to broadcasting, to undertake to cultivate a taste for things worth while, rather than yield to so large an extent to the desire on the part of youth for jazz music and things of that sort?

Commissioner PICKARD. Yes; I think you are entirely right, Judge Davis.

Mr. DAVIS. But at the same time, nearly all of the valuable wave lengths are given to stations which devote a large part of their program to jazz and popular music, in which a great many people are not interested at all; is not that true?

Commissioner PICKARD. I believe the program directors have tried to give their listeners what they want; I think that is an answer to your question.

Mr. DAVIS. I will say I do not think they have done it, though.

Commissioner PICKARD. I am not sure, either.

Mr. DAVIS. I think they have lacked a whole lot of doing it. I think they have given entirely too much recognition to that portion of our population which wants that character of programs and have overlooked the fact that more mature people and more serious-minded people, who perhaps are not as prone to give expression to their views by writing letters and such things as that, do not care for that but do care for things that are more worth while.

Commissioner PICKARD. Yes; I think your deduction is a correct one.

COMMISSION'S EXCUSE FOR NOT MAKING MORE EQUAL DISTRIBUTION

The chief excuse of the commission for not making a more equitable distribution of broadcasting licenses, wave lengths, and power has been that there was no demand for same in the zones and States below their quota.

Speaking with particular reference to the situation in the third, or southern zone, Admiral Bullard, former chairman of the Federal Radio Commission, stated last August:

It is a fact that the Southern States are not particularly well represented in the broadcasting field. But it is also a fact that the commission can not be held responsible for this state of affairs; because, if the people of the South do not want broadcasting stations and do not make applications for them, the commission can not take any action whatsoever.

Then Judge Sykes, when he was on the stand, in discussing this subject, made substantially the same statement; then Commissioner Caldwell made substantially the same statement, and he said, in part, that "Just as far as applications from the South have been made, they have been recognized, etc.

In an effort to defend his failure to protect the interests of his own zone, Commissioner Sykes was willing to reflect on that great section of the country by stating that his section had been backward in the matter.

In this connection, I wish to state that at first I assumed that Commissioner Sykes was naturally desirous of seeing that the intolerable situation in his zone should be improved, and that his desires and efforts were being thwarted by the other members of the commission. However, in the light of his untenable excuse for the South not receiving fair treatment and his rush to the defense of the unconfirmed nominees on the Radio Commission, including Caldwell, urging the Senate to confirm them, I have been compelled to recede from my former opinion. I can not believe that Commissioner Sykes is at heart disloyal to his own section; in my opinion Commissioner Caldwell has dominated the commission and Commissioners Sykes and Pickard have been "me-too" men, not having the courage to vigorously assert their opinions and insist upon fair treatment for the neglected sections of the country. Although Commissioner Lafount has only been on the commission for two months, yet he got busy and induced the commission to make 70 changes in his zone in order to improve the situation therein.

APPLICATIONS FOR LICENSES, BETTER WAVE LENGTHS, AND MORE STATION POWER

In accordance with a request therefor made at the committee hearings, the commission filed a list by zones of applications for new licenses, different wave lengths or more power, together

with action thereon, or the lack of action where such was the case. This information completely refutes the excuse that has been made that better treatment had not been accorded the third zone and other sections because there had been no applications therefor, and that the commission could not initiate applications.

This data in detail appears on pages 41 to 51 of the recent hearings before the Committee on the Merchant Marine and Fisheries of the House, and I invite particular attention to same. However, I wish to give a synopsis of that data as follows:

### APPLICATIONS FOR NEW BROADCASTING-STATION LICENSES

#### FIRST ZONE

One application at Saranac Lake, N. Y., granted for 10 watts.
Nine applications from New York, Massachusetts, New Jersey, and District of Columbia still pending.

#### SECOND ZONE

Four applications granted for a total of 130-watt power on high kilocycle bands.
Nine applications disapproved.
Ten applications still pending.

#### THIRD ZONE

Eleven applications approved for a total of 1,145-watt power, all on high kilocycle frequencies.
Commissioners Sykes and Caldwell had much to say about the new licenses they had granted in this zone.
Twenty-six applications still pending.

#### FOURTH ZONE

Six applications granted for a total of 5,825-watt power, including a 5,000-watt station in Chicago.
The commission has also issued a permit to a company owned or controlled by Samuel Insull to construct a 50,000-watt station with studio in Chicago and transmitter out of the city.
It is stated in the application that this station is to be used by seven designated public utilities. It is also stated that "the policy of this station will be to furnish to the public a service which will foster and promote the cordial relations with the public which the station owners as public utilities now enjoy."
Attention is called to the fact that Chicago is already the most congested area in the country, except New York City. Not counting the Insull station, which is expected to be completed by April 1, Illinois—chiefly Chicago—has more station power than the other nine States in the fourth zone combined.
Thirty-four applications in the fourth zone have been denied, 3 applications in Kansas, 5 in Missouri, 2 in Indiana, 5 in Minnesota, 1 in Wisconsin, 1 in North Dakota, 1 in South Dakota, 4 in Illinois, and 9 in Iowa.
Ten applications for new licenses in the fourth zone are still pending, of which 3 are from Indiana, 2 North Dakota, 1 South Dakota, 1 Kansas, 1 Iowa, and 2 Illinois.

#### FIFTH ZONE

Six applications granted for a total of 750-watt power, all on high-kilocycle frequencies.
Twenty applications have been disapproved.
Two applications are still pending.

*Existing stations that have applied for change in power or wave length and power*

GRANTED

|  | Number stations | Power requested | Power granted |
|---|---|---|---|
| First zone | 22 | 89,655 | 81,905 |
| Second zone | 7 | 6,350 | 2,215 |
| Third zone | 13 | 27,550 | 9,615 |
| Fourth zone | 20 | 141,100 | 27,065 |
| Fifth zone | 15 | 11,650 | 6,215 |

It will be noted that the first zone, which already had much more power than any other zone, was granted decidedly a larger per cent of the amount requested than any other zone. Ten New York stations were granted 60,500 watts of the power granted in the first zone.

*Existing stations that have applied for change in power or wave length, which applications are*

PENDING

|  | Number stations | Power requested |
|---|---|---|
| First zone | 11 | 15,150 |
| Second zone | 5 | 22,100 |
| Third zone | 10 | 48,500 |
| Fourth zone | 15 | 83,900 |
| Fifth zone | 18 | 20,600 |

*Existing stations that have applied for change in power or wave length, which applications are*

DENIED

|  | Number stations | Power requested |
|---|---|---|
| Second zone | 1 | 500 |
| Fourth zone | 6 | 10,000 |
| Fifth zone | 5 | 2,650 |

#### INFORMAL APPLICATIONS

The foregoing data with respect to applications only includes formal applications upon regular application forms procured from the commission. In transmitting the lists of applications and action thereon, the Secretary of the Federal Radio Commission wrote to the committee as follows:

> Besides these formal applications requested, the commission has received hundreds of casual or informal inquiries for station licenses, increased power, or channels, each of which has been promptly answered, and the conditions in the broadcasting band carefully explained with the result that no formal application has been filed.

In his speech the other day, instead of taking the magnanimous position that he did not want the radio monopoly or the stations in his city to "hog the air," the gentleman from New York [Mr. CELLER], rehashed the unfair and misleading arguments advanced by the agents of the radio monopoly against a fair distribution of broadcasting licenses. In his belabored effort to show that the third, or southern zone, was not entitled to any more consideration, he quoted some very inaccurate figures as to farmer ownership of receiving sets in that section, which had been palmed off on him by somebody. He otherwise reflected upon the citizenship of that great section. New York is a great city and has as good citizens as may be found anywhere; the same is true with respect to the citizenship in the third zone. We are perfectly willing to compare citizenship with New York City. It is true that we have a considerable number of negroes with us, but they all speak and understand the English language and they are all American citizens and loyal to their country. As a matter of fact, I have some very near and very dear relatives residing in New York City and that constitutes an additional reason why I wish to improve radio reception in that city.

While he has ordinarily taken a contrary position, yet I am surprised that the gentleman from New York is lined up in this instance with the radio monopoly. In the last Congress he made a speech in the House in which he said in part:

> We suffer tremendously in New York by virtue of our inability to control the New York Telephone Co., and this great and mighty combine, the Bell system, stretching all over the territories covered by your constituencies, gentlemen, because of the evils it is guilty of, goes unpunished and uncontrolled. There is no control whatsoever over the telephone companies, and I desire to read you the many companies that enter into this combine. There are, for example, the New England Telephone & Telegraph Co., the Chesapeake & Potomac Telephone Co., the Cumberland Telephone & Telegraph Co., the Illinois Bell Telephone Co., the Ohio Bell Telephone Co., the Wisconsin Telephone Co., the Southern Telephone Co., the Northwestern Bell Telegraph & Telephone Co., the Southwestern Bell Telephone Co., the Mountain States Telephone & Telegraph Co., the Pacific Telephone & Telegraph Co., and with all their ramifications and with all their subsidiary companies they control not only wired and wireless telephonic and telegraphic communication in all its branches, all the basic patents with reference thereto, the manufacture and distribution of all machinery and appliances used by them. They reach out in almost very direction.
>
> The American Telephone & Telegraph Co., with its various subsidiaries and associated companies, constitutes the most gigantic trust in America. Moreover, it has a tighter hold and more direct control over the lives of ordinary people and all phases of business than any other corporation whatsoever.

The gentleman from New York was correct in his characterization of the American Telephone & Telegraph Co., except that it is not the most gigantic trust in America, for the reason that it is only one of the several members of the Radio Trust, and the whole is larger than any of its parts. This shows what we have the fight when we undertake to legislate in the interest of all the people with respect to radio.

The CHAIRMAN. The time of the gentleman from Tennessee has expired.

Mr. SANDLIN. I yield the gentleman 15 additional minutes.

The CHAIRMAN. The gentleman from Tennessee is recognized for 15 additional minutes.

LXIX——251

Case: 1:10-cv-07003 Document #: 45-2 Filed: 07/06/11 Page 14 of 19 PageID #:310

3988                CONGRESSIONAL RECORD—HOUSE                MARCH 2

#### METHODS OF THE MONOPOLY

Mr. DAVIS. I want to say that this monopoly is no respecter of persons. I want to call your attention to one of the practices of the radio monopoly. You know the great Loyal Order of Moose, which, I believe, was organized by our distinguished Secretary of Labor. The Supreme Lodge of the World, Loyal Order of Moose, have a broadcasting station at Mooseheart, Ill. The call letters of this station, WJJD, are in honor of Secretary of Labor Davis. This station is authorized to use only 1,000 watt power, and divides time with a Chicago station. Having a large membership throughout the country, who are naturally interested in this order and its broadcasting station, they, like numerous other independent stations, have an application on file with the Radio Commission for more power, asking for the privilege of using 20,000 watt power; they have also sought at a public hearing to secure this increased power. However, these applications are still pending. In this connection, do you not think that this splendid order, with its very large membership, was more entitled to a 20,000-watt station than Samuel Insull was entitled to a 50,000-watt station to broadcast propaganda in the interest of his various utilities?

Reverting to the methods of the radio monopoly, I call attention to what has happened to station WJJD, which is typical of what has happened to other independent stations. I shall let this correspondence speak for itself. I read:

> DEPARTMENT OF LABOR,
> OFFICE OF THE SECRETARY,
> *Washington, February 18, 1928.*
>
> Hon. EWIN L. DAVIS,
> *House of Representatives, Washington, D. C.*
>
> MY DEAR CONGRESSMAN: Replying to your letter of February 9 with reference to the use of a Western Union wire in the hook up of our radio station at Mooseheart with the Palmer House in Chicago, would say that I took this matter up with our radio manager at Mooseheart and am just in receipt of a reply from him, copy of which I inclose for your information.
>
> I trust this explanation is satisfactory. With kindest regards, I am,
> Most cordially yours,
> JAMES J. DAVIS.

Here is the letter which he incloses and to which he refers:

> LOYAL ORDER OF MOOSE,
> *Station WJJD, February 16, 1928.*
>
> Mr. JAMES J. DAVIS,
> *United States Secretary of Labor,*
> *Washington, D. C.*
>
> DEAR MR. DAVIS: I am returning the letter of Congressman DAVIS regarding the use of Western Union and telephone lines in connection with our broadcasting station, WJJD.
>
> When we connected with the Palmer House in Chicago, necessitating private broadcasting lines in Mooseheart, we procured estimates from the Illinois Bell Telephone Co., also from the Western Union. However, as the telephone company had an installation charge of some $10,000 which was not charged by the Western Union, we contracted for the Western Union lines.
>
> Since that time, however, it has not been possible for us to connect any telephone lines with our Western Union circuits, which has prevented the broadcasting of any chain programs. It seems that the telephone company has a ruling that they will not permit any telephone lines to be connected in any way with Western Union lines, although I understand that the Western Union Co. has no objection to having the telephone lines connected with theirs.
>
> The Western Union lines have proved very satisfactory, although I believe it will be necessary for us to replace them with telephone lines in the operation of our new transmitter, inasmuch as until we have telephone lines we will be prevented from participating in national broadcasting.
>
> Sincerely and fraternally yours,
> C. A. HOWELL.

Mr. ABERNETHY. It is a great benevolent order?

Mr. DAVIS. Of course, it is a great benevolent order.

Now, the stranglehold of this Radio Trust is such that if an American citizen or company obtains a license from his or its government to operate under a broadcasting license, that is not all; it must first pay a fee to the American Telephone & Telegraph Co.; in the case of an ordinary station some $2,000 or $3,000; and then they must buy the broadcasting apparatus from the monopoly, and then if they want any chain broadcasting they have got to make a contract for the use of a wire, not with some independent company but with a member of the radio monopoly, the American Telephone & Telegraph Co.

Then, as in the case of the Mooseheart station, before they are given the privilege of paying for radio service over a telephone wire they must make the American Telephone & Telegraph Co., or its subsidiary, a present of $10,000. Unless they comply with the terms of the telephone member of the monopoly the National Broadcasting Co. will not permit the station to receive its chain program. The National Broadcasting Co. was organized and is owned by the Radio Corporation of America, the General Electric Co., and the Westinghouse Electric & Manufacturing Co., all members of the monopoly.

The Radio Trust harasses its competitors in the manufacture of receiving apparatus in various ways. It forced 25 or 30 of the independent manufacturers to enter into written contracts under which it required each of them to pay a royalty of 7½ per cent on the full invoice price of their completed sets and a minimum of $100,000 a year, and also required the independents to buy vacuum tubes from the trust, this practically destroying the business of the independent tube manufacturers.

In the case of Arthur D. Lord, receiver in equity for the DeForest Radio Co. *v.* The Radio Corporation of America (Equity No. 670), in the United States District Court for the District of Delaware, the court on February 6, 1928, enjoined enforcement by the defendant of the contracts for the sale of tubes on the ground that such agreements constituted an unfair method of competition and would be in violation of the Sherman Act and Clayton Act.

In another case, the DeForest Radio Co. brought suit against the Radio Corporation of America in the court of chancery in New Jersey, charging that the defendant for the past two or three years had planted spies in complainant's factory in Jersey City to learn its trade and trade secrets, such spies holding jobs in the complainant's factory and all the while pretending to loyally serve both employers, for pay from each, and seeking to enjoin the Radio Corporation of America to remove the spies, discontinue the practice, and from making use of the information obtained.

The Radio Corporation of America admitted imposing its spies, as employees, on the complainant, but claiming that their purpose was to obtain information to prove that complainant was infringing some of its patented devices; it being specifically claimed by defendant that the complainant was using a certain thoriated wire in violation of what is known as the Langmuir patent, which patent the Radio Corporation was licensed to use, that issue then pending in the court to be determined. In this connection it is interesting to note that the DeForest Radio Co. won their case against the General Electric Co. within the last month in the decision rendered by the United States District Court of Delaware, in which the said Langmuir patent was held to be invalid.

The case relative to the spies was heard by Vice Chancellor Backes, who decided the issues against the Radio Corporation of America, who appealed the case to the Court of Appeals of New Jersey, where said case was heard and the decision of the lower court affirmed by all 15 members of the court of appeals, the opinion of the vice chancellor thus affirmed, by the higher court concluding as follows:

> I am not at all content with its explanation that the defendant's aim was solely self-protective. I am impressed that it sought a line, on all of the complainant's activities, and certainly its orders to the spies were not short of that. Their espionage was general. However, that may be, the case, as it stands, convicts the defendant by its confession, of unlawful conduct by mean and reprehensible methods, for no one admires a spy nor his works, not even his employer. Whether spying through debauched servants is justifiable, and whether the facts upon which the justification rests, convict the claimant of unclean hands, are matters to be settled only at final hearing, and until then the defendant will be enjoined and the information impounded. (99 New Jersey, E. Q. Rep. 456.)

These are some typical instances of methods employed by the radio monopoly, which is bending every energy to defeat the distribution amendment reported by the House committee. Not only are their lobbyists assiduously working on Capitol Hill, but their propagandists are sending communications to broadcasters throughout the country misrepresenting the facts and representing that such broadcasters will either lose their licenses or have their power substantially reduced if this equalization provision is adopted. Misled by this false propaganda, many broadcasters are wiring their Members of Congress, urging them to oppose this legislation. In the vast majority of such cases such broadcasters would not only not be disturbed but could obtain increased station power if desired. However, I regret to say that some Members of Congress, acting upon such telegrams and without investigating the true situation are apparently preparing to vote against the interests of their constituents.

The bill, including this amendment, will probably be acted upon in the House next Thursday. The radio monopoly is strongly in favor of extending the present jurisdiction of the Federal Radio Commission, as they have performed to their

entire satisfaction, but they will bend every energy to defeat the equalization provision. I sincerely hope that in the meantime the Members of the House will investigate for themselves. I respectfully suggest that they read the committee report, the statement of Commissioner Caldwell, and my reply thereto, and the various official statistics which I shall insert in the RECORD in connection with this speech.

Mr. GARRETT of Tennessee. Will the gentleman yield?

Mr. DAVIS. I yield to my distinguished colleague from Tennessee.

Mr. GARRETT of Tennessee. Does the gentleman think that the bill as reported from the committee, which I have not had the opportunity of examining, will give some relief from this situation, considering the amendments that I understand are proposed in connection with the extension of the life of the commission?

Mr. DAVIS. There is no question about that. It will afford great relief.

I am in favor of extending the present jurisdiction of the commission, provided the amendments restricting their power during the next year and directing an equalization of broadcasting licenses shall also be adopted, but I am opposed to extending the jurisdiction of the commission without such amendments.

There are many other measures, such as I advocated during the consideration of the radio bill in the last Congress, which, in my opinion, would do much toward curbing this monopoly, but the committee decided not to consider antimonopoly provisions at this time, although it was tentatively agreed that they would be considered later.

What we are particularly seeking in the measure under discussion is to give the commission another year within which to perform the service which they were expected to do during the first year, but to prevent them during that period from freezing the present intolerable situation by the issuance of licenses for three and five years, and also directing that they shall equalize broadcasting privileges so that we may have fairly distributed throughout the country some great national broadcasting stations, some zone or sectional stations, and State and local stations, so that the owner of a receiving set may satisfactorily receive the program from whatever station he desires, and not be compelled to listen to only a few stations, as is generally the case now. [Applause.]

*Estimated number of receiving sets in the different radio zones and States, as of January 1, 1927*

FIRST ZONE

| State | Number receiving sets | Per cent of total in United States |
|---|---|---|
| Maine | 44,200 | 0.68 |
| New Hampshire | 27,650 | .41 |
| Vermont | 21,550 | .33 |
| Massachusetts | 239,200 | 5.68 |
| Connecticut | 79,950 | 1.23 |
| Rhode Island | 43,500 | .67 |
| New York | 655,850 | 10.09 |
| New Jersey | 193,700 | 2.98 |
| Delaware | 13,650 | .21 |
| Maryland | 81,900 | 1.26 |
| District of Columbia | 42,900 | .66 |
| Total | 1,445,050 | 24.20 |

SECOND ZONE

| State | Number receiving sets | Per cent of total in United States |
|---|---|---|
| Pennsylvania | 503,100 | 7.74 |
| Virginia | 91,000 | 1.40 |
| West Virginia | 60,450 | .93 |
| Ohio | 363,350 | 5.59 |
| Michigan | 271,700 | 4.18 |
| Kentucky | 78,100 | 1.20 |
| Total | 1,367,700 | 21.04 |

THIRD ZONE

| State | Number receiving sets | Per cent of total in United States |
|---|---|---|
| North Carolina | 91,550 | 1.41 |
| South Carolina | 48,100 | .74 |
| Georgia | 91,750 | 1.41 |
| Florida | 77,900 | 1.20 |
| Alabama | 68,250 | 1.05 |
| Tennessee | 97,500 | 1.50 |
| Mississippi | 49,400 | .76 |
| Arkansas | 52,000 | .80 |
| Louisiana | 83,200 | 1.28 |
| Texas | 277,550 | 4.27 |
| Oklahoma | 100,750 | 1.55 |
| Total | 1,037,950 | 15.97 |

*Estimated number of receiving sets in the different radio zones and States, as of January 1, 1927—Continued*

FOURTH ZONE

| State | Number receiving sets | Per cent of total in United States |
|---|---|---|
| Indiana | 176,300 | 2.72 |
| Illinois | 468,000 | 7.20 |
| Wisconsin | 169,000 | 2.60 |
| Minnesota | 148,850 | 2.29 |
| North Dakota | 38,850 | .60 |
| South Dakota | 39,150 | .60 |
| Iowa | 182,000 | 2.80 |
| Nebraska | 100,500 | 1.55 |
| Kansas | 101,000 | 1.55 |
| Missouri | 201,500 | 3.10 |
| Total | 1,625,150 | 25.01 |

FIFTH ZONE

| State | Number receiving sets | Per cent of total in United States |
|---|---|---|
| Montana | 31,200 | 0.48 |
| Idaho | 27,300 | .42 |
| Wyoming | 14,950 | .23 |
| Colorado | 82,550 | 1.27 |
| New Mexico | 21,350 | .33 |
| Arizona | 24,700 | .38 |
| Utah | 40,950 | .63 |
| Nevada | 5,200 | .08 |
| Washington | 120,250 | 1.85 |
| Oregon | 71,500 | 1.10 |
| California | 422,100 | 6.34 |
| Total | 862,050 | 13.11 |

Hawaii and Alaska included in fifth zone; no figures available.

THE ASSOCIATION OF COLLEGE AND UNIVERSITY
BROADCASTING STATIONS,
*University Place, Nebr., January 11, 1927.*

Hon. EWIN L. DAVIS,
*United States House of Representatives,*
*Washington, D. C.*

DEAR SIR: Under date of December 30 we submitted to you a copy of certain resolutions which were drawn up by a committee representing the college broadcasting stations at the Philadelphia meetings of the American Association for the Advancement of Science. Word has just reached us from friends in Washington advising us that there is a tendency on the part of some members of the conference committee on radio to leave out the provision in the Dill bill which instructed the commission to give due regard to the needs of broadcasting stations in educational institutions in the assignment of wave lengths and program hours.

From our standpoint this clause is a very necessary one especially since great pressure will be brought to bear by the business interests to retain every possible advantage in the allotment of wave lengths. Many of our large colleges and some of our State universities are now operating on wave lengths so crowded that satisfactory broadcasting is almost hopeless, and are compelled to be in constant competition with commercial stations, whose programs consist largely of the cheapest kind of jazz and in constant efforts to sell goods. Our organization has no funds available for lobbying in order to present our viewpoint and we respectfully urge that you give us the benefit of special instructions along the lines indicated, in order that the high type of noncommercial programs presented by college stations shall not be completely lost, in the hopeless competition with the advertiser's stations, whose sole claim for time is their desire to sell goods.

Very respectfully yours,

THE ASSOCIATON OF COLLEGE AND
UNIVERSITY BROADCASTING STATIONS.
By J. C. JENSEN, *Secretary.*

The CHAIRMAN. The time of the gentleman from Tennessee has again expired.

Mr. SANDLIN. Mr. Chairman, I yield to the gentleman from Illinois [Mr. ADKINS].

Mr. ADKINS. Mr. Chairman, the time for general debate having expired on this side, I ask unanimous consent to have incorporated in the RECORD a speech I made over the radio on farm relief.

The CHAIRMAN. The gentleman from Illinois asks unanimous consent to extend his remarks by the insertion of a speech made by him over the radio on farm relief. Is there objection?

There was no objection.

Mr. ADKINS. Mr. Chairman, under the leave to extend my remarks in the RECORD I include the following speech I made over the radio on farm relief:

## *Debate Preceding Passage of the Communications Act of 1934*, 78 Cong. Rec. 8843 (1934)

(Apprehensive Discussion of the Allocation of Air Time and the Difficulties Surrounding the Financing of Noncommercial Educational Radio Broadcasters)

Mr. HEBERT. I wish to announce that the Senator from Pennsylvania [Mr. REED], the Senators from New Jersey [Mr. KEAN and Mr. BARBOUR], the Senator from Pennsylvania [Mr. DAVIS], and the Senator from Wyoming [Mr. CAREY] are necessarily detained from the Senate.

The PRESIDING OFFICER. Seventy-nine Senators having answered to their names, a quorum is present.

Mr. DILL. Mr. President, I shall not detain the Senate at any great length, but in light of the statements which have been made by the proponents of the amendment I feel that I should make some explanation of the reason why this amendment was rejected.

The amendment was presented by Father Harney, of the Paulist Fathers, representing station WLWL in New York. Full hearings were had, and the committee considered it carefully and rejected the amendment by an overwhelming vote, but adopted instead a provision in the bill requiring the Commission to make a study of the question of educational broadcasting, and to submit recommendations to Congress.

It might be concluded from the arguments made here by those who propose this amendment that the committee and I are not anxious for educational and religious broadcasts. I think the record of my activities in radio will show that I have always been one of the most insistent among those who wanted to see a larger use of radio for educational, religious, and fraternal purposes and for nonprofit purposes generally. I am extremely anxious now that some plan may be worked out for a larger use of radio for educational and religious purposes; but the amendment presented by the Senators from New York and West Virginia does not suggest the proper method, in my judgment, to bring about such a result.

In the first place, the amendment proposes to wipe out all existing allocations. It did propose to allow 3 months, which now has been changed, I understand, to 6 months, because it would be impossible under the law to wipe out the licenses before they had expired except for violation of the law.

In the second place, it compels a reallocation by the new commission of all the stations in the United States within a period, as the amendment has been changed, of 6 months. I think that is impracticable. I do not believe the new commission will be able to reallocate all the stations in that short period of time.

The third and strongest objection which I have is that these stations are not to be what we understand as, educational and religious stations merely, but they are to be stations that are to sell time on the air to advertisers who will make use of the stations for advertising purposes. Thus we are simply changing the ownership of these stations from the present commercial owners to owners who call themselves nonprofit organizations.

The records show that a large percentage of stations are not making any money as it is. It is safe to say that even if these nonprofit organizations could borrow money—and I do not know where they could borrow it, but if they could borrow money with which to build these stations and maintain them, it would require the sale of between 60 and 75 percent of their valuable time to maintain the stations and pay back the money which it would cost to build the new stations.

I remind the Senate that it costs a large sum of money to build a high-power radio station and to employ the engineers that may be necessary, and so to handle the station that its broadcasts may be heard throughout the country.

Mr. LOGAN. Mr. President, will the Senator yield?

The PRESIDING OFFICER (Mr. THOMAS of Utah in the chair). Does the Senator from Washington yield to the Senator from Kentucky?

Mr. DILL. I yield.

Mr. LOGAN. The Senator says it requires a large sum of money to build and operate a radio station. For my own satisfaction, I should like to know approximately what one of these large radio stations costs?

Mr. DILL. Anywhere from one hundred to two hundred thousand dollars.

Mr. LOGAN. So an educational or religious or nonprofit association would have to provide some such sum as that in order to establish a station?

Mr. DILL. They would have to, if they established a high-powered station. I am told that it costs practically as much each year to operate and maintain a station as it does to build it in the first place.

This is not a new subject. I myself, with the Senator from Michigan, in 1931, induced the Senate to pass a resolution to investigate the question, particularly of educational stations. A series of questions was propounded to the Radio Commission. I have here the answers to some of those questions, and I particularly call attention to the reply to the question—

What applications by public educational institutions for increased power and more effective frequencies have been granted since the Commission's organization? What refused?

Answer. In the period—

Since the organization of the Commission—

from February 23, 1927, to January 1, 1932, the Commission considered 81 applications from educational institutions for additional and more effective radio facilities, 52 of which were from public educational institutions and 29 from private educational institutions.

\* \* \* Thirty-two of these applications were granted in full; 27 were granted in part; 10 were denied; \* \* \* 10 were dismissed at the request of the applicant.

So, out of 71, all but 10 were granted either in full or in part.

There are today some 63 stations operated in the United States by educational, agricultural, religious, or nonprofit organizations, but none of them exceeds 5,000 watts. There is one 5,000-watt station, and I think there are one or two 1,500-watt stations and one or two 1,000-watt stations, but the large percentage of them are small stations. They are used only for a few hours a day and some of them for only a few hours a week.

It is the conviction on the part of those who have made a study of this subject that this question must be solved in some other way. I am not prepared to say what is the best method. I may say, however, that the owners of large radio stations now operating have suggested to me that it might be well to provide in the license grant that a certain percentage of the time of a radio station shall be allotted to religious, educational, or nonprofit users by their paying the actual cost of operation for the hours which they actually use such station.

Mr. LOGAN. Mr. President, will the Senator yield?

The PRESIDING OFFICER. Does the Senator from Washington yield further to the Senator from Kentucky?

Mr. DILL. I yield.

Mr. LOGAN. I should like to ask the Senator who is going to determine how much of the total time allotted shall be allocated to labor, how much to education, and how much to religion?

Mr. DILL. I was coming to that very point in just a moment and I will answer it now. If we should provide that 25 percent of time shall be allocated to nonprofit organizations, someone would have to determine—Congress or somebody else—how much of the 25 percent should go to education, how much of it to religion, and how much of it to agriculture, how much of it to labor, how much of it to fraternal organizations, and so forth. When we enter this field we must determine how much to give to the Catholics probably and how much to the Protestants and how much to the Jews.

Mr. LOGAN. And to the Hindus.

Mr. DILL. Yes; and probably the infidels would want some time.

Mr. LOGAN. Yes; there is a national association of atheists. They perhaps would want their part of the time.

Mr. DILL. Yes; and when we go into the field of the educational institutions, it must be determined how much time shall be given to State institutions, how much to private institutions, how much to land-grant colleges, and so forth. So we find ourselves right back in the same maze of difficulties in which we now are. We must go to the Commission to subdivide the time; so that the difficulty today is not in the law; the difficulty probably is in the failure of the present Commission to take steps that it ought to take to see to it that a larger use is made of radio facilities for

education and religious purposes. However, it should be said in defense of the Commission that religious and educational institutions do not have the money with which to build and maintain radio stations. The Senator from North Dakota [Mr. FRAZIER] said to me a few moments ago that the educational radio station in his State has been compelled to close, not because the commission took away its time or restricted it, but because it did not have the money with which to operate. I myself have long believed that we ought to charge fees from commercial stations for the use of these frequencies and that such fees might well be put into a fund and used to establish a Government educational station. I hope something of that kind may be done, but just in what direction we should go, or how we should solve the problem, I am unable to say. I feel certain, however, that it would be a mistake for Congress by statute to fix absolutely 25 percent, 20 percent, 15 percent, 10 percent, or any other fixed percentage; but rather this discussion and this provision should cause the new commission to realize the importance of some serious, careful study of this question with a view to submitting recommendations to the Congress as to what, if anything, should be done by Congress.

Mr. OVERTON. Mr. President——

Mr. DILL. I yield to the Senator from Louisiana.

Mr. OVERTON. What is considered to be educational? Has that term any well-defined meaning? Is music educational; is song educational; is the drama educational?

Mr. DILL. Undoubtedly there is an element of education in all of them. I want to say in that connection, in answer to the Senator from New York, who said that only 2 percent of our radio time is used for educational and religious purposes, that he was speaking of the 63 stations which I have mentioned and not of the 550 or 600 other stations that continually put on educational and religious programs. I dare say that many of the speeches of the Senator from New York, as well as those of other Senators, would be considered partly educational, at least. They are put out by the large radio chains which furnish the American people the great radio programs.

I recognize the objection on the part of educational organizations to accepting free time from a commercial station. That objection is that they feel themselves handicapped; they feel themselves limited in the freedom they would like to have to present educational subjects because they may be offensive to the station from which they receive time. I recognize that as an objection, and because of that I think some plan should be worked out which would enable them to make some payment and have the free right to the use of the air; but I cannot believe, with the present financial status of the educational and religious organizations of this country, that there is any hope of their using 25 percent of our radio facilities effectively, even if we gave them the right under this bill. They have not the money and there is nowhere they can secure money except they go into the commercial field and themselves become commercial stations.

Mr. WAGNER. Mr. President——

Mr. DILL. I yield to the Senator from New York.

Mr. WAGNER. I should like to ask the Senator whether the Commission, in granting licenses to any of the larger purely commercial stations, ever made it a condition for granting the license that any part of the time be used for religious, cultural, or educational purposes?

Mr. DILL. I think not; and I suggest that that is one of the possibilities that might be worked out.

Mr. WAGNER. They have had a long time in which to think about it.

Mr. DILL. I am not defending the Radio Commission; Heaven knows, I do not hold any brief for the present Radio Commission; I am glad it is going to be abolished and that new policies will be established by the Radio Commission.

Mr. BORAH. Mr. President——

Mr. DILL. I yield to the Senator from Idaho.

Mr. BORAH. I understood the Senator to state some time ago that his construction of this amendment was to the effect that those taking the allocation for religious, agricultural, and education and labor, and so forth, could turn the station into a commercial one.

Mr. DILL. The amendment specifically so provides, as the Senator will see if he will read subsection (g).

Mr. BORAH. I have read it.

Mr. DILL. Beginning in line 16, it reads:

The facilities reserved for, or allocated to, educational, religious, agricultural, labor, cooperative, and similar non-profit-making associations shall be equally as desirable as those assigned to profit-making persons, firms, or corporations. In the distribution of radio facilities to the associations referred to in this section, the Commission shall reserve for and allocate to such associations such radio broadcasting facilities as will reasonably make possible the operation of such stations on a self-sustaining basis.

The only way they could be "self-sustaining" would be by selling time; the only people to whom they could sell time would be advertisers, and the only use advertisers could make of the time would be to advertise their products on the air, just as they now do.

Mr. BORAH. The Senator then construes "self-sustaining" to mean that they must necessarily become "self-sustaining" from the commercial field?

Mr. DILL. I do not see any other method. Why would they sell time if they were self-sustaining?

Mr. BORAH. There would not be a sufficient demand from the religious, educational, and other uses to utilize all the time.

Mr. DILL. I will read the remainder of the subsection (g)—

And to that end the licensee may sell such part of the allotted time as will make the station self-supporting.

Mr. BORAH. Is that the construction of the Senator from New York?

Mr. WAGNER. I do say that organizations which exist for the purpose of making a profit are distinctly excluded from the use of this time.

Mr. DILL. But they do not make a profit until they make enough to more than pay for the cost of the station and the maintenance of the station. There would be no profit until they have paid those expenses.

Mr. HATFIELD. The Senator is now proposing an amendment, is he not?

Mr. WAGNER. I am quite willing to add, so there may be no question about it, "educational, religious, agricultural, labor, and cooperative associations which are not organized for profit and which do not directly or indirectly provide a source of profit for their members or employees or anyone else." That is as all-embracing as I can make it.

Mr. DILL. But the Senator proposes to leave the right to sell time and make the station self-supporting.

Mr. WAGNER. That is quite a different thing from profit. Such patronage may come, and undoubtedly will come, from the very educational institutions which will ask for time on these stations.

Mr. DILL. If the Senator is going to limit it to selling time to educational and religious organizations who will buy it, that is a different proposition. I do not know of more than one or two religious organizations which buy time. They are all given the time free.

Mr. WAGNER. They have their own stations.

Mr. DILL. A few of them have, but they have not the money with which to buy time. I feel that it would be absolutely impracticable, if we do not allot the time to commercial stations, to hope for them to raise any money.

Mr. BONE. Mr. President, will my colleague yield?

The PRESIDING OFFICER. Does the Senator from Washington yield to his colleague?

Mr. DILL. I yield.

Mr. BONE. As I read the proposed amendment, it would require the Radio Commission arbitrarily to destroy, or what would amount to destroying, 25 percent of the radio facilities now existing in any community where anyone else sought to take advantage of the facilities. They simply would be permitted to use the wave length or the power in watts of existing stations. Is that correct?

Mr. DILL. At the end of the license period they would have a right to allocate to new stations, but they have that right under existing law.

Mr. BONE. I understand; but it is a right which, I assume, has not been exercised.

Mr. DILL. Yes; it has been exercised.

Mr. BONE. I am trying to get some light on the matter. Suppose in the State of Washington the Radio Commission should decree that out of 100,000 watts of power now employed by radio stations there should be a reduction to 75,000 watts. That would mean, if I understand the amendment aright, that stations now operating with 25,000 watts of power would be summarily cut off and, of course, that value would be destroyed.

Mr. DILL. The commission would decide whether it would reduce all stations or certain stations, or would delete and take out of operation certain stations. There is no limit as to the method. Under the law, of course, the public interests would have to be considered in that connection.

Mr. President, I do not want to take the time of the Senate any further. I hope the amendment will be defeated. I believe it would be an extremely bad policy for Congress to begin the allocation of wave lengths. I believe we will do more for educational and religious progress by having the new commission study the matter and let it come back to Congress with some practical plan that will make use of existing facilities, rather than attempt to grant an arbitrary 25 percent and then allow those stations to be turned into commercial stations.

Mr. WAGNER. Mr. President, I should like to perfect my amendment in this manner: On page 2, line 5, strike out the words "90 days" and substitute therefor "6 months", and in line 8, strike out "90 days" and insert in lieu thereof "6 months."

The PRESIDING OFFICER. The Senator has the right to modify his amendment.

Mr. WHITE. Mr. President, the pendency of the amendment and the discussion to which we have listened confirm me in the view I have always had as to the unwisdom of offering this legislation in its entirety at this time. I have felt strongly that the wise thing for us to have done would have been to follow the recommendation of the President, as I understood it to be, to enact legislation creating a new commission, to transfer to that commission the present authorities of law, and to enjoin upon the commission the obligation to study the problem of communications during the summer and fall, and to report to the Congress of the United States, when we convene in January next, its recommendations as to comprehensive communications legislation.

I believed when the legislation was first suggested, and I believe now that that is the sound course for Congress to pursue. A majority of the committee were decidedly of the contrary opinion, and I bowed to the judgment of the majority.

One of the particular things to which it seems to me the commission might have given its attention during the summer is the study of the precise problem presented by the pending amendment. The amendment in its substance basically is not new, for even back in 1927, when the present radio law was written, there was pending before the committees of Congress and before the Congress itself and before the conferees the question of giving legislative preference or legislative priority to some particular user of radio communication.

I recall very well when the bill passed the Senate in 1927 there was embodied in it a provision that land-grant colleges should have a preference or priority in the use of frequencies. That provision was dropped in conference. It was dropped because depending upon that provision was a string of applications for special recognition in the law. At that time, when it was being urged that special recognition should be given to land-grant colleges, there were religious organizations or institutions asking that they be given the same legislative preference which was proposed to be given to the land-grant colleges. There were all sorts of groups and organizations throughout the United States asking that if we gave statutory preference to land-grant colleges, we should accord similar recognition to them.

At that time it was the judgment of the Congress that we had to adopt one of two courses. We either had to strike from the legislation special consideration for land-grant colleges and grant to the regulatory body full power and authority with respect to the granting of licenses, or the Congress faced the obligation of making a complete allocation to services.

I object to the pending amendment for the considerations suggested by the Senator from Washington [Mr. DILL]. I object also more strongly because it seems to me it flies in the face of a sound principle. We must, as I said, do one of two things. We must here in the Congress make a complete allocation of the radio spectrum to services, or we must leave it entirely alone. I have long been a believer, and I believe now, that commercial activities occupy too much of the time and use too many of the radio facilities of the country.

I recall very definitely I urged, in legislation which I introduced in the House a number of years ago, that we should give to the regulatory body the power, and we should lay upon them the express duty of establishing priorities in the character of service. That is precisely what the pending proposal is, but it only takes one step in that direction. It proposes that we shall take only 25 percent of the radio facilities, and that we shall give them to a somewhat indefinite group, religious, educational, non-profit-making organizations. They are indefinite almost in number. How many of them there are I do not know. As a practical result, we have all of these non-profit-making organizations contending among themselves not for a place in the entire radio spectrum but for a part of only 25 percent of the radio spectrum. If that shall be granted the controversy will be intensified, and the situation will not be cured at all.

Manifestly, we should either go ahead as a Congress and divide up the entire spectrum among persons and organizations for uses here in the United States or we should leave it alone in its entirety and place the responsibility of allocation where it already is—upon the Federal Radio Commission.

It seems to me that if this amendment should be adopted it would go through the entire radio structure of the United States like a tornado, leaving destruction and chaos in its wake.

I join with the Senator from Washington [Mr. DILL] in expressing the earnest hope that the amendment may not have the approval of this body.

The PRESIDING OFFICER. The question is on the amendment offered by the Senator from New York [Mr. WAGNER] and the Senator from West Virginia [Mr. HATFIELD].

Mr. WAGNER. I ask for the yeas and nays on the amendment.

The yeas and nays were ordered.

Mr. WAGNER. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Adams | Copeland | Johnson | Pope |
| Ashurst | Couzens | Keyes | Robinson, Ark. |
| Austin | Cutting | King | Schall |
| Bachman | Dill | La Follette | Shipstead |
| Bailey | Duffy | Lewis | Smith |
| Bankhead | Erickson | Logan | Steiwer |
| Barkley | Fess | Lonergan | Stephens |
| Black | Fletcher | McCarran | Thomas, Utah |
| Bone | Frazier | McGill | Thompson |
| Borah | George | McKellar | Townsend |
| Brown | Gibson | McNary | Tydings |
| Bulkley | Goldsborough | Metcalf | Vandenberg |
| Bulow | Hale | Murphy | Van Nuys |
| Byrd | Harrison | Norris | Wagner |
| Byrnes | Hastings | Nye | Walcott |
| Capper | Hatch | O'Mahoney | Walsh |
| Clark | Hatfield | Overton | Wheeler |
| Connally | Hebert | Patterson | White |

Mr. LEWIS. I announce the absentees as announced by me upon the previous roll call.

LXXVIII——558