# _Communications Act of 1934 (Relevant Sections)_, Pub. L. No. 73-416, 48 Stat. 1064 (1934)

(Establishment of the Federal Communications Commission and a Legal Basis for Regulating Nation-Wide Wired and Wireless Communications)

1064  73d CONGRESS. SESS. II. CHS. 651, 652. JUNE 19, 1934.

[CHAPTER 651.]

AN ACT

June 19, 1934.
[S. 3040.]
[Public, No. 415.]

To give the Supreme Court of the United States authority to make and publish rules in actions at law.

*Be it enacted by the Senate and House of Representatives of the* Supreme Court of United States. Power to prescribe rules in civil actions at law. *United States of America in Congress assembled,* That the Supreme Court of the United States shall have the power to prescribe, by general rules, for the district courts of the United States and for the courts of the District of Columbia, the forms of process, writs, pleadings, and motions, and the practice and procedure in civil actions at law. Said rules shall neither abridge, enlarge, nor modify the substantive rights of any litigant. They shall take effect six months after their promulgation, and thereafter all laws in conflict therewith shall be of no further force or effect.

Rights of litigant.
Effective date.

Rules in equity and law may be united.

Proviso.
Right of trial by jury.

Effective date of united rules.

SEC. 2. The court may at any time unite the general rules prescribed by it for cases in equity with those in actions at law so as to secure one form of civil action and procedure for both: *Provided, however,* That in such union of rules the right of trial by jury as at common law and declared by the seventh amendment to the Constitution shall be preserved to the parties inviolate. Such united rules shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session.

Approved, June 19, 1934.

---

[CHAPTER 652.]

AN ACT

June 19, 1934.
[S. 3285.]
[Public, No. 416.]

To provide for the regulation of interstate and foreign communication by wire or radio, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Communications Act of 1934.

## TITLE I—GENERAL PROVISIONS

Purposes of Act.

### PURPOSES OF ACT; CREATION OF FEDERAL COMMUNICATIONS COMMISSION

SECTION 1. For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is hereby created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this Act.

Federal Communications Commission created.

Application of Act.

### APPLICATION OF ACT

To interstate and foreign communications; transmission of energy by radio.

Persons to whom applicable.

SEC. 2. (a) The provisions of this Act shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio; and to the licensing and regulating of all

Such classification shall be made after hearing, upon notice to the carrier, the State commission (or the Governor, if the State has no State commission) of any State in which the property of said carrier is located, and such other persons as the Commission may prescribe.

(d) In making a valuation of the property of any wire telephone carrier the Commission, after making the classification authorized in this section, may in its discretion value only that part of the property of such carrier determined to be used in interstate or foreign telephone toll service.

*Hearing and notice.*

*Valuation of property used only in interstate, etc., service.*

## TITLE III—SPECIAL PROVISIONS RELATING TO RADIO

*Special provisions relating to radio.*

### LICENSE FOR RADIO COMMUNICATION OR TRANSMISSION OF ENERGY

*License for radio communication or transmission of energy. Purpose of title.*

SECTION 301. It is the purpose of this Act, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any Territory or possession of the United States or in the District of Columbia to another place in the same Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States; or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this Act and with a license in that behalf granted under the provisions of this Act.

*Operation of apparatus for radio communication or transmission of energy without license, forbidden.*

### ZONES

*Zones.*

SEC. 302. (a) For the purposes of this title the United States is divided into five zones, as follows: The first zone shall embrace the States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Delaware, Maryland, and the District of Columbia; the second zone shall embrace the States of Pennsylvania, Virginia, West Virginia, Ohio, Michigan, and Kentucky; the third zone shall embrace the States of North Carolina, South Carolina, Georgia, Florida, Alabama, Tennessee, Mississippi, Arkansas, Louisiana, Texas, and Oklahoma; the fourth zone shall embrace the States of Indiana, Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, Iowa, Nebraska, Kansas, and Missouri; and the fifth zone shall embrace the States of Montana, Idaho, Wyoming, Colorado, New Mexico, Arizona, Utah, Nevada, Washington, Oregon, and California.

*Division of United States into.*

1082          73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934.

Territories and insular possessions.

(b) The Virgin Islands, Puerto Rico, Alaska, Guam, American Samoa, and the Territory of Hawaii are expressly excluded from the zones herein established.

General powers of Commission.

GENERAL POWERS OF COMMISSION

SEC. 303. Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

Classify radio stations.

(a) Classify radio stations;

Prescribe nature of services.

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

Assign frequency bands.

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

Determine locations.

(d) Determine the location of classes of stations or individual stations;

Regulate transmitting apparatus.

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

Prevent interferences.

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry

Proviso.
Consent of station licenses to changes of frequencies.

out the provisions of this Act: *Provided, however,* That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this Act will be more fully complied with;

Study new radio uses.

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

Establish zones.

(h) Have authority to establish areas or zones to be served by any station;

Regulate chain broadcasting.

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

Regulate keeping of station records.

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

Make exclusions from requirements.

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

Prescribe station operator qualifications.

(l) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to such citizens of the United States as the Commission finds qualified;

Suspend license of operator.

(m) Have authority to suspend the license of any operator for a period not exceeding two years upon proof sufficient to satisfy the Commission that the licensee (1) has violated any provision of any Act or treaty binding on the United States which the Commission is authorized by this Act to administer or any regulation made by the Commission under any such Act or treaty; or (2) has failed to carry out the lawful orders of the master of the vessel on which he is employed; or (3) has willfully damaged or permitted radio apparatus to be damaged; or (4) has transmitted superfluous radio communications or signals or radio communications containing profane or obscene words or language; or (5) has willfully or maliciously interfered with any other radio communications or signals;

A043

(n) Have authority to inspect all transmitting apparatus to ascertain whether in construction and operation it conforms to the requirements of this Act, the rules and regulations of the Commission, and the license under which it is constructed or operated; *Inspect transmitting apparatus.*

(o) Have authority to designate call letters of all stations; *Designate call letters.*

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this Act; *Cause publication of call letters.*

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. *Require lighting of radio towers.*

### WAIVER BY LICENSEE

*Waiver by licensee.*

SEC. 304. No station license shall be granted by the Commission until the applicant therefor shall have signed a waiver of any claim to the use of any particular frequency or of the ether as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise. *Claim to use of particular frequency.*

### GOVERNMENT-OWNED STATIONS

*Government - owned stations.*

SEC. 305. (a) Radio stations belonging to and operated by the United States shall not be subject to the provisions of sections 301 and 303 of this Act. All such Government stations shall use such frequencies as shall be assigned to each or to each class by the President. All such stations, except stations on board naval and other Government vessels while at sea or beyond the limits of the continental United States, when transmitting any radio communication or signal other than a communication or signal relating to Government business, shall conform to such rules and regulations designed to prevent interference with other radio stations and the rights of others as the Commission may prescribe. *Exemption from designated provisions. Ante, p. 1082. Assignment of frequencies to. Requirement to conform to regulations to prevent interference.*

(b) Radio stations on board vessels of the United States Shipping Board Bureau or the United States Shipping Board Merchant Fleet Corporation or the Inland and Coastwise Waterways Service shall be subject to the provisions of this title. *Regulation of stations aboard United States vessels.*

(c) All stations owned and operated by the United States, except mobile stations of the Army of the United States, and all other stations on land and sea, shall have special call letters designated by the Commission. *Call letters of Federal stations.*

### FOREIGN SHIPS

*Foreign ships.*

SEC. 306. Section 301 of this Act shall not apply to any person sending radio communications or signals on a foreign ship while the same is within the jurisdiction of the United States, but such communications or signals shall be transmitted only in accordance with such regulations designed to prevent interference as may be promulgated under the authority of this Act. *Regulations governing signals on, within U.S. jurisdiction.*

### ALLOCATION OF FACILITIES; TERM OF LICENSES

*Allocation of facilities.*

SEC. 307. (a) The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act, shall grant to any applicant therefor a station license provided for by this Act. *Station license, granting authorized.*

Allocation of broadcasting licenses.

(b) It is hereby declared that the people of all the zones established by this title are entitled to equality of radio broadcasting service, both of transmission and of reception, and in order to provide said equality the Commission shall as nearly as possible make and maintain an equal allocation of broadcasting licenses, of bands of frequency, of periods of time for operation, and of station power, to each of said zones when and insofar as there are applications

Of frequencies, time of operation, and station power.
Modifications to effect equality within zones, authorized.

therefor; and shall make a fair and equitable allocation of licenses, frequencies, time for operation, and station power to each of the States and the District of Columbia, within each zone, according to population.  The Commission shall carry into effect the equality of broadcasting service hereinbefore directed, whenever necessary or proper, by granting or refusing licenses or renewals of licenses, by changing periods of time for operation, and by increasing or decreasing station power, when applications are made for licenses or renewals of licenses: *Provided*, That if and when there is a lack

Provisos.
When lack of applications for available facilities within zone.

of applications from any zone for the proportionate share of licenses, frequencies, time of operation, or station power to which such zone is entitled, the Commission may issue licenses for the

Issue of temporary licenses to applicants from other zones.

balance of the proportion not applied for from any zone, to applicants from other zones for a temporary period of ninety days each, and shall specifically designate that said apportionment is only for

Charging of allocations to States.

said temporary period.  Allocations shall be charged to the State or District wherein the studio of the station is located and not where

Proviso.
Applications for additional licenses.

the transmitter is located: *Provided further*, That the Commission may also grant applications for additional licenses for stations not exceeding one hundred watts of power if the Commission finds that such stations will serve the public convenience, interest, or necessity, and that their operation will not interfere with the fair and efficient radio service of stations licensed under the provisions of this section.

Allocation of fixed percentages of radio facilities.
Commission to study proposal.

(c) The Commission shall study the proposal that Congress by statute allocate fixed percentages of radio broadcasting facilities to particular types or kinds of non-profit radio programs or to persons identified with particular types or kinds of non-profit activities, and shall report to Congress, not later than February 1, 1935, its recommendations together with the reasons for the same.

License, term of.

(d) No license granted for the operation of a broadcasting station shall be for a longer term than three years and no license so granted for any other class of station shall be for a longer term than five years, and any license granted may be revoked as hereinafter pro-

Renewals.

vided.  Upon the expiration of any license, upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed three years in the case of broadcasting licenses and not to exceed five years in the case of other licenses, but action of the Commission with reference to the granting of such application for the renewal of a license shall be limited to and governed by the same considerations and practice which affect the granting of original applications.

Granting of.

(e) No renewal of an existing station license shall be granted more than thirty days prior to the expiration of the original license.

Licenses.

APPLICATIONS FOR LICENSES; CONDITIONS IN LICENSE FOR FOREIGN COMMUNICATION

Applications for.

SEC. 308. (a) The Commission may grant licenses, renewal of licenses, and modification of licenses only upon written application

Provisos.
Emergency granting for Federal stations on vessels or aircraft.

therefor received by it: *Provided, however*, That in cases of emergency found by the Commission, licenses, renewals of licenses, and modifications of licenses, for stations on vessels or aircraft of the United States, may be issued under such conditions as the Com-

Case: 1:10-cv-07003 Document #: 45-3 Filed: 07/06/11 Page 7 of 30 PageID #:322

mission may impose, without such formal application. Such licenses, however, shall in no case be for a longer term than three months: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States. <span style="float:right">Term of.</span>

<span style="float:right">Issue of.</span>

(b) All such applications shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee under oath or affirmation. <span style="float:right">Information in applications.</span>

(c) The Commission in granting any license for a station intended or used for commercial communication between the United States or any Territory or possession, continental or insular, subject to the jurisdiction of the United States, and any foreign country, may impose any terms, conditions, or restrictions authorized to be imposed with respect to submarine-cable licenses by section 2 of an Act entitled "An Act relating to the landing and the operation of submarine cables in the United States", approved May 24, 1921. <span style="float:right">License for foreign communication.</span>

<span style="float:right">Terms, conditions, etc., in.</span>

<span style="float:right">Vol. 42, p. 8.</span>

HEARINGS ON APPLICATIONS FOR LICENSES; FORM OF LICENSES; CONDITIONS ATTACHED TO LICENSES

SEC. 309. (a) If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. In the event the Commission upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe. <span style="float:right">Examination of application.</span>

<span style="float:right">Hearing if decision of Commission adverse.</span>

(b) Such station licenses as the Commission may grant shall be in such general form as it may prescribe, but each license shall contain, in addition to other provisions, a statement of the following conditions to which such license shall be subject: <span style="float:right">Form of license.</span>

(1) The station license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized therein. <span style="float:right">Conditions.</span>

(2) Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of this Act.

(3) Every license issued under this Act shall be subject in terms to the right of use or control conferred by section 606 hereof.

A046

1086      73d CONGRESS.  SESS. II.  CH. 652.  JUNE 19, 1934.

LIMITATION ON HOLDING AND TRANSFER OF LICENSES

Limitation on holding and transfer of licenses.   SEC. 310. (a) The station license required hereby shall not be granted to or held by—

Aliens.   (1) Any alien or the representative of any alien;

Foreign governments.   (2) Any foreign government or the representative thereof;

Foreign corporations.   (3) Any corporation organized under the laws of any foreign government;

Corporation having alien officer.   (4) Any corporation of which any officer or director is an alien or of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country;

Corporation controlled by other corporation having alien officers.   (5) Any corporation directly or indirectly controlled by any other corporation of which any officer or more than one-fourth of the directors are aliens, or of which more than one-fourth of the capital stock is owned of record or voted, after June 1, 1935, by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or the revocation of such license.

Limitations not applicable, Federal vessels, aircraft, etc.   Nothing in this subsection shall prevent the licensing of radio apparatus on board any vessel, aircraft, or other mobile station of the United States when the installation and use of such apparatus is required by Act of Congress or any treaty to which the United States is a party.

Rights, etc., of licensee not transferable.   (b) The station license required hereby, the frequencies authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner either voluntarily or involuntarily disposed of, or indirectly by transfer of control of any corporation holding such license, to any person, unless the Commission shall, after securing full information, decide that said transfer is in the public interest, and shall give its consent in writing.

Refusal of licenses and permits.       REFUSAL OF LICENSES AND PERMITS IN CERTAIN CASES

Grounds for.   SEC. 311. The Commission is hereby directed to refuse a station license and/or the permit hereinafter required for the construction of a station to any person (or to any person directly or indirectly controlled by such person) whose license has been revoked by a *Post*, p. 1087.  court under section 313, and is hereby authorized to refuse such station license and/or permit to any other person (or to any person directly or indirectly controlled by such person) which has been finally adjudged guilty by a Federal court of unlawfully monopolizing or attempting unlawfully to monopolize, radio communication, directly or indirectly, through the control of the manufacture or sale of radio apparatus, through exclusive traffic arrangements, or Granting of license not to estop aggrieved person.  by any other means, or to have been using unfair methods of competition. The granting of a license shall not estop the United States or any person aggrieved from proceeding against such person for violating the law against unfair methods of competition or for a violation of the law against unlawful restraints and monopolies and/or combinations, contracts, or agreements in restraint of trade, or from instituting proceedings for the dissolution of such corporation.

Revocation of license.       REVOCATION OF LICENSES

Grounds for.   SEC. 312. (a) Any station license may be revoked for false statements either in the application or in the statement of fact which *Ante*, p. 1084.  may be required by section 308 hereof, or because of conditions

A047

revealed by such statements of fact as may be required from time to time which would warrant the Commission in refusing to grant a license on an original application, or for failure to operate substantially as set forth in the license, or for violation of or failure to observe any of the restrictions and conditions of this Act or of any regulation of the Commission authorized by this Act or by a treaty ratified by the United States: *Provided, however,* That no *Proviso.* such order of revocation shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed revocation, has been given to the licensee. Such licensee may make written application to the Commission at any time within said fifteen days for a hearing upon such order, and upon the filing of such written application said order of revocation shall stand suspended until the conclusion of the hearing conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of revocation.

*Proviso.*
Revocation order, when effective.

Application for hearing.

Temporary suspension of order.

Final decision.

(b) Any station license hereafter granted under the provisions of this Act or the construction permit required hereby and hereafter issued, may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this Act or of any treaty ratified by the United States will be more fully complied with: *Provided, however,* That no such order of modification shall become final until the holder of such outstanding license or permit shall have been notified in writing of the proposed action and the grounds or reasons therefor and shall have been given reasonable opportunity to show cause why such an order of modification should not issue.

Modification of license or permit.

*Proviso.*
Notice to holder required.

### APPLICATION OF ANTITRUST LAWS

Antitrust laws.

SEC. 313. All laws of the United States relating to unlawful restraints and monopolies and to combinations, contracts, or agreements in restraint of trade are hereby declared to be applicable to the manufacture and sale of and to trade in radio apparatus and devices entering into or affecting interstate or foreign commerce and to interstate or foreign radio communications. Whenever in any suit, action, or proceeding, civil or criminal, brought under the provisions of any of said laws or in any proceedings brought to enforce or to review findings and orders of the Federal Trade Commission or other governmental agency in respect of any matters as to which said Commission or other governmental agency is by law authorized to act, any licensee shall be found guilty of the violation of the provisions of such laws or any of them, the court, in addition to the penalties imposed by said laws, may adjudge, order, and/or decree that the license of such licensee shall, as of the date the decree or judgment becomes finally effective or as of such other date as the said decree shall fix, be revoked and that all rights under such license shall thereupon cease: *Provided, however,* That such licensee shall have the same right of appeal or review as is provided by law in respect of other decrees and judgments of said court.

Application of.

Penalties for violations.

License revocation.

*Proviso.*
Appeals.

### PRESERVATION OF COMPETITION IN COMMERCE

Preservation of competition in commerce.

SEC. 314. After the effective date of this Act no person engaged directly, or indirectly through any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such person, or through an agent, or otherwise, in the business of transmitting and/or receiving for hire energy, communications, or signals by radio in accordance with the terms of the license issued under this Act, shall by purchase, lease, construction,

Limitation on ownership of communication facilities.

A048

1088 73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934.

On ownership of stock.

or otherwise, directly or indirectly, acquire, own, control, or operate any cable or wire telegraph or telephone line or system between any place in any State, Territory, or possession of the United States or in the District of Columbia, and any place in any foreign country, or shall acquire, own, or control any part of the stock or other capital share or any interest in the physical property and/or other assets of any such cable, wire, telegraph, or telephone line or system, if in either case the purpose is and/or the effect thereof may be to substantially lessen competition or to restrain commerce between any place in any State, Territory, or possession of the United States,

By person engaged in transmitting for hire interstate or foreign messages.

or in the District of Columbia, and any place in any foreign country, or unlawfully to create monopoly in any line of commerce; nor shall any person engaged directly, or indirectly through any person directly or indirectly controlling or controlled by, such person, or through an agent, or otherwise, in the business of transmitting and/or receiving for hire messages by any cable, wire, telegraph, or telephone line or system (a) between any place in any State, Territory, or possession of the United States, or in the District of Columbia, and any place in any other State, Territory, or possession of the United States; or (b) between any place in any State, Territory, or possession of the United States, or the District of Columbia, and any place in any foreign country, by purchase, lease, construction, or otherwise, directly or indirectly acquire, own, control, or operate any station or the apparatus therein, or any system for transmitting and/or receiving radio communications or signals between any place in any State, Territory, or possession of the United States, or in the District of Columbia, and any place in any foreign country, or shall acquire, own, or control any part of the stock or other capital share or any interest in the physical property and/or other assets of any such radio station, apparatus, or system, if in either case the purpose is and/or the effect thereof may be to substantially lessen competition or to restrain commerce between any place in any State, Territory, or possession of the United States, or in the District of Columbia, and any place in any foreign country, or unlawfully to create monopoly in any line of commerce.

Facilities for candidates for public office.

## FACILITIES FOR CANDIDATES FOR PUBLIC OFFICE

Equal opportunity required.

Rules.

Proviso.
Limitation on licensee power of censorship.

Sec. 315. If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, and the Commission shall make rules and regulations to carry this provision into effect: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate.

Lotteries and similar schemes.

## LOTTERIES AND OTHER SIMILAR SCHEMES

Broadcasting prohibited.

Penalty provision.

Sec. 316. No person shall broadcast by means of any radio station for which a license is required by any law of the United States, and no person operating any such station shall knowingly permit the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes. Any person violating any provision of this section shall,

A 049

upon conviction thereof, be fined not more than $1,000 or imprisoned not more than one year, or both, for each and every day during which such offense occurs.

#### ANNOUNCEMENT THAT MATTER IS PAID FOR

Announcement that broadcast is paid for.

SEC. 317. All matter broadcast by any radio station for which service, money, or any other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person.

#### OPERATION OF TRANSMITTING APPARATUS

Operation of transmitting apparatus.

SEC. 318. The actual operation of all transmitting apparatus in any radio station for which a station license is required by this Act shall be carried on only by a person holding an operator's license issued hereunder. No person shall operate any such apparatus in such station except under and in accordance with an operator's license issued to him by the Commission.

Requirement of qualified operator.

#### CONSTRUCTION PERMITS

Construction permits.

SEC. 319. (a) No license shall be issued under the authority of this Act for the operation of any station the construction of which is begun or is continued after this Act takes effect, unless a permit for its construction has been granted by the Commission upon written application therefor. The Commission may grant such permit if public convenience, interest, or necessity will be served by the construction of the station. This application shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and the financial, technical, and other ability of the applicant to construct and operate the station, the ownership and location of the proposed station and of the station or stations with which it is proposed to communicate, the frequencies desired to be used, the hours of the day or other periods of time during which it is proposed to operate the station, the purpose for which the station is to be used, the type of transmitting apparatus to be used, the power to be used, the date upon which the station is expected to be completed and in operation, and such other information as the Commission may require. Such application shall be signed by the applicant under oath or affirmation.

Requirement.

Granting by Commission.

Application for.
Contents.

Signature.

(b) Such permit for construction shall show specifically the earliest and latest dates between which the actual operation of such station is expected to begin, and shall provide that said permit will be automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow, unless prevented by causes not under the control of the grantee. The rights under any such permit shall not be assigned or otherwise transferred to any person without the approval of the Commission. A permit for construction shall not be required for Government stations, amateur stations, or stations upon mobile vessels, railroad rolling stock, or aircraft. Upon the completion of any station for the construction or continued construction of which a permit has been granted, and upon it being made to appear to the Commission that all the terms, conditions, and obligations set forth in the application and permit have been fully met, and that no cause or circumstance arising or first coming to the knowledge of the Commission since the granting of the permit would, in the judgment of

Dates of station operation to be specified.

Automatic forfeiture if not met.

Exception.

Assignment of rights prohibited.

Limitation on requirement of permits.

License for operation to issue when conditions met.

86637°—34—— 69

A0 50

1090      73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934.

Nature of license.

the Commission, make the operation of such station against the public interest, the Commission shall issue a license to the lawful holder of said permit for the operation of said station. Said license shall conform generally to the terms of said permit.

Stations liable to interfere with distress signals.
Designation of.

DESIGNATION OF STATIONS LIABLE TO INTERFERE WITH DISTRESS SIGNALS

SEC. 320. The Commission is authorized to designate from time to time radio stations the communications or signals of which, in its opinion, are liable to interfere with the transmission or reception of distress signals of ships. Such stations are required to keep a licensed radio operator listening in on the frequencies designated for signals of distress and radio communications relating thereto during the entire period the transmitter of such station is in operation.

Requirement during operation.

Distress signals and communications.

DISTRESS SIGNALS AND COMMUNICATIONS

Transmission of; requirement.

SEC. 321. (a) Every radio station on shipboard shall be equipped to transmit radio communications or signals of distress on the frequency specified by the Commission, with apparatus capable of transmitting and receiving messages over a distance of at least one hundred miles by day or night. When sending radio communications or signals of distress and radio communications relating thereto the transmitting set may be adjusted in such a manner as to produce a maximum of radiation irrespective of the amount of interference which may thus be caused.

Adjustment of transmitting set.

Absolute priority of.

(b) All radio stations, including Government stations and stations on board foreign vessels when within the territorial waters of the United States, shall give absolute priority to radio communications or signals relating to ships in distress; shall cease all sending on frequencies which will interfere with hearing a radio communication or signal of distress, and, except when engaged in answering or aiding the ship in distress, shall refrain from sending any radio communications or signals until there is assurance that no interference will be caused with the radio communications or signals relating thereto, and shall assist the vessel in distress, so far as possible, by complying with its instructions.

Interfering signals to cease.

Intercommunication in mobile service.

INTERCOMMUNICATION IN MOBILE SERVICE

Requirement.

SEC. 322. Every land station open to general public service between the coast and vessels at sea shall be bound to exchange radio communications or signals with any ship station without distinction as to radio systems or instruments adopted by such stations, respectively, and each station on shipboard shall be bound to exchange radio communications or signals with any other station on shipboard without distinction as to radio systems or instruments adopted by each station.

Interference between Government and commercial stations.
Division of time.

INTERFERENCE BETWEEN GOVERNMENT AND COMMERCIAL STATIONS

SEC. 323. (a) At all places where Government and private or commercial radio stations on land operate in such close proximity that interference with the work of Government stations cannot be avoided when they are operating simultaneously, such private or commercial stations as do interfere with the transmission or reception of radio communications or signals by the Government stations concerned shall not use their transmitters during the first fifteen minutes of each hour, local standard time.

AD 51

73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934. 1091

(b) The Government stations for which the above-mentioned division of time is established shall transmit radio communications or signals only during the first fifteen minutes of each hour, local standard time, except in case of signals or radio communications relating to vessels in distress and vessel requests for information as to course, location, or compass direction.

*Time for operating Government station.*

*Exception, when distress signals.*

### USE OF MINIMUM POWER

*Use of minimum power.*

SEC. 324. In all circumstances, except in case of radio communications or signals relating to vessels in distress, all radio stations, including those owned and operated by the United States, shall use the minimum amount of power necessary to carry out the communication desired.

*Requirement.*

### FALSE DISTRESS SIGNALS; REBROADCASTING; STUDIOS OF FOREIGN STATIONS

*False distress signals.*

SEC. 325. (a) No person within the jurisdiction of the United States shall knowingly utter or transmit, or cause to be uttered or transmitted, any false or fraudulent signal of distress, or communication relating thereto, nor shall any broadcasting station rebroadcast the program or any part thereof of another broadcasting station without the express authority of the originating station.

*Prohibition on transmitting.*

*On unauthorized rebroadcasting.*

(b) No person shall be permitted to locate, use, or maintain a radio broadcast studio or other place or apparatus from which or whereby sound waves are converted into electrical energy, or mechanical or physical reproduction of sound waves produced, and caused to be transmitted or delivered to a radio station in a foreign country for the purpose of being broadcast from any radio station there having a power output of sufficient intensity and/or being so located geographically that its emissions may be received consistently in the United States, without first obtaining a permit from the Commission upon proper application therefor.

*Studios of foreign stations.*

*Permits required.*

(c) Such application shall contain such information as the Commission may by regulation prescribe, and the granting or refusal thereof shall be subject to the requirements of section 309 hereof with respect to applications for station licenses or renewal or modification thereof, and the license or permission so granted shall be revocable for false statements in the application so required or when the Commission, after hearings, shall find its continuation no longer in the public interest.

*Application therefor.*

*Ante, p. 1085.*

### CENSORSHIP; INDECENT LANGUAGE

SEC. 326. Nothing in this Act shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication. No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication.

*Power of censorship denied Commission.*

*Indecent language.*

### USE OF NAVAL STATIONS FOR COMMERCIAL MESSAGES

*Naval stations for commercial messages.*

SEC. 327. The Secretary of the Navy is hereby authorized, unless restrained by international agreement, under the terms and conditions and at rates prescribed by him, which rates shall be just and reasonable, and which, upon complaint, shall be subject to review and revision by the Commission,[1] to use all radio stations and apparatus, wherever located, owned by the United States and under the

*Secretary of Navy authorized to use.*

*Rates.*

[1] So in original.

AO 52

1092        73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934.

control of the Navy Department. (a) for the reception and transmission of press messages offered by any newspaper published in the United States, its Territories or possessions, or published by citizens of the United States in foreign countries, or by any press association of the United States, and (b) for the reception and transmission of private commercial messages between ships, between ship and shore, between localities in Alaska and between Alaska and the continental United States: *Provided*, That the rates fixed for the reception and transmission of all such messages, other than press messages between the Pacific coast of the United States, Hawaii, Alaska, Guam, American Samoa, the Philippine Islands, and the Orient, and between the United States and the Virgin Islands, shall not be less than the rates charged by privately owned and operated stations for like messages and service: *Provided further*, That the right to use such stations for any of the purposes named in this section shall terminate and cease as between any countries or localities or between any locality and privately operated ships whenever privately owned and operated stations are capable of meeting the normal communication requirements between such countries or localities or between any locality and privately operated ships, and the Commission shall have notified the Secretary of the Navy thereof.

*Proviso.*
*Minimum rates.*

*When right to use naval stations terminates.*

*Special provision as to Philippine Islands and Canal Zone.*

SPECIAL PROVISION AS TO PHILIPPINE ISLANDS AND CANAL ZONE

SEC. 328. This title shall not apply to the Philippine Islands or to the Canal Zone. In international radio matters the Philippine Islands and the Canal Zone shall be represented by the Secretary of State.

*Radio laws in territories and possessions.*
*Administration of. Designation of officer.*

ADMINISTRATION OF RADIO LAWS IN TERRITORIES AND POSSESSIONS

SEC. 329. The Commission is authorized to designate any officer or employee of any other department of the Government on duty in any Territory or possession of the United States other than the Philippine Islands and the Canal Zone, to render therein such services in connection with the administration of the radio laws of the United States as the Commission may prescribe: *Provided*, That such designation shall be approved by the head of the department in which such person is employed.

*Proviso.*
*Approval required.*

*Procedural and administrative provisions.*
*Jurisdiction to enforce act and Commission orders.*
*District courts.*

TITLE IV—PROCEDURAL AND ADMINISTRATIVE PROVISIONS

JURISDICTION TO ENFORCE ACT AND ORDERS OF COMMISSION

SECTION 401. (a) The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of this Act by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this Act.

*Enforcement of Commission orders.*

(b) If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or other-

*Process.*

wise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

(c) Upon the request of the Commission it shall be the duty of any district attorney of the United States to whom the Commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this Act and for the punishment of all violations thereof, and the costs and expenses of such prosecutions shall be paid out of the appropriations for the expenses of the courts of the United States.

> Institution of proceedings for punishing violations.

> Costs.

(d) The provisions of the Expediting Act, approved February 11, 1903, as amended, and of section 238 (1) of the Judicial Code, as amended, shall be held to apply to any suit in equity arising under Title II of this Act, wherein the United States is complainant.

> Vol. 32, p. 823; Vol. 36, p. 1157.

PROCEEDINGS TO ENFORCE OR SET ASIDE THE COMMISSION'S ORDERS— APPEAL IN CERTAIN CASES

> Commission orders.

SEC. 402. (a) The provisions of the Act of October 22, 1913 (38 Stat. 219), relating to the enforcing or setting aside of the orders of the Interstate Commerce Commission, are hereby made applicable to suits to enforce, enjoin, set aside, annul, or suspend any order of the Commission under this Act (except any order of the Commission granting or refusing an application for a construction permit for a radio station, or for a radio station license, or for renewal of an existing radio station license, or for modification of an existing radio station license), and such suits are hereby authorized to be brought as provided in that Act.

> Enforcement of, provisions applicable. Vol. 38, p. 219.

> Orders excepted.

(b) An appeal may be taken, in the manner hereinafter provided, from decisions of the Commission to the Court of Appeals of the District of Columbia in any of the following cases:

> Appeals from.

(1) By any applicant for a construction permit for a radio station, or for a radio station license, or for renewal of an existing radio station license, or for modification of an existing radio station license, whose application is refused by the Commission.

> Who may take.

(2) By any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application.

(c) Such appeal shall be taken by filing with said court within twenty days after the decision complained of is effective, notice in writing of said appeal and a statement of the reasons therefor, together with proof of service of a true copy of said notice and statement upon the Commission. Unless a later date is specified by the Commission as part of its decision, the decision complained of shall be considered to be effective as of the date on which public announcement of the decision is made at the office of the Commission in the city of Washington. The Commission shall thereupon immediately, and in any event not later than five days from the date of such service upon it, mail or otherwise deliver a copy of said notice of appeal to each person shown by the records of the Commission to be interested in such appeal and to have a right to intervene therein under the provisions of this section, and shall at all times thereafter permit any such person to inspect and make copies of the appellant's statement of reasons for said appeal at the office of the Commission in the city of Washington. Within thirty days after the filing of said appeal the Commission shall file with the court the originals or certified copies of all papers and evidence presented to it upon the application involved, and also a like copy of its decision thereon, and shall within thirty days thereafter file a full state-

> Filing of appeal; procedure.

> Effectiveness of decision complained of.

> Notice of appeal; mailing.

> Persons having right to intervene.

> Certification and filing of evidence upon application by Commission.

ment in writing of the facts and grounds for its decision as found and given by it, and a list of all interested persons to whom it has mailed or otherwise delivered a copy of said notice of appeal.

**Notice of intention to intervene.**

(d) Within thirty days after the filing of said appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission.

**Nature of interest to be stated.**

**Who considered interested party.**

Any person who would be aggrieved or whose interests would be adversely affected by a reversal or modification of the decision of the Commission complained of shall be considered an interested party.

**Determination of appeal.**

(e) At the earliest convenient time the court shall hear and determine the appeal upon the record before it, and shall have power, upon such record, to enter a judgment affirming or reversing the decision of the Commission, and in event the court shall render a decision and enter an order reversing the decision of the Commission, it shall remand the case to the Commission to carry out the judgment of the court: *Provided, however,* That the review by the court shall be limited to questions of law and that findings of fact by the Commission, if supported by substantial evidence, shall be conclusive unless it shall clearly appear that the findings of the Commission are arbitrary or capricious. The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 240 of the Judicial Code, as amended, by appellant, by the Commission, or by any interested party intervening in the appeal.

**Decision.**

**Proviso.**
**Nature of review.**

**Judgment final.**

**Writ of review.**

**Judgment for costs.**

(f) The court may, in its discretion, enter judgment for costs in favor of or against an appellant, and/or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

**Inquiry by Commission.**

INQUIRY BY COMMISSION ON ITS OWN MOTION

**Authority to institute.**

SEC. 403. The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this Act, or concerning which any question may arise under any of the provisions of this Act, or relating to the enforcement of any of the provisions of this Act. The Commission shall have the same powers and authority to proceed with any inquiry instituted on its own motion as though it had been appealed to by complaint or petition under any of the provisions of this Act, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had, excepting orders for the payment of money.

**Power to proceed thereon.**

**Report of investigations.**

REPORTS OF INVESTIGATIONS

**Requirement.**

SEC. 404. Whenever an investigation shall be made by the Commission it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the Commission, together with its decision, order, or requirement in the premises; and in case damages are awarded such report shall include the findings of fact on which the award is made.

A 0 55

73d CONGRESS. SESS. II. CH. 652. JUNE 19, 1934. 1095

REHEARING BEFORE COMMISSION

SEC. 405. After a decision, order, or requirement has been made
by the Commission in any proceeding, any party thereto may at
any time make application for rehearing of the same, or any matter
determined therein, and it shall be lawful for the Commission in
its discretion to grant such a rehearing if sufficient reason therefor
be made to appear: *Provided, however,* That in the case of a deci-
sion, order, or requirement made under Title III, the time within
which application for rehearing may be made shall be limited to
twenty days after the effective date thereof, and such application
may be made by any party or any person aggrieved or whose inter-
ests are adversely affected thereby. Applications for rehearing shall
be governed by such general rules as the Commission may establish.
No such application shall excuse any person from complying with
or obeying any decision, order, or requirement of the Commission,
or operate in any manner to stay or postpone the enforcement
thereof, without the special order of the Commission. In case a
rehearing is granted, the proceedings thereupon shall conform as
nearly as may be to the proceedings in an original hearing, except
as the Commission may otherwise direct; and if, in its judgment,
after such rehearing and the consideration of all facts, including
those arising since the former hearing, it shall appear that the
original decision, order, or requirement is in any respect unjust or
unwarranted, the Commission may reverse, change, or modify the
same accordingly. Any decision, order, or requirement made after
such rehearing, reversing, changing, or modifying the original
determination, shall be subject to the same provisions as an original
order.

MANDAMUS TO COMPEL FURNISHING OF FACILITIES

SEC. 406. The district courts of the United States shall have juris-
diction upon the relation of any person alleging any violation, by a
carrier subject to this Act, of any of the provisions of this Act which
prevent the relator from receiving service in interstate or foreign
communication by wire or radio, or in interstate or foreign trans-
mission of energy by radio, from said carrier at the same charges, or
upon terms or conditions as favorable as those given by said carrier
for like communication or transmission under similar conditions to
any other person, to issue a writ or writs of mandamus against said
carrier commanding such carrier to furnish facilities for such com-
munication or transmission to the party applying for the writ:
*Provided,* That if any question of fact as to the proper compensation
to the carrier for the service to be enforced by the writ is raised
by the pleadings, the writ of peremptory mandamus may issue, not-
withstanding such question of fact is undetermined, upon such terms
as to security, payment of money into the court, or otherwise, as the
court may think proper pending the determination of the question
of fact: *Provided further,* That the remedy hereby given by writ of
mandamus shall be cumulative and shall not be held to exclude or
interfere with other remedies provided by this Act.

PETITION FOR ENFORCEMENT OF ORDER FOR PAYMENT OF MONEY

SEC. 407. If a carrier does not comply with an order for the pay-
ment of money within the time limit in such order, the complainant,
or any person for whose benefit such order was made, may file in the
district court of the United States for the district in which he resides
or in which is located the principal operating office of the carrier,
or through which the line of the carrier runs, or in any State court

*Rehearing before Commission.*

*Application for.*

*Authority to grant.*

*Proviso.*
*Time within which application filed.*

*Rules governing re-hearing.*

*Compliance with or-ders during pendency required.*

*Proceedings upon re-hearing.*

*Modification of orig-inal decision.*

*Mandamus to com-pel furnishing of facili-ties.*
*Jurisdiction of dis-trict courts to issue.*

*Proviso.*
*Issue of preemptory mandamus when ques-tion of proper compen-sation.*

*Nature of remedy.*

*Petition for enforce-ment of order for pay-ment of money.*
*Filing in district court.*

A056

# <u>Third Annual Report of the Federal Communications Commission (Excerpt)</u>

(Analysis of the Study of the Allocation of Bandwidth to Noncommercial Educational Broadcasters, Pursuant to Section 307(c) of the Communications Act of 1934)

# THIRD ANNUAL REPORT

OF THE

# Federal Communications Commission

FOR THE

FISCAL YEAR ENDED JUNE 30

## 1937

*Copy 3*



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON: 1937

For sale by the Superintendent of Documents, Washington, D. C. - - - - - - - Price 30 cents

Ao 57

## FEDERAL RADIO EDUCATION COMMITTEE

*Origin and purpose.*—The Federal Radio Education Committee was sponsored and appointed by the Commission with the cooperation of other Government departments as a result of the Commission's study pursuant to section 307 (c) of the Communications Act of 1934 and the conferences held pursuant thereto.[18]

The Communications Act of 1934, section 307 (c), provides:

> The Commission shall study the proposal that Congress by statute allocate fixed percentages of radio broadcasting facilities to particular types or kinds of non-profit radio programs, or to persons identified with particular types or kinds of non-profit activities, and shall report to Congress, not later than February 1, 1935, its recommendations together with the reasons for the same.

In accordance with this mandate, the Commission held a public hearing in its offices during October and November 1934, at which voluminous information was supplied. On the basis of this information and of other information in the files of the Commission, a report was made to the Congress dated January 22, 1935. The Commission proposed in that report (p. 7) to hold a national conference at an early date in Washington, at which time plans for mutual cooperation between broadcasters and nonprofit organizations could be made to the end that the educational experience of the educators be combined with the program technique of the broadcasters, thereby better to serve the public interest.

This conference was held on May 15, 1935, in Washington, D. C. Due notice was given to all broadcast licensees of the Commission, the National Association of Broadcasters, all chain broadcasting companies, all educational, religious, and eleemosynary institutions, and all persons, groups, and associations of every character interested in the subject to be present and to participate in this conference. The cooperation and participation of all Governmental agencies, particularly of the United States Bureau of Education, were especially requested. It was expected that at this hearing definite plans would be presented for consideration and study.

As a result of this conference it was decided to appoint a committee to be known as the Federal Radio Education Committee. Dr. John W. Studebaker, United States Commissioner of Education, accepted the chairmanship of the committee, and invitations for membership to the committee, were sent to persons prominent in the fields of education and broadcasting. On December 18, 1935, the Commission announced the names of the members on this committee as follows:

Mr. Waldo Abbott, University of Michigan.
Mr. Merlin Aylesworth, president, National Broadcasting Co.
Mr. James W. Baldwin, managing director, National Association of Broadcasters.

---

[18] There is here given a brief outline of the activities of the Commission relative to this section of the act prior to the formation of the Federal Radio Education Committee and prior to the last fiscal year. This outline is given at this time as no previous mention of this work has been made in an annual report to Congress. A separate report was made as required.

45

Mr. Edgar Bill, Radio Station WMBD.
Dr. S. Parks Cadman, Federal Council of Churches of Christ in America.
Dr. Morse A. Cartwright, director, American Association for Adult Education.
Dr. W. W. Charters, director, Bureau of Educational Research, Ohio State University.
Dr. Harry W. Chase, chancellor, New York University.
Mr. Gardner Cowles, Jr., Des Moines Register.
Mr. Lester E. Cox, Radio Station KWTO.
Mr. Edwin Craig, Radio Station WSM.
Dr. A. G. Crane, president, University of Wyoming.
Dr. Walter Damrosch, National Broadcasting Co.
Mr. Milton S. Eisenhower, Director of Information, Department of Agriculture.
Mr. John Elmer, Radio Station WCBM.
Mr. O. D. Fisher, Station KOMO.
Mr. Leo J. Fitzpatrick, president, National Association of Broadcasters.
Mr. Willard Givens, secretary, National Educational Association.
Mr. Tom C. Gooch, Daily Times Herald.
Mr. William Green, president, American Federation of Labor.
Mrs. Rose Jacobs, president, Hadassah Women's Zionist Organization.
Rev. Geo. W. Johnson, Catholic University of America.
Dr. C. B. Jolliffe, Radio Corporation of America.
Mr. Lambdin Kay, Station WSB.
Mr. John F. Killeen, Director of Broadcast Division, Federal Communications Commission.
Dr. Cline M. Koon, Office of Education, Department of Interior.
Mrs. B. F. Langworthy, president, National Congress of Parents and Teachers.
Miss Luella S. Laudin, Women's National Radio Committee.
Mr. H. B. McCarty, president, National Association of Educational Broadcasters, University of Wisconsin.
Mr. A. J. McCosker, president, Bamberger Broadcasting Service, Inc.
Mrs. Harold V. Milligan, president, Women's National Radio Committee.
Dr. Robert A. Millikan, president, California Institute of Technology.
Mr. William S. Paley, president, Columbia Broadcasting System.
Mr. A. D. Ring, assistant chief engineer, Federal Communications Commission.
Mr. John Shepard, III, president, The Yankee Network.
Dr. Levering Tyson, director, National Advisory Council on Radio in Education.
Miss Judith C. Waller, Mid-West Educational Director, National Broadcasting Co.
Mr. Frederick A. Willis, Columbia Broadcasting System.
Mr. Geo. F. Zook, president, American Council on Education.

*Activities of the committee.*—After the formation of this committee, an agenda was prepared for the first meeting, which was called by Chairman Studebaker, in February 1936. The primary objectives of the Federal Radio Education Committee, under the chairmanship of the Commissioner of Education, were as follows:

1. Eliminate controversy and misunderstanding between groups of educators and between the industry and educators.
2. Promote actual cooperative arrangements between educators and broadcasters on national, regional, and local bases.

Since the formation of this committee it has carried forward the study pursuant to section 307 (c) of the act with the full cooperation of the Commission. The report of the chairman, Dr. John W. Studebaker, for the last fiscal year follows:

## REPORT OF THE FEDERAL RADIO EDUCATION COMMITTEE

### By J. W. Studebaker, *Chairman*

Following the appointment of the Federal Radio Education Committee by the Federal Communications Commission, in December 1935, J. W. Studebaker, chairman of the committee, organized a small planning committee consisting of a half-dozen members—Messrs. James W. Baldwin, Levering Tyson, A. D. Ring, C. M. Koon, C. F. Klinefelter, with J. W. Studebaker as chairman and Mrs. Gertrude Broderick as secretary. The purpose of the planning committee was to survey the possibilities for collecting and correlating data on which the main committee might base its deliberations when it came together for a meeting.

Since this was the first attempt that had been made for broadcasters and educators to meet together around the same table to discuss their various problems and to try to solve them cooperatively, the planning committee, in trying to arrive at some mode of action, soon discovered an almost total lack of factual material on which the committee might proceed to make recommendations to the Federal Communications Commission. It was agreed in the planning committee that before anything could be accomplished the necessary factual material would have to be compiled. It was agreed finally that the committee might well undertake a program of studies.

As a means of getting started, the planning committee designed a number of studies for purposes of consideration and discussion by the general committee. These studies were briefly outlined in an agenda and the general committee was called together for a meeting in Washington in February 1936. The general committee agreed that the study program was the proper procedure for the committee to adopt and each committee member was invited by the chairman to submit additional studies which might be incorporated in the program. As a result of that invitation, outlines of some 18 studies were developed.

The general committee voted to appoint subcommittees which would be charged with the responsibility of getting the program under way. The newly appointed committees were as follows:

An executive committee—replacing the old planning committee:

| | |
|---|---|
| J. W. Studebaker, *Chairman.* | Willard Givens. |
| C. F. Klinefelter, *Vice Chairman.* | R. C. Higgy. |
| Gertrude G. Broderick, *Secretary.* | Rev. George Johnson. |
| J. W. Baldwin. | A. D. Ring. |
| John Elmer. | Levering Tyson. |

A technical subcommittee to revise the outline of each project, to estimate the probable cost, and recommend to the executive committee:

| | |
|---|---|
| W. W. Charters, *Chairman.* | C. M. Koon. |
| Gertrude G. Broderick, *Secretary.* | Henry C. Link. |
| Hadley Cantril. | Robert S. Lynd. |
| John Karol. | Edward S. Robinson. |

A subcommittee on conflicts and cooperation, to study the problem of conflicts and to determine what it considered to be the responsi-

47

48    REPORT OF THE FEDERAL COMMUNICATIONS COMMISSION

bility of the Federal Radio Education Committee with regard to them:

| A. G. Crane, *Chairman.* | H. B. McCarty. |
| Gertrude G. Broderick, *Secretary.* | George B. Porter. |
| Harry C. Butcher. | Thomas Reed. |
| William B. Dolph. | Frank M. Russell. |
| M. S. Eisenhower. | |

An intensive 2-day meeting in Washington developed a report by the technical committee to the executive committee, recommending 16 studies at an estimated cost of $187,800. An additional study was proposed but it was felt that because of its highly technical nature, it should be scrutinized carefully by specialists in the field of research in psychology and sociology. The project was labeled "The Influence of Radio on Children and Adults" and Dr. Hadley Cantril, of the technical subcommittee, was appointed to head an extra committee which would design in detail the kind of study that was being proposed.

Dr. Cantril met with some dozen men and a study was proposed at an estimated cost of $54,000. This amount was added to the above-mentioned $187,800.

The conflicts committee also held a meeting in Washington, at which time it reviewed the proposed program of studies as set up and accepted by the technical and executive committees. It was felt that for their purposes it would be necessary for additional studies to be made to bring out information which would be necessary for the successful operation of the conflicts committee. Two additional studies which this committee proposed were accepted by the executive committee and added to the original proposal, making a total of $257,800 to cover the entire immediate research program of the committee.

The proposal was placed in the hands of the chairman, J. W. Studebaker, whose next responsibility was to find ways and means of financing the program. Since the results of these studies would be shared in by broadcasters and educators alike, it was believed that the broadcasting industry might be called upon to contribute part of the fund if educators—through some of the foundations—could contribute the other part.

On January 8th of this year, Judge E. O. Sykes and J. W. Studebaker extended a joint invitation to representatives of the broadcasting networks, the National Association of Broadcasters, the presidents of the Carnegie and the Rockefeller Foundations, and the director of the National Advisory Council of Radio in Education, to meet at the Federal Communications Commission to discuss in a closed, informal session just what could be done to finance the program. Following is a list of those who attended:

James W. Baldwin, National Association of Broadcasters.
Harry C. Butcher, Columbia Broadcasting System.
Commissioner Norman S. Case, Federal Communications Commission.
Dr. F. P. Keppel, president, Carnegie Corporation.
C. F. Klinefelter, Office of Education.
Lenox R. Lohr, National Broadcasting Co.
A. J. McCosker, Mutual Broadcasting Co.
John Marshall, The Rockefeller Foundation.
William S. Paley, Columbia Broadcasting System.
Anning S. Prall, Federal Communications Commission.

A. D. Ring, Federal Communications Commission.
John F. Royal, National Broadcasting Co.
Frank M. Russell, National Broadcasting Co.
David H. Stevens, The Rockefeller Foundation.
J. W. Studebaker, Commissioner of Education.
Levering Tyson, National Advisory Council on Radio in Education.
Frederick A. Willis, Columbia Broadcasting System.
Judge E. O. Sykes, presiding, Federal Communications Commission.
Gertrude G. Broderick, secretary, Federal Radio Education Committee.

Before making actual commitments it was suggested by some of the men in the industry that it might be possible to reduce the amount of money involved, by reworking the study outlines, combining some with others. It was agreed to select out of the attending group a small committee composed of three educators and three broadcasters, to undertake the revamping of the study program. That committee consists of the following members:

| | |
|---|---|
| Levering Tyson, *Chairman.* | John F. Royal. |
| W. W. Charters. | Frederick A. Willis. |
| Hadley Cantril. | James W. Baldwin. |

The committee agreed to report to the same group in about 6 weeks.

On March 12, at a meeting in Washington of the group which met on January 8, the revised program was presented by Chairman Tyson and further discussion followed. The informal "Committee of Six"—as it was referred to—reduced the original amount requested from $257,800 to $250,500. In so doing, certain studies were eliminated and others were combined. It is expected that the entire program can be completed within a period of 2 years.

There was unanimous agreement that the Committee of Six had done so well with their first assignment that they should be given the further responsibility of canvassing the potential financial sources. It is expected that the results of this canvass will be available soon.

In addition to the exploratory work of the subcommittee up to date, the Office of Education launched an experiment in genuine cooperative effort, the results of which are significant and should be useful to the committee in some of its future deliberations.

From the discussions which took place in the meetings of the original planning committee, the general committee, and the various subcommittees, it became quite evident that one large category of problems was concerned with difficulties relative to local and regional broadcasting. Local station managers, for example, reported that they had available time which they would be glad to have utilized by educational agencies if satisfactory programs could be provided. Many of the local school superintendents and officials of colleges and universities freely commented on the cooperative attitude of local station managers, but confessed their lack of experience in building and producing suitable educational programs. While none of the studies proposed by the subcommittees dealt with a direct attack on the situation I, as chairman of the Federal Radio Education Committee, felt justified in launching some experimental work designed to bring about a gradual improvement in what is essentially a local problem.

The Office of Education has been operating an experimental educational broadcast program for the past year and a half, financed with emergency relief funds. In connection with this activity, after consultations with J. W. Baldwin, of the National Association of

50   REPORT OF THE FEDERAL COMMUNICATIONS COMMISSION

Broadcasters, and Levering Tyson, of the National Advisory Council on Radio in Education, we established a script writing, editing, and exchange service as a joint enterprise between the Radio Project and the Federal Radio Education Committee. An initial series of scripts was written, designed expressly for local station production. Station managers and the local educational agencies were circularized with a view to encouraging educational groups to engage in the actual production of this series over local stations. The success of this initial step was so pronounced that an exchange service was started whereby educational scripts which had been produced at one time or another were edited and made available for local purposes. Scripts broadcast over networks chains by the radio project were also made available.

Following are a few significant figures indicating the success of this undertaking:

Within the year programs furnished by the script exchange have been carried by 108 radio stations located in 41 States.

One hundred and eight stations have carried 161 programs series furnished by the exchange.

Each series has averaged 6 scripts (or 6 programs), making a total in the 161 series of 966 programs carried by 108 stations.

More than 1,700 local groups, including high schools, colleges and universities, theater guilds, C. C. C. camps, radio stations, and many others, have been served by this script exchange.

These groups have received 50,000 copies of radio scripts, 10,000 copies of the Radio Manual, Glossary of Radio Terms, and Music Arrangements.

It is believed that the study program, as it has been designed, will make it possible to carry out the charter given to the committee by the Federal Communications Commission—namely, to combine forces which will:

1. Eliminate controversy and misunderstanding between groups of educators and between the industry and educators.

2. Promote actual cooperative arrangements between educators and broadcasters on national, regional, and local bases.

There is reason to feel that sufficient funds will be available within the next few months to get the program under way. A complete detailed report on the proposed program will be sent to you within the next 2 or 3 months.

A063

# *Adoption of Rules Governing Operation of "Non-Commercial Educational" Broadcast Stations*, 3 Fed. Reg. 312 (1938)

(Initial Use of Licensing Term "Non-Commercial Educational Broadcaster" and Initial Reservation of Radio Bandwidth for Exclusive Use by Educational Broadcasters)

3. Nor may he act as chief operator on any vessel having continuous hours of service for public correspondence.

4. The holder of this class license may not act as chief operator on a *cargo vessel* (other than a vessel operated exclusively on the Great Lakes) which maintains a continuous radio watch by operators as required by treaty or statute until he shall have had at least six months' satisfactory service as a qualified radiotelegraph operator on a vessel of the United States.

5. The holder of this class license may not act as sold operator on a vessel (other than a vessel operated exclusively on the Great Lakes) required by statute to have a *radio installation* until he shall have had at least six months' satisfactory service as a qualified radiotelegraph operator on a vessel of the United States.

### Radiotelegraph Operator, First Class

Any station while using type B, A1, A2, A3, or A4 emission.

#### Exceptions

1. The license is not valid for the operation of any of the various classes of broadcast stations other than a relay broadcast station.

2. The holder of this class license may not act as chief or sole operator on a *vessel* (other than a vessel operated exclusively on the Great Lakes) required by treaty or statute to be *equipped* with a *radiotelegraph* installation until he has had at least six months' satisfactory service as a qualified radiotelegraph operator on a vessel of the United States.

#### Special Privileges

1. An operator of any professional class may operate any station in the experimental service on a frequency above 30,000 kilocycles in accordance with station license.

2. Subject to the limitations set forth above the holder of any class radiotelephone operator license may operate a radiotelephone point-to-point station or a coastal telephone station while using A1 or A2 emission, for testing or other transmission entirely incidental to the service of such station.

3. The holder of a radiotelephone operator license of any class, when the license also certifies to his proficiency in International Morse Code (16 words per minute plain language, see Rule 436) may operate aircraft stations on *domestic* flights while using any type emission by the station license.

[SEAL]           T. J. SLOWIE, *Secretary.*

[F. R. Doc. 38–419; Filed, February 8, 1938; 9:58 a. m.]

---

### ADOPTION OF RULES GOVERNING OPERATION OF "NON-COMMERCIAL EDUCATIONAL" BROADCAST STATIONS

The Commission on January 26, 1938, adopted the following:

RULE 1057. The term "non-commercial educational broadcast station" means a high frequency broadcast station licensed to an organized non-profit educational agency for the advancement of its educational work and for the transmission of educational and entertainment programs to the general public.

RULE 1058. The operation of, and the service furnished by, non-commercial educational broadcast stations shall be governed by the following regulations in addition to the rules and regulations governing high frequency broadcast stations.

(a) A non-commercial educational broadcast station will be licensed only to an organized non-profit educational agency and upon a showing that the station will be used for the advancement of the agency's educational program.

(b) Each station may transmit programs directed to specific schools in the system for use in connection with the regular courses as well as routine and administrative material pertaining to the school system and may transmit educational and entertainment programs to the general public.

(c) Each station shall furnish a non-profit and non-commercial broadcast service. No sponsored or commercial pro-

gram shall be transmitted nor shall commercial announcements of any character be made. A station shall not transmit the programs of other classes of broadcast stations unless all commercial announcements and commercial references in the continuity are eliminated.

(d) The transmitting equipment, installation, and operation as well as the location of the transmitter shall be in conformity with the requirements of good engineering practice as released from time to time by the Commission.

(e) Any rule or regulation governing high frequency broadcast stations which permits or requires operation different from or in conflict with the provisions of this rule shall not apply to non-educational broadcast stations.

RULE 1059.

(a) The following channels (frequencies) are allotted for assignment to non-commercial educational broadcast stations:

| | | | | |
|---|---|---|---|---|
| 41,020 | 41,220 | 41,420 | 41,620 | 41,820 |
| 41,060 | 41,260 | 41,460 | 41,660 | 41,860 |
| 41,100 | 41,300 | 41,500 | 41,700 | 41,900 |
| 41,140 | 41,340 | 41,540 | 41,740 | 41,940 |
| 41,180 | 41,380 | 41,580 | 41,780 | 41,080 |

(b) Stations serving the same area will not be assigned to channels separated less than 160 kc.

(c) Amplitude modulation shall be employed exclusively unless it can be shown that there is a need for frequency modulation in which case such modulation may be authorized provided sufficient channels can be grouped so as to obtain the required band width without causing interference to established stations or preventing the full expansion of the service.

(d) Only one channel (frequency) will be assigned to a station.

(e) Since these channels are not assigned on an experimental basis, the requirements for report on experimental work, as specified for high frequency broadcast stations, do not apply.

[SEAL]           T. J. SLOWIE, *Secretary.*

[F. R. Doc. 38–418; Filed, February 8, 1938; 9:58 a. m.]

---

### AMENDMENT TO RULE 262A, B, B AND 262 D

The Commission on February 1, 1938 amended Rule 262A, B, b and 262 D to read in part as follows:

NORTHERN TRANSCONTINENTAL CHAIN AND FEEDERS (RED)

Available for aircraft and aeronautical stations.

| | | | |
|---|---|---|---|
| 3,147.5 | 3,182.5 | 5,122.5 | 5,592.5 |
| 3,162.5 | 3,222.5 | 5,572.5 | 5,662.5 |
| 3,172.5 | 4,335 | 5,582.5 | 5,697.5 day only [10] |
| | 4,480 | | |

SOUTHERN TRANSCONTINENTAL CHAIN AND FEEDERS (BROWN)

Available for aeronautical and aircraft stations.

| | | | |
|---|---|---|---|
| 2,946 | 3,257.5 | 3,457.5 | 5,612.5 |
| 3,222.5 [a] | 3,242.5 | 3,467.5 | 5,632.5 |
| 3,232.5 | 3,447.5 | 5,602.5 | 5,652.5 |
| | | | 5,887.5 [a] |

NORTHWESTERN CONTINENTAL CHAIN AND FEEDERS (PURPLE)

Available for aeronautical and aircraft stations.

| | | |
|---|---|---|
| 2,854 | 3,005 | 5,377.5 day only |
| 2,994 | 3,127.5 | 5,887.5 [d] |
| | 4,917.5 | |

[a] Day only—not to be used within 300 miles of Canada.
[a] Subject to the condition that no interference is caused to the international service.
[10] Subject to the condition that no interference is caused to existing services and that the operating frequency will be maintained within 0.02 percent of the assigned frequency.

#### D. PUBLIC SERVICE FREQUENCIES

The frequency which may be authorized for public aviation service is as follows:

4,495

[SEAL]           T. J. SLOWIE, *Secretary.*

[F. R. Doc. 38–417; Filed, February 8, 1938; 9:57 a. m.]

A064

# *Address by Frank R. McNinch Before National Association of Broadcasters, February 15, 1938 (Excerpt)*, 83 Cong. Rec. 1904 (1938)

(FCC Chairman's Speech on the Allocation of Channels to Nonprofit Educational Agencies and the "Peculiar and Unique Public Interest" Nature of Radio Broadcasting)

1904 APPENDIX TO THE CONGRESSIONAL RECORD

from Switzerland, on the other hand, declined steadily from $2,927,000 in 1935 to $2,463,000 in 1937.

Imports of Swiss watches and watch movements were valued at $6,153,000 in 1937 as compared with $5,854,000 in 1936 and $3,650,000 in 1935. This increase of imports reflects in part the reduction in watch smuggling which the cooperation between the Swiss and American authorities, pursuant to the trade agreement, has made possible. That the increase in legitimate watch imports has not adversely affected the watch industry in the United States is indicated by the fact that during 1936 and most of 1937 the industry was working practically at full capacity.

A table showing the total dollar value (franc values of Swiss imports from the United States converted into dollar values at the average annual rates of exchange) of Swiss imports from the United States and of United States imports from Switzerland, for 1934 through 1937, follows:

| | Swiss imports for consumption from the United States | United States imports for consumption from Switzerland |
|---|---|---|
| 1934 | $24,567,000 | $15,205,000 |
| 1935 | 22,565,000 | 16,095,000 |
| 1936 | 26,886,000 | 20,942,000 |
| 1937 | 28,962,000 | 26,060,000 |

## Reclassification of W. P. A. Workers

### EXTENSION OF REMARKS
OF

## HON. WILLIAM I. SIROVICH
OF NEW YORK

IN THE HOUSE OF REPRESENTATIVES
*Tuesday, May 10, 1938*

CORRESPONDENCE WITH THE PRESIDENT

Mr. SIROVICH. Mr. Speaker, on April 22, 1938, I wrote the following letter to the President of the United States:

APRIL 22, 1938.

Hon. FRANKLIN D. ROOSEVELT,
*The President of the United States, Washington, D. C.*

MY DEAR MR. PRESIDENT: Because of my great love and affection for you, and as one of your stanchest supporters on the floor of the House, I have determined to write to you regarding certain conditions in the W. P. A. which will create tremendous havoc, chaos, and disintegration in the fine work the W. P. A. has done in the past.

Without warning, orders have reached sponsors that 24 W. P. A. projects in New York City will be discontinued and the workers reclassified. This move is based upon the new celling that man plus material cost per individual shall not exceed $1,000 per year, instead of $1,240 which they have received in the past, cutting the purchasing and consuming power of all these workers. This order will be completed April 30, 1938.

Sponsors, high-grade heads of city, State, and Federal agencies, have planned, laid out, and overseen work that now will fall by the wayside because of this order.

This unjust move will disintegrate the organization of the W. P. A. Skilled workers will no longer have the possibility of maintaining their skill. They will be reclassified. This unjust move destroys their hope and advancement. It has shattered the morale and esprit de corps of the organization. It has made rebels of those who have dedicated the best that is in them for the cause.

Many of my colleagues in Congress have spoken to me and stated they will refuse to support the W. P. A. unless these obnoxious and offensive features that discriminate against the hard-working intellectual, cultured, and unfortunate men and women who happen to be the victims of our economic depression are removed.

In behalf of many of my colleagues in Congress I appeal to you as President of the United States, one of the greatest humanitarians, and the best friend of the unemployed in this Nation, to rescind this action of the W. P. A. Administrator.

The elimination of this unjust plan will restore faith to the public and help to promote their earning and purchasing power which is the greatest contributory factor in this present recession. It will right a wrong and give an evidence to the people of our Republic of the love and affection that you have for the underprivileged and inarticulate who have no one to appeal to but their great President.

With every good and kind wish to you and trusting that I may receive a reply to this important matter shortly, I beg to remain,
Very sincerely yours,

WILLIAM I. SIROVICH.

On May 9 I received the following reply, which speaks for itself:

THE WHITE HOUSE,
*Washington, May 9, 1938.*

The Honorable WILLIAM I. SIROVICH,
*House of Representatives.*

MY DEAR CONGRESSMAN SIROVICH: I have received your letter of April 22, 1938, concerning certain Works Progress Administration projects in New York City.

In order to provide work relief for the increased numbers in need thereof, the Works Progress Administration is making certain necessary adjustments to more equitably distribute the funds available. The question of eliminating projects with a high per man-year cost has been under consideration for many months. From time to time the Works Progress Administration has requested and received permission to continue the operation of certain projects which have not fully met the requirements of the works program.

Where possible the sponsor has been requested to contribute a sufficient amount to make the project suitable for continued operation under that program. In some cases it has been found that a correct classification of the personnel will be sufficient to permit the continued operation of projects. In some cases a combination of the two are necessary. It is possible that a very few projects will be discontinued.

However, as the sponsors of all projects prosecuted with funds provided by the Emergency Relief Appropriation Act of 1937 have signed agreements to finance such part of the entire cost of projects as is not to be supplied from Federal funds, there should be no question that any work will fall by the wayside as a result of the action taken by the Works Progress Administration.

Furthermore, where it is found necessary to discontinue the prosecution of projects with Federal funds, workers in need of relief, not required by the sponsor for the completion of such projects, are being given employment on other projects with as little delay as possible.

Sincerely yours,

M. H. McINTYRE,
*Secretary to the President.*

## Radio—Mass Communication

### EXTENSION OF REMARKS
OF

## HON. ARTHUR CAPPER
OF KANSAS

IN THE SENATE OF THE UNITED STATES
*Tuesday, May 10 (legislative day of Wednesday, April 20), 1938*

ADDRESS BY FRANK R. McNINCH BEFORE NATIONAL ASSOCIATION OF BROADCASTERS, FEBRUARY 15, 1938

Mr. CAPPER. Mr. President, I present an address delivered by Hon. Frank R. McNinch, Chairman of the Federal Communications Commission, to the National Association of Broadcasters at their sixteenth annual convention in Washington, D. C., on February 15, 1938, and ask unanimous consent to have it printed in the RECORD.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

When I took office as chairman of the F. C. C., I had but little understanding of the wide scope of the duties and responsibilities of the Commission in the licensing and regulation of the radio. Each week has brought to me an increasing realization of the importance of the Commission's work to the public as well as to the industry. So intriguing and fascinating has the Commission's field of opportunity for public service become, that while, as it was expressed in the press, I was loaned from the Power Commission to the Communications Commission for a period of a few months, I am now planning, gentleman, to continue in this work until I may have had a part in at least charting a course of constructive regulation and the formulation of policies for the guidance of the industry and the solution of some of the more important problems inherent in radio and facing your industry.

In a remarkably short time radio has taken first rank as a means of mass communication. The very fact that radio has this power to carry its message direct and daily to so many of our citizenship, stamps it as a unique public utility which is affected with a peculiar and distinct public interest and one whose basic problems are social rather than economic. This challenging social significance lifts radio to a new and a different and a higher level of responsibility than any other means of communication. It stamps it, in my judgment, with an imperative dedication to the public service. You cannot escape that. You dare not seek to avoid the fullest discharge of the public trust and the trusteeship that is yours incident to the license you hold. For while we no

A065

## APPENDIX TO THE CONGRESSIONAL RECORD

cating liquors. There is comparatively little advertising of intoxicating beverages over the radio, and you are to be congratulated on so largely eliminating this sort of sales appeal. But I believe you would do well if the American public understood you were not willing to lend your facilities for sales talks intended to increase the consumption of intoxicating beverages, especially when you remember that that appeal is to be made in the home to children of all ages and both sexes.

The majority of our citizens have registered their will that it should be lawful to sell such beverages, but the minority has, I believe, a right to have its homes protected against that which is offensive.

I commend the industry upon the service it has rendered without compensation to many fine social, religious, civic, and educational causes. Your contribution has been noteworthy. There are, however, yet wider fields of usefulness for the radio. I believe you will win and deserve an even larger measure of public favor than you now enjoy if you can find it practicable to make your facilities available for even greater measures of public service.

As you know, the Commission has recently made allocation of some 25 channels in the high-frequency band between 41,000 and 42,000 kilocycles to recognized nonprofit educational agencies for the advancement of educational work in local communities. You have a great opportunity to supplement this local educational work by close and active cooperation with organizations devoted to educational broadcasting, including the Federal Radio Education Committee which was appointed by the Commission in December 1935. This committee has already accomplished a great deal in the field of educational broadcasting and it now has a program of projects which, if the means are available to continue its work, would prove of great value in advancing the cause of educational broadcasting.

And now I touch a sensitive spot. This committee's budget calls for $250,000 to carry forward 10 projects for from 2 to 4 years. Of this amount, $167,000 was allotted to foundations and has been subscribed, so I am advised. The sum of $83,000 was allotted to broadcasters, and I understand that only a relatively small part of this amount has been forthcoming. I respectfully commend the work of this committee for your favorable consideration.

I have read with satisfaction the code of ethics adopted at your 1935 convention and every licensee who lives up to this code strictly will show his sincere desire to use the license privilege to serve the interests of the public. I am especially concerned with those code declarations intended to protect and benefit the listeners and I note with gratification this declaration in your code: "Recognizing the radio audience includes persons of all ages and all types of political, social, and religious belief, every member station will endeavor to prevent the broadcasting of any matter which would commonly be regarded as offensive."

This is a sound declaration for the protection of the rights of minorities, which has always been one of the proudest boasts of our American traditions. To attempt to justify a broadcast of something offensive to racial, religious, social, or other groups on the ground that the majority will not be offended by such a broadcast is, in my opinion, to overlook that which I believe to be a fact, that the majority is fairminded and will itself resent an abuse of or an injustice to the minority.

May I informally express the hope that I may come to know each of you personally. I shall be delighted to have you come to see me. If you have problems now or later I would like for you to come in and talk them over, for in such conferences minds may often meet and meet constructively.

I could have but one purpose, it seems to me, in desiring to stay with this work for a while longer and that is because I would like to serve the public in this wide field of opportunity. If I may somehow find the wit and wisdom, and if I may summon the courage to do it, I'd like to help the industry and I'd like to advance the interests of the listening public.

This may not always be best be done by pursuing the course of least resistance. Often that may be the very course that leads us to hurt and to harm. If you may have the notion that I intend to regulate the industry strictly, may I ask you to look at the record in another industry which was regulated strictly insofar as we were capable of doing it. The sum total, I believe, is rather generally agreed to have been constructive and helpful and redounded to the good of the industry.

If I may not always be able to accept your views, I hope at least you will believe me to be sincere and fair and earnestly desirous of helping you solve problems so that the industry may be lifted up and exalted in the public favor. If anyone may be asking the question as to whether there may be any future change in the licensing system we may now have, you hold the answer. By your fruits the public will know you and judge you.

I want your good will. You have mine. I want your help. You shall have mine. I want your candid judgment and frank expression of opinion when you come to see me about anything. I don't want you to say the thing that you think I may want you to say. I shall not do that with you. I shall say that to you which I honestly believe may be best for you, and I shall appreciate your doing that to me.

And I wonder if you would be surprised, because of some of the things you may have heard about me, if you learn, after all, that I am a very tolerant man. I think I know how to engage in discussion and controversy without rancor, without feeling, and with-

out the dethronement of reason. If I may have your confidence I may be able to help your industry. In helping you I shall be helping the public for which you work—the public which is my boss and whose word is the last word on any and everything touching public affairs.

Finally, may I share the high hope expressed by the President in his letter to you that your industry will prove itself to be worthy of the great public trust reposed in it.

---

## Federal Aid to Education

### EXTENSION OF REMARKS
#### OF
### HON. PAT HARRISON
OF MISSISSIPPI

#### IN THE SENATE OF THE UNITED STATES

*Tuesday, May 10 (legislative day of Wednesday, April 20), 1938*

#### RADIO ADDRESS BY A. F. WHITNEY, MAY 7, 1938

Mr. HARRISON. Mr. President, I ask unanimous consent to have printed in the RECORD an address delivered by A. F. Whitney, president, Brotherhood of Railroad Trainmen, on May 7, 1938.

There being no objection, the address was ordered to be printed in the RECORD, as follows:

Brother Chairman and friends, organized labor is united behind the program of the National Conference on Federal Aid to Education. We support the program unsolicited, for we are in the habit of being in the vanguard in the educational movement.

We unionists are proud of the fact that America's first labor movement was the outstanding champion of the public-school system. We are proud of the fact that labor sponsored the land-grant colleges after the Civil War; proud that labor supported laws compelling school attendance; proud that labor led the move for free textbooks; that labor stimulated the program for vocational education; that labor contributed to the adult education movement; that labor is now cooperating in the extension of workers' education; and, finally, that labor has brought into the fold of the organized progressive movement of America many of our teachers and professors, who, because of their status as union members, have more security and better tenure of employment.

Why, you may ask—why are workers devoted to the cause of extending educational opportunities to all sections of the population? The answer was given 100 years ago by the workers of Pennsylvania, who asserted:

"All history corroborates the melancholy fact, that in proportion as the mass of the people become ignorant, misrule and anarchy ensue—their liberties are subverted, and tyrannic ambition has never failed to take advantage of their helpless condition. * * * Let the productive classes, then, unite for the preservation of their free institutions, and by procuring for all the children in the Commonwealth republican education, preserve our liberties from the dangers of foreign invasion or domestic infringement. * * * Our Government is republican, our education should be equally so."

It is not without significance that where freedom no longer rings, there trade unions are abolished and education relegated to the dark ages. In Hitlerland the aggressive labor leaders were killed outright or tortured in concentration camps; the best of German literature was burned or segregated from the "Aryan" stuff. A "German" physics was substituted for a "Jewish" science. A minor official in a slaughterhouse became rector of the University of Berlin. And with what result?

William E. Dodd, Jr., who made a first-hand study of the conditions in Nazi universities, gives us these findings:

"In 1924 the total spring registration in the universities was 69,300. By 1931 it had grown to 131,000. In 1933 when the Nazis seized power, it was 130,000. But by the winter of 1935 it fell to 77,000, and 76,800 in the spring of 1936. Thus fascism drives German education back to pre-war standards."

A more striking example of the deathblows struck at education by fascism, as contrasted with the encouragement given by democracy, is to be found in war-torn Spain today. According to a recent press release issued by the American League for Peace and Democracy, one of the organizations sponsoring the National Conference on Federal Aid to Education:

"In rebel territory, beginning October 1, and during the whole part of the next academic term, 7 national institutes of learning will be closed, together with the scholastic institutions of Málaga and Seville and 40 other institutes of lower rating. On the other hand, the republican government, in the midst of war, has decreed a credit of 40,000,000 pesetas for the construction of new schools, 70,000,000 pesetas for improvements in all schools, including canteens, swimming pools, and educational materials,

A066