# House Report 94-245, Part 1

Public Broadcasting Financing Act of 1975

| 94TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT No. |
| 1st Session | | 94-245, Pt. I |

# PUBLIC BROADCASTING FINANCING ACT OF 1975

MAY 22, 1975.—Reported with an amendment, referred to the Committee on Appropriations for a period ending not later than July 22, 1975, for consideration of such provisions of the bill as fall within the jurisdiction of that Committee under rule X, clause 1(b), and ordered to be printed

Mr. STAGGERS, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

[To accompany H.R. 6461]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H.R. 6461) to amend certain provisions of the Communications Act of 1934 to provide long-term financing for the Corporation for Public Broadcasting and for other purposes, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

## COMMITTEE AMENDMENT

The amendment is as follows:
Page 3, line 10, after "expended" and before the period insert the following:

> , and a significant portion of such funds, including those funds distributed pursuant to paragraph (5) of this subsection, shall be utilized for the development and dissemination of instructional programming.

## EXPLANATION OF COMMITTEE AMENDMENT

Your Committee has had a long-standing concern that instructional programming remain an important component of public broadcasting. (See H. Rept. 92-979, (April 11, 1972) p. 4; H. Rept. 92-1292 (August 3, 1972) p. 5; and H. Rept. 93-324 (June 22, 1973) p. 11.) Accordingly, it adopted the amendment set forth above which provides that a significant portion of the funds authorized and appropriated under this legislation (including a significant portion of the funds distributed directly to on-the-air public broadcasting stations under proposed section 396(k)(5) be used for the development and dissemination of instructional programming.

A 107

The term "significant portion" as used in the amendment requires discussion. It is used rather than a fixed percentage in recognition of the fact that flexibility must be exercised in administering the amendment. For example, in fiscal year 1973 (the latest period for which reliable statistics are available), 32.1% of the total of 809,588 hours of programming broadcast by the 221 public television stations then in operation was devoted to classroom programming. During the same period the 121 CPB-qualified radio stations then in operation broadcast 716,790 hours of programming of which only 2.6% was in-school or in-service programming.

Furthermore, the entities which are licensed to engage in noncommercial broadcasting fall into four categories: (1) institutions of higher education, (2) local public school systems, (3) State or local governmental authorities, and (4) community organizations. Presumably institutions of higher education, local public school systems, and State or local governmental authorities devote a much larger portion of their broadcast time to instructional programming than do community organizations. And, of course, there are other differences between public broadcasting stations which dictate that a fixed percentage not be used in this amendment.

## SUMMARY OF LEGISLATION

H.R. 6471 would—

(1) Authorize and appropriate for the operation of the Corporation for Public Broadcasting (CPB) for each fiscal year in the period beginning July 1, 1975, and ending September 30, 1978, an amount equal to 40 percent of the amount of non-Federal financial support received by public broadcasting entities in the second year preceding each such fiscal year, and for each of the two fiscal years in the period beginning October 1, 1978, and ending September 30, 1980, an amount equal to 33⅓ percent of such support received in the second year preceding each such fiscal year. This authorization and appropriation would be subject to the following limitations:

| Fiscal year or period: | Limitation |
|---|---|
| 1976 | $88,000,000 |
| July 1, 1976–September 30, 1976 [1] | 22,000,000 |
| 1977 | 103,000,000 |
| 1978 | 121,000,000 |
| 1979 | 140,000,000 |
| 1980 | 160,000,000 |

[1] Transitional period from fiscal year beginning July 1 to fiscal year beginning October 1 as provided in title V of the Congressional Budget and Impoundment Control Act of 1974 (Public Law 93-344).

(2) Require that of the amounts appropriated to the CPB the following portions be distributed directly to on-the-air noncommercial educational broadcasting stations for their programming, operation, and maintenance:

40 percent or more of amounts appropriated for the period July 1, 1975, through September 30, 1976, and for any fiscal year in which the amount appropriated is $88 million or more but less than $121 million;

45 percent or more of the amount for any fiscal year in which the amount appropriated is $121 million or more but less than $160 million; and

50 percent or more of the amount for any fiscal year in which the amount appropriated is $160 million.

The funds distributed under the bill to any public broadcasting station for any fiscal year could not exceed an amount equal to one-half of the station's total non-Federal financial support during the second preceding fiscal year. This would assure that no public broadcasting station was mainly supported by Federal funds.

(3) Authorize the CPB to engage in the development and use of non-broadcast communications technologies such as cable television and communications satellites for the distribution and dissemination of educational radio and television programs.

## Committee Jurisdiction

The legislation herein reported provides authorizations and appropriations for the Corporation for Public Broadcasting for the period from July 1, 1976, through September 30, 1980. These authorizations and appropriations are based on the non-Federal financial support received by public broadcasting entities during the second fiscal year preceding the fiscal year for which the authorizations and appropriations are made. This plan was recommended by the Task Force on Long-Range Financing (see below p. 16) and adopted by the Administration in the legislation which it submitted to the Congress. Both regarded this approach as a necessary means of assuring that the budgetary and appropriations processes of the Federal Government would not intrude on freedom of expression in public broadcasting. However desirable the purpose, the Interstate and Foreign Commerce Committee recognizes that all appropriations in the bill are wholly within the jurisdiction of the Appropriations Committee. Accordingly, the Committee on Interstate and Foreign Commerce has taken no action with respect to the appropriations language in the legislation. References to appropriations in this report are solely for the sake of accuracy in reporting on the provisions of the bill.

## Committee Action

*Hearings*

The Committee, acting through its Subcommittee on Communications, held one day of overview hearings on public broadcasting on March 19, 1975. In those hearings the Subcommittee received testimony from the Chairmen of the Boards and Presidents of the Corporation for Public Broadcasting and of the Public Broadcasting Service and from the Presidents of the Association of Public Radio Stations and of National Public Radio.

On April 8, 1975, the Subcommittee began five days of hearings (April 8–10, 14 and 22) on H.R. 4563 (introduced by Chairman Staggers, for himself and Mr. Devine, at the request of the Administration), the forerunner of H.R. 6461. In those hearings the Chairmen of the Boards and Presidents of the Corporation for Public Broadcasting and of the Public Broadcasting Service and the Presidents of the Association of Public Radio Stations and National Public Radio were the initial witnesses, and, appearing as a panel, were also the closing witnesses in the hearing.

4

In addition, the Subcommittee received testimony from a panel representing the Advisory Committee of National Organizations (ACNO) to the Corporation for Public Broadcasting. Included on the panel were representatives of the National Council of Churches of Christ, the National Association for the Advancement of Colored People, the National Education Association, the National Congress of Parents and Teachers, the U.S. National Student Association, and the American Council for Better Broadcasts, some of 45 member national organizations of ACNO.

Other witnesses included the Acting Director of the White House Office of Telecommunications Policy, Commissioner Benjamin Hooks of the Federal Communications Commission, the President of the National Association of Educational Broadcasters, representatives of the National Organization for Women, the National Council of Women, the National Black Media Coalition, the Council of AFL–CIO Unions for Professional Employees, and of the National University Extension Association.

Statements were also received from the Honorable Clarence J. Brown, and the Honorable William Clay. Mr. Clay appeared on behalf of the Congressional Black Caucus. In addition, the chairman of the Committee for Economic Development filed a statement with the Subcommittee.

No witness appeared in opposition to the legislation and there was nearly unanimous support for the higher limitations on appropriations which are contained in H.R. 6461.

*Mark-up*

The Subcommittee on Communications met on April 28, 1975, to mark-up H.R. 4563. Three amendments to the legislation were unanimously adopted by the Subcommittee. These amendments—

    (1) Raised the limitation on authorizations and appropriations as shown in the table below and made corresponding adjustments in the amounts distributed directly to public broadcasting stations.

[In millions of dollars]

| Fiscal year | From— | To— |
|---|---|---|
| 1976 | $70.0 | $88 |
| 1976 (July 1–Sept. 30) | 17.5 | 22 |
| 1977 | 80.0 | 103 |
| 1978 | 90.0 | 121 |
| 1979 | 95.0 | 140 |
| 1980 | 100.0 | 160 |
| Total | 452.5 | 634 |

    (2) Increased the ratio of non-Federal financial support of public broadcasting to authorizations and appropriations under the legislation from 2.5:1 to 3:1 for the purpose of determining the authorization and appropriations under the legislation for fiscal years 1979 and 1980.

    (3) Clarified the responsibility of directors and officers of the CPB to testify before appropriate Congressional committees.

A clean bill incorporating these amendments was prepared and introduced by the Subcommittee Chairman, Mr. Macdonald, for himself and the full membership of the Subcommittee (Messrs.

Murphy, Carney, Wirth, Brodhead, Frey, and Madigan). The bill (H.R. 6461) was unanimously reported to the full committee.

On May 13, 1975, the full Committee considered H.R. 6461, adopted the Committee instructional programming amendment described above, and by a unanimous voice vote ordered the bill reported to the House.

## USE OF FUNDS

If non-Federal financial support of public broadcasting is sufficiently great to achieve the maximum authorizations and appropriations provided in the legislation, it is expected that the Federal funds will be used generally as shown in the following table. It should be emphasized that this table represents estimates for purposes of planning and should not be regarded as a mandated allocation of funds.

|  | Fiscal year— | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 1976 $88 | 1977 $103 | 1978 $121 | 1979 $140 | 1980 $160 |
| Television: | | | | | |
| Support of local stations | 44,000 | 51,500 | 60,500 | 70,000 | 80,000 |
| Distribution | 12,000 | 13,400 | 14,800 | 15,900 | 17,000 |
| Production | 9,934 | 12,100 | 14,700 | 20,100 | 23,000 |
| TV staff | 558 | 612 | 666 | 716 | 769 |
| Total | 66,492 | 77,612 | 90,666 | 106,716 | 120,769 |
| Radio: | | | | | |
| Support of local stations | 5,665 | 6,600 | 7,700 | 8,900 | 10,400 |
| Distribution | 1,658 | 2,200 | 2,500 | 2,700 | 3,000 |
| Production | 3,703 | 4,100 | 4,500 | 5,100 | 5,700 |
| Radio staff | 232 | 255 | 277 | 298 | 320 |
| All other | 2,425 | 2,303 | 2,521 | 2,538 | 2,156 |
| Total | 13,683 | 15,458 | 17,498 | 19,536 | 21,576 |
| Common broadcast services and support: | | | | | |
| Research | 2,216 | 2,493 | 2,787 | 3,060 | 3,340 |
| Training | 670 | 754 | 843 | 926 | 1,011 |
| Other | 1,586 | 1,784 | 1,995 | 2,191 | 2,391 |
| Total | 4,472 | 5,031 | 5,625 | 6,177 | 6,742 |
| Program direction and administration | 2,259 | 2,478 | 2,695 | 2,899 | 3,114 |
| Contingency | 1,094 | 2,421 | 4,516 | 4,672 | 7,799 |
| Total | 88,000 | 103,000 | 121,000 | 140,000 | 160,000 |

## BACKGROUND AND NEED

*Radio*

Noncommercial broadcasting had its start in 1919 when the Secretary of Commerce and Labor, under authority of the Radio Act of 1912, licensed radio station 9XM (changed in 1922 to WHA) to the University of Wisconsin in Madison, Wisconsin. By 1925, noncommercial broadcasting in the United States was being carried on by 171 educational organizations. (In that same year, there were 390 commercially licensed AM broadcasting stations.)

In 1929, the Secretary of the Interior appointed an Advisory Committee on Education by Radio, comprised of representatives of education, broadcasting, and related fields, to study the uses of radio in the classroom and in adult education, and the development of educational radio in general.

Section 307(c) of the Communications Act of 1934, provided that "The [Federal Communications] Commission shall study the proposal that Congress by statute allocate fixed percentages of radio broadcasting facilities to particular types or kinds of non-profit radio programs or to persons identified with particular types or kinds of non-profit activities, and shall report to Congress, not later than February 1, 1935, its recommendations together with the reasons for the same."

In its report to Congress, the FCC concluded that "there is no need for a change in existing law" inasmuch as "the interests of the non-profit organizations would be better served by giving educators access to costly and efficient equipment and access to an established audience." Accordingly, the FCC held a national conference in May, 1935, to explore plans for cooperation between broadcasters and non-profit organizations. From this conference, the FCC created the Federal Radio Education Committee (FREC). In 1936, the FREC urged "that a portion of the ultra high frequencies be reserved for non-commercial use by organized educational agencies.

In 1938, the FCC set aside certain AM channels between 41 and 42 megacycles for what were then called "curricular" stations—channels to be used exclusively for educational institutions. With the licensing of more and more commercial radio stations, however, and with those stations providing an increasing number of services previously offered by public radio, the noncommercial radio industry went into eclipse.

The slow reversal in the declining trend of public radio came with the introduction of FM broadcasting. By 1945, when the FCC reserved 20 FM channels exclusively for non-commercial educational broadcasting, there were only nine FM public radio stations. In three years, the number grew to 27 such stations, and in 1948, the FCC authorized low-power (10-watt) educational FM broadcasting. With the authorization of 10-watt stations, FM public broadcasting proliferated. During the next 20 years, the number of public FM stations grew to 362. Of these, more than 45 percent had a power of 10 watts.

Today there are about 740 FM public radio broadcasting stations. However, only 176 public radio broadcasting stations are today qualified to receive CPB assistance of which 20 are AM stations. In order to qualify for such assistance a radio station must meet the following criteria:

    (1) The station must be licensed by the FCC as a noncommerical educational radio station.

    (2) The station must operate with a power of no less than 250 watts.

    (3) A minimum of one adequately equipped studio and separate control room must be available to provide for local program production and origination.

    (4) In fiscal year 1975 the station must have a minimum of four full-time professional members of whom at least 1 must be employed in a managerial or programming position.

    (5) In fiscal year 1975 the station must be on the air at least 52 weeks, 7 days a week, and 16 hours a day.

    (6) The radio station's daily broadcast schedule should be devoted primarily to programming of good quality which serves demonstrated community needs of an educational, informational,

and cultural nature within its primary signal area. Such programming should be intended for a general audience.

The 176 CPB-qualified public radio stations serve 62 percent of the American public. At present, 34 major metropolitan centers have no CPB-qualified public radio service including such cities as Cleveland, Ohio; Newark, New Jersey; Sacramento, California; Charlotte, North Carolina; South Bend, Indiana; and Honolulu, Hawaii. The funds provided in H.R. 6461 are necessary if the goal of providing acceptable local public radio service to 90 percent of the population of the United States is to be realized.

Last year over 70 percent of the programs broadcast by CPB-qualified public radio stations were locally produced and originated. Approximately 15 percent of their programs were provided by National Public Radio either through interconnection with other public radio stations or from NPR productions. A sterling example of the kind of program which can be provided by public radio is *All Things Considered*. This program is in magazine format and consists of correspondents from NPR and its member stations examining various issues, events, and ideas. *All Things Considered* is carried over the NPR interconnection in the late afternoon for 90 minutes Monday through Saturday of each week. In addition, NPR makes available to a nationwide audience important congressional hearings, debates from the United Nations, and other significant events which would otherwise not be broadcast.

*Television*

As early as 1949, the FCC was considering the advisability of providing channels for noncommercial educational television operation. In 1951, as part of a general review of television, the Commission proposed the establishment of educational TV channels.

In 1952, the FCC authorized the reservation of 242 station channels—80 in the VHF band and 162 in the UHF band—for the exclusive use of non-commercial educational television. In that same year, the Ford Foundation created the National Educational Television and Radio Center (later to become NET) with a grant of over one million dollars. (In the period from 1951 to date, the Ford Foundation has made grants and expenditures of more than $275 million in support of noncommercial broadcasting, but is now in the process of phasing out its support so that its resources may be used for other undertakings.)

In May 1953, the nation's first educational television station, KUHT, went on the air at the University of Houston, Texas. In 1962, there were 76 educational television broadcasting stations on the air. The Educational Television Facilities Act (Public Law 87–447) was enacted in 1962. Amending the Communications Act of 1934, the new law initially authorized $32 million to be made available to the states "* * * over a five-year period to assist (through matching grants) in the construction of educational television broadcasting facilities." In the first five years of the program, 113 new educational television broadcasting stations had either begun operation or were under construction.

By 1967, the Carnegie Commission on Educational Television, under the chairmanship of Dr. James R. Killian, Jr., had researched and documented the enormous potential of noncommercial broadcast-

8

ing for service to the people of the United States. In its report, "Public Television, A Program for Action," the Commission proposed the creation of a private, non-governmental corporation to "provide * * * leadership, standards of excellence, and an instrument by which the hundreds of local stations can act from time to time in concert." The Corporation would "exist primarily to make it possible for those stations, one by one, to provide the greatest public service to their communities."

In passing the Public Broadcasting Act of 1967, Congress recognized the sensitive role the Corporation must play in noncommercial broadcasting's development. On the one hand, it was to facilitate the full development of noncommercial broadcasting in which "programs of high quality [would be] obtained from diverse sources" and assist in the development of interconnection and related systems; but, on the other hand, its work was to be done "in ways that will most effectively assure the maximum freedom of the noncommercial educational television or radio broadcast systems and local stations from interference with or control of program content or other activities."

Today almost 80 percent of the American public is within the reach of public television. The programs broadcast by public television stations are funded and produced by many diverse sources. Many of those programs are funded and produced by the public television stations themselves to meet the particular needs of their local audiences. Many are of high quality, but testimony received by the Committee indicates that substantially more funds are needed to permit local stations to give adequate service to all the audiences they are expected to serve. Larger community service grants to these stations from the CPB, which this legislation makes possible, will permit these stations to produce programs of greater diversity and excellence and increase their ability to serve the varied needs of their service areas. Most instructional programming is now locally produced and is generally funded by State or local educational agencies. This legislation will assure that sufficient funds are available for instructional programming.

Foundations, corporations, and other entities such as the National Science Foundation and the National Endowments for the Arts and Humanities presently underwrite all or part of the costs of particular programs or series which for the most part are presented on public television by means of the PBS national interconnection. These programs and series of programs have generally been of high quality and have contributed substantially to the excellence of overall public television offerings. However, your committee has serious concern that this method of funding public television programs tends to vest the entity providing the funding with the making of vital program decisions which under the Communications Act of 1934 are intended to be made by the broadcast licensee.

Approximately 30 percent of the programs distributed over the national public television interconnection during fiscal year 1975 were funded by the Station Program Cooperative, which is administered by the Public Broadcasting Service. The Station Program Cooperative is a mechanism through which local stations select the programs which they will support financially. When a particular

9

program or series receives sufficient support to cover its production costs, it becomes a part of the PBS program schedule. The second Station Program Cooperative recently undertook to select approximately $18 million worth of programs for the 1975–76 television season. Of the $18 million, $10 million has been provided by the CPB and the Ford Foundation, the balance by the public television stations themselves. This reflects an increased participation by the stations from the first Station Program Cooperative which was funded with $5.2 million from the Ford Foundation, $4.2 million from the CPB, and $4 million from the stations, a total of $13.4 million.

Among the programs which will be funded by the Station Program Cooperative for the 1975–76 television season are many with which viewers of public television are already familiar including *Sesame Street, Electric Company, Washington Week in Review, Nova, Bill Moyer's Journal, Firing Line, Woman, Black Perspective on the News, Consumer Survival Kit, Wall Street Week, Book Beat,* and *Hollywood Television Theater*.

Your committee regards the Station Program Cooperative as an innovative means of local selection and funding of programs for public television but has concern that it does not provide adequate programming which is responsive to the needs of the elderly, women, and minorities.

Since the public broadcasting stations are themselves funding ongoing programs through the Station Program Cooperative, the CPB has concentrated on providing funds for research, development, and piloting intended to provide new programs for the public television stations in selected categories. Thus, within the last month, the Corporation has granted (1) $300,000 to WITF–TV, Hershey, Pennsylvania, for the production of eight one-hour anthology programs to be called *Images of Aging* dealing with images and attitudes toward aging, (2) $400,000 to WNET–TV for the funding of *Woman Alive!*, a series of 10 half-hour programs devoted to presenting the many varied experiences, explorations, and changes in the lives of women today, and (3) $100,000 to the Nguzo Saba Films, an independent minority production company of San Francisco, California, for the piloting of the first of two programs entitled *Were You There?* which is expected to be an innovative black cultural program. In addition, $700,000 has been allocated by the Corporation to fund a third pilot and for support of a series of innovative programs on black culture.

The average cost of public television programs for national distribution during prime time is approximately $50,000 per hour. This is substantially less than the average cost of prime time commercial network television programming which is about $250,000 per hour. If public television programs are going to reach the audiences for which they are intended, they will have to be funded at levels more nearly comparable to those of commercial television programs.

In large measure because of the high cost of public television programs there has been extensive use by public television stations of programs produced abroad. These programs, while of technical excellence, were developed for foreign audiences. Enactment of H.R. 6461 should lessen the reliance of public television broadcasting stations on foreign programs and permit them to be supplanted in large