measure with programs of equal or higher quality produced in this country.

Another major need of public television broadcasting stations which approaches program production in its importance is for "state-of-the-art" equipment. A recent study conducted by the CPB at the request of U.S. Office of Education has established that it would require slightly over $104 million to upgrade the technical facilities of existing public television stations to allow them to provide service to the public in a manner comparable to their commercial counterparts.

*Corporation for Public Broadcasting*

The Corporation for Public Broadcasting is a private, independent, nonprofit corporation established pursuant to title II of the Public Broadcasting Act of 1967 (47 U.S.C. 396–399) and under the terms of the District of Columbia Non-Profit Corporation Act.

CPB operates under a bipartisan board of directors consisting of 15 members. Members of the board are appointed by the President by and with the advice and consent of the Senate for staggered terms of 6 years. No more than a simple majority of the CPB Board may be members of the same political party.

Under the Public Broadcasting Act of 1967 the Corporation for Public Broadcasting has four principal purposes. They are to (1) assist in the production and procurement of programs of excellence for presentation over public television and radio stations, (2) assist in the establishment and development of one or more systems of interconnection for such stations, (3) assist in the establishment and development of one or more systems of public broadcasting stations, and (4) act so as to assure the maximum freedom of noncommercial educational broadcasting systems and stations from interference with or control of program content or other activities.

*PBS–NPR–APRS*

Soon after it became operational (in 1969), the CPB together with public broadcasting licensees established the Public Broadcasting Service, an independent corporation whose principal purpose was to distribute programs to public television broadcasting stations in the United States. A somewhat similar organization, National Public Radio (NPR), became operational in 1971. NPR is made up of CPB-qualified public radio stations.

In early 1973 a thorough reassessment of the structure of public broadcasting was undertaken by the CPB and public broadcasting stations. As a result of that reassessment, in March 1973, the Public Broadcasting Service was reconstituted as a nonprofit membership corporation which today represents 151 public television licensees which operate 253 public television stations. To represent the CPB-qualified public radio stations in the United States the Association of Public Radio Stations was formed. Although National Public Radio has some similarities to PBS—both are membership organizations managed by the members, and both draw from local sources for their programs—there are four basic differences: NPR produces programs, while PBS does not; PBS obtains programming from its member stations and a variety of producing entities which are partially funded by CPB, while NPR is principally funded by CPB and supplements its production by contracting with local stations and other producing agencies for programs it will carry; PBS policy making is shared by two boards representing the station managers and station

11

board chairmen, NPR policy is set by one board of directors comprised of station representatives and lay representatives.

*CPB–PBS Agreement*

As a basis for their interaction, the CPB and PBS on May 31, 1973, entered into the following agreement under which they now operate:

A JOINT RESOLUTION OF THE CORPORATION FOR PUBLIC BROADCASTING AND THE PUBLIC BROADCASTING SERVICE

*Resolved, by the Boards of the Corporation for Public Broadcasting and the Public Broadcasting Service, That—*

In order to effect a vigorous partnership in behalf of the independence and diversity of public television and to improve the excellence of its programs;

To enhance the development, passage by Congress, and approval by the Executive branch of a long-range financing program that would remove public broadcasting from the political hazards of annual authorizations and appropriations;

To further strengthen the autonomy and independence of local public television stations; and

To reaffirm that public affairs programs are an essential responsibility of public broadcasting,

the Boards of the Corporation for Public Broadcasting (CPB) and the Public Broadcasting Service (PBS) do hereby jointly adopt the following agreement:

1. CPB will, in consultation with PBS, other interested parties, and the public, decide all CPB funded programs through a CPB program department. The consultation prior to CPB's decision is vital so that the CPB programming department will understand what the licensees' needs are and thus avoid any possibility that CPB will fund programs that the licensees do not want. By such a consultation, well in advance of CPB program decisions, time and vitally needed dollars can be saved and the public can be best served. In the event that the PBS program department dissents from any particular program decision of the CPB program department, the PBS program department may appeal to the chief executives of CPB and PBS. Should these executives fail to agree, final appeal may be made to the respective chairmen of the two organizations whose joint decision will be final.

2. All non-CPB funded programs, accepted under PBS Broadcast Journalism Standards and normal PBS procedures, will have access to the interconnection.

3. Should there be any conflict of opinion as to balance and objectivity of any programs, regardless of the source of funding, either group can appeal to a monitoring committee consisting of three CPB trustees and three PBS trustees. It will take four votes of this committee to bar a program's access to the interconnection.

4. PBS, on behalf of the stations, will prepare a draft schedule of programs for interconnection. The draft schedule will be for one year divided into four quarters. It will be resubmitted each quarter for the ensuing four quarters. To preserve the mutual interests of both CPB and PBS, CPB will be advised and consulted in the development of the draft schedule, and when each

approval of CPB. In the event that the CPB program department does not agree to the draft schedule, it may appeal to the chief executives of CPB and PBS. Should these executives fail to agree, the issue shall be presented for final decision to the board chairmen of CPB and PBS. Should they fail to agree, they shall choose a third person to whom the issue will be presented and whose decision shall be final. Emergency scheduling decisions will be made in accordance with procedures approved by the chairmen of the CPB and PBS boards. In any event, the draft and final schedules shall reflect the arrangements of programs of interconnection service to stations, and shall not be regarded as a schedule of programs for broadcast by the stations.

5. There is hereby established a Partnership Review Committee consisting of an equal number of trustees of CPB and PBS. Such committee shall assess the working of the partnership on a regular basis with formal meetings to be held not less than four times per year. For a five-year period beginning with the adoption of this joint resolution, this committee will be charged with the responsibility of making recommendations to the boards for any modifications which they may deem desirable.

6. CPB and PBS will formalize an annual contract for the physical operation of the interconnection not later than August 31, 1973. Physical operation of the interconnection will be by PBS and will be funded by CPB. Any dispute as to the terms of the contract will be resolved by the chairmen of CPB and PBS no later than September 30, 1973. CPB will continue to finance PBS activities as it has in the past until September 30, 1973. Following that date, PBS will finance its own activities, receiving from CPB only the funds necessary for the physical interconnection services which it will render under the contract.

7. CPB and PBS hereby agree that CPB will provide the mutually desired bedrock of localism by unrestricted grants to the public television stations, under a formula accepted by CPB and PBS, aggregating annually not less than 30% at a $45 million level, increasing proportionately to: 40% at a $60 million level, 45% at a $70 million level and 50% at an $80 million level. CPB and PBS will express this commitment to the Congress in connection with the pending legislation.

*Authorizations-Appropriations—Non-Federal Financial Support*

The following table shows the steady increase in the Federal funding of the Corporation for Public Broadcasting and the corresponding increases which have taken place in non-Federal financial support of public broadcasting:

(In millions of dollars)

| Fiscal year: | Authorization | Appropriation | Non-Federal financial support |
|---|---|---|---|
| 1969 | 9 | 5.0 | (¹) |
| 1970 | 20 | 15.0 | 122.4 |
| 1971 | 35 | 23.0 | 155.5 |
| 1972 | 35 | 35.0 | 174.5 |
| 1973 | 45 | ³ 35.0 | 199.2 |
| 1974 | 55 | 47.5 | 223.2 |
| 1975 | 65 | 62.0 | (¹) |

13

## LONG-RANGE, INSULATED FINANCING FOR CPB

*Committee Position*

The quest for long-range, insulated financing for public broadcasting and its importance is abundantly documented in the reports of this Committee. Pertinent excerpts follow:

### CORPORATION FINANCING

The bill reserves the question of permanent financing for consideration during the next session of Congress. It is felt that since there are no precedents upon which to base judgments, a clearer view than is possible at the present time as to the Corporation's future needs can be obtained after it has gained operational experience.

Estimates of future requirements of the Corporation (from $40 million in fiscal year 1969 to $160 million in fiscal year 1980), including the portion expected from Federal sources, were furnished by HEW and the Carnegie Commission. In addition, various proposals were made for permanent financing of the Corporation. However, most witnesses agreed that starting funds should now be appropriated and that the decision on the structure of future financing should await further study and experience.

Although funds for fiscal year 1968 are herein authorized by direct appropriation, some members of the committee believe that this type of financing should not be used in the future.

The hearings make it evident that a decision regarding the permanent financing is largely dependent upon the nature and operations of the Corporation. The composition of the Board is not yet evident. The operational policies are not yet set. It is difficult to make long-range predictions of financial requirements or the most desirable means of fulfilling these needs until the Corporation is in existence. Although both the Carnegie Commission and HEW have made projections of future financial requirements (see App. IV and V), they still are not those of the Corporation, and the views of the Directors of the Corporation will be of invaluable assistance in helping to shape the final provisions for permanent financing.

The method of permanent financing is partially dependent upon the level of support which can be expected from private sources. The Corporation will need time to contact individuals, businesses, foundations, and local governments and survey the possibility of annual campaigns for the benefit of educational broadcasting stations and the Corporation. In the past decade there has been substantial support for ETV and this is expected to continue. It was testified that the private sector is eager to play its part. The newly formed National Citizens Committee for Public Television as well as similar State commissions will assist in marshalling support. The Columbia Broadcasting System has promised a gift of $1 million when the Corporation is organized. The Communication Workers of America, AFL-CIO, have pledged $100,000 to the Corporation.

HEW supplied information to the committee predicting private contributions to educational television of $20 million by 1973, assuming that vigorous fundraising is undertaken. (See App. V.) It could not be stated with certainty how much of this amount would be allocated to the Corporation, but HEW believes $5 million is a reasonable estimate. The Carnegie Commission reported that in 1980 the Corporation could expect an additional $4 million annually from foundation sources. The Carnegie Commission further reported that State and local governments appropriated $33 million for ETV in 1965–66 and that State and local governments, foundations, other private sources, and the general public can be expected to contribute $75 million annually by 1980. However, witnesses were unanimous in their opinions that private contributions and support from local and State governments will be wholly inadequate to sustain a workable noncommerical broadcasting system. Other sources of revenue are essential.

When the Corporation is organized, one of its principal responsibilities will be to provide funds to local stations. Studies will be necessary to determine the proper level of this support. HEW submitted projections which show that local stations may require corporation grants of $10 million in fiscal year 1969 and $31 million in fiscal year 1970.

In view of the many uncertainties with regard to both the estimated fund requirements and the possible sources of support, the committee is forced to reject all suggestions for permanent financing at this time and await more specific information from the Corporation. President Johnson has requested that Congress wait until next year for his proposals and recommendations on permanent financing. At that time detailed budgets can be proposed showing staff commitments, the degree of public and private support expected, and the costs of selected approaches to initial operations in the areas of program acquisition and interconnection of stations, and most importantly, what operating grants will be necessary to sustain the operations of the local stations. The committee believes it is perfectly workable to establish the Corporation this year with 1 year's financing and resolve the issue of long-range financing after further study and experience. (House report no. 572, 90th Congress, first session, August 21, 1967, pages 20–21.)

\*    \*    \*    \*    \*    \*    \*

As enacted, the Public Broadcasting Act of 1967 authorized the appropriation of $9 million for fiscal year 1968 to support the Corporation until a long-range plan for financing could be formulated and placed in operation.

In his education message to the Congress dated February 5, 1968, the President stated:

> We have acted also to launch an historic educational force in American life: public broadcasting—noncommercial radio and television service devoted first and foremost to excellence.
> Last year the Congress authorized the Corporation for Public Broadcasting. This year we must give it life.

## BACKGROUND

The establishment of a source of funding to provide long-term, insulated financing has long been seen as an essential goal if public broadcasting is to fulfill its potential of offering diverse and excellent educational radio and television programming, free of governmental influences. Even before the enactment of the Public Broadcasting Act of 1967, the Carnegie Commission on Educational Television, in recognition of the uniquely sensitive relationship between program content and Federal funding, recommended a plan of permanent financing that would insulate the Corporation and public broadcasting from possible pressures that might naturally result from the annual budgeting and appropriation process.

Since 1967, however, the Congress has quite properly chosen not to institute a long-range funding plan, in view of questions regarding the structure of the public broadcasting system and the policies of the Corporation and the Public Broadcasting Service (PBS). Now, many of these questions have been resolved. Public broadcasting is making important contributions to the nation's life by providing educational and cultural programs of diversity and excellence. The important role of local stations in the hierarchy of the system has been acknowledged in principles and policies adopted by the Corporation and the other national entities that represent local stations.

## INSULATED FUNDING

The time has come, therefore, to affirm the Federal commitment to the principle of public broadcasting with a long-term financing plan that acknowledges it progress and recognizes its potential. The bill the Administration submits today provides for a five-year authorization and appropriation covering fiscal years 1976 through 1980, building upon the current year authorization and appropriation, which continue the increases in funding for the Corporation over the past five years. This multi-year appropriation provision will minimize the possibility of any government scrutiny of or influence on programming that might occur in the course of the usual annual budgetary, authorization and appropriation process. In addition, it will enable the Corporation and local stations to undertake advance program planning with assurance as to the level of Federal funding available in the foreseeable future.

The authorization and appropriation of funds for the Corporation would be based upon matching fund principles that have worked successfully in providing both private foundation and government funds to public broadcasting in the past. There would be a 40 percent Federal match of the entire public broadcasting system's non-Federal income, so that $1.00 in Federal funds would be appropriated for every $2.50 received by the Corporation, stations and other public broadcasting entities in the form of private contributions and State and local government support. The matching formula would establish a Federal commitment to provide substantial support to the public broad-

19

casting system while providing an incentive for encouraging continued and increased non-Federal support. The matching principle also assures that Federal assistance does not become a dominant force in the system; a risk that no one in public broadcasting or government is prepared to take. As an additional safeguard in this regard, the bill imposes ceilings on the permissible appropriation for each fiscal year, beginning at $70 million in fiscal year 1976 and reaching $100 million in fiscal year 1980. In view of the system's growth and development in recent years, ceiling are sufficiently high to permit continued growth and still offer the system meaningful incentive to increase non-Federal financial support in view of the record of non-Federal contributions in recent years. At the same time, ceiling comport with sound fiscal policy in light of the fact that this would be the Congress first venture into multiyear appropriations for public broadcasting.

Moreover, the Corporation would remain fully accountable to the public and to the Congress for its use of public funds, in that the bill requires that officials of the Corporation make themselves available for annual oversight hearings before appropriate congressional committees. Several existing provisions in the Public Broadcasting Act also assure continued public accountability. For example, the General Accounting Office is authorized to audit the books of the Corporation, as well as the records of any recipient of a grant from the confirmation by the Senate; and the ultimate safeguard, of course, is the congressional prerogative to amend the funding provisions of the Act at any time.

\* \* \* \* \* \* \*

*Presidential Statement*

The following statement of President Ford in transmitting the legislation to the Congress should also be noted:

OFFICE OF THE WHITE HOUSE PRESS SECRETARY,
THE WHITE HOUSE,
*February 13, 1975.*

STATEMENT BY THE PRESIDENT

The Administration today sent a bill to the Congress that will appropriate Federal funds for the Corporation for Public Broadcasting over a five-year period, starting with $70 million in fiscal 1976 and reaching $100 million by 1980. To assure that Federal support does not dominate public broadcasting and to encourage continued non-Federal contributions, the Federal funds would be provided on a matching basis—with one Federal dollar for every $2.50 in non-Federal revenues up to the annual ceiling.

Since enactment of the Public Boradcasting Act of 1967, the Federal Government has supported the growth and development of noncommercial educational radio and television through annual appropriations. During this time, public broadcasting has developed and matured into a far-reaching, effective medium for bringing high quality educational and cultural programming to millions of Americans.

A recurring question in public broadcasting has been how to reconcile Government funding with the possibility of Government control. On the one hand, if Federal funds are used to support public broadcasting, the Government must be able to evaluate how the funds are spent. To do otherwise would be irresponsible. On the other hand, strict accountability by public broadcasting to the Government can lead to Government direction of programing, which is contrary to the principles of free expression on which our Nation was founded. It is this issue alone which requires that the Congress consider a five-year appropriation for public broadcasting.

This bill is a constructive approach to the sensitive relationship between Federal funding and freedom of expression. It would eliminate the scrutiny of programing that could be associated with the normal budgetary and appropriations processes of the Government. At the same time, it would still permit periodic review of public broadcasting by the Congress. I believe that it will assure the independence of noncommercial radio and television programing for our Nation; and, long-term Federal funding will add stability to the financing of public broadcasting which may enhance the quality of its programming. I urge the Congress to enact it promptly.

SECTION-BY-SECTION EXPLANATION OF H.R. 6461, AS REPORTED

### SECTION 1

This section provides that the legislation may be cited as the "Public Broadcasting Financing Act of 1975".

### SECTION 2

Subsection 396(k) of the Act is amended to establish a five-year Federal financing plan for the Corporation for Public Broadcasting and to assure that a reasonable portion of the fund appropriated to the Corporation is distributed directly to local stations.

Paragraph (3) of Subsection 396(k) would establish a "Public Broadcasting Fund" in the Treasury, to which there would be authorized for appropriation, for fiscal years 1976-1978, amounts equal to 40 percent of the total non-Federal financial support received by public broadcasting entities during each second-preceding fiscal year, and for fiscal years 1979 and 1980, amounts equal to 33⅓ percent of the total non-Federal financial support received by such entities during fiscal years 1977 and 1978, respectively. A one-year time lag is necessary to accumulate the information for determining the amount on which the match is to be based. The three-month period between July 1, 1976, and September 30, 1976, which is the transition period between the July 1 Federal fiscal year and the new October 1 fiscal year, is treated as a separate authorization period pursuant to section 502(a) of Congressional Budget and Impoundment Control Act of 1974 (Public Law 93-344). The basis for the 40 percent match for this three-month period is one-fourth of the non-Federal contributions to public broadcasting entities during fiscal year 1975. The appropriation for each fiscal year could not exceed the following ceilings: $88 million

21

in fiscal year 1976; $103 million in fiscal year 1977; $121 million in fiscal year 1978; $140 million in fiscal year 1979; and 160 million in fiscal year 1980. Finally, the appropriation for the three-month transition period could not exceed $22 million.

Paragraph (4) would appropriate to the Public Broadcasting Fund the amounts authorized by paragraph (3). These funds would, of course, be actually appropriated into the Public Broadcasting Fund. Amounts otherwise appropriated to departments and agencies of the Federal Government and paid to public broadcasting entities pursuant to a grant or contract would not be considered for this purpose. Amounts appropriated to the Fund would remain available until expended and would be used solely for the expenses of the Corporation. Under the committee amendment (described above) a significant portion of those amounts and of the amounts distributed to on-the-air public broadcasting stations (see discussion of paragraph (5) below) would have to be used for the development and dissemination of instructional programming. This paragraph also sets forth the procedure whereby the amounts appropriated each year would be disbursed from the Public Broadcasting Fund to the Corporation. The Corporation would be required to determine the amount of non-Federal financial support received by public broadcasting entities during each second preceding year, and to certify that amount to the Treasurer of the United States. The Treasurer, upon receipt of such certification, would pay from the Fund to the Corporation the amount of the appropriation.

For this purpose the Corporation has established procedures to be followed by public broadcasting entities making reports to the Corporation with respect to non-Federal financial support received by them. Each such report would have to be certified by the chief executive officer of the entity (which in most instances will be a public broadcasting station manager) and then have it independently verified by an outside financial organization, usually a firm of certified public accountants. Since these reports will be used by the Corporation for making certifications to the Secretary of the Treasury and will be the basis for funds being appropriated into the Public Broadcasting Fund, section 1001 of title 18, United States Code, will apply to these reports of the public broadcasting entities. Section 1001 provides:

§ 1001. Statements or entries generally.

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

It should also be noted that the CPB pursuant to section 396(l)(3)(B) of the Act now audits recipients of assistance from it at least once every 5 years and is taking steps to increase the frequency of such audits to at least once every 3 years.

Paragraph (5) would require the Corporation to set aside a specified percentage of the appropriated funds for distribution to on-the-air noncommercial educational broadcast stations. The statutory percentage for distribution to stations would be 40 percent for the fifteen

22

month period from July 1, 1975 to September 30, 1976 and in any fiscal year in which the appropriation was $88 million or more but less than $121 million; 45 percent at an appropriation level of $121 million or more but less than $160 million; and 50 percent at an appropriation level of $160 million. The statutory percentage is expressed as a minimum, so that the Corporation could reserve a greater amount than that specified in the bill.

Paragraph (6) sets forth the method for distributing the funds reserved pursuant to paragraph (5). The Corporation would be required to establish, and review annually, after consultation with the licensees and permittees of on-the-air educational stations, critreia and conditions for the distribution of these funds. In each fiscal year, the Corporation would be required to divide the funds into two portions, one to be distributed to television stations and one to be distributed to radio stations. Each licensee or permittee of an on-the-air educational television station would receive a basic grant from the portion reserved for television. The amount of this basic grant would be the same for each station, and would be determined annually by the Corporation in consultation with the stations. The balance of the amount reserved for television stations would be distributed among licensees and permittees of such stations as are eligible to receive additional grants under criteria established by the Corporation in consultation with the stations. These additional grants would be apportioned among eligible stations on the basis of a formula designed to (a) provide for the financial needs of stations in relation to the communities and audiences they undertake to serve and (b) stimulate non-Federal financial support for station activities. The bill does not prescribe a precise formula for the distribution of additional grants, but rather states these two objectives that the formula is to achieve. The details of the formula, as well as the weight assigned to each factor, would be determined by the Corporation in consultation with the stations.

A somewhat different distribution mechanism is established for noncommercial educational radio stations. Many such stations are licensed to educational institutions for purposes of training students in broadcasting and do not render a direct service to the general public. Accordingly, only those stations that are eligible according to public interest criteria established by the Corpration would receive grants from the portion of funds reserved for distribution to radio stations. The bill does provide, however, that each such eligible radio station would receive a basic grant. As with television stations funds in addition to the basic grant would be distributed to eligible radio stations according to a formula that would stimulate non-Federal income and reflect the needs of stations in relation to the audiences they serve.

The bill assures that licensees and permittees of stations will play a significant role in the decisionmaking processes relating to distribution of fun ls to stations. The Corporation would be required to consult with licensees and permittees (including their authorized representatives) in (a) apportioning the funds between radio and television, (b) determining the amount of the basic grant to stations, (c) establishing eligibility criteria for radio stations and fo additional grants to television stations, and (d) establishing the formula for

A 125