

22

month period from July 1, 1975 to September 30, 1976 and in any fiscal year in which the appropriation was $88 million or more but less than $121 million; 45 percent at an appropriation level of $121 million or more but less than $160 million; and 50 percent at an appropriation level of $160 million. The statutory percentage is expressed as a minimum, so that the Corporation could reserve a greater amount than that specified in the bill.

Paragraph (6) sets forth the method for distributing the funds reserved pursuant to paragraph (5). The Corporation would be required to establish, and review annually, after consultation with the licensees and permittees of on-the-air educational stations, critreia and conditions for the distribution of these funds. In each fiscal year, the Corporation would be required to divide the funds into two portions, one to be distributed to television stations and one to be distributed to radio stations. Each licensee or permittee of an on-the-air educational television station would receive a basic grant from the portion reserved for television. The amount of this basic grant would be the same for each station, and would be determined annually by the Corporation in consultation with the stations. The balance of the amount reserved for television stations would be distributed among licensees and permittees of such stations as are eligible to receive additional grants under criteria established by the Corporation in consultation with the stations. These additional grants would be apportioned among eligible stations on the basis of a formula designed to (a) provide for the financial needs of stations in relation to the communities and audiences they undertake to serve and (b) stimulate non-Federal financial support for station activities. The bill does not prescribe a precise formula for the distribution of additional grants, but rather states these two objectives that the formula is to achieve. The details of the formula, as well as the weight assigned to each factor, would be determined by the Corporation in consultation with the stations.

A somewhat different distribution mechanism is established for noncommercial educational radio stations. Many such stations are licensed to educational institutions for purposes of training students in broadcasting and do not render a direct service to the general public. Accordingly, only those stations that are eligible according to public interest criteria established by the Corpration would receive grants from the portion of funds reserved for distribution to radio stations. The bill does provide, however, that each such eligible radio station would receive a basic grant. As with television stations funds in addition to the basic grant would be distributed to eligible radio stations according to a formula that would stimulate non-Federal income and reflect the needs of stations in relation to the audiences they serve.

The bill assures that licensees and permittees of stations will play a significant role in the decisionmaking processes relating to distribution of fun ls to stations. The Corporation would be required to consult with licensees and permittees (including their authorized representatives) in (a) apportioning the funds between radio and television, (b) determining the amount of the basic grant to stations, (c) establishing eligibility criteria for radio stations and fo additional grants to television stations, and (d) establishing the formula for

A 125

23

apportioning additional grants among stations, including the right to be assigned to the statutory objectives of stimulating non-Federal income and reflecting the needs of stations in relation to the audiences they serve.

In order to assure that Federal funds do not become a dominant factor in the financing of stations, this paragraph also provides that the funds distributed according to this subsection may not exceed, in any fiscal year, one-half of a licensee's or permittee's total non-Federal financial support during the fiscal year second preceding the fiscal year in which the distribution is made. This limitation would not apply to grants made by the Corporation under developmental programs designed to meet special needs of particular stations.

Paragraph (7) provides that the funds distributed to stations may be used at their discretion for purposes related to the provision of non-commercial educational television and radio programs. Several examples of such purposes are set forth, including: producing, broadcasting or otherwise disseminating educational television or radio programs; procuring national or regional program distribution services that make educational television or radio programs available for broadcast or other dissemination at times chosen by stations; acquiring, replacing, and maintaining facilities, and real property used with facilities, for the production, broadcast or other dissemination of educational television and radio programs; developing and using non-broadcast communications technologies (such as cable television and communication satellites) for educational television or radio program transmission purposes.

This list of purposes for which funds may be used by stations is not meant to be exhaustive. For example, although not specifically mentioned, it is intended that these funds could be used for the payment of dues or assessments to organizations which represent the interests of stations. One purpose for listing several typical uses of the funds is to make it clear that stations may undertake the development and use of non-broadcast methods of transmitting programs to the public. In this regard, the term "dissemination" is intended to mean delivery of programs to viewers and listeners of non-broadcast technologies.

### SECTION 3

Subsection 396(g)(2)(H) is amended to permit the Corporation to conduct research, demonstrations, or training in the use of non-broadcast communications technologies, as discussed above, for the dissemination of educational television or radio programs.

### SECTION 4

A provision is added to subsection 396(i) of the Act, which pertains to the annual report of the Corporation. The new provision states that the officers and directors of the Corporation shall be available to testify before appropriate committees of the Congress with respect to the annual report of the Corporation, the report of any audit made by the Comptroller General pursuant to subsection 396(l) of the Act, or any other matter which any such committee may determine. Even with long-term Federal financing, the Corporation remains fully

24

accountable to the public and to the Congress for its use of public funds. In view of the multi-year appropriation provision of the bill, this addition will provide the opportunity for appropriate Congressional review of the Corporation and its activities. This will facilitate review of such matters as employment of, and programming for, minorities and women and ascertainment of community problems, needs, and interests in the field of public broadcasting.

### SECTION 5

The provision in the bill for appropriations amounting to 40 percent of the non-Federal income of public broadcasting entities and the limitation on the amount of funds that may be distributed to a station, expressed as a percentage of non-Federal income. necessitate the inclusion of two new definitions in the Act.

The term "public broadcasting entity" is defined to mean the Corporation for Public Broadcasting, any licensee or permittee of a non-commercial educational broadcast station, and any nonprofit institution engaged primarily in the production, acquisition, distribution or dissemination of educational television or radio programs. Examples of the latter category include program production organizations, such as the Children's Television Workshop, and organizations providing program distribution services to stations such as the Public Broadcasting Service and National Public Radio.

The term "non-Federal financial support" is defined to mean the total value of cash and fair market value of property and services (except for personal services of volunteers) received as gifts, grants, bequests, donations, or other contributions for the construction or operation of non-commercial educational broadcast stations, or for the production, acquisition, distribution or dissemination of educational television or radio programs and related activities. The definition includes such funds received from any source other than (1) the Federal Government or (2) any public broadcast entity. The latter exception is intended to eliminate the double counting of funds circulated within the public broadcasting system. Thus, for example, income from a non-Federal source received in the first instance by a national public broadcasting organization and then distributed to stations or other public broadcasting entities would be counted only once.

In addition, the term is defined to include income received for public broadcasting purposes from State and local governments and educational institutions, as well as contract payments from such entities in exchange for services or materials relating to the provision of educational or instructional television or radio programs. Excluded from the definition are contract payments for such services from sources other than State and local governments and educational institutions, as well as contract payments in exchange for commercial services which might be provided by public broadcasting entities.

### OVERSIGHT FINDINGS AND RECOMMENDATIONS

During the 94th Congress, the Subcommittee on Communications held one day of overview hearings on public broadcasting in addition to five days of hearings on this legislation. The Committee has not received an oversight report with respect to public broadcasting from

A127

25

either its own Subcommittee on Oversight and Investigations or the Committee on Government Operations.

The Committee has reviewed the substantial progress that has been made since the enactment of the Public Broadcasting Act of 1967. In less than eight years, a highly complex and sophisticated structure has been created which attempts to provide a broad and balanced public service to the many segments and interests of American society, and does so with a high degree of success. It is necessary only to look at public broadcasting's achievement in the development and presentation of children's programming, in the arts and humanities, and in coverage of public affairs to realize the significance of this service to the American people. Moreover, a start has been made in the development of programs to serve special interest audiences, including the many minorities in our population. Furthermore, the availability of these programs has been enhanced by the development and operation of an interconnection system and by the creation of many new stations to serve areas of the country previously denied access to programs of this quality. One of the best indications of the success of all these efforts has been the growing interest and direct financial support from a large segment of the American public.

Nevertheless, the Committee believes that much remains to be done in order to achieve a system which is responsive to the maximum degree possible to the special interests and needs of many Americans. The Committee has thus given special attention to certain areas of concern wherein special efforts can render public broadcasting a better and more useful public service. The Committee feels that this legislation—providing as it does for insulation, planning, stability, and adequate financial support over a five-year period—provides public broadcasting with the ability to address these areas of concern effectively.

The Committee intends to engage in oversight of public broadcasting's federally supported activities on at least an annual basis and feels that the following findings and recommendations will serve as appropriate goals for that oversight process. In addition, certain reports must be developed to assist the Committee in performing its oversight functions.

*Ascertainment*

The FCC is long overdue in requiring public broadcasting stations to engage in ascertainment of the problems, needs, and interests of their service areas. It is the feeling of the Committee that a formal ascertainment process applicable to public broadcasting stations is necessary in order to insure that the highest standard of community service is achieved by those stations. However, the Committee believes that the ascertainment process itself should be simplified as much as possible in order to minimize the cost to the licensees.

The Committee also recommends that each public broadcasting licensee develop, as soon as possible, local initiatives for improving ascertainment of community needs and for providing greater community input to decisions on programs.

*Board Meetings*

The Committee recommends that meetings of the Board of Directors of the Corporation for Public Broadcasting and of the boards of other public broadcasting entities be open to the public. The Committee

A 128

26

feels this procedure is imperative if the public is to have access to the decision-making processes which guide public broadcasting.

*Employment Practices*

While a serious effort is being made by most public broadcasting entities with respect to providing equal employment opportunities in professional and policymaking positions for members of minority groups and women, the Committee feels that much more remains to be done and should be done as soon as possible. Suggestions were made to the Committee by responsible representatives of minority and women's groups during the hearings which deserve attention.

The Committee recommends that the Corporation for Public Broadcasting significantly expand its efforts to assist licensees in assuring equal employment opportunity for women and minorities and that PBS and APRS compile and make available to CPB for dissemination to the public detailed statistics as to equal employment opportunity efforts on the local station level. These steps are important if oversight is to be facilitated and if progress is to be more readily measured.

The Committee recommends that CPB, PBS, APRS, and NPR strengthen their affirmative action programs to insure equal employment opportunities for qualified women and minority employees and candidates for employment, and that all public broadcasting entities take immediate steps to recruit qualified women and minority candidates for responsible positions within their organizations.

The Committee also recognizes that some problems exist with regard to the wages paid employees in public broadcasting. The Committee recommends that management and labor consider these problems carefully and meet to discuss ways in which they can be effectively dealt with. The Committee calls upon CPB, PBS, NPR, APRS, the licensees, and the various unions of broadcast employees to cooperate fully in this matter.

*Program Production*

The Committee is concerned that program decisions on all levels be made with greater public participation. CPB, PBS, and NPR should inform the public about the procedures by which they establish program funding priorities, carry out program development and select pilot programs. Formal input with regard thereto should be sought from the Special Assistant to the President of CPB for Minority Affairs and from its Advisory Council of National Organizations (ACNO), and recommendations submitted should be acted upon by the CPB Board.

The Committee makes the following specific recommendations concerning program development.:

1. CPB should concentrate its piloting efforts on making certain that the broadest possible range of national programing is available. Research should be undertaken to determine if programs are effectively reaching the audiences for which they are designed. More attention should be given to development and piloting of programs for women, minorities, and the elderly and near-elderly. These programs should recognize the special educational and public service needs of these groups.

2. CPB should insure that decisions regarding the expenditure of its funds for program support reflect the needs of women and minorities, whether such decisions are made directly by CPB, shared with

27

others, or made entirely by CPB grantees. For example, the functions of the Station Program Cooperative should be responsive to these needs as long as it continues to be a mechanism for making program decisions.

3. Corporate and other sources of grants to public broadcasting should be encouraged to make those grants for general purposes rather than earmarking them for the production, acquisition, or presentation of specific programs.

4. The CPB should compile an annual report on the number and length of programs produced abroad which are carried by PBS, the cost of such programs, and the number of repeat showings of such programs. While the Committee recognizes that many fine programs presently distributed by PBS and NPR are produced abroad, it is apparent that programs of the same high caliber can be produced domestically, and the Committee wishes to encourage the development of such programs as more funds are made available to public broadcasting.

5. The Committee recommends that the CPB carefully evaluate the report on "Public Broadcasting and Education" which has been submitted to it by the Advisory Council of National Organizations and seriously consider implementing appropriate recommendations, especially in the areas of early childhood and adult education.

## AGENCY REPORTS

The Committee received no written reports on this legislation from any department or agency of the Federal government. However, see the statement of the President in submitting the antecedent of this legislation to the Congress which appears above in this report.

## COST ESTIMATE

In compliance with clause 7 of Rule XIII of the Rules of the House of Representatives, the following statement is made relative to the cost of this legislation:

Assuming that the amounts of non-Federal financial support received by public broadcasting entities reach the levels shown in the second column from the left in the table below, the amounts of appropriation under the legislation for each of the next five fiscal years is shown in the right-hand column in that table:

[In thousands of dollars]

| Base fiscal year | Non-Federal financial support for public broadcasting | Ratio of non-Federal support to Federal appropriations | Appropriation for fiscal year | Maximum amount which could be appropriated |
|---|---|---|---|---|
| 1974 | [1] 223,200 | 2.5:1 | 1976 | 88,000 |
| 1975 | 220,000 | 2.5:1 | [2] 1976 | 22,000 |
| 1976 | 257,500 | 2.5:1 | 1977 | 103,000 |
| 1977 | 302,500 | 2.5:1 | 1978 | 121,000 |
| 1978 | 420,000 | 3:1 | 1979 | 140,000 |
|  | 480,000 | 3:1 | 1980 | 160,000 |
| Total | | | | 634,000 |

[1] Actual.
[2] July 1 to Sept. 30.

A130

28

No estimate of the cost of carrying out this legislation was received from the Congressional Budget Office or any agency of the Federal government.

### INFLATION IMPACT STATEMENT

Pursuant to Rule XI 2(1)(4) of the House of Representatives, the Committee makes the following statement with regard to the inflationary impact of the bill as reported:

There has been Federal funding for the Corporation for Public Broadcasting over the last 7 fiscal years at progressively higher levels (see table showing appropriations for the CPB above, p. 27). The authorizations/appropriations contained in the legislation herein reported continue that progression. The difference between the amount appropriated for fiscal year 1975 ($62 million) and the amount which would be authorized/appropriated under the legislation for fiscal year 1976 ($88 million) is $16 million. This is .00004% of proposed total outlays for fiscal year 1976 as determined under the conference report on H. Con. Res. 218 (H. Rept. 94–198), the First Concurrent Resolution on the Fiscal Year 1976 Budget. Your committee is unaware of any inflationary impact on the economy that this would have.

Authorizations/appropriations for the four succeeding fiscal years under the legislation are similarly increased. Because the amounts involved represent such a small portion of the expected total budgetary outlays for those fiscal years, there is unlikely to be any inflationary impact on the economy.

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### COMMUNICATIONS ACT OF 1934

\*     \*     \*     \*     \*     \*     \*

### PART IV—GRANTS FOR EDUCATIONAL TELEVISION BROADCASTING FACILITIES

\*     \*     \*     \*     \*     \*     \*

### TITLE III—PROVISIONS RELATING TO RADIO

\*     \*     \*     \*     \*     \*     \*

### SUBPART B—CORPORATION FOR PUBLIC BROADCASTING

#### CONGRESSIONAL DECLARATION OF POLICY

Sec. 396. (a) The Congress hereby finds and declares—

(1) that it is in the public interest to encourage the growth and development of noncommercial educational radio and television broadcasting, including the use of such media for instructional purposes;

29

(2) that expansion and development of noncommercial educational radio and television broadcasting and of diversity of its programming depend on freedom, imagination, and initiative on both the local and national levels;

(3) that the encouragement and support of noncommercial educational radio and television broadcasting, while matters of importance for private and local development, are also of appropriate and important concern to the Federal Government;

(4) that it furthers the general welfare to encourage noncommercial educational radio and television broadcast programming which will be responsive to the interest of people both in particular localities and throughout the United States, and which will constitute an expression of diversity and excellence;

(5) that it is necessary and appropriate for the Federal Government to complement, assist, and support a national policy that will most effectively make noncommercial educational radio and television service available to all the citizens of the United States;

(6) that a private corporation should be created to facilitate the development of educational radio and television broadcasting and to afford maximum protection to such broadcasting from extraneous interference and control.

## CORPORATION ESTABLISHED

(b) There is authorized to be established a nonprofit corporation, to be known as the "Corporation for Public Broadcasting", which will not be an agency or establishment of the United States Government. The Corporation shall be subject to the provisions of this section, and, to the extent consistent with this section, to the District of Columbia Nonprofit Corporation Act.

## BOARD OF DIRECTORS

(c)(1) The Corporation shall have a Board of Directors (hereinafter in this section referred to as the "Board"), consisting of fifteen members appointed by the President, by and with the advice and consent of the Senate. Not more than eight members of the Board may be members of the same political party.

(2) The members of the Board (A) shall be selected from among citizens of the United States (not regular fulltime employees of the United States) who are eminent in such fields as education, cultural and civic affairs, or the arts, including radio and television; (B) shall be selected so as to provide as nearly as practicable a broad representation of various regions of the country, various professions and occupations, and various kinds of talent and experience appropriate to the functions and responsibilities of the Corporation.

(3) The members of the initial Board of Directors shall serve as incorporators and shall take whatever actions are necessary to establish the Corporation under the District of Columbia Nonprofit Corporation Act.

(4) The term of office of each member of the Board shall be six years; except that (A) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed for the remainder of such term; and (B)

A 132

30

the terms of office of members first taking office shall begin on the date of incorporation and shall expire, as designated at the time of their appointment, five at the end of two years, five at the end of four years, and five at the end of six years. No member shall be eligible to serve in excess of two consecutive terms of six years each. Notwithstanding the preceding provisions of this paragraph, a member whose term has expired may serve until his successor has qualified.

(5) Any vacancy in the Board shall not affect its power, but shall be filled in the manner in which the original appointments were made.

### ELECTION OF CHAIRMAN; COMPENSATION

(d)(1) The President shall designate one of the members first appointed to the Board as Chairman; thereafter the members of the Board shall annually elect one of their number as Chairman. The members of the Board shall also elect one or more of them as Vice Chairman or Vice Chairmen.

(2) The members of the Board shall not, by reason of such membership, be deemed to be employees of the United States. They shall, while attending meetings of the Board or while engaged in duties related to such meetings or in other activities of the Board pursuant to this subpart be entitled to receive compensation at the rate of $100 per day including travel time, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, equal to that authorized by law (section 5703 of Title 5) for persons in the Government service employed intermittently.

### OFFICERS AND EMPLOYEES

(e)(1) The Corporation shall have a President, and such other officers as may be named and appointed by the Board for terms and at rates of compensation fixed by the Board. No individual other than a citizen of the United States may be an officer of the Corporation. No officer of the Corporation, other than the Chairman and any Vice Chairman, may receive any salary or other compensation from any source other than the Corporation during the period of his employment by the Corporation. All officers shall serve at the pleasure of the Board.

(2) Except as provided in the second sentence of subsection (c)(1) of this section, no political test of qualification shall be used in selecting, appointing, promoting, or taking other personnel actions with respect to officers, agents, and employees of the Corporation.

### NONPROFIT AND NONPOLITICAL NATURE OF THE CORPORATION

(f)(1) The Corporation shall have no power to issue any shares of stock, or to declare or pay any dividends.

(2) No part of the income or assets of the Corporation shall inure to the benefit of any director, officer, employee, or any other individual except as salary or reasonable compensation for services.

(3) The Corporation may not contribute to or otherwise support any political party or candidate for elective public office.

A133

31

## PURPOSES AND ACTIVITIES OF THE CORPORATION

(g)(1) In order to achieve the objectives and to carry out the purposes of this subpart, as set out in subsection (a) of this section, the Corporation is authorized to—

(A) facilitate the full development of educational broadcasting in which programs of high quality, obtained from diverse sources, will be made available to noncommercial educational television or radio broadcast stations, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature;

(B) assist in the establishment and development of one or more systems of interconnection to be used for the distribution of educational television or radio programs so that all noncommercial educational television or radio broadcast stations that wish to may broadcast the programs at times chosen by the stations;

(C) assist in the establishment and development of one or more systems of noncommercial educational television or radio broadcast stations throughout the United States;

(D) carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the noncommercial educational television or radio broadcast systems and local stations from interference with or control of program content or other activities.

(2) Included in the activities of the Corporation authorized for accomplishment of the purposes set forth in subsection (a) of this section, are, among others. not specifically named—

(A) to obtain grants from and to make contracts with individuals and with private, State, and Federal agencies, organizations, and institutions;

(B) to contract with or make grants to program production entities, individuals, and selected noncommercial educational broadcast stations for the production of, and otherwise to procure, educational television or radio programs for national or regional distribution to noncommercial educational broadcast stations;

(C) to make payments to existing and new noncommercial educational broadcast stations to aid in financing local educational television or radio programming costs of such stations, particularly innovative approaches thereto, and other costs of operation of such stations;

(D) to establish and maintain a library and archives of noncommercial educational television or radio programs and related materials and develop public awareness of and disseminate information about noncommercial educational television or radio broadcasting by various means, including the publication of a journal;

(E) to arrange, by grant or contract with appropriate public or private agencies, organizations, or institutions, for interconnection facilities suitable for distribution and transmission of educational television or radio programs to noncommercial educational broadcast stations;

A134