*"Educational TV Station Still A 'Blueprint'"*
*Article from* Chicago Daily Tribune, March 14, 1954

*Confirming $150,000 earmarked by Chicago Board of Education
toward educational television channel WTTW.*

EDUCATIONAL TV STATION STILL A 'BLUEPRINT'
Chicago Daily Tribune (1923-1963); Mar 14, 1954;
ProQuest Historical Newspapers Chicago Tribune (1849 - 1987)
pg. W10

# EDUCATIONAL TV STATION STILL A 'BLUEPRINT'

BY ANTON REMENIH

WTTW, Chicago's coming educational television station, is still in the back stretch, and don't bet $2 that it will win, place, or even show in 1954. It now looks as if "Window to the World" won't begin telecasting until well into 1955.

While $868,000 of the $1,-100,000 needed to set up channel 11 and keep it running for a two year "shakedown" period is already in hand, the project appears temporarily stalled.

"I'm not satisfied with the progress of installation or financing," said Edward L. Ryerson, former head of Inland Steel who is now donating most of his time to getting WTTW on the road.

## Nothing Like It

Channel 11 faces two major problems. One—the one road blocking earlier impetus—is finding a station manager. A number of educators and/or broadcasters have been approached, but so far no one wants the job badly enough to give up his present security to gamble on a new thing.

The man for the job, for which there is virtually no precedence, must know telecasting and good TV programming when he sees it. He must "understand the educational aspects," tho he need not be a formal educator, and he should possess "reasonable" abilities as an administrator.

"When we are able to announce the appointment of a manager and a station site [another unsolved problem], we will at once create much wider interest," said Ryerson. "After all, all the contributions so far have been on faith and a dream—a television station dedicated to advancement of human knowledge and culture."

## Not Even Buttons

The second problem is money. More than 200 community fund drives have collected almost $170,000. Door to door solicitation and group gifts, mostly small, total $105,500. Corporations gave $244,500, and foundations account for almost $200,000, with the Ford Foundation contributing $150,-000. The board of education also has earmarked $150,000.

But channel 11 fathers are frankly disappointed at "some very big people" who have not yet contributed to the pot. The largest single donation so far has been $5,000.

This lack of husky individual gifts here is in sharp contrast to other cities organizing educational TV stations. At Chapel Hill, N. C., for instance, a couple donated $200,000, and 18 other families, individuals, and stores and companies contributed $500,000. At St. Louis, Mo., a department store executive gave $215,000, and at Seattle, Wash., a woman offered $182,000.

## Films on Paper

With the Manley Trade and Vocational school, 2935 Polk st., eliminated as a station site, the favorite potential spot now is the Science museum, South Shore dr. and 57th st. But nothing is jelled.

The committee on programs, headed by Dr. Norbert Hruby of Loyola university, is busy preparing programs—on paper. Cost of filming a half hour show—and without studios and equipment yet in sight the committee is thinking mostly about film shows—runs up to $3,500.

By the end of this month the committee expects to have 12 film series on paper, and currently is applying for financial help to the Ford Foundation supported Educational Television and Radio center at Ann Harbor, Mich. The center would pay costs of filming done at commercial shops here and in return would have use of the programs for distribution throut the nation.

The proposed program series include Brookfield zoo's "Man and the Animal Kingdom"; Loyola's "Price of Liberty," a study of civil liberties; Illinois Institute of Technology's "Cultural Development of Chicago," and the University of Chicago's "Development of Institutions in Ancient Culture," basically an archaeological series.

The Chicago Educational Television association, composed of educational and cultural institutions that will participate in channel 11 programming, is growing steadily. It now includes 25 voting and 12 associate members.

With all this "moxey" and money behind WTTW, it cannot fail—once it gets rolling. But compared to progress elsewhere, educational TV here is dragging its feet.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

A 207

### *"Educational TV Center to Open Oct. 24"*
### Chicago Tribune, October 15, 1965

*Article confirming that $6,650,000 funded through contracts with the
Chicago Board of Education, National Educational Television network,
and Chicago Area School Television, Inc.*

Case: 1:10-cv-07003 Document #: 45-13 Filed: 07/06/11 Page 4 of 26 PageID #:510

# EDUCATIONAL TV CENTER TO OPEN OCT. 24

## Special Telecast Set for Stations

BY LARRY WOLTERS

Chicago's Educational Television center at 5400 N. St. Louis av., together with its new transmitters atop the 1000 Lake Shore Plaza building, are to be dedicated with a special telecast at 1:30 p. m. Sunday, Oct. 24. Dr. John W. Taylor, executive director of the Chicago Educational Television association, disclosed yesterday.

Some 400 community leaders will attend. The association is the licensee for educational stations WTTW [Channel 11] and the new WXXW, channel 20 in the ultra-high frequencies.

**Cost 2.5 Millions**

The new studio, plant, and equipment cost 2.5 millions. Of this the plant, on a five acre tract adjacent to Illinois Teachers college — Chicago [North], cost $1,000,000, Taylor said.

The cost of the new TV center has been partially underwritten by gifts from commercial stations and networks. Contributions of $100,000 each were made by WGN-TV, NBC, CBS, and ABC. Another $200,000 came from the Harris Foundation of St. Paul; $54,000 was donated by the A. Montgomery Ward Foundation and $150,000 came from the Chicago Community trust.

A major portion of credit for the center goes to Edward L. Ryerson, retired chairman of the board of Inland Steel company, who is president of the Educational Television association.

**Active Since 1953**

Back in 1953, Ryerson recognized the great potential of educational television to fight ignorance and apathy and to add important values to the community's life.

In the years since then WTTW's expenses have totaled 10 million dollars, but only a third of the costs have been born by the community. More than $3,325,000 was contributed by individuals, foundations, and corporations.

The remainder of $6,650,000 has been funded thru service and production contracts with the Chicago Board of Education, the National Educational Television network, and Chicago area School Television, Inc., for in-school telecasting of instruction to 160 school districts in the metropolitan area.

**Ford Matching Funds**

Other sources are being canvassed for additional capital financing to take advantage of Ford incentive grants up to a half million dollars [based on contributions in the years 1964 thru 1967].

A dinner and preview will be held at the center next Thursday evening for the Citizens council composed of 110 of the city's civic, cultural, and social leaders.

WXXW, financed completely thru educational broadcasting contracts, does not require public subscription.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

A 208

*"Our History"*
*WTTW website page*

*from http://www.wttw.com/main.taf?p=7,2*



Tuesday, April 05, 2011 - 50°F

**ABOUT US**

Our Mission
▶ Our History
Local Productions
National Productions
Our Sponsors
Pressroom
Management & Board
Financial Information
Employment
Volunteer
Directors
Advisory Board
Contact Us

Search [        ]  ▶ Go



WTTW is
my source
for...

Have you ever
told a friend
about something
you saw on
WTTW?
Let us and your
community
know what
WTTW
means to you.



## ◻ Our History



### A New Channel

In 1952, the Federal Communications Commission lifted a freeze on the number of television channels on the broadcast spectrum. Many of the new channels would be reserved for educational purposes and Inland Steel chairman Edward Ryerson, imagining the impact such a station could have on Chicago, made it his mission to make sure that Chicago had its own non-commercial television channel. "The plan to acquire the license from the FCC for the use of Channel 11 is an opportunity that offers unknown and unlimited advantages for every citizen in this area," Ryerson said in 1953. This would be the viewer's station and programming would help to "make each day brighter." But, first things first, Chicago's Window To The World had to make it to air.

The Chicago Educational Television Association was formed by Ryerson and other civic leaders to lobby for, create, and fund Chicago's educational station. A public television station was born.

Using offices and a temporary studio in Chicago's Banker's Building, a staff of writers-directors was hired and trained for work in television. Report to the Teachers, WTTW11's first program, was broadcast September 6, 1955. In short order, under the leadership of Dr. John Taylor, former University of Louisville president and deputy director-general of UNESCO, WTTW's staff of 54 would regularly schedule 40 programs a week, Monday through Friday. They would also find a permanent home as a "working exhibit" in studios located in the east wing of the Museum of Science and Industry.

### A Series of Firsts

Blending information and entertainment programming, WTTW's low-budget, offbeat offerings quickly escalated in number. On its first anniversary, it was reported that WTTW had doubled its program output, telecasting 43 hours a week. Most importantly during its brief history, the station had scored several television firsts for Chicago and the nation. This new educational outlet had broadcast the first remote from Orchestra Hall, the first language course, and the first series on income tax preparation, which climaxed with a two-hour SPEC-TAX-ULAR special.

Working in conjunction with Chicago's Board of Education in 1956, WTTW became the first station in

### TAKE THE PLUNGE
### Become a Member



**Your $40 Membership includes:**

A one-year subscription to the Network Chicago Guide.

The WTTW11 Card – your ticket to a variety of members only discounts.

Much more!

**Sign Up Today!**

### LOVE TO EAT OUT?
### Get 2-for-1 Discounts
### At Great Restaurants!



**Your $150 WTTW11 Membership Includes:**

2-FOR-1 DISCOUNTS and other special offers at hundreds of restaurants, museums, theaters, bed &

the country to televise college courses for credit via its TV College. Chicago-area students were now able to enroll at one of the participating junior colleges and attend classes at home in front of their television sets. Having access to a full junior-college curriculum, within five years approximately 15,000 students had enrolled for credit. A decade later, TV College's yearly report noted that 80,000 people had enrolled for credit with an overall viewership estimated at 10,000 per broadcast.

In 1961, following its success with TV College, WTTW's commitment to teachers, schools, and education brought about its involvement with the Midwest Program on Airborne Television Instruction (MPATI). Transmitting from a four-engine DC-6 airplane circling a six-state Midwest region, MPATI tele-lessons were broadcast daily to participating high schools and colleges, and a potential 7 million students. WTTW11 was selected as one of a small number of national production centers to produce two of the tele-courses, World History and American History.

### Catering To Kids

Beyond direct classroom-oriented instruction, programming for children has always played an important role at WTTW11. Today, Arthur, Sesame Street, Dragon Tales, and Calliou leap instantly to mind. In the early days, there were programs like Story Time with Miss Bunny, The Storyteller with Val Bettin, and Totem Club.

Co-founded by Don Clayton and Rachel Stevenson, Totem Club originally starred Joe Kelly of Quiz Kids fame and, for most of its eight-year run, National Barndance celebrity Arkie the Arkansas Woodchopper. Short on budget but long on ideas, the series was broadcast live five days a week, offering children a specific viewing experience each day. There was Grandmother's Kitchen, Funcraft for You, Let's Make a Play, Dr. Andy Merrick's Animal Clinic, Indian stories with Chief White Eagle, plus, over time, science day, animal day, baseball with Hall-of-Famer Roger Hornsby, water safety day, ice skating, and farm day. At one point, TV Guide reported that WTTW staffers were advising children not to watch every day of the week but to pick segments most suitable to their needs and interests. For her work in producing Totem Club and her pioneering efforts to make the series available to deaf children, Rachel Stevenson was honored with McCall's Golden Mike Award in 1962.

From his cluttered rolltop desk, or from the reasonable facsimile of a distant planet's surface, Dr. Daniel Q. Posin of DePaul University explained astronomy and physics to viewers of all ages in ways that were unique, entertaining, and always informative. Of course, his mechanical Venus's-flytrap might eat viewer mail and his inquisitive cat Miranda might periodically create a bit of on-air mischief. Notwithstanding, this respected scientist-academician would be honored time and again for his style of presentation and unusual use of the medium as developed in his Universe Around Us, Dr. Posin's Universe, and Dr. Posin's Giants.

### Arts on the Air

Perhaps the best-known series from those early years was Festival – a "local excursion into the fine arts." Creatively using the medium of television to stimulate interest in various fields of human endeavor, this series, produced and directed by Jim McPharlin, offered Chicagoans ballet, modern dance, music,

breakfasts, retail outlets, family activities, and more.

A one-year subscription to the Network Chicago Guide.

Much more!

**Learn More**

satire, and drama. Festival would provide a foundation for future arts programming and, in the process, recall imaginative production/scenic techniques cultivated in the critically acclaimed Chicago School of Television days of the late 1940s and early 1950s.

On the heels of its first successful membership drive, WTTW entered its second decade of operation on August 15, 1965, in new studios at 5400 N St. Louis Avenue. Designed by architects Perkins and Will, the new facility was built on five acres of land providing 52,000 square feet of work space. Three studios were designed into the facility – large enough, it was said, "to hold an entire symphony orchestra and high enough to permit dramatic productions requiring quick scene changes."

During this second decade, WTTW programming moved to another level of distinction. In 1968, delivering a steady stream of literary notables into viewers' homes, Book Beat, hosted by Robert Cromie, became the first of seven WTTW offerings to win the prestigious George Foster Peabody Award for excellence in broadcasting. One year later, in 1969, the legendary Burr Tillstrom and his Kuklapolitan Players, urged out of television retirement by WTTW Chairman of the Board Newton N. Minow, produced a series of half-hour specials resulting in an Emmy Award for Outstanding Achievement in Children's Programming. It was also during this period that WTTW initiated its Auction as an entertaining and effective method of fundraising.

### Goal: Building Audience

The second important era in WTTW11 history occurred in 1971 when Board Chairman Minow recruited Washington, DC career broadcaster, William J. McCarter, to assume leadership of WTTW. Setting the goal of building audience, McCarter promptly expanded the broadcast schedule to seven days a week, introducing a wide range of general interest programming in the process. Under McCarter, WTTW emerged as a major production center producing a large number of nationally broadcast series and specials. Broadcasting more than any public station in the country, with 120 logged hours per week, the station continued its tradition of excellence with such memorable programs as SoundStage, Consumer Game, Made in Chicago, and Prime Time Chicago. Never veering from principles of fiscal responsibility, McCarter's programming and financial successes led to the Harvard Business School's selection of WTTW as a case study of a prudent, well-run major public television station.

Cited by A. C. Nielsen as the most-watched public station in the country, WTTW began its third decade with an eclectic program lineup balanced between national and local programming, with a dash of international production mixed in for good measure. The highly acclaimed 26-part series on school de-segregation, As We See It, and the profound examination of mandatory retirement, Miles to Go Before We Sleep, were both WTTW Peabody Award winners. Ruth Page's ballet, The Merry Widow, was translated to television and also received a Peabody Award for the effort. Opening Soon at a Theater Near You (later retitled Sneak Previews) was developed as the first movie review series in the country starring Gene Siskel and Roger Ebert.

On the international level, WTTW's co-productions with the BBC culminated in the three-part Atlantic

Realm series and the six-part Peabody Award winner, *The Making of a Continent*.

For local audiences, there was again a wide range of offerings, including sports with Chicago Tribune columnist Mike Royko's World Series of Softball, The Do-It-Yourself "Messiah," Joel Weisman's Chicago Week in Review, Chicago Commodities Report, the innovative Public Newscenter, Chicago Tonight, and the last broadcast home for Chicago's legendary Kup's Show. In turn, Image Union provided a home and much-needed creative outlet for independent film and video producers.

## New Levels of Excellence

The fourth decade witnessed spirited political coverage on the local, state, and national levels, plus documentary production that gave new meaning to the term public affairs. Technically, WTTW became the first local television station in the country to produce a program utilizing high-definition technology. Special programs, including Mozart by the Masters and Solti's Beethoven: The Fifth Symphony Revisited, were applauded by Chicago audiences as was Wild Chicago and its unorthodox view of the people and places comprising Chicago's urban jungle. Excellence in children's programming was encouraged through WTTW's American Children's Television Festival, a national first, culminating in the presentation of Ollie Awards, honoring the best in children's programming and the most gregarious of the Kuklapolitan Players. In like fashion, the Golden Apple Awards for Excellence in Teaching continued its long tradition of paying homage to and encouraging outstanding Chicago-area educators.

In the 1990s, new program concepts, the development of innovative formats, and the creation of unique production partnerships have been trademarks of WTTW's local and national productions. Chicago Matters began as a collaborative effort between WTTW and the Chicago Community Trust. More recently, the collaboration has expanded to include WBEZ/Chicago Public Radio, The Chicago Reporter, and the Chicago Public Library. This hard-hitting, award-winning series has tackled, among other topics, the tough problems of violence, racism, aging, and immigration policies – problems that confront many Chicagoans on a daily basis. Chicago Matters has also become the longest running multi-media public affairs series in the nation. Another one of WTTW's Peabody Award winners, The New Explorers, a co-production with Kurtis Productions, Ltd., portrayed 20th-century scientists as adventurers working in space, under the oceans, or, possibly, with endangered species. The series has led to a greater understanding and appreciation for those who dedicate their lives to scientific research and to the improvement of life on our planet. The series has also demonstrated its effectiveness as an educational component in science classrooms across the country.

For contemporary music lovers everywhere, in 1993, Center Stage – a Chicago Production Center and VH-1 Network co-production, made its national debut to critical acclaim. In uncomplicated settings, performers such as k. d. lang, Keith Richards, and Neil Young were free to explore their music more fully "with as few frills and distractions as possible." Combining lively music with pleasing visuals, The Kidsongs Television Show was designed to provide entertainment and educational experiences. Learning

by singing is a goal, and the series provided an active element of participation for young viewers.

As in decades past, WTTW specials continue to bring unique experiences and messages to our viewers with emphasis on quality and state-of-the-art production sophistication. In 1993, Love in Four Acts featured four of Chicago's young choreographers sharing their interpretations of love by creating dance works specifically designed for the electronic wizardry of digital television. The Real McTeague, a production of The Chicago Production Center, was aired nationally via Great Performances on PBS. Combining the Lyric Opera production of McTeague with the Frank Norris novel and Erich von Stroheim silent film, this unique program was selected from among 500 entries in 30 countries to be screened at the Festival dei Popoli in Florence, Italy. In 1994, Remembering Chicago, a magical reminiscence of our city in the 1920s, 30s, and 40s was watched by Chicagoans of every age. Weaving memories and film footage from a variety of sources, including WTTW viewers, the Chicago Transit Authority, the Chicago Sun-Times, and the Chicago Historical Society, the program won the Chicago Headline Club's 1995 Peter Lisagor Award for Exemplary Journalism. Due to the success of the first program, sequels followed such as Remembering Chicago Again and Remembering Chicago and World War II.

### Where We Are Now

In 1995, WTTW president William J. McCarter was selected to receive the National Academy of Television Arts and Sciences Silver Circle award in recognition of his more than 25 years of service to the television industry and his significant contributions to Chicago broadcasting. In 1998, after a stellar 26-year career at WTTW, McCarter announced his retirement and Dan Schmidt took over as President and CEO of Window To The World Communications, Inc.

Under Schmidt's leadership, the station's commitment to producing the best programming, both for local and national audiences, has continued to deepen. Check, Please!, Chicago Stories, Artbeat Chicago, Arts Across Illinois, Network Chicago Presents, Candidate Free Time, and Geoffrey Baer's popular tour programs have all created a direct connection between the station and its audience. The expansion of WTTW11's flagship public affairs program to an hour-long program with hosts Phil Ponce and Carol Marin has contributed to the station's ever-growing audience and set the course for new projects, including The Friday Night Show and Chicago Sunday. Nationally, WTTW has charted new territory by producing and launching the new Soundstage series, shot entirely in High-Definition and distributed throughout the PBS system.

The station has also kept a keen eye on the changing technological landscape. In 2003, WTTW11 opened its state-of-the-art Digital Broadcast Operations Control Center, setting the stage for high-definition program service. The following year, WTTWDigital was launched, becoming Chicago's first 24-hour high definition channel.

As technologies change, WTTW11 is also dedicated to finding ways to make the viewer's relationship with the station more concrete. Whether through an event like the WTTWKids Fun and Run or Taste of Check, Please!, a community-based health screening, or one of the hundreds of educational workshops conducted

for parents, educators and children each year, building tangible connections to the community has become a mission-critical endeavor.

Today, under Dan Schmidt's guidance, WTTW11 is still the most-watched public television station in the country, serving more than 65% of Illinois' population as well as areas of Indiana, Wisconsin, and Michigan.

### The Window to the World Opens Wide

In 1955, the vision was bright and clear. Edward L. Ryerson and his colleagues were on an educational and cultural mission for their fellow Chicagoans. To be sure, no one could know what was to follow. This was risky business – educational television for a city with a rich, successful, commercial television history. But, through the efforts of its administrative leadership, producers, production personnel, performers, and most importantly, its viewers, the station has evolved and prospered. And through the efforts of its six distinguished Chairmen of the Board – Edward L. Ryerson, Newton N. Minow, Irving B. Harris, Henry W. Meers, John W. McCarter, Martin Koldyke, and the current chairman, Sandra Guthman – the vision has grown brighter and stronger.

From its earliest program offerings to its most recent, WTTW has been an agent for change – a bridge to the world of ideas around us. From its earliest broadcasts, WTTW has helped us to know ourselves through innovative, entertaining, and intellectually stimulating programming.

For 50 years, it has indeed been our Window To The World.

---

Network Chicago  contact us | site map | pressroom | WTTW digital archives | production services | sponsorship

98.7 wfmt 

Privacy Policy & Terms of Use
©2011 Network Chicago

# *Community Service Grant General Provisions and Eligibility Criteria*

Published by the Corporation for Public Broadcasting, FY2011



Corporation
for Public
Broadcasting

Corporation for Public Broadcasting
FY2011 Television Community Service Grant
General Provisions and Eligibility Criteria

The enclosed General Provisions contain all
requirements for a community service grant
recipient to maintain eligibility and specify allowed
use and restrictions of the grantee's community
service grant.

The licensee is responsible for meeting and
understanding all requirements as contained in the
General Provisions. As such, the General Provisions
should be read by the grantee's licensee official and
head of grantee.

If you have any questions about the General
Provisions, please contact isis@cpb.org. Make sure to
include your call letters and four-digit grantee ID.

# TABLE OF CONTENTS

SECTION 1. ELIGIBILITY ................................................................................................................4

A.    Eligible Grantees ...........................................................................................................................4

B.    Criteria and Eligibility of Multi-Provider Markets and Program Differentiation Incentive ..........................4

    1.    Multi-Provider Market Definition ............................................................................................4

    2.    Multi-Provider Market Base Grant Split ..................................................................................4

    3.    Definition of Primary and Secondary Grantee .........................................................................4

    4.    Program Differentiation Incentive (PDI) .................................................................................4

        (1)    Definition of Program Differentiation ..........................................................................4

        (2)    Calculation of Program Differentiation Incentive ........................................................5

        (3)    Compliance with Program Differentiation Incentive ....................................................5

C.    Maintaining Eligibility ...................................................................................................................5

SECTION 2. OPERATIONAL REQUIREMENTS ............................................................................5

A.    License ...........................................................................................................................................5

B.    Broadcast Schedule ........................................................................................................................6

C.    Employment Requirement ..............................................................................................................6

D.    Minimum Non-Federal Financial Support ......................................................................................6

SECTION 3. USE OF GRANT FUNDS ............................................................................................6

A.    Purposes .........................................................................................................................................6

    1.    Programming, Production and Services ....................................................................................7

    2.    Broadcasting, Transmission and Distribution ..........................................................................7

    3.    Program Information and Promotion ........................................................................................7

    4.    Fundraising and Membership Development ..............................................................................8

    5.    Underwriting and Grant Solicitation ........................................................................................8

    6.    Management and General .........................................................................................................8

    7.    Purchase, Rehabilitation or Improvement of Capital Assets ....................................................9

B.    Restrictions ....................................................................................................................................9

SECTION 4. GRANT SPENDING PERIOD, PAYMENT SCHEDULE AND REPORTING REQUIREMENTS...9

A.    Grant Spending Period ...................................................................................................................9

B.    Payment Schedule ........................................................................................................................10

C.    CSG Offer Expiration ..................................................................................................................10

D.    Reporting Requirements ...............................................................................................................10

A 216

SECTION 5. EXPENDITURE OF FUNDS ........................................................................................................10

    A.    Unexpended Funds ..............................................................................................................................10

    B.    Unauthorized Expenditures .................................................................................................................10

    C.    Documentation of Expenditures ..........................................................................................................11

SECTION 6. EXTENT OF CPB COMMITMENT .............................................................................................11

SECTION 7. TERMINATION ...........................................................................................................................11

SECTION 8. ASSIGNMENT .............................................................................................................................11

SECTION 9. COMMUNICATIONS ACT REQUIREMENTS ...........................................................................11

    A.    Open Meetings, Open Records, Community Advisory Board, and Mail Lists and Political Activities .......11

    B.    Record Keeping and Audit Requirements ...........................................................................................12

    C.    Equal Opportunity ..............................................................................................................................12

SECTION 10. NONDISCRIMINATION .............................................................................................................12

SECTION 11. EQUAL OPPORTUNITY AND CPB ASSISTANCE ..................................................................13

SECTION 12. GOVERNING LAW AND JURISDICTION ...............................................................................13

SECTION 13. OTHER REQUIREMENTS ........................................................................................................13

    A.    CPB Role and Cooperation with Government Agencies .....................................................................13

    B.    Laws and Regulations Applicable ........................................................................................................14

    C.    Suspension or Cancellation of CPB Assistance ..................................................................................14

    D.    Applicants Ineligible to Receive CPB Assistance ...............................................................................14

    E.    FCC Compliance .................................................................................................................................14



Corporation
for Public
Broadcasting

# FY2011 Television Community Service Grant (CSG)
## General Provisions and Eligibility Criteria

Note: "Recipient," as used below, refers to the license holder as well as to the station.

## SECTION 1. ELIGIBILITY

A. **Eligible Grantees:** For the purpose of this grant criteria statement, an "eligible grantee" shall be defined as existing grantees that received Television Community Service Grants (CSGs) during FY2010 and a licensee of one or more on-the-air (analog UHF or VHF, or DTV) stations operating under a noncommercial educational license granted by the FCC. Only grantees meeting or exceeding both the eligibility criteria outlined in Section 1 and the operational requirements outlined in Section 2 are eligible to receive FY2011 Television Community Service Grants.

All Television Community Service Grant eligible grantees will receive a base grant, which is calculated as 0.1% of CPB's annual appropriation and includes the basic grant. Exceptions include:
- Stations located in multi-provider markets; and
- Stations with NFFS above $55 million, which are not eligible for a base grant but do receive a basic grant.

B. **Criteria and Eligibility of Multi-Provider Markets and Program Differentiation Incentive**

1. **Multi-Provider Market Definition:** Multi-Provider Market exists where the broadcast signals of one grantee reach more than 50 percent of the population served by another and less than 20 percent of the population served by the grantees is unduplicated.

2. **Multi-Provider Market Base Grant Split:** The grant recipients in each Multi-Provider Market receive equal shares of a single base grant.

3. **Definition of Primary and Secondary Grantee**
   (1) A primary grantee is defined as the grantee with the greatest NFFS in the market.
   (2) A secondary grantee is a grantee with NFFS less than the primary grantee.

4. **Program Differentiation Incentive (PDI):** To encourage diverse program services reflecting the wide-ranging needs of unserved and underserved audiences, CPB provides an incentive to those secondary grantees in designated Multi-Provider Markets that substantially differentiate their programming from that of any other grantee in the market.
   (1) **Definition of Program Differentiation**
      - CPB-qualified programming that expands the choices available to viewers, such as non-duplicative content acquired from sources other than PBS, or

A 218

- CPB-qualified programming that is time shifted to provide audiences with increased access to programs and series distributed by the PBS National Program Service (NPS), and
- CPB-qualified programming on the station's primary channel that is non-duplicative of that of all other stations in the Multi-Provider Market at least 90 percent of the total broadcast programming hours over the course of any week.
- Programming is considered as non-duplicative when no part of a specific program episode on the secondary station's primary channel overlaps the same program episode on another station's primary channel. For example, starting a 60-minute episode of *Nova* on one station 30 minutes after the same episode has begun airing on another station will be considered duplicative. However, different episodes of the same series aired at the same time would be considered non-duplicative.

(2) **Calculation of Program Differentiation Incentive:** In calculating the NFFS-matching (or incentive) portion of a grantee's grant amount, only the programming on a station's primary channel will be included in the calculation of a differentiated program service. The NFFS of each grantee eligible for the program differentiation incentive will be weighted as follows:
- NFFS up to the first $2 million will be multiplied by a factor of 1.75.
- NFFS between $2 million and $4 million will be multiplied by a factor of 1.25.

(3) **Compliance with Program Differentiation Incentive:** Eligible secondary grantees will be required to certify that its previous year's programming schedule was differentiated from that of every other grantee in the Multi-Provider Market. The secondary station is required to make its program schedule available for no less than three years after the end of the expenditure period.

CPB will verify grantee certification by reviewing a small number of markets each year as part of its normal financial reporting desk review process. If duplication is found in any week in excess of 10 percent, CPB may find that the grantee (or grantees) has falsely certified its eligibility for the Program Differentiation Incentive.

A grantee that certifies its undifferentiated programming as differentiated on a repeated basis is subject to a penalty, including the loss of eligibility for the PDI.

C. **Maintaining Eligibility:** As the legal entity to which CPB is authorized to make a grant, a station's licensee is responsible for maintaining the station's eligibility and compliance with operational requirements, and for notifying CPB as soon as possible when it fails to maintain eligibility and compliance. CPB considers the licensee and the station the recipient of the CSG and refer to both in this document as the grantee, except where a distinction is otherwise specified.

Grantees found to be out of compliance with the Television CSG General Provisions and Eligibility Criteria without the benefit of a waiver may have their current or a future CSG and their Interconnection Grants reduced or eliminated. In addition, late filing of the certified CPB Annual Financial Report (AFR), audited financial statements (AFS), annual Station Activities Benchmarking Study (SABS), annual Station Activities Survey (SAS) may result in a reduction of up to 1/365th of the next year's grant for each day any report remains outstanding.

## SECTION 2. OPERATIONAL REQUIREMENTS

A. **License:** Each grantee must be operating under a valid renewable broadcast license issued by the United States Federal government and be in compliance with all of the license requirements for operation of a non-commercial educational television station.

B. **Broadcast Schedule:**

1. The substantial majority of each station's daily total programming hours broadcast on all of its channels, including its primary and additional multicast channels, must be devoted to CPB-qualified programming, which is defined as general audience programming that serves demonstrated community needs of an educational, informational and cultural nature.

2. Programs that further the principles of particular political or religious philosophies, or that are designed primarily for in-school or professional in-service audiences are not considered CPB-qualified programming.

3. Stations that are closed-circuit, campus stations managed and operated by and for students, and/or stations that provide in-service training programming to licensee employees, clients, and/or representatives; or stations licensed to political organizations do not meet this criterion.

4. The station must broadcast on a schedule of seven days per week, fifty-two weeks per year, for a total of at least 3,000 hours or 58 hours a week.

C. **Employment Requirement:** Each grantee must have a staff headed by a manager or other chief executive officer who:

- has the responsibility and authority to determine when and what material shall be broadcast over the station; and
- has the responsibility and authority to administer disbursements under a budget authorized by the governing board of the licensee.

D. **Minimum Non-Federal Financial Support:** Each grantee must have a minimum non-Federal financial support (NFFS) of $800,000. Grantees with NFFS below $800,000 will be allowed to continue in the CSG program provided that they continue to receive clean audits (including accompanying IPA management letter identifying significant internal control risks), with no audit findings that question the grantee's continuing operating viability.

## SECTION 3. USE OF GRANT FUNDS

A. **Purposes:** Community Service Grants (CSGs) are to be used to augment the capability of public broadcast stations supported by CPB to expand the quality and scope of their services to the community.

The CSG may be used as specified in Section 396(k)(7) of the Communications Act of 1934, 47 U.S.C. 396(k)(7), which provides that "The funds distributed...may be used at the discretion of the grantees for purposes related primarily to the production or acquisition of programming."

CSG expenditures must fall in seven categories:

1. Programming, Production and Services
2. Broadcasting, Transmission and Distribution
3. Program Information and Promotion
4. Fundraising and Membership Development
5. Underwriting and Grant Solicitation
6. Management and General
7. Purchase, Rehabilitation or Improvement of Capital Assets

1. **Programming, Production and Services**

   (1) **Programming and Production:** This function consists of the production and/or acquisition of programming and conducting program operations. This category includes such functions as program development, program planning, equipment operation, and editing. Below is a list of some activities whose costs, including salaries and benefits for personnel engaged in the activities, should be included in this classification:
      - Broadcast rights for programs or series or rights to use or adapt published materials
      - Program or web content planning and research (script writing, printing, and consulting)
      - Directors, producers, cast, stagehands, engineers, technicians, and other personnel involved
      - Rental of facilities or production equipment
      - Space, supplies, and other station resources used
      - Repair and maintenance of programming and production equipment
      - Depreciation and amortization of station equipment and leasehold improvements used
      - The portion of the Public Broadcasting Service (PBS) National Program Service assessment and other PBS programming fees (e.g., PFP, Plus, etc.) that are related to this function

   (2) **Educational Programs:** Any documentation must clearly identify the percentage of the grant funds used to create or purchase programs with educational intent or instructional design. "Educational intent" is defined as addressing a specific educational interest of a target audience. "Instructional design" is defined as having educational intent; involving educators substantially in program development; providing ancillary materials in support of, or as a supplement to, the programs; and obtaining rights for institutional off-air recording, audio visual, reversioning, etc., as appropriate, at the time of production.

   (3) **Educational Outreach Activities:** This includes expenditures for community outreach activities related to local or national programs. Such activities could include, but are not limited to: local or national services that provide means for viewers and listeners to follow up on programs through computer, video, and audio conferencing; town meetings; local call-in shows; public service announcements; telephone hot lines; and dissemination of related information and materials.

2. **Broadcasting, Transmission and Distribution:** This function consists principally of program transmission, interconnection, and other content distribution. Also included are scheduling and engineering. Below is a list of some activities whose costs, including salaries and benefits for personnel engaged in these activities, should be included in this classification:
   - Scheduling programs for airing
   - Repair and maintenance of broadcasting equipment
   - Depreciation of antennae, transmission, and other broadcasting equipment
   - Distribution and interconnection fees
   - The portion of the PBS programming assessment and the portion of the PBS member services assessment related to interconnection and program distribution
   - Web hosting and streaming fees

3. **Program Information and Promotion:** This function consists of informing the viewing or listening public of specific available program services. Below is a list of some activities whose costs, including salaries and benefits for personnel engaged in those activities, should be included in this classification:

   - Producing or acquiring "spots" designed for the promotion of specific programs
   - Materials and related supplies used for promoting programs and services
   - Advertising in newspapers or other media
   - Preparing, reproducing, and distributing program guides

- Travel and related expenses of promotion
- The portion of PBS programming assessment related to this function
- Supporting services

4. **Fundraising and Membership Development:** Fundraising consists of inducing others to contribute money, securities, time, materials, or facilities. Below is a list of some activities whose costs, including salaries and benefits for personnel engaged in those activities, should be included in this classification:
   - Costs incurred in the solicitation of underwriting funds and grants
   - Costs of membership development
   - Acquiring and distributing fundraising material
   - Designing, printing, and distributing leaflets or posters for fundraising
   - Meetings for the purpose of improving fundraising techniques
   - Services of fundraising consultants and talent
   - Developing and maintaining contributor records
   - Committee meetings dealing with fundraising policies and issues, including the preparation of minutes and reports of such meetings
   - Program and production costs of broadcast appeals for funds
   - Mailing costs related to fundraising
   - Direct costs of special fundraising activities and auctions

5. **Underwriting and Grant Solicitation:** Underwriting development consists of soliciting program underwriting funds and general support grants from foundations, corporation, or governments. Expenditures should be classified separately in this category (rather than combined with fundraising and membership development expenditures or with management and general expenditures) if the expenditures are significant.

6. **Management and General:** This function consists of supervising and controlling overall, day-to-day operations, including accounting and office service departments. It also includes resources and activities whose costs are not directly identified with another function, but which are indispensable to the conduct of those activities and to an organization's existence. This includes expenses for the overall direction of the entity's general board activities, business management, general recordkeeping, budgeting and related purposes. Below is a list of some activities whose costs, including salaries and benefits for personnel engaged in those activities, should be included in the classification:
   - Human resource administration, including recruiting, retention, and benefit programs
   - Accounting, auditing, and budgeting
   - Information technology systems and support services, where not specifically devoted to other functions
   - Legal services of a general (non-program) nature
   - All occupancy costs not specifically identifiable with other functions
   - Office functions that provide general support throughout the organization (e.g., corporate receptionists and telephone attendants, central mail services, and maintenance of corporate archives)
   - Maintenance of operations manuals, directors committee lists, and expenses related to governing board, Community Advisory Board, or administrative committee meetings
   - Depreciation of buildings, furnishings, and equipment used in management and general functions
   - Dues for the Association of Public Television Stations and other public broadcasting station-membership organizations, and the portion of the PBS member services assessment that is not related to interconnection

7. **Purchase, Rehabilitation or Improvement of Capital Assets**: This includes expenditures for purchase, rehabilitation, or improvement of tangible capital assets such as studio and station equipment and vehicles, buildings and other structures, and other capital assets that are funded with the CSG.

CSGs may be used to sustain activities begun with previous CPB CSG funds.

B. **Restrictions**:

1. No CPB funds shall be used for purposes of conducting any reception, or providing any other entertainment, for any officer or employee of the federal government or any state or local government.

2. No CPB funds shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence legislation or appropriation before Congress or any state legislature.

3. No CSG funds may be expended on the production, acquisition or distribution of programs which do not qualify under CPB's Broadcast Schedule eligibility criterion (Section 2.B.). Such programs include any that further the principles of particular political or religious philosophies, or that are designed primarily for in-school or professional in-service audiences.

4. The station's licensee may not impound or otherwise withhold or inappropriately restrict the use of CSG funds by the station(s). CSG funds may not be used to supplant funds or other support already being provided to the station(s) by the licensee, or to offset budgeting cutbacks by the licensee. For purposes of these General Provisions and Eligibility Criteria, "supplant" is defined as "to reduce the amount of funds or other support already being provided by the licensee in proportion to, or because of, funding through the CSG."

5. CSG funds may not be used to offset an institutional licensee's overhead or expenses.

6. CSG funds or proceeds from the liquidation or transfer of assets acquired with CSG funds must be used solely for the benefit of the public broadcast station.

7. Full-time station personnel whose salaries are paid by CSG funds must exercise full-time responsibilities over broadcast station operations. Such personnel shall not be required by the licensee to perform duties unrelated to the operation of the broadcast station(s).

8. CSG funds shall not be used by the grantee for personnel services, programming (both production and acquisition), or technical facilities in excess of standard amounts usually paid, charged or otherwise applied by the grantee for the same services and facilities under similar circumstances.

9. Grantee agrees that if, at any time during the grant period covered by this agreement, it should cease to provide the public broadcasting services for which this grant is made, it shall, upon request of the Corporation for Public Broadcasting, return any or all of the grant funds to the Corporation for Public Broadcasting.

## SECTION 4. GRANT SPENDING PERIOD, PAYMENT SCHEDULE AND REPORTING REQUIREMENTS

A. **Grant Spending Period:** The FY2011 grant spending period extends from October 1, 2010 through September 30, 2012.

B. **Payment Schedule:** FY2010 CSGs will be disbursed to the licensee in two payments: the first payment will be disbursed beginning November 2010, and the second payment will be disbursed beginning March 2011. However, each grant payment will be contingent upon the grantee submitting all of the required forms, reports and/or other documents as required by CPB.

C. **CSG Offer Expiration:** The CSG Agreement must be properly executed by June 30, 2011 or the grant may be forfeited. If payment is not desired at the time the Agreement is executed, then the grantee should specify, in writing to ISIS@cpb.org, the later date on which it would like the funds to be disbursed.

D. **Reporting Requirements:** To avoid delayed disbursement of FY2011 CSG payments and possible penalty reductions in future CSGs, the required documents and reports must be completed and submitted to CPB in a timely fashion. All financial forms (Annual Financial Report and Audited Financial Statements) must be completed no later than five months after the close of the grantee's fiscal year. As a condition of receiving the CSG, each grantee must also complete and submit the annual Station Activity Benchmark Study (SABS) and Station Activities Survey (SAS). SABS and SAS are fielded in January and February of each year. If the grantee submits its financial reports, SABS or SAS past the filing deadline, it will be subject to a financial penalty, which will be deducted from the grantee's CSG.

Each CPB Television CSG recipient must file a consolidated Annual Financial Report (AFR) on behalf of all supported stations that are licensed to the same entity.

Each AFR must include only NFFS that is received by or on behalf of the supported station(s) or network of stations. For details as to what qualifies as NFFS, please review the FY2010 Financial Reporting Guidelines (http://www.cpb.org/stations/frg/).

The operations of all co-licensed noncommercial television stations must be consolidated to earn and benefit from a single CSG.

Stations that are closed circuit, campus stations managed and operated by and for students, and/or stations that provide in-service training programming to licensee employees, clients, and/or representatives, are not eligible for consolidation.

## SECTION 5. EXPENDITURE OF FUNDS

A. **Unexpended Funds:** All FY2011 CSG funds must be expended by September 30, 2012. All funds that are not expended by September 30, 2012 must be returned to CPB, as there is no carry-over provision. Make check payable to the Corporation for Public Broadcasting. (See Section 7, Termination, regarding repayment of unexpended funds at the date of termination.)

B. **Unauthorized Expenditures:** CSG funds shall be used only while the recipient is in conformity with (a) the representations and data contained in the eligibility application package and all of the attachments thereto; and (b) these general provisions and eligibility criteria for the FY2011 Television CSG, the certification of eligibility, and all other related documents.

In addition, CSG funds shall be expended only in accordance with the purposes and restrictions set forth in these general provisions and eligibility criteria and other similar restrictions to be determined by CPB policy decisions from time to time.

Expenditures or uses of CSG funds which are inconsistent with such purposes and restrictions and

A 224

- which are made during any time in which the grantee fails to be in conformity with Sections 3.A. and 3.B.; or

- which are not fully supported by available documentation in accordance with the record keeping provisions in Section 9.B.,

shall be considered unauthorized expenditures. The amounts of all unauthorized expenditures shall be fully repaid to CPB immediately upon CPB's request.

C. **Documentation of Expenditures:** All CSG expenditures must be supported by documentation (invoices, contracts, bills of sale, check stubs, etc.). Documentation for outreach activities funded by CSG must include description of activity funded and, when applicable, which educational institutions and organizations were involved. The grantee must keep documentation pertaining to grant expenditures in their files for **10 years after the close of the expenditure period**, and such documentation must be made available for CPB review upon request. CPB will use such documentation as the basis for audits of CSG expenditures.

Expenditures that cannot be supported with documentation may be disallowed. Undocumented expenditures cannot be replaced with other station expenditures after the expenditure period ends. All disallowed expenditures are subject to refund to CPB. Disallowed expenditures include those expressly prohibited by the CSG General Provisions and other similar restrictions to be determined by CPB policy decisions from time to time.

## SECTION 6. EXTENT OF CPB COMMITMENT

No commitment, expressed or implied, is assumed by CPB to provide funds in excess of the amount offered by CPB.

## SECTION 7. TERMINATION

Failure to maintain compliance with these General Provisions and Eligibility Criteria and the commitments attested to by the Recipient in the CSG Agreement may result in termination of CSG funding. The amounts of all unexpended CPB funds at the date of termination shall be fully repaid to CPB immediately. Checks should be made payable to the Corporation for Public Broadcasting.

## SECTION 8. ASSIGNMENT

No rights or obligations under any CSG shall be assigned in whole or in part by the licensee without the prior written consent of CPB. Stations are required to understand all obligations contained in this document.

## SECTION 9. COMMUNICATIONS ACT REQUIREMENTS

A. **Open Meetings, Open Records, Community Advisory Board, and Mail Lists and Political Activities:** As a condition of accepting this CSG, the licensee and the station must certify that they currently comply, and agree that they will continue to comply in full throughout the term of this CSG, with all Sections of the Communications Act. What is provided here is a summary of the Communications Act requirements as to which grantees must certify their compliance to CPB; nothing herein replaces or supersedes other applicable laws and regulations.

In general, the Communications Act requires that board meetings, board committee meetings and advisory body meetings be open to the public, that annual financial and audit reports be available for public inspection, that reports on minority employment be available for public inspection, and that certain licensees

maintain community advisory boards. In addition, there are limitations on the use of donor information and strict prohibitions on exchanging or renting such information to political organizations and/or candidates. For a complete discussion of the requirements please consult the website: http://www.cpb.org/stations/certification/.

NOTE: The Communications Act provisions about open board meetings, open records, and mail lists and political activities apply to all grantees. Only certain licensees are required to have a community advisory board.

B.  **Record Keeping and Audit Requirements:** All recipients of CSG funds must satisfy the requirements of the Communications Act of 1934, as amended, 47 U.S.C. 396(l) (3) (B, C, and D). This federal law mandates record-keeping and auditing and requires that CPB or its representatives have access to eligibility, operational, Communication Act (open meetings, open financial records, Community Advisory Board, EEO, and mail lists and political activities), and financial records. Operational records and documentation for CSGs would include such things as broadcast schedules identifying general audience programming that serves demonstrated community needs of an educational, informational, and cultural nature. Consult the Web site (http://stations.cpb.org/system/certification/certreq3.html) for more information.

Furthermore, discrete accounting and proper documentation shall be maintained to support all FY 2011 CSG revenues and expenditures. All CSG expenditures must meet the test of allowability as stated throughout this document and as provided by all other CSG-related documents and policies. CSG funds which cannot be accounted for because of recipient's failure to comply with this requirement may be subject to repayment to CPB. The recipient shall maintain such other records that CPB may require to facilitate an effective audit. CSG records must be retained for no less than 10 years after the end of the expenditure period.

If there are any subsequently discovered inaccuracies, whether reported by the applicant or discovered during the course of an audit, CPB may adjust the grant downward, as accurate data may require and as determined by CPB. If a downward adjustment is warranted, CPB may recover overpayment through a reduction in future grant awards as an alternative to requiring immediate return of any overpayment. If recovery of overpayment is required, CPB will notify the grantee by letter of the actions CPB intends to take and notify the grantee that it has 30 days from the date of the letter to respond or seek clarification in writing about CPB's intended actions. If CPB does not receive any written response from the grantee within those 30 days, CPB will implement the actions described in the letter.

C.  **Equal Opportunity:** The Communications Act requires each licensee or permittee of a public broadcast station to file with CPB an annual statistical report that: (1) identifies by race and sex the number of employees in each of eight full-time and part-time job categories (officials and managers; professionals; technicians; office and clerical personnel; skilled craft persons; semi-skilled operatives; unskilled operatives; and service workers); and (2) states the number of job openings occurring during the course of the year. CPB currently requires that this statistical information be provided in the employment portion of the annual Station Activities Survey (SAS), which all CPB-qualified CSG recipients must file with CPB. This statistical information also must be made available to the public at the central office of the station and at every location where more than five full-time employees are regularly assigned work.

## SECTION 10. NONDISCRIMINATION

A.  Recipient agrees that it will not discriminate against any employee or applicant for employment because of race, color, religion, age, sex, national origin, or physical or mental handicap. Recipient will take affirmative action to ensure that applicants are considered for employment, without regard to their race, color, religion, age, sex, national origin, or physical or mental handicap.

B. Recipient further agrees that it will comply with all laws and regulations prohibiting discrimination on the basis of race, color, religion, age, sex, national origin, or physical or mental handicap that may be applicable to Recipient. These laws may include, but are not limited to Title III of the Public Telecommunications Financing Act of 1978 (47 U.S.C. 398); Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2002e); the Equal Pay Act of 1963 (29 U.S.C. 206); the Age discrimination in Employment Act of 1967 (29 U.S.C. 621-634); Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2002d); Title IX of the Education Amendment of 1972 (20 U.S.C. 1681); Title V of the Rehabilitation Act of 1973 (29 U.S.C. 790-794); and the Federal Communications Commission's regulations concerning equal employment opportunity (47 C.F.R. 73.2080).

C. Recipient will include the provisions of this section in all subcontracts and delegations entered into in connection with the CSG.

## SECTION 11. EQUAL OPPORTUNITY AND CPB ASSISTANCE

A. Every licensee or permittee of a public broadcast station which receives funds from CPB must certify to CPB that it complies with the FCC regulations concerning equal employment opportunity (47 C.F.R. 73.2080). Each licensee or permittee of a broadcast station with more than five full-time employees must further certify that the job openings identified in the statistical reports described above were filled in accordance with such FCC regulations, or provide a statement of the reasons for not filling the positions in accordance with such regulations. CPB currently requires that these certifications and, if necessary, the statement of reasons be provided in the CSG Certification of Eligibility.

B. In addition, in accepting the General Provisions and Eligibility Criteria, Recipient agrees to implement the following policy on "Equal Opportunity and CPB Assistance" as a term or condition of the CSG.

C. It is the policy of CPB to (1) fully comply with all applicable laws and regulations, including laws and regulations prohibiting discrimination against any person on the basis of race, color, religion, national origin, age, sex, or physical or mental handicap; and (2) require that each Recipient of assistance from CPB, whether in cash or in-kind, comply with all such laws and regulations.

## SECTION 12. GOVERNING LAW AND JURISDICTION

Except as otherwise required by law, the Recipient agrees that the CSG and all instruments between the Recipient and CPB executed pursuant thereto shall be construed under the laws of the District of Columbia. Notwithstanding the jurisdiction of any other court, the Recipient expressly submits and consents in advance to the jurisdiction of the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia for all claims or disputes pertaining directly or indirectly to any CSG or Interconnection Grant, any supplement thereto, or any matter arising there from. The Recipient further agrees that in any action or proceeding commenced in any court in the District of Columbia, the Recipient shall be deemed to have been duly served with process of such court when process is delivered to the Recipient personally or by certified or registered mail (return receipt requested), within or without the District of Columbia.

## SECTION 13. OTHER REQUIREMENTS

A. **CPB Role and Cooperation with Government Agencies:** CPB is a private, nonprofit corporation. Because CPB is neither a government agency nor a law enforcement body, it does not have the legal authority to investigate and adjudicate complaints based upon allegedly discriminatory practices by recipients of its assistance that such agencies and bodies do. CPB will, however, promptly refer all such complaints received by it to a government agency with jurisdiction for any proceedings that may be appropriate. Further, CPB

will cooperate fully with every agency with jurisdiction to inquire into allegedly discriminatory practices of Recipients of CPB assistance.

B. **Laws and Regulations Applicable:** Applicable laws and regulations prohibiting discrimination against persons on the basis of race, color, religion, national origin, age, sex, or physical or mental handicap may be federal, state, or local and may vary from Recipient to Recipient and from jurisdiction to jurisdiction. Each applicant or Recipient of CPB assistance shall inform itself of the laws and regulations applicable to it, and CPB shall not undertake to so inform the applicant or Recipient, unless a law or regulation requires that CPB do so, and then CPB shall undertake to inform the applicant or Recipient only to the extent the law requires.

C. **Suspension or Cancellation of CPB Assistance:** Whenever a court or government agency with jurisdiction shall make a final determination that a Recipient of assistance from CPB is in violation of federal, state, or local laws and regulations prohibiting discrimination on the basis of race, color, religion, age, national origin, sex, or physical or mental handicap, and notice of such determination is given in writing to CPB by the court, agency, or any other person and officially certified, CPB shall promptly notify the Recipient that unless the Recipient shall demonstrate to the satisfaction of CPB within 30 days that the violation has been fully corrected or that the Recipient is in full compliance with all remedial provisions of such final determination, CPB shall suspend or cancel all assistance to the Recipient.

Whenever such final determination is appealed or otherwise challenged in an appropriate forum, whether or not the effect of such determination is stayed pending appeal, CPB shall notify the Recipient that, unless the Recipient can show cause to the contrary within 30 days, CPB shall suspend or cancel CPB assistance. If CPB decides to suspend such assistance, then all sums that would otherwise have been payable to the Recipient shall be held by CPB pending completion of the appellate process, but the provision of in-kind assistance shall not be suspended or canceled pending the appeal.

D. **Applicants Ineligible to Receive CPB Assistance:** An applicant for assistance from CPB, whom a court or government agency with jurisdiction has made a final determination to be in violation of any federal, state, or local law or regulation prohibiting discrimination on the basis of race, color, religion, age, national origin, sex, or physical or mental handicap, shall be ineligible for assistance from CPB, unless the applicant shall demonstrate to the satisfaction of CPB that the violation has been fully corrected or that it is in full compliance with all remedial provisions of such final determination.

E. **FCC Compliance:** All stations benefiting from a CSG must fully comply with FCC regulations and the terms of the station's broadcast license. Failure to do so may result in the loss of CPB funding.