# Appendix C

## Codes, Mission Statements

These examples of codes of practice, statements of principles, and mission statements are being used currently by stations or news organizations. Some are part of larger policy statements and operations manuals. They are offered, not as statements to be adopted by any station, but as ideas to be used in developing policies. In addition, PBS has published *Program Standards and Journalism Guidelines* for use by program producers. Final responsibility for the integrity of broadcast material is the obligation of each station.

### Statement of Principles of Editorial Integrity in Public Broadcasting

(Developed by the Editorial Integrity Project, the Wingspread Conference, 1985)

The mission of public broadcasting is to bring to Americans the highest accomplishments of our society and civilization in all of its rich diversity, to permit American talent to fulfill the potential of the electronic media to educate and inform, and to provide opportunities for diverse groups of the American people to benefit from programming unavailable from other sources.

The basis of public broadcasting's mission lies in the Communications Act of 1934 as amended in 1967. Congress determined that Americans' general welfare would be furthered by encouraging public telecommunications services responsive to the people's interests. Congress also found that supporting public telecommunications was an important concern of the federal government, and that developing public broadcasting programming depended on freedom, imagination, and initiative on both local and national levels.

No one is more important to the fulfillment of public broadcasting's mission than the men and women serving on the boards of trustees of local licensee stations. So that the trustees can make the best decisions on issues affecting the licensee, they must encourage both comments and criticism from citizens' groups and public representatives. Trustees need to assure they are responsive to the needs of the public in a responsible manner. Each board should have a public policy stating the principles by which it intends to conduct the business of the licensee, including the solicitation of public comment. That policy should recognize the taxpayers' right to criticize the public broadcasting agency.

Trustees are also responsible for guarding public broadcasting's editorial integrity and its reputation. Editorial integrity in public broadcasting programming means the responsible application by professional practitioners of a free and independent decision-making process which is ultimately accountable to the needs and interests of all citizens. Programming based on the principles of editorial integrity will guarantee journalistic objectivity, as well as a fair and balanced presentation of issues.

In order to assure that programs meet the standards of editorial integrity the public has a right to expect, the following five principles and guidelines established a foundation for trustee action. The principles and guidelines also form a basic standard by which the services of a public broadcasting licensee can be judged. At the same time, they form a basis for evaluating all aspects of a public broadcasting station's governance, from enabling legislation to the policy positions of the licensee board. The ultimate goal of the principles and guidelines is to assist public broadcasting trustees in fulfilling their vital role in this important public service.

#### I. We Are Trustees of a Public Service.

Public broadcasting was created to provide a wide range of programming services of the highest professionalism and quality which can educate, enlighten, and entertain the American public, its audience and source of support. It is a noncommercial enterprise, reflecting the worthy purpose of the federal and state governments to provide education and enrichment to their citizens.

As trustees of this public service, part of our job is to educate all citizens and public policymakers to our function, and to assure that we can certify to all

citizens that station management responsibly exercises the editorial freedom necessary to achieve public broadcasting's mission effectively.

II. Our Service Is Programming.

The purpose of public broadcasting is to offer its audiences public and educational programming which provides alternatives in quality, type, and scheduling. All activities of a public broadcasting licensee exist solely to enhance and support excellent programs. No matter how well other activities are performed, public broadcasting will be judged by its programming service and the value of that service to its audiences.

As trustees, we must create the climate, the policies, and the sense of direction which assure that the mission of providing high quality programming remains paramount.

III. Credibility Is the Currency of Our Programming.

As surely as programming is our purpose, and the product by which our audiences judge our value, that judgment will depend upon their confidence that our programming is free from undue or improper influence. Our role as trustees includes educating both citizens and public policymakers to the importance of this fact and to assuring that our stations meet this challenge in a responsible and efficient way.

As trustees, we must adopt policies and procedures which enable professional management to operate in a way which will give the public full confidence in the editorial integrity of our programming.

IV. Many of Our Responsibilities Are Grounded in Constitutional or Statutory Law.

Public broadcasting stations are subject to a variety of statutory and regulatory requirements and restrictions. These include the federal statute under which licensees must operate, as well as other applicable federal and state laws. Public broadcasting is also cloaked with the mantle of First Amendment protection of a free press and freedom of speech.

As trustees we must be sure that these responsibilities are met. To do so requires us to understand the legal and constitutional framework within which our stations operate, and to inform and educate those whose position or influence may affect the operation of our licensee.

V. We Have a Fiduciary Responsibility for Public Funds.

Public broadcasting depends upon funds provided by individual and corporate contributions; and by local, state, and federal taxes. Trustees must therefore develop and implement policies which can assure the public and their chosen public officials alike that this money is well spent.

As trustees, we must assure conformance to sound fiscal and management practices. We must also assure that the legal requirements placed on us by funding sources are met. At the same time, we must resist the inappropriate use of otherwise legitimate oversight procedures to distort the programming process which such funding supports.

## Alabama Educational Television Commission

## Code of News Ethics

The Alabama Educational Television Commission (AETC) is a broadcast organization, chartered by the Federal Communications Commission to serve the public interest, necessity, and convenience. As one method of fulfilling this obligation, the AETC is committed to providing news and information to its audience so they can make informed decisions about issues affecting their lives.

It is the intent of the AETC to inform the public of important events and issues in an accurate, fair, and timely manner, and to carry out this responsibility with intelligence and integrity.

To these ends the Alabama Educational Television Commission declares acceptance of the standards of practice here set forth:

ACCURACY: The aim of all AETC News and Public Affairs broadcasts shall be to inform and broaden the public's understanding of issues and events in an objective and factual manner. Inaccuracies and a lack of thoroughness are inexcusable.

Case: 1:10-cv-07003 Document #: 45-16 Filed: 07/06/11 Page 3 of 13 PageID #:563

All News and Public Affairs broadcasts will be clear of editorialization by the journalist or by other employees or members of the Alabama ETV Commission.

FAIRNESS: AETC news personnel shall respect the rights, privacy, dignity, and well-being of all persons encountered in the course of gathering and reporting the news, and shall guard against any practices that could deprive individuals of their constitutional rights. The broadcast of any errors shall be promptly and completely corrected.

BALANCE: Recognizing that there are many views on most issues, AETC personnel shall make continual efforts to reasonably represent all sides of an issue.

NEWS SELECTION: The selection of News/Public Affairs material for broadcast shall be determined by that material's value in serving the public interest. The selection of material in this regard shall be solely the responsibility of the AETC staff charged with such editorial determinations.

TECHNIQUE: AETC news personnel shall avoid sensationalism and the use of any techniques to deceive or mislead the audience in any broadcast. The role of a reporter is solely that of a reporter or observer and personnel shall avoid any participatory role.

ETHICS: AETC news personnel, as all journalists, are accountable to the general public in their news reports. Recognizing this responsibility and obligation, all AETC news personnel shall conduct themselves in a manner to avoid compromising their journalistic independence and integrity, in fact or in appearance. Recognizing the danger of such, AETC management will determine and impose guidelines regarding conflicts of interest for News/Public Affairs personnel with particular attention to such areas as secondary employment, political involvement, and outside compensation.

PROPERTY RIGHTS: AETC shall maintain all property rights to material broadcast or gathered in the course of broadcast by any and all News/Public Affairs personnel. Guidelines shall be established regarding the maintenance of such materials with appropriate realization of and adherence to such concerns as journalistic integrity and source of disclosure.

OUTSIDE REQUESTS FOR BROADCAST OR OUTTAKE MATERIAL[1]

In the gathering and presentation of news materials the AETC stores some, but not all, broadcast, excerpts from broadcasts, and film, tape, or audio outtakes. Any outside requests for examination or use of this material must be promptly and without commitment referred to the appropriate management personnel.

Broadcast Material

The AETC will attempt to comply with all reasonable requests for recordings of its news/public affairs material which are broadly disseminated to the public. All AETC produced news/public affairs program material is copyrighted. It should be noted that:

--such recordings will be provided and licensed for personal review and reference only. A standard fee for these recordings shall be imposed.

--public exhibition or rebroadcast of the material in whole or in part is generally prohibited. An exception to this procedure may be made by the AETC Executive Director if the intent of the request is 1) secondary distribution of several complete broadcasts in a program series, or 2) playback of one or a series of programs for educational usage in an institutional setting.

--delivery of requested material is subject to execution of an appropriate license agreement.

Outtake Material

Generally, news/public affairs outtakes are available only to the AETC and will not voluntarily[2] be provided for viewing, copying, or any other purpose.

An exception to this procedure may be made, at standard fees, if the material does not include the voices or appearances of AETC news/public affairs personnel and if the material is 1) clearly neutral (i.e., establishing shots of a city skyline), or 2)

[1] "Outtake material" is all nonbroadcast material recorded by the AETC but not used for broadcast or general public dissemination.

[2] "Voluntary" means in the absence of a compelling specific subpoena.

A258

non-controversial, non-news-related, and cultural (i.e., footage of Indian arrowheads), or 3) of profound historical or cultural interest, many years old, and released by the Executive Director.

The AETC reserves the right to release material for use by *bona fide* news agencies. (Revised Jan. 31, 1984.)

## Nebraska Educational Communications Commission

## Network Program Policy

The Nebraska Educational Telecommunications Act provides that public telecommunications in Nebraska is to be educational, noncommercial, and statewide.

The Act makes the Nebraska Educational Telecommunications Commission responsible for public telecommunications operations, and directs that the Commission, considering "the needs of the entire," shall "establish general policies relating to the nature and character of educational television broadcasts."

At the suggestion of the 1966 Commission, the Nebraska ETV Network Program Advisory Committee [now reconstituted as Community Advisory Boards] originated the following statement of policy on programming transmitted by the Nebraska Educational Television Network. This statement was amended slightly and reaffirmed by the Commission in 1979.

### Nature of Programs

The prime objective of Nebraska ETV programs is to afford the viewer an opportunity to learn in one or more of the following areas: the humanities, including literature; the physical, natural, or social sciences; the esthetic, practical, or industrial arts. Additionally, the Network will provide viewers with the opportunity to learn more about current events, political, social, and public affairs issues which affect their lives.

In the pursuit of a broad educational objective, programs transmitted by the Nebraska ETV Network shall seek to promote understanding and an appreciation of culture, and shall respect the usual tenets of good taste, responsibility, and fairness.

### Noncommercialism

Inasmuch as Nebraska ETV programs are concerned with education and not with the sale of goods or services for financial profit, programs transmitted by the Network shall be devoid of material which recommends, or in the opinion of a representative group of viewers seems to recommend, one commercial product or service over another similar commercial product or service.

The Nebraska Educational Telecommunications Commission will not permit any Network transmission to be used for the sale of products or services, except that viewers may be informed as to specific instructional materials supplemental to the educational objective of the program, such as a course syllabus or textbook. Solicitation of funds is not permitted except in the instance of generating contributions to the nonprofit citizens support organization, Nebraskans for Public Television, Inc.

### Nonsectarianism

Programs transmitted by the Nebraska ETV Network shall not propose acceptance or rejection of any religious dogma or belief.

### Political Programs

Success of the American form of government at the local, state, or national level depends primarily upon a widespread understanding of public issues and leaders and upon widespread participation in the activities of citizenship. Promotion of interest in governmental affairs and in the acceptance of the responsibilities or citizenship is a function Nebraska ETV Network programs will serve.

Programs transmitted by the Nebraska ETV Network will deal with political subjects incisively, fairly, accurately, and with responsibility. It is axiomatic that qualified spokespersons representing conflicting points of view on significant political issues will be accorded equal opportunity on Network programs to support their positions freely, restricted only by the bounds of responsibility and common decency.

The sole purpose of any Nebraska ETV Network program dealing with candidates for public office or with issues scheduled for a decision by voters shall be to inform and to interest viewers in the affairs of citizenship. This purpose, together with a disclaimer of any endorsement, shall be stated at the opening

and close of any Network program involving candidates for public office or issues being submitted for a decision of the voters.

**Public Affairs**

In the pursuit of its total mission it is expected that the Nebraska ETV Network will perforce engage in public affairs programming, i.e., programs concerned with a wide variety of public events.

The precise role of such programming in the day-to-day conditions of the Nebraska ETV Network of necessity must be left to the Network's Program Manager, subject to the following guidelines:

1. Public affairs programs on the Nebraska ETV Network will deal with subjects and issues of significance.
2. Public affairs programs on the Nebraska ETV Network should be in the public interest in Nebraska.
3. Public affairs programs on the Nebraska ETV Network will present a balanced, responsible, and insofar as possible, a total view of the subject matter.
4. Of itself, controversy will not be considered sufficient reason for either airing or not airing a public affairs program.
5. In the accomplishment of public affairs programming, the Program Manager and staff members shall avoid material which can reasonably be expected to offend the public taste in Nebraska unless such material is clearly essential to the educational objective of the program.

**Special Events**

Programs designed to inform Nebraskans about their state, its communities, agriculture, business, industries, and people are to be encouraged. High school, college, and university speech, drama, and athletic competitions; and pageants, parades, and rodeos are given priority according to the interest and usefulness they generate on a broad statewide basis.

**Entertainment**

Programs which are primarily for the purpose of entertaining an audience shall provide the viewers with an opportunity for enhancing their cultural appreciation for music, drama, and the arts.

Instructional Television

The Nebraska Educational Telecommunications Commission is dedicated to the proposition that use of the Nebraska ETV Network for instructional purposes can contribute to the improvement of Nebraska education. The Commission supports research, experiments, and projects primarily concerned with improved instructional uses of the available Network facilities. Primary concern for elementary and secondary education is coupled with concern for preschool education and postsecondary instruction designed to meet a variety of individual needs.

## KGNU (Boulder, Colo.) News and Public Affairs Policy

**Alternative News...or just Biased Views?**

KGNU is proud of its long-standing tradition of being the Front Range's "alternative" news and public affairs resource, offering a counterbalance to the messages of our mainstream media. As such, we express views and illuminate issues not found in the general media, and we use a broad mix of resources for both local and non-local news and public affairs programs to provide coverage not found elsewhere. KGNU seeks to air controversial issues, and to represent minority views. We value the support of our listeners who believe in the First Amendment to the Constitution and we attempt to attain its maximum exercise. (Abstracted from *KGNU News and Public Affairs Policy Proposal* and subsequent *Policy*)

But...

KGNU also strives for fair and accurate presentation of diverse points of view, even though its programmers may hold strong opinions themselves. In particular, we acknowledge the need for full airing of diverse political positions during election periods.

The Program Committee wishes to emphasize the critical necessity of using the strategies listed below to ensure fairness and accuracy:

1. Seek out more than one, two, or three perspectives on an issue. The more interviews, research, and diverse resources you use in your program, the closer you will come to "the truth."

2. Question sweeping and/or accusatory statements. Ask your guests, callers, etc.: "Why do you think that?," "What proof of this do you have?," and so forth. And equally importantly--Refrain from making such statements yourself. Avoid such statements as "X lied about issue Y" or "Z wasn't smart enough to see that Y was clearly the case," even if you suspect that they may be true.

   Libel is a serious charge for which KGNU can be prosecuted and fined. To protect KGNU, you must question generalizations and accusatory statements made by others, as well as avoid making such statements yourself.

3. Play the devil's advocate. If you are interviewing just one person on a controversial issue, you must present arguments against your guest's point of view. Use statements like: "Your critics say X--how do you respond to that?" This strategy is particularly crucial if you agree with your guest about the issue.

4. Avoid predictable, boring, and self-indulgent programming. This usually comes about because you and your guest agree; because you aren't asking penetrating questions; and/or because you talk too much about your own opinion.

5. Make clear to listeners where your own bias lies. Do not present personal opinions or viewpoints in which you have a long-standing or vested interest without advising your audience of your stake in the matter. And don't forget: Your guest(s)' opinions are the focus of the program--not yours.

6. Do not "cheerlead." If you are covering a protest or political action, do not cover it as a cheerleader for any cause. Ask difficult and penetrating questions of everyone you interview.

News and public affairs programmers should review this policy with KGNU's news and public affairs director for possible further elaboration and clarification of operating practices.

## Ohio University Telecommunications Center

### Guidelines for the Treatment of Controversial Issues of Public Importance

The mission of the University as licensee of WOUB-AM, WOUB-FM, WOUB-TV, and WOUC-TV is to offer a variety of programs designed to serve the interests and needs of the audiences for these stations. The Statements of Purpose of these stations mandate that their programming will include news, public affairs, and information services, both produced locally and acquired from outside sources. Responding to audience needs and interests in these programming areas requires the treatment of controversial issues of public importance.

Further, the treatment of such issues by all broadcasting stations is required by law. All stations are subject to regulation by the Federal Communications Commission. They must abide by the rules established under the Communications Act of 1934, as amended. In addition, all public broadcasting stations are governed by the Public Broadcasting Act of 1967, as amended. While the regulatory and legal history in this area is complex, the spirit of the law is perhaps best illustrated by the two key statements which follow:

1. "It is the right of the public to be informed, rather than any right on the part of the Government, any broadcast licensee or any individual member of the public to broadcast his own particular views on any matter which is the foundation stone of the American system of broadcasting." (FCC, June 1, 1949)

2. "No noncommercial educational broadcasting station may engage in editorializing[3] or support or oppose any candidate for political office." (Public Broadcasting Act, Sec. 399, 1967)

Within this framework of laws, rules, and regulations, the coverage by these stations of controversial issues of public importance will be characterized by fairness, balance, and objectivity.

---

[3] "Editorializing" is defined as an expression of the licensee's opinion on a controversial issue of public importance.

Fairness and Balance--Coverage of public issues will be fair. These stations will make their facilities available for the expression of the contrasting views of responsible spokespersons on various controversial issues of public importance. These stations will play a conscious and positive role in bringing about balanced presentations by making a reasonable effort to secure responsible representatives of opposing points of view.

Balance cannot be guaranteed by a simple, precise formula such as "equal time," since the result may be a distortion of complex relationships and the undermining of the role of intelligent journalism, which is to make sense out of confused and complicated issues. Most serious issues pose many "sides," not just two starkly opposed views that can be accommodated by a neat, even treatment. Balance requires the honest, unceasing effort to recognize and represent this full range of views.

The Fairness Doctrine of the FCC requires all stations to provide balanced treatment of controversial issues within their overall schedules. The Public Broadcasting Act exhorts stations supported in part by federal funds to provide ". . . balance in all programs or series of programs of a controversial nature." Where possible, these stations will follow that more demanding stand and provide balance within each program or program series. This approach increases the likelihood of public awareness of the access to opposing points of view.

Objectivity--Coverage of controversial issues of public importance will be objective.

Objectivity can be approached systematically through:

--accurate and thorough research
--careful writing
--production techniques appropriate to the subject matter
--sensitive editing which preserves meaning and balance, and
--neutrality, which does not favor or discriminate.

Additionally, objectivity requires that programs concerning controversial issues of public importance will not advocate particular points of view, leading listeners and viewers to preconceived conclusions. Rather, listeners and

views should be furnished with sufficient information to permit independent decisionmaking.

Objectivity also requires that, in keeping the provisions of the Public Broadcasting Act, these stations will not editorialize, nor will they support or oppose any candidate for political office.

Procedures--The University as licensee is ultimately responsible under the law for assuring that the programming of these stations is in accordance with federal statute and regulation. This responsibility neither can, nor should, be delegated to any other authority. As a practical matter, however, while the above guidelines will be rigorously observed by station staff in the local production of programming concerning controversial issues of public importance, these stations must rely heavily on their respective networks and on outside producers who supply the bulk of programming concerned with more--than-regional issues. The public radio and television networks have developed procedures for implementing and ensuring the highest standards of journalistic integrity, and these stations will exercise constant vigilance to ensure that these procedures are implemented and enforced by the appropriate network personnel and that network programming broadcast locally meets the above guidelines. Programs acquired from sources which cannot ensure adherence to similar standards will be previewed prior to broadcast. In the event that such previewing is not possible, sufficiently detailed program information will be obtained so that a determination of the programs' fairness, balance, and objectivity can be made.

Responsibility for adherence to the above guidelines rests with the Program Directors and the News Director, acting in their roles as program schedulers and as executive producers.

Where necessary, questions regarding the application of these guidelines will be referred to the Director of the Telecommunications Center. The Director will be notified of proposals to broadcast programs treating particularly sensitive public issues and of any public complaints or requests for response time received by the stations.

## Ohio University Telecommunications Center

### Guidelines for the Review of Questionable Program Material

The broadcasting stations operated by Ohio University must remain free to present various artistic works, life-styles, and modes of expression even though some program materials may be offensive to some members of the audience. It is the purpose of this statement to set down guidelines to be used by broadcasting station personnel as they review program material which is likely to offend some segments of the public. This statement is intended to guide, not inhibit, those who program these stations as they seek to serve diverse tastes and interests.

At the same time, it is imperative that those who manage these stations exercise ultimate control over the selection of program materials. The maintenance of editorial control carries with it an obligation to review program materials in order to assure that their broadcast is consonant with the editorial standards of the licensee and that such broadcasts will not violate applicable legal standards.

There exist two primary legal focal points by which that second aspect of your review of program material should be guided: it is a federal criminal offense (and, very likely, a violation of state law as well) to broadcast "obscene" material; it is contrary to Federal Communications Commission Rules to broadcast "indecent or profane" material in certain circumstances. The following discussion may be helpful in supplying content to those two somewhat amorphous prohibitions.

I. Definitions

A. *Obscene Material.* The Supreme Court has structured a tripartite definition of obscene material. Programming should be considered as obscene, and therefore never appropriate for broadcast, if it meets each of the three following conditions. Material is obscene:

1. if the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to prurient interests; and

2. if the work depicts or describes, in a patently offensive way, sexual conduct; and
3. if the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

For the purpose of discerning "contemporary community standards," the referent is the local or regional audience served by the station. Although the test for obscenity is, therefore, contextual in the sense that it may vary from community to community, the determination of what does and does not comprise obscene programming does not depend on the audience likely to receive any particular program. In contradistinction to indecent programming, as that term is defined below, the broadcast of obscene material is not made permissible by the fact that a program is aired at a time likely to reach only segments of the community less susceptible to or less offended by the program content. If it is determined that the average person applying community standards would find the program content prurient and if the program depicts sexual conduct in a patently offensive way and if the program, considered in its totality, does not have significant social importance, then the program may not be broadcast.

B. *Indecent Material.* The FCC has been upheld by the courts in prohibiting the broadcast of indecent programming. This term has been defined as follows:

> The concept of 'indecent' is intimately connected with the exposure of children to language that described, in terms patently offensive as measured by contemporary community standards for the broadcast media, sexual or excretory activities and organs, at times of day when there is a reasonable risk that children may be in the audience.

Quite plainly, the concept of "indecent" programming is a good deal more expansive than the definition of obscene material. There is, however, a countervailing consideration in the bar to indecent broadcasts. Programming that would be unacceptable for broadcast during times of the day when children are likely to be among the audience is permissibly aired during broadcast hours when the probability of a child's exposure to the programming is very small. Thus, material that, while not obscene, falls within the description of

"indecent" material may be broadcast, but only at times when there is little risk that the broadcast will be accessible to children. Obviously, broadcast in the late night hours is the surest way to comply with this requirement. Additionally, prior to the broadcast of any such program, on-air notification of the potentially offensive content of the program should be employed.

II. Guidelines for Program Directors and the Director of the Center

1. Is the questionable material essential to the meaning of the program as a whole? In many cases, gratuitous material may be edited from a program without affecting its meaning.
2. Does the questionable material reflect the personal lifestyle of a speaker or central character and is it therefore essential? Again, gratuitous material may be edited without affecting program meaning.
3. Is the questionable material essential to a documentary or a *bona fide* news program? Such material should be retained in order to present the subject properly.
4. Is the questionable material a part of a work of art (poem, drama, etc.)? If the work of art is to be retained, it should be presented without editing or distortion.
5. Does the overall program have serious literary, artistic, political, or scientific value? If so, it cannot be deemed to be obscene (see definition above).
6. Is the program material of special value or relevance to a specific segment of the community? If so, consideration should be given to its placement at a time when the desired audience will be available and its impact on others who may object to the content will be minimized. Special care should be taken to avoid broadcasting questionable material at times when children are most likely to be in the audience. In addition, use may be made of on-air notification of special content prior to the broadcast.

III. Procedures

The following procedures should be used to assure program review at each level necessary:

1. Network Programs

Both NPR and PBS provide systems for advance notification of programs which may merit review within these guidelines. Notices of this sort are brought to the attention of the Public Radio Program Director by the Program Coordinator who reviews related NPR non-broadcast announcements each day. The Operations Department carries written notices from PBS to the Public TV Program Director immediately upon receipt of them. An attempt should be made to acquire additional information about questionable programs, if necessary. When network facilities permit, questionable programs should be previewed or auditioned. If possible, samples should be retained for further review.

After gathering information on or experience with the program, the Program Director should seek to determine its proper treatment by applying the guidelines provided here. If the proper treatment of the program remains unclear, the question should be taken to the Director of the Center for resolution. In any case, the Director of the Center should be notified of any judgments of this sort which are under consideration, even though they may be resolved by the Program Director.

2. Pre-Recorded Programs (Tapes, Discs, and Films)

Any individual program or series of programs which deals with potentially questionable material should be previewed or auditioned by the Program Director or another staff member to whom he/she has given that responsibility.

Generally, program suppliers can be relied upon to mark or "flag" programs with potentially questionable content. All such programs should be reviewed and a decision should be made about their use following the procedure outlined in Section II above. Flags of this sort should be noted by the Radio or Television Traffic Manager, and they should be immediately brought to the attention of the appropriate program service director.

3. **Local Programming**

The Program Directors, News Director, and Director of Educational Telecommunications act as executive producers for any material produced through these facilities. Producers engaged in the development of programs which may contain questionable material are required to call these cases to the attention of the appropriate Executive Producer well in advance of their planned use on the air or on the Athens City Cable channel.

Many of the guidelines provided here may be applied during the production process in order to strengthen the effectiveness of the program. In those cases where the functioning of questionable material cannot adequately be determined without the full development of the context in which it is to be presented, program production should proceed subject to review by the Executive Producer after it has been completed.

In those "live" broadcast situations where questionable material may be presented spontaneously and where it cannot otherwise be controlled (telephone dialogues, etc.), tape delay systems should be employed.

Questionable program material produced for possible use on the Athens City Cable channel will be reviewed using the process and guidelines described above. The first level of review will be provided by the Director of Educational Telecommunications. If the question of use remains unresolved, the material will be reviewed by the Director of the Telecommunications Center. In those cases where the Center Director decides against use on the channel and the producer disagrees, the producer may request further review by a panel consisting of five members appointed by the Cable Channel Steering Committee for that purpose. The panel's judgment should be final in these cases.

## Society of Professional Journalists

## Code of Ethics

The Society of Professional Journalists, Sigma Delta Chi believes the duty of journalists is to serve the truth.

We BELIEVE the agencies of mass communication are carriers of public discussion and information, acting on their Constitutional mandate and freedom to learn and report the facts.

We BELIEVE in public enlightenment as the forerunner of justice, and in our Constitutional role to seek the truth as part of the public's right to know the truth.

We BELIEVE those responsibilities carry obligations that require journalists to perform with intelligence, objectivity, accuracy, and fairness.

To these ends, we declare acceptance of the standards of practice set forth:

I. **Responsibility**

The public's right to know of events of public importance and interest is the overriding mission of the mass media. The purpose of distributing news and enlightened opinion is to serve the general welfare. Journalists who use their professional status as representatives of the public for selfish or other unworthy motives violate a high trust.

II. Freedom of the Press

Freedom of the press is to be guarded as an inalienable right of people in a free society. It carries with it the freedom and the responsibility to discuss, question, and challenge actions and utterances of our government and of our public and private institutions. Journalists uphold the right to speak unpopular opinions and the privilege to agree with the majority.

III. Ethics

Journalists must be free of obligation to any interest other than the public's right to know the truth.

1. Gifts, favors, free travel, special treatment, or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted.

2. Secondary employment, political involvement, holding public office, and service in community organizations should be avoided if it compromises the integrity of journalists and their employers. Journalists and their employers should conduct their personal lives in a manner that protects them from conflict of interest, real or apparent. Their responsibilities to the public are paramount. That is the nature of their profession.

3. So-called news communications from private sources should not be published or broadcast without substantiation of their claims to news value.

4. Journalists will seek news that serves the public interest, despite obstacles. They will make constant efforts to assure that the public's business is conducted in public and that public records are open to public inspection.

5. Journalists acknowledge the newsman's ethic of protecting confidential sources of information.

6. Plagiarism is dishonest and unacceptable.

IV. Accuracy and Objectivity

Good faith with the public is the foundation of all worthy journalism.

1. Truth is our ultimate goal.

2. Objectivity in reporting the news is another goal that serves as the mark of an experienced professional. It is a standard of performance toward which we strive. We honor those who achieve it.

3. There is no excuse for inaccuracies or lack of thoroughness.

4. Newspaper headlines should be fully warranted by the contents of the articles they accompany. Photographs and telecasts should give an accurate picture of an event and not highlight an incident out of context.

5. Sound practice makes clear distinction between news reports and expressions of opinion. News reports should be free of opinion or bias and represent all sides of an issue.

6. Partisanship in editorial comment that knowingly departs from the truth violates the spirit of American journalism.

7. Journalists recognize their responsibility for offering informed analysis, comment, and editorial opinion on public events and issues. They accept the obligation to present such material by individuals whose competence, experience, and judgment qualify them for it.

8. Special articles or presentations devoted to advocacy or the writer's own conclusions and interpretations should be labeled as such.

V. Fair Play

Journalists at all times will show respect for the dignity, privacy, rights, and well-being of people encountered in the course of gathering and presenting the news.

1. The news media should not communicate unofficial charges affecting reputation or moral character without giving the accused a chance to reply.

2. The news media must guard against invading a person's right to privacy.

4266

3. The media should not pander to morbid curiosity about details of vice and crime.

4. It is the duty of the news media to make prompt and complete correction of their errors.

5. Journalists should be accountable to the public for their reports and the public should be encouraged to voice its grievances against the media. Open dialogue with our readers, viewers, and listeners should be fostered.

VI. Pledge

Adherence to this code is intended to preserve and strengthen the bond of mutual trust and respect between American journalists and the American people.

The Society shall--by programs of education and other means--encourage individual journalists to adhere to these tenets, and shall encourage journalistic publications and broadcasters to recognize their responsibility to frame codes of ethics in concert with their employees to serve as guidelines in furthering these goals.

Adopted 1926; revised 1973, 1984, 1987.

## Public Radio News Directors Incorporated

## Code of Ethics

Whereas, Public Radio News Directors Incorporated (PRNDI) was formed in December 1984 to enhance news and information programming, and

Whereas, PRNDI was formed to encourage professional development, and

Whereas, PRNDI is to foster events to pursue developmental goals of journalists, producers, editors, independent contractors, students, and volunteer news and public information aides, and

Whereas, PRNDI members serve many communities and interests that deserve news programs of the highest standards of honesty, fairness, integrity, balance, compassion, and technical quality;

Now, therefore, Public Radio News Directors Incorporated does advance and call upon members to follow this code of ethical conduct.

1. Prepare and deliver news programs accurately to maintain public trust. All errors of fact, bias, or omission must be corrected immediately.

2. Strive to eliminate personal, station, or community bias and balance matters of race, creed, religion, ethnic origin, gender, and sexual preference.

3. Recognize, understand, and vigorously pursue our public's right-to-know laws. Members must evaluate the merit and news value of materials provided by anonymous sources. After deliberation, members must insure the sancrity of those sources based upon right to privacy and guard against its violation.

4. Make efforts to name those who provide newsworthy information and avoid all sound presentations not generated at the news site.

5. Responsibly evaluate the newsworthiness of all broadcast items and guard against undue pressure from non-news personnel.

6. Honor legitimate requests to hold or embargo newsworthy material provided in advance.

7. Avoid making false representations to obtain materials from those who might otherwise object to discussing matters with reporters, editors, producers, independent contractors, student aides, or volunteers under your direction.

8. Inform news sources when conversations are being recorded.

9. Make no promises or guarantees to report, promote, or advance materials without true news value.

10. Avoid the reality or perception of all conflicts of professional and personal interests. These include rejection of gifts, favors, commissions, privileges, or special access which cloud perception.

11. In every case possible, maintain a separation of duty during station pledge drives and other fund-raising efforts. If possible, this separation should include all news-related personnel.

12. Reconsider the associations with community events, service projects, boards, councils, or commissions when conflicts of interest arise and to work to assign stories on those organizations to reporters.

13. Avoid employment that involves work for politicians, corporations, companies, sponsors, underwriters, or station donors which strain professional obligation and public trust.

14. Avoid participation in any event (marches, demonstrations, picketing, rallies) that compromise professional integrity and future news or public information assignments.

15. Maintain and upgrade these standards as circumstances require.

16. Require all news employees, independent contractors, producers, editors, talent, aides, and volunteers under member direction to adhere to these standards.

And, upon acceptance of these standards, members should advance them by personal action. By doing so, members maintain a standard of excellence which enhances the value of the news delivered. Members doing so provide worth to their stations, their communities, and the employees under their direction. This provides the public with a trustworthy product that is beyond reproach.

Adopted July 27, 1991

Advance comment for

**Decisions...**
**Decisions...**

"Here is a basic framework on which to build your station's editorial standards and ethical decisionmaking guidelines. Check out the strong bibliography!"
Tripp Sommer
President
Public Radio News Directors Incorporated

"The handbook provides a practical compilation on problems we all face, with insight into how some of us have chosen to deal with recurring common concerns."
Sandra Polizos
Executive Producer
Alabama Public Television

"I think it will be a useful tool stations can use to craft or revise their own guidelines for these important issues. They are issues each station must consider and think through, and then reflect upon, in the way they run and program their stations."
Steve Olson
President
Public Radio Program Directors Association

"...the results of your efforts will be well received by our members."
Skip Hinton
President
Southern Educational Communications Association

"What a wonderful handbook! I'm using it as a backgrounder for new public affairs staff."
Virginia Fox
Executive Director
Kentucky Educational Television

"Our editorial integrity is more important to us than our funding. This excellent compendium, without question, will be significantly useful to the stations."
Ron Hull
General Manager, KUON-TV, and
Associate General Manager,
Nebraska ETV Network