*U.S. Dept. of Education*
*Grant Award Notification, 9/30/2010 – 9/29/2011*

Window To The World Communications, Inc.

U295A100026

Reese P. Marcusson
Window to the World Communications, Inc.
WTTW National Media Production,
5400 N. St Louis Avenue

Chicago, IL 60625



### U.S. Department of Education
### Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | **RECIPIENT NAME:** Window to the World Communications, Inc. WTTW National Media Production, 5400 N. St. Louis Avenue Chicago, IL 60625 | **5** | **AWARD INFORMATION** PR/AWARD NUMBER U295A100026 ACTION NUMBER 01 ACTION TYPE New AWARD TYPE Discretionary |

**2 PROJECT TITLE**
84.295A
UMIGO: yoU Make it GO

**6 AWARD PERIODS**
BUDGET PERIOD 09/30/2010 - 09/29/2011
PERFORMANCE PERIOD 09/30/2010 - 09/29/2015

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 02 | 09/30/2011 - 09/29/2012 | $6,376,525.00 |
| 03 | 09/30/2012 - 09/29/2013 | $6,500,000.00 |
| 04 | 09/30/2013 - 09/29/2014 | $6,500,000.00 |
| 05 | 09/30/2014 - 09/29/2015 | $6,500,000.00 |

**3 PROJECT STAFF**

RECIPIENT PROJECT DIRECTOR
Reese P. Marcusson     (773) 509 - 5408

EDUCATION PROGRAM CONTACT
Joseph F. Caliguro     (202) 205 - 5449

EDUCATION PAYMENT CONTACT
GAPS PAYEE HOTLINE     (888) 336 - 8930

**7 AUTHORIZED FUNDING**
THIS ACTION     $6,623,475.00
BUDGET PERIOD     $6,623,475.00
PERFORMANCE PERIOD     $6,623,475.00

**4 KEY PERSONNEL**

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Reese Marcusson | Project Director | 15% |
| Juliette Buford | Financial Director | 15% |
| Michael Polis | Co-Proj Director | 50% |
| Julia Fischer | Project Manager | 100% |
| Glen Schuster | Curric. Coordinato | 50% |

**8 ADMINISTRATIVE INFORMATION**

DUNS/SSN     006929186
REGULATIONS     CFR PART XXX
    EDGAR AS APPLICABLE
ATTACHMENTS     A, B OII TEP, C, E1, E2, E4, E5, F, N, S, U, V, HS2

**9 LEGISLATIVE AND FISCAL DATA**

AUTHORITY: PL 107-110 ESEA AS AMENDED BY THE NO CHILD LEFT BEHIND ACT
PROGRAM TITLE: READY-TO-LEARN TELEVISION

CFDA/SUBPROGRAM NO: 84.295A

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0204A | 2010 | 2010 | EU000000 | B | U78 | 000 | 295 | 4101C | $6,623,475.00 |

Ver. 3
ED-GAPS001 (01/98)

WTTW 0000008

*A* 399

U.S. Department of Education

Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

PR/AWARD NUMBER:  U295A100026

RECIPIENT NAME:  Window to the World Communications, Inc.
WTTW National Media Production,

TERMS AND CONDITIONS

(1)  By accepting this award, the recipient agrees to notify the relevant program office in the Department and provide a reasonable period of time for the Department to respond, before it can agree to provide any portion of this award to the Association of Community Organizations for Reform Now (ACORN) or its subsidiaries. This condition takes into account Division E, Section 511 of the Consolidated Appropriations Act, 2010 (P. Law. No. 111-117), and pending litigation on related matters. If you have any questions about this condition or the status of these matters, please contact the program office.

(2)  THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT: (1) THE RECIPIENT'S APPLICATION (BLOCK 2), (2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS (BLOCK 8), AND (3) THE SPECIAL TERMS AND CONDITIONS SHOWN AS ATTACHMENTS (BLOCK 8).

THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34 CFR 75.253, THE DEPARTMENT OF EDUCATION WILL CONSIDER CONTINUED FUNDING IF: (1) CONGRESS HAS APPROPRIATED SUFFICIENT FUNDS UNDER THE PROGRAM, (2) THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN THE BEST INTEREST OF THE GOVERNMENT, (3) THE RECIPIENT HAS MADE SUBSTANTIAL PROGRESS TOWARD MEETING THE OBJECTIVES IN ITS APPROVED APPLICATION, AND (4) THE RECIPIENT HAS SUBMITTED REPORTS OF PROJECT PERFORMANCE AND BUDGET EXPENDITURES THAT MEET THE REPORTING REQUIREMENTS FOUND AT 34 CFR 75.118 AND ANY OTHER REPORTING REQUIREMENTS ESTABLISHED BY THE SECRETARY.

IN ACCORDANCE WTH 34 CFR 74.25(c)(2), OR 34 CFR 80.30(d)(3) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOC K 4 MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.

THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

(3)  Cooperative Agreement - See Attached Clause for Details

(4)  Forward Funding - See Attached Clause for Details

_Carol Lynns_                    9/28/2010

**AUTHORIZING OFFICIAL**              **DATE**

Ver. 3
ED-GAPS001 (01/98)

WTTW 0000009

A 400

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula, and Block Grants**     (See Block 5 of the Notification)

1. **RECIPIENT NAME** - The legal name of the recipient, name of the primary organizational unit that will undertake the funded activity, and the complete address of the recipient. The recipient is commonly known as the "grantee."

2. **PROJECT TITLE AND CFDA NUMBER** - Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

3. **PROJECT STAFF** - This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    *RECIPIENT PROJECT DIRECTOR - The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    EDUCATION PROGRAM CONTACT - The U.S. Department of Education staff person responsible for the programmatic, administrative and business-management concerns of the Department.

    EDUCATION PAYMENT CONTACT - The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

4.* **KEY PERSONNEL** - Name, title and percentage (%) of effort the key personnel identified devotes to the project.

5. **AWARD INFORMATION** - Unique items of information that identify this notification.

    PR/AWARD NUMBER - A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number."

    ACTION NUMBER - A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    ACTION TYPE - The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    AWARD TYPE - The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK.

6. **AWARD PERIODS** - Project activities and funding are approved with respect to three different time periods, described below:

    BUDGET PERIOD - A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    PERFORMANCE PERIOD - The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    *FUTURE BUDGET PERIODS - The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

7. **AUTHORIZED FUNDING** - The dollar figures in this block refer to the *Federal* funds provided to a recipient during the award periods.

    *THIS ACTION - The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    *BUDGET PERIOD - The total amount of funds available for use by the grantee during the stated budget period to this date.

    *PERFORMANCE PERIOD - The amount of funds obligated from the start date of the first budget period to this date.

    RECIPIENT COST-SHARE - The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    RECIPIENT NON-FEDERAL AMOUNT - The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be **required** to provide the non-federal funds.

8. **ADMINISTRATIVE INFORMATION** - This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    DUNS/SSN - A unique, identifying number assigned to each recipient for payment purposes. The number is based on either the recipient's assigned number from Dun and Bradstreet or the individual's social security number.

    *REGULATIONS - The parts of the Education Department General Administrative Regulations (EDGAR) and specific program regulations that govern the award and administration of this grant.

    *ATTACHMENTS - Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

9. **LEGISLATIVE AND FISCAL DATA** - The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

    FUND CODE, FUNDING YEAR, AWARD YEAR, ORG. CODE, PROJECT CODE, OBJECT CLASS - The fiscal information recorded by the U.S. Department of Education's Grant Administration and Payment System to track obligations by award.

    AMOUNT - The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION' {See "AUTHORIZED FUNDING" above (Block 7)).

10. **TERMS AND CONDITIONS OF AWARD** - Requirements of the award that are binding on the recipient.

    *AUTHORIZING OFFICIAL - The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award.

**FOR FORMULA AND BLOCK GRANTS ONLY:**

(See also Blocks 1, 2, 5, 6, 8, 9 and 10 above)

3. **EDUCATION STAFF** - The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

7. **AUTHORIZED FUNDING**

    CURRENT AWARD AMOUNT - The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

    PREVIOUS CUMULATIVE AMOUNT - The total amount of funds awarded under the grant before this action.

    CUMULATIVE AMOUNT - The total amount of funds awarded under the grant, this action included.

------------------------

\* This item differs or does not appear on formula and block grants.

WTTW 0000010

*A*401



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE CHIEF FINANCIAL OFFICER
& CHIEF INFORMATION OFFICER
September 28, 2010

Reese P. Marcusson
Window to the World Communications, Inc.
WTTW National Media Production,
5400 N. St. Louis Avenue
Chicago, IL 60625

SUBJECT: Payee Verification for Grant Award U295A100026

This is to inform you of the payee for the above listed grant award issued by the United States Department of Education.

Grantee DUNS/SSN: 006929186
Grantee Name: Window to the World Communications, Inc.
            WTTW National Media Production,

Payee DUNS/SSN: 006929186

Payee Name: Window To The World Communications, Inc.

If any of the above information is not correct, please contact a Payee Customer Support Representative at 1-888-336-8930. Please send all correspondence relating to payee or bank information changes to the following address:

> U.S. Department of Education
> 400 Maryland Ave, SW
> Room 4C138
> Washington, DC 20202
>
> Attn: Claudia Staplefoote
> Phone: (202) 401-1117
> Fax: (202) 260-5505

Additional Special Conditions
Window to the World Communications (WTTW) – U295A100026

Cooperative Agreement Clause

In accordance with 34 CFR 75.234(b), this award is classified as a cooperative agreement and will include substantial involvement on the part of the education program contact identified in block 3. This award is made with the condition that the recipient and the U.S. Department of Education successfully negotiate a final cooperative agreement, which delineates the special provisions between the U.S. Department of Education and the recipient, and that the recipient signs and returns by October 29, 2010.

Forward Funding

Funding the highest rated applications at the requested level would leave a balance in FY 2010 of $123,475. Consequently, the Department is forward funding a portion of the second budget period of the WTTW award by $123,475.

## *Television Community Service Grant Agreement (2011)*
### *10/1/2010 – 9/30/2012*

Corporation For Public Broadcasting (CPB) offers Defendant, WTTW, a
FY2011 Television Community Service Grant in the amount of $3,565,470;
applicant must "comply with all terms and conditions set forth in FY2011
*Television Community Service Grant General Provisions and Eligibility
Criteria* which are expressly made a part of this offer."

Current Grantee View:
**WTTW-TV**

# Television Community Service Grant Agreement (2011)
Expenditure Period 10/01/2010 - 09/30/2012

TV CSG Agreement

TV CSG Agreement

## Grantee Information

| | |
|---|---|
| **ID** | 1754 |
| **Grantee Name** | WTTW-TV |
| **City** | Chicago |
| **State** | IL |
| **Licensee Type** | Community |

## Television Community Service Grant Offer - Fiscal Year 2011

**Licensee Name**            Window to the World Communications, Inc.

The Corporation for Public Broadcasting (CPB), relying on representations made by the applicant in the Application for a Television Community Service Grant and Interconnection Grant, and the certifications and relevant data and information contained in all of the related documents and forms and in the CPB Annual Financial Report for Fiscal Year 2009 submitted by applicant, hereby offers applicant a Fiscal Year 2011 Television Community Service Grant in the amount below. The amount of this grant has been computed using the Community Service Grant formula recommended by the TV CSG Review Task Force and adopted by the CPB Board of Directors. It includes the Fiscal Year 2011 portion of the funds returned to the Television Community Service Grants program from the Future Fund and the Small Station Fund.

(Special Note: The amount offered represents the combined grant amounts for all CPB-supported television stations licensed to the above referenced licensee.)

This offer is contingent upon CPB's receipt of its full authorized appropriation for Fiscal Year 2011 ($430,000,000), and is subject to decreases.

This offer is subject to acceptance by the applicant, which acceptance shall constitute an agreement by the applicant to comply with all of the terms and conditions set forth in the Fiscal Year 2011 Television Community Service Grant General Provisions and Eligibility Criteria which are expressly made a part of this Offer.

| | Amount |
|---|---|
| **Original Amount** | $3,565,470 |

CORPORATION FOR PUBLIC BROADCASTING

September 1, 2010

# *FCC*
# *Application Renewal of Broadcast License, March 2011*

Window To The World Communications, Inc.

LICENSE RENEWAL AUTHORIZATION

THIS IS TO NOTIFY YOU THAT YOUR APPLICATION
FOR RENEWAL OF FULL-POWER TELEVISION
LICENSE, BRET-20050729CYS, WAS GRANTED ON
12/14/2006 FOR A TERM EXPIRING ON 12/01/2013
AND IS SUBJECT TO THE CONDITION THAT NO
LATER THAN FEBRUARY 17, 2009 THE LICENSEE
SHALL SURRENDER EITHER ITS ANALOG OR ITS
DIGITAL TELEVISION CHANNEL FOR REALLOCATION
OR REASSIGNMENT PURSUANT TO COMMISSION
REGULATIONS.  THE CHANNEL RETAINED BY THE
LICENSEE WILL BE USED TO BROADCAST DIGITAL
TELEVISION ONLY AFTER THIS DATE.

CHANNEL:   11

THIS IS YOUR LICENSE RENEWAL AUTHORIZATION
FOR STATION WTTW.

FACILITY ID: 10802

LOCATION: CHICAGO, IL

THIS CARD MUST BE POSTED WITH THE STATION'S
LICENSE CERTIFICATE AND ANY SUBSEQUENT
MODIFICATIONS.

WINDOW TO THE WORLD COMMUNICATIONS,
INC.
5400 NORTH ST. LOUIS AVE
CHICAGO, IL   60625

WTTW 0000013

A 405

| Federal Communications Commission<br>Washington, D.C. 20554 | Approved by OMB<br>3060-0110<br>(March 2011) | FOR FCC USE ONLY |
|---|---|---|
| **FCC 303-S** | | |
| **APPLICATION FOR RENEWAL OF BROADCAST STATION LICENSE** | | FOR COMMISSION USE ONLY<br>FILE NO.<br>BRET - 20050729CYS |
| Read INSTRUCTIONS Before Filling Out Form | | |

**Section I - General Information- TO BE COMPLETED BY ALL APPLICANTS**

| 1. | Legal Name of the Licensee<br>WINDOW TO THE WORLD COMMUNICATIONS, INC. | | |
|---|---|---|---|
| | Mailing Address<br>5400 N. ST. LOUIS AVENUE | | |
| | City<br>CHICAGO | State or Country (if foreign address)<br>IL | ZIP Code<br>60625 - 4698 |
| | Telephone Number (include area code)<br>7735095408 | E-Mail Address (if available)<br>RMARCUSSON@NETWORKCHICAGO.COM | |
| | FCC Registration Number:<br>0002860179 | Facility ID Number<br>10802 | Call Sign<br>WTTW |
| 2. | Contact Representative<br>TODD D. GRAY | Firm or Company Name<br>DOW LOHNES & ALBERTSON, PLLC | |
| | Mailing Address<br>1200 NEW HAMPSHIRE AVE NW<br>SUITE 800 | | |
| | City<br>WASHINGTON | State or Country (if foreign address)<br>DC | Zip Code<br>20036 - 6802 |
| | Telephone Number (include area code)<br>2027762000 | E-Mail Address (if available)<br>TGRAY@DOWLOHNES.COM | |

| 3. | If this application has been submitted without a fee, indicate reason for fee exemption (see 47 C.F.R. Section 1.1114):<br>◯ Governmental Entity ◉ Noncommercial Educational Licensee ◯ Other<br>◯ N/A (Fee Required) |
|---|---|
| 4. | **Purpose of Application**<br>◉ Renewal of license<br><br>◯ Amendment to pending renewal application<br><br>If an amendment, submit as an exhibit a listing by Section and Item Number the portions of the pending application that are being revised.    [ Exhibit 1 ] |
| 5. | **Facility Information:** ◯ Commercial ◉ Noncommercial Educational |
| 6. | **Service and Community of License**<br>a. ◯ AM ◯ FM ◉ TV ◯ FM Translator ◯ LPFM<br>   ◯ TV Translator ◯ Low Power TV ◯ Class A TV<br><br>|

| Community of License /Area to be Served | |
|---|---|
| City: CHICAGO | State : IL |

b. Does this application include one or more FM translator station(s), or TV translator station(s),   ◯ Yes ◉ No<br>LPTV station(s), in addition to the station listed in Section I question 1? (The callsign(s) of<br>any associated FM translators, TV translators or LPTV stations will be requested in Section

WTTW 0000014
A406

|   | V). | | |
|---|---|---|---|
| 7. | **Other Authorizations.** List call signs, facility identifiers and location(s) of any FM booster or TV booster station(s) for which renewal of license is also requested. | Exhibit 2 | ⌐ N/A |

Menu

NOTE: In addition to the information called for in Sections II, III, IV and V, an explanatory exhibit providing full particulars must be submitted for each item for which a "No" response is provided.

## Section II - Legal - TO BE COMPLETED BY ALL APPLICANTS

| | | |
|---|---|---|
| 1. | **Certification.** Licensee certifies that it has answered each question in this application based on its review of the application instructions and worksheets. Licensee further certifies that where it has made an affirmative certification below, this certification constitutes its representation that the application satisfies each of the pertinent standards and criteria set forth in the application, instructions and worksheets. | ⊙ Yes ○ No |
| 2. | **Character Issues.** Licensee certifies that the neither the licensee nor any party to the application has or had any interest in, or connection with: | |
| | a. any broadcast application in any proceeding where character issues were left unresolved or were resolved adversely against the applicant or party to the application; or | ⊙ Yes ○ No <br> See Explanation in <br> Exhibit 3 |
| | b. any pending broadcast application in which character issues have been raised. | ⊙ Yes ○ No <br> See Explanation in <br> Exhibit 4 |
| 3. | **Adverse Findings.** Licensee certifies that, with respect to the licensee and each party to the application, no adverse finding has been made, nor has an adverse final action been taken by any court or administrative body in a civil or criminal proceeding brought under the provisons of any laws related to the following: any felony; mass media-related antitrust or unfair competition; fraudulent statements to another governmental unit; or discrimination. | ⊙ Yes ○ No <br><br> See Explanation in <br> Exhibit 5 |
| 4. | **FCC Violations during the Preceding License Term.** Licensee certifies that, with respect to the station(s) for which renewal is requested, there have been no violations by the licensee of the Communications Act of 1934, as amended, or the rules or regulations of the Commission during the preceding license term. If No, the licensee must submit an explanatory exhibit providing complete descriptions of all violations. | ⊙ Yes ○ No <br><br> See Explanation in <br> Exhibit 6 |
| 5. | **Alien Ownership and Control.** Licensee certifies that it complies with the provisions of Section 310 of the Communications Act of 1934, as amended, relating to interests of aliens and foreign governments. | ⊙ Yes ○ No <br><br> See Explanation in <br> Exhibit 7 |
| 6. | **Anti-Drug Abuse Act Certification.** Licensee certifies that neither licensee nor any party to the application is subject to denial of federal benefits pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988, 21 U.S.C. Section 862. | ⊙ Yes ○ No |
| 7. | **Non-Discriminatory Advertising Sales Agreements.** Commercial licensee certifies that its advertising sales agreements do not discriminate on the basis of race or ethnicity and that all such agreements held by the licensee contain nondiscrimination clauses. Noncommercial licensees should select "not applicable." | ○ Yes ○ No <br> ○ N/A <br><br> See Explanation in <br> Exhibit 8 |

I certify that the statements in this application are true, complete, and correct to the best of my knowledge and belief, and are made in good faith. I acknowledge that all certifications and attached Exhibits are considered material representations. I hereby waive any claim to the use of any particular frequency as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise, and request an authorization in accordance with this application. (See Section 304 of the Communications Act of 1934, as amended.)

| | |
|---|---|
| Typed or Printed Name of Person Signing <br> REESE P. MARCUSSON | Typed or Printed Title of Person Signing <br> EXECUTIVE VICE PRESIDENT AND CFO |
| Signature | Date <br> 7/29/2005 |

WILLFUL FALSE STATEMENTS ON THIS FORM ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001), AND/OR REVOCATION OF ANY STATION LICENSE OR CONSTRUCTION PERMIT (U.S. CODE, TITLE 47, SECTION 312(a)(1)), AND/OR FORFEITURE (U.S. CODE, TITLE 47, SECTION 503).

Menu

Section IV - TO BE COMPLETED BY TV AND CLASS A LICENSEES ONLY

| | | |
|---|---|---|
| 1. | **Biennial Ownership Report:** Licensee certifies that the station's Biennial Ownership Report (FCC Form 323 or 323-E) has been filed with the Commission as required by 47 C.F.R. Section 73.3615. | ⊙ Yes ○ No<br><br>See Explanation in<br>Exhibit 17 |
| 2. | **EEO Program:** Licensee certifies that: | |
| | a. The station's Broadcast EEO Program Report (FCC Form 396) has been filed with the Commission, as required by 47 C.F.R. Section 73.2080(f)(1).<br><br>Specify FCC Form 396 File Number : B396 - 20050729CXE | ⊙ Yes ○ No<br><br>See Explanation in<br>Exhibit 18 |
| | b. The station has posted its most recent Broadcast EEO Public File Report on the station's website, as required by 47 C.F.R. Section 73.2080(c)(6). | ⊙ Yes ○ No<br>○ N/A<br><br>See Explanation in<br>Exhibit 19 |
| 3. | **Local Public File.** Licensee certifies that the documentation, required by 47 C.F.R. Section 73.3526 or 73.3527, as applicable, has been placed in the station's public inspection file at the appropriate times. | ⊙ Yes ○ No |
| 4. | **Violent Programming.** Licensee certifies that no written comments or suggestions have been received from the public that comment on its station's programming and characterize that programming as constituting violent programming.<br><br>If No, **submit as an Exhibit** a summary of those written comments and suggestions received from the public. | ⊙ Yes ○ No<br>○ N/A<br><br>See Explanation in<br>Exhibit 20 |
| 5. | **Children's Programming Commercial Limitations.** For the period of time covered by this application, the licensee certifies that it has complied with the limits on commercial matter as set forth in 47 C.F.R. Section 73.670. (The limits are no more than 12 minutes of commercial matter per hour during children's programming on weekdays and no more than 10.5 minutes of commercial matter per hour during children's programming on weekends. The limits also apply pro rata to children's programs which are 5 minutes or more and which are not part of a longer block of children's programming.)<br><br>If No, **submit as an Exhibit** a list of each segment of programming 5 minutes or more in duration designed for children 12 years and under and broadcast during the license period which contained commercial matter in excess of the limits. For each programming segment so listed, indicate the length of the segment, the amount of commercial matter contained therein, and an explanation of why the limits were exceeded. | ○ Yes ○ No<br>⊙ N/A<br><br><br><br>See Explanation in<br>Exhibit 21 |
| 6. | For the period of time covered by this application, the applicant certifies that it has filed with the Commission, **and incorporates by reference,** the Children's Television Programming Reports (FCC Form 398) as described in 47 C.F.R. Section 73.3526.<br><br>If No, **submit as an Exhibit** a statment of explanation. | ○ Yes ○ No<br>⊙ N/A<br><br>See Explanation in<br>Exhibit 22 |
| 7. | For the period of time covered by this application, the applicant certifies that the average number of hours of CORE programming per week broadcast by the station totalled 3 hours or more (averaged over a six-month period). | ○ Yes ○ No<br>⊙ N/A<br><br>See Explanation in<br>Exhibit 23 |
| 8. | The licensee certifies that it identifies each CORE Program aired at the beginning of the airing of each program as required by 47 C.F.R. Section 73.673. | ○ Yes ○ No<br>⊙ N/A |

| | | |
|---|---|---|
| | If No, submit as an Exhibit a statment of explanation. | See Explanation in<br>[ Exhibit 24 ] |
| 9. | The licensee certifies that it provides information identifying each CORE Program aired on its station, including an indication of the target child audience, to publishers of program guides as required by 47 C.F.R. Section 73.673.<br><br>If No, submit as an Exhibit a statement of explanation. | ○ Yes ○ No<br>● N/A<br><br>See Explanation in<br>[ Exhibit 25 ] |
| 10. | The licensee certifies that it publicizes the existence and location of the station's Children's Television Programming Reports (FCC Form 398) as required by 47 C.F.R. Section 73.3526(e)(11)(iii).<br><br>If No, submit as an Exhibit a statement of explanation , including the specific steps the applicant intends to implement to ensure compliance in the future. | ○ Yes ○ No<br>● N/A<br><br>See Explanation in<br>[ Exhibit 26 ] |
| 11. | The licensee may include as an exhibit any other comments or information it wants the Commision to consider in evaluating compliance with the Children's Television Act. This may include information on any other non-core educational and informational programming that the applicant aired or plans to air, or any existing or proposed non-broadcast efforts that will enhance the educational and informational value of such programming to children. See 47 C.F.R. Section 73.671, NOTE 2. | [ Exhibit 27 ] |
| 12. | Continued Class A Eligibility. Licensee certifies that its station does, and will continue to, broadcast: (a) a minimum of 18 hours per day; and (b) an average of at least 3 hours per week of programming each quarter produced within the market area served by the station, a group of commonly controlled low power or Class A stations whose predicted Grade B contours are contiguous. | ○ Yes ○ No<br>● N/A<br><br>See Explanation in<br>[ Exhibit 28 ] |
| 13. | Discontinued Operations. Licensee certifies that during the preceding license term, the station has not been silent for any consecutive 12-month period. | ● Yes ○ No<br><br>See Explanation in<br>[ Exhibit 29 ] |
| 14. | Silent Station. Licensee certifies that the station is currently on the air broadcasting programming intended to be received by the public. | ● Yes ○ No |
| 15. | Environmental Effects. Licensee certifies that the specified facility complies with the maximum permissible radio frequency electromagnetic exposure limits for controlled and uncontrolled environments.<br><br>By checking "Yes" above, the licensee also certifies that it, in coordination with other users of the site, will reduce power or cease operation as necessary to protect persons having access to the site, tower or antenna from radio frequency electromagnetic exposure in excess of FCC guidelines. | ● Yes ○ No<br><br>See Explanation in<br>[ Exhibit 30 ] |
| 16. | Local TV Ownership Waiver. Has the licensee been granted a "failing" or "marginal" station waiver of 47 C.F.R. Section 73.3555(b)?<br><br>If Yes, submit as an Exhibit a specific factual showing of the program-related benefits that have accrued to the public as a result of that waiver. | ○ Yes ● No<br><br>See Explanation in<br>[ Exhibit 31 ] |

[ Menu ]

*Illinois Arts Council, Grant Agreement*
*3/15/2011 – 8/31/2011*

Window To The World Communications, Inc.



# Grant Agreement

Grant Number: 20110774

THIS AGREEMENT, made by and between the ILLINOIS ARTS COUNCIL, an agency of the State of Illinois (hereinafter referred to as COUNCIL) and

NAME:     WTTW Communications Inc
ATTN:     Reese Marcusson
ADDRESS:  5400 N St Louis Ave
CITY:     Chicago, IL 60625-4623

(hereinafter referred to as GRANTEE).

The COUNCIL and GRANTEE hereby agree as follows:

1. Upon execution of this contract, COUNCIL agrees to make a lump sum grant payable to GRANTEE in the amount of **$188,333.00** for the following program (hereinafter referred to as PROJECT): **for a Public Radio & Television Basic Grant**

SPECIAL CONDITIONS:

2. All grant monies payable hereunder shall be expended by GRANTEE for PROJECT between **March 15, 2011** (beginning date) and **August 31, 2011** (ending date).

Additionally:
   (a)  GRANTEE may expend grant monies for PROJECT expenses incurred between the beginning date above and the ending date of this AGREEMENT, as described in its application to the COUNCIL.
   (b)  If, for any reason, GRANTEE needs to extend the term of this AGREEMENT, application must be made in writing to the COUNCIL prior to the above ending date of PROJECT. If no extension has been requested of, and approved by, the COUNCIL, any monies payable hereunder remaining after the completion of the PROJECT, or after the date set forth above, must be returned to the COUNCIL within 45 days.

3. GRANTEE agrees that credit shall be given COUNCIL on all public notices, publicity, printed programs, public media, and other applicable material. The following language shall be used in such notices:

   **'This program is partially supported by a grant from the Illinois Arts Council, a state agency.'**

4. GRANTEE agrees to the following with respect to reports on this grant:
   (a)  To submit to COUNCIL within **thirty days** after the ending date of PROJECT a 'Financial Report' on forms provided and a 'Narrative Report' on forms provided or prepared according to instructions provided.
   ( b) To comply with any subsequent requirements which may be adopted by COUNCIL with respect to grant reporting.

5. If the grant amount awarded in this contract is in excess of $25,000 GRANTEE agrees to the following: To submit to the COUNCIL quarterly reports within thirty days after the end of each quarter, which describe the progress of the program, project, or use and the expenditure of the grant funds related thereto  **Failure to submit timely and acceptable reports will jeopardize the receipt of future funds from the Council.**

WTTW 0000019

A411

6. The GRANTEE agrees to the following:

(a). to account for grant expenditures separately. If separate accounting is not feasible, all grant expenditures shall be properly identified in the records.

(b to maintain books and records related to the performance of the contract and necessary to support amounts charged to the State under the contract for a minimum of three (3) years from the last action on the contract. Grantee further agrees to cooperate fully with any audit and to make the books and records available to the Auditor General, chief procurement officer, internal auditor, the purchase agency and Attorney General.

(c). upon request, to make available to COUNCIL and the General Assembly of the State of Illinois all audited and unaudited financial statements for each year in which a grant was received from COUNCIL. COUNCIL shall have unlimited access to the accounts, books, records, and other financial documents of GRANTEE supporting information stated in GRANTEE'S application for COUNCIL funds or any subsequent documentation regarding PROJECT funded hereunder.

7. Any and all patents, copyrights, or other legal interests in and to PROJECT, or materials generated in pursuance of PROJECT, shall be the sole and exclusive property of GRANTEE or GRANTEE'S design. GRANTEE, however, agrees to supply COUNCIL with copies of any newspaper articles or related events contemplated hereunder, and hereby grants to COUNCIL free and unlimited license to use such newspaper articles for such purpose as COUNCIL, in its sole discretion, shall determine.

8. GRANTEE agrees that no monies payable hereunder shall be used for the purchase of permanent equipment, capital improvements or construction and related depreciation, to pay balance of GRANTEE'S previous year's deficit, out-of-state touring, or subsidizing an individual's academic study.

9. GRANTEE agrees that no person shall, on the grounds of race, color, religion, sex, national origin, ancestry, age, marital status, sexual orientation, disability, military status, unfavorable discharge from military service, or citizen status, while otherwise qualified, be excluded from participation in, be denied benefits of, or be otherwise subjected to discrimination under any program or activity supported in whole or in part by funds provided hereunder.

10. If funds provided hereunder are used in whole or in part for the employment of any person, GRANTEE further agrees that no person shall on the grounds of race, color, religion, sex, national origin, ancestry, age, marital status, sexual orientation, disability, military status, unfavorable discharge from military service, or citizen status, while otherwise qualified, be denied equal opportunity in the hiring process, or be otherwise discriminated against with respect to compensation, terms, conditions, or benefits of employment.

11. GRANTEE agrees that it shall fully comply with all rules, regulations, and other requirements now existing or which may hereafter be adopted by COUNCIL with respect to GRANTS of this nature.

12. Obligations of the State will cease immediately without penalty of further payment being required if in any fiscal year the Illinois General Assembly fails to appropriate or otherwise make available sufficient funds for this agreement.

13. 30 ILCS 705/10 requires all interest earned on grant funds held by GRANTEE to become part of the grant principal when earned and be treated accordingly for all purposes. If the cost of accounting for the interest or allocating the interest to principal is significant in terms of the amount of interest received, then the interest earned on grant funds may be retained by GRANTEE. Interest earned on grant funds, held by GRANTEE after the expiration of the grant, becomes part of the principal and is subject to recovery under 30 ILCS 705/4.

14. GRANTEE certifies under oath that:

(a). It is not barred from being awarded a contract under 30 ILCS 500/50-5. Section 50-5 prohibits a Grantee from entering into a contract with a State agency if the Grantee has been convicted of bribery or attempting to bribe an officer or employee of the State of Illinois, or if the Grantee has made an admission of guilt of such conduct which is a matter of record. The Grantee further acknowledges that the chief procurement officer may declare the related contract void if this certification is false.

(b). It is not barred from being awarded a contract under 30 ILCS 500/50-10.5. Section 50-10.5 prohibits a Grantee from entering into a contract with a State agency if the Grantee, or any officer, director, partner, or other managerial agent of Grantee has been convicted of within the last 5 years of a felony under the Sarbanes-Oxley Act of 2002 or a Class 3 or Class 2 felony under the Illinois Securities Law of 1953 or if the Grantee is in violation of Subsection (e). The Grantee further acknowledges that the chief procurement officer may declare the related contract void if this certification is false.

(d) It will not engage in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance in the performance of the contract.

(e) It and any affiliate, is not barred from being awarded a contract under 30 ILCS 500/50-aa. Section 50-11 prohibits a contractor from entering into a contract with a State agency if the grantee knows or should know that it, or any affiliate, is delinquent in the payment of any debt to the State as defined by the Debt Collection Board. The contractor further acknowledges that the chief procurement officer may declare the related contract void if this certification is false.

(f) It is not barred from being awarded a contract under 30 ILCS 500/50-14. Section 50-14 prohibits a grantee from entering into a contract with a State agency if the grantee has been found by a court or the Pollution Control Board to have committed a willful or knowing violation of the Environmental Protection Act within the last 5 years. The grantee further acknowledges that the contracting State agency may declare the related contract void if this certification is false.

(g) All professional performers and related or supporting personnel so employed shall receive not less than the prevailing minimum compensation as determined by the Secretary of Labor. Labor standards are set out in 29 CFR Part 505 'Labor Standards on Projects or Productions Assisted by Grants from the National Endowment for the Arts and Humanities.' Copies of this regulation may be obtained by writing to the Grants Office, National Endowment for the Arts, Nancy Hanks Center, 1100 Pennsylvania Avenue N.W., Washington, D.C. 20506-0001.

(h) No part of any project or production will be performed or engaged in under working conditions which are unsanitary or hazardous or dangerous to the health and safety of the employees so engaged. Compliance with the safety and sanitary laws of the State in which the performance or part thereof is to take place shall be prima facie evidence of compliance.

(h) Grantee is not now suspended or debarred from federal sponsorship of grant funding. Suspension of a grant is an action by a Federal sponsoring agency that temporarily suspends Federal sponsorship of the grant pending corrective action by the recipient or pending a decision to terminate the grant by the Federal sponsoring agency. Termination of a grant means the cancellation of Federal assistance, in whole or in part, at any time prior to the date of completion. If you or your organization is suspended or debarred by one Federal agency, you are suspended or debarred by all Federal agencies.

(j) All information in this grant agreement is true and correct to the best of the Grantee's knowledge, information, and belief; that the funds shall be used only for the purposes described in the grant agreement; and that the award of grant funds is conditioned upon such certification.

ILLINOIS ARTS COUNCIL:                          GRANTEE:

by _T A Scrogum_                                **WTTW COMMUNICATIONS INC**
                                                Print Grantee Name
_by L E Stehlow_
_3-15-11_                                        by _Reese Marcusson_
                                                Signature of Authorized Agent/Individual)
Terry A. Scrogum,
Executive Director                              **REESE MARCUSSON**
Lynne E. Stehlow,                               Print Name of Individual Signing
Intergovernmental Services Specialist II
                                                _EVP/CFO_   _2/25/11_
                                                Print Title and Date

This agency is requesting disclosure of information that is necessary to accomplish the statutory purpose as outlined under chapter 20 ILCS Act 3915/4. Disclosure of this information is REQUIRED. Failure to provide any information will result in this form not being processed.

WTTW 0000021

A413

*Perspective -*
*"From wasteland to broadband in 50 years"*
*Chicago Tribune, May 8, 2011*

Editorial by Newton N. Minow, Former FCC Chair, currently WTTW
Board Member and Senior Counsel at Sidley Austin, LLP

# Perspective

## Chicago Tribune

# From wasteland to broadband in 50 years

**By Newton N. Minow**

When President John F. Kennedy appointed me chairman of the Federal Communications Commission 50 years ago, phone calls went by wire and radio and television signals went by air. In 1961, there were 2¾ television networks. One phone company. No personal computers. No public television. No public radio. FM radio was dormant. Fledgling cable. No Internet. Usually there was only one black-and-white television in the house and all members of the family watched the same program at the same time. Audiences were passive; they listened or watched silently.

On May 5 of that year, there was a great triumph: the successful launch of the first American to fly in space, Cmdr. Alan Shepard. On May 8, Shepard returned from his flight to meet Kennedy and Congress. On the same day, Kennedy was to speak to the National Association of Broadcasters in Washington and invited me to accompany him. I was to meet him outside the Oval Office to ride with him to the Sheraton Park Hotel.

As I waited, Kennedy emerged and said, "Newt, how about taking the Shepards with us to the broadcasters?" Of course, I said, and the president went back into his office to make the arrangements. He returned to say, "It's all set. Now come with me, I want to change my shirt. And what do you think I should say to the broadcasters?"

Although I had known Jack Kennedy before he was president, it was intimidating to find myself in the bedroom of the president of the United States watching him change shirts and being asked to suggest his remarks for the broadcasters. Nervously I mumbled something about how we handled our space launches compared to the Soviets, that unlike them we invited radio and television to cover the events live, not knowing whether success or failure would follow. The Soviets operated in secret. That afternoon the president, without notes, gave a graceful, witty, thoughtful talk about the value of an open, free society, exemplified by radio and television coverage of Shepard's flight. The broadcasters responded with a standing ovation.

The next day I returned to the same platform for my first speech as FCC chairman. In that speech, I asked the nation's television broadcasters "to sit down in front of your television set when your station goes on the air and stay there without a book, magazine, newspaper, profit-and-loss sheet or rating book to distract you — and keep your eyes glued to that set until the station signs off. I can assure you that you will observe a vast wasteland.

"Is there one person in this room who claims that broadcasting can't do better? ... Your trust accounting with your beneficiaries is overdue."

The broadcasters clearly thought I should have changed my shirt before speaking, and there was no standing ovation. Instead, the Hollywood producer of "Gilligan's Island" showed what he thought of my speech by naming the sinking ship after me — the SS Minnow.

That was 50 years ago, which means that

*Please turn to Page 23*



PLACING THE BLAME WHERE IT BELONGS

# TV: Vast, but not a wasteland

Continued from Page 20

for half a century, people have been asking me if I still think television is a vast wasteland. It is certainly vast, far vaster than we could have imagined in 1961. And parts of it are a wasteland, but most of what I hoped for has far exceeded my most ambitious dreams. And the promise and possibility of television is so vast that we can only guess where it will take us next.

In 1961, many broadcasters saw television only as an entertainment medium. Network news was a scant 15 minutes. Children's programs were few and far between, and few had much to teach them or spark their imaginations. Some cities had only one, or perhaps two, television stations. The number of commercials far exceeded the broadcasters' own code of standards. Educational television was struggling in its crib. Black candidates for public office were denied television time for their campaigns. Major cities like New York, Los Angeles and Washington did not have noncommercial television stations. Cable was barely beginning.

I believed the most constructive role for government was to open the opportunity for more men and women to create more choices for viewers and listeners. So we expanded choice through satellites, cable, public broadcasting and stereo FM. As we launched the first communications satellite, President Kennedy asked me why I thought communication satellites were so important, I told him communication satellites were more important than sending a man into space because they would send ideas into space, and ideas last longer than men.

At the beginning, broadcasters loved cable because cable extended broadcast signals to places not reached through the airwaves. Later, visionaries like Ted Turner turned cable into a major force of its own. Now it is television that is mostly delivered by wires and satellites, and phone calls that go through the air.

After I left government, I saw television from every perspective. ... CBS board member with Walter Cronkite, as a board member of a major advertising agency that created the magnificent Hallmark dramas and commercials, as a board member of independent commercial television and cable ventures, as chairman of the Carnegie Foundation — which first funded Sesame Street — and as chairman of RAND Corp., where early work on the Internet began. Now, at 85, I've been around the block and exceptionally fortunate to see history.

The last 50 years have seen a technological explosion. In television alone, viewers can now see and hear program services like CNN, PBS, NPR, HBO, Showtime, ESPN, A&E, CSPAN, Nickelodeon, MSNBC, CNBC, USA — and dozens more. A television set is no longer just a box in your living room. It is also the phone in your pocket. It goes where you go. The wasteland has turned into broadband.

But there are still two major broadcasting areas where we have failed. One is politics, where candidates must raise enormous and corrupting amounts of money from special interests including unions and corporations to appear on television. We should make public service time available to candidates to remove constant fundraising pressures.

The other is our current debate whether to continue less than four cents per person per day provided by our taxes for public broadcasting. Some ask why we need public broadcasting. I believe we need it for the same reasons we support public libraries — while we also have bookstores. We need it for the same reason we support public parks — while we also have country clubs. We need it to provide more choices for all of us.

My 50-year-old speech is remembered for two words, "vast wasteland." Fifty years from now, I hope another speech I gave, on Jan. 11, 1962, at Washington's National Press Club, will be remembered for something else I said: "For just as surely as a commercial is wrapped around a station break, the television industry in the long run faces one result or another: more competition or more regulation. My own vote is for more competition. And my faith is in the belief that this country needs and can support many voices of television — and the more voices we hear, the better, the richer and the freer we shall be."

*Newton N. Minow, a Chicago lawyer, is senior counsel at Sidley Austin LLP.*

A415